## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| In Re ALGER, COLUMBIA, JANUS,  ) | Case No. 1:04-MD-15863-JFM |
| MFS, ONE GROUP, PUTNAM, PIMCO  ) | |
| _____ ) | |
| This Document Pertains To:     ) | |
| ) | |
|     Alger Subtrack                ) | |
| _____ ) | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Donna Gaffney and plaintiff Gerald Born (collectively, "Plaintiffs"), by their undersigned attorneys, individually and on behalf of all others similarly situated, make the following allegations for their Consolidated Amended Class Action Complaint.  These allegations are based on Plaintiffs' personal knowledge as to themselves and their purchases and holdings of shares of Alger mutual funds, and on information and belief derived from investigations of their counsel as to all other matters.  The investigations of counsel included, among other things, review of public filings by Alger (as defined herein) with the U.S. Securities and Exchange Commission ("SEC"), press releases and other public statements issued or made by Alger and its officers and/or trustees, and interviews with persons, including former Alger employees, having knowledge regarding Alger's activities during the relevant time period.  Plaintiffs believe that the ongoing investigations of their counsel will yield further information in support of the claims alleged herein.

## NATURE OF THE ACTION

1.      This is a class action brought on behalf of a class (the "Class") consisting of all persons (other than defendants, their families and affiliates) who, during the period from

November 1, 1998 to September 3, 2003, inclusive (the "Class Period"), purchased and/or held shares in any mutual fund in the Alger Fund Complex (collectively, the "Funds") advised and/or managed by Fred Alger Management, Inc., and were adversely affected by market timing and/or late trading in the Funds.  Plaintiffs bring this action to remedy violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 ("the Exchange Act"), the Investment Company Act of 1940 (the "ICA"), and the common law of the states of Delaware, Massachusetts, New Jersey, and/or New York.

2.       This class action concerns improper trading practices in the Funds.  In particular, defendants perpetrated two schemes that deprived Plaintiffs and the other members of the Class of millions dollars of their hard-earned monies that they invested in mutual funds, which were traditionally viewed as relatively safe investments for long-term investors.

3.       One scheme employed by defendants was "market timing" of the Funds, an investment technique involving short-term, "in and out" trading of mutual fund shares, designed to exploit inefficiencies in the way mutual fund companies price their shares.  Alger improperly permitted certain investors to market time the Funds, thereby allowing these favored investors to take advantage of short-term inefficiencies in the pricing of the Funds in order to reap millions of dollars of short-term profits at the expense of long-term investors, including Plaintiffs and the other members of the Class.

4.       Another scheme employed by defendants was "late trading" of the Funds.   By law, orders to buy, sell or exchange mutual fund shares must be placed at or before 4:00 p.m. eastern time on a particular day in order to receive that day's net asset value ("NAV"), which is the price of each share of a fund.  Contrary to this rule, Alger illegally permitted certain investors

2

to place orders long after 4 p.m. eastern time on a given day, or even up to 12:30 p.m. eastern time on the following day, and still receive the previous day's NAV, thereby allowing these favored investors to capitalize on post- 4:00 p.m. information, while those who traded their mutual fund shares lawfully could not.

5.     Alger allowed certain favored investors to engage in market timing and late trading in order to increase the amount of assets in the Funds, which produced greater fees for Alger at the expense of other investors, including Plaintiffs and the other members of the Class.

6.     Alger never disclosed that it was permitting certain favored investors to engage in market timing and late trading, which had detrimental effects on other investors, including Plaintiffs and the other members of the Class.  Thus, Plaintiffs and the other members of the Class purchased and/or held shares of the Funds without knowing that Alger was permitting certain favored investors to engage in market timing and late trading, and thus effectively to steal profits from, and increase fees and expenses for, long-term investors.

7.     Alger, however, did not act alone in the perpetration of this scheme, which cost innocent investors millions of dollars in investment losses and improper fees.  For example, in addition to selling the right to engage in market timing (generally known as "timing capacity") directly to certain select investors, Alger also engaged various brokerage firms to sell timing capacity on its behalf.  As detailed below, these brokerage firms negotiated for timing capacity in the Funds and then sold this capacity to the market timers.  These brokers received substantial fees, which were calculated as a percentage of the amounts traded by the market timers, from both the timers and Alger.

3

8.     The wrongful conduct of brokers was not limited to negotiating for and selling timing capacity in the Funds.  Certain brokerage houses also executed, or "cleared," timing transactions, with full knowledge of the harmful effects of timing on the performance of mutual funds, in return for fees paid by both Alger and the market timers.  These brokers implemented a variety of deceptive devices and schemes for the purpose of facilitating market timing.  Other large brokerage firms provided sophisticated financing arrangements to market timers that included the creation of false accounts to facilitate the timing scheme, all in return for substantial fees and other compensation.

9.     As a result of their schemes, the defendants – including Alger; the favored investors who were allowed to engage in market timing and late trading; and the brokers, clearing platforms, and other middlemen who participated in and facilitated the improper and illegal trading – profited handsomely, while long-term investors, including Plaintiffs and the other members of the Class, suffered enormous damages.

## JURISDICTION AND VENUE

10.     Both this Court and the respective transferor courts have jurisdiction over the federal law claims asserted herein pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 44 of the ICA (15 U.S.C. § 80a-43).  Pursuant to 28 U.S.C. § 1367, both this Court and the respective transferor courts may exercise supplemental jurisdiction over the state law claims asserted herein.  Pursuant to the decision of the MDL Panel, this action has been transferred to the District of Maryland for adjudication.  Accordingly, venue is proper in both this District and the respective transferor districts.

## PARTIES

### THE PLAINTIFFS

11.     Plaintiff Donna Gaffney ("Gaffney") purchased and held shares of the Alger

MidCap Growth Portfolio during the Class Period and has been damaged thereby.  Pursuant to

Case Management Order No. 1, approved by the Court on or about May 25, 2004, the Court

appointed Gaffney to serve as Lead Plaintiff in the Alger Subtrack.

12.     Plaintiff Gerald Born purchased and held shares of the Alger Capital Appreciation

Portfolio during the Class Period and has been damaged thereby.

### THE DEFENDANTS

#### Registrants

13.     Defendants The Alger Fund (the "Alger Fund"), The Alger American Fund (the

"American Fund"), The Alger Institutional Funds (the "Institutional Fund"), and The Spectra

Fund (the "Spectra Fund") (collectively, the "Registrants") are open-end registered investment

companies organized as business trusts under the laws of the Commonwealth of Massachusetts,

with their principal executive offices located at 111 Fifth Avenue, New York, New York 10003.

#### Alger Entities

14.     Defendant Alger Associates, Inc. ("Alger Associates") is a financial services

holding company organized under the laws of the State of New York, with its principal executive

offices located at 30 Montgomery Street, Jersey City, New Jersey 07302.  Alger Associates owns

and/or controls various operating entities under the "Alger" name, including, but not limited to,

the Funds; the Registrants; Fred Alger & Company, Incorporated; Fred Alger Management, Inc.;

and Alger Shareholder Services, Inc.

15.     Defendant Fred Alger & Company, Incorporated ("Alger Inc.") is a financial services company organized under the laws of the State of Delaware, with its principal executive offices located at 30 Montgomery Street, Jersey City, New Jersey 07302.

16.     Defendant Fred Alger Management, Inc. ("Alger Management") is an investment management company organized under the laws of the State of New York, with its principal executive offices located at 111 Fifth Avenue, New York, New York, 10003.

17.     Defendant Alger Shareholder Services, Inc. ("Alger Services") is a financial services company organized under the laws of the State of Delaware, with its principal executive offices located at 30 Montgomery Street, Jersey City, New Jersey 07302.

### Officers and Trustees

18.     Defendant Fred M. Alger, III ("Fred Alger") has served as Chairman of the Boards of Alger Associates, the Funds, the Registrants, Alger Inc., Alger Management, and Alger Services at all times relevant hereto, and as President of each of Alger Associates, the Funds, the Registrants, Alger Inc., Alger Management, and Alger Services since September 2001. According to the Funds' public filings, Fred Alger "is the chief market strategist for all of the [Alger Fund's] portfolios, overseeing the investments of each portfolio since September 2001."

19.     Defendant James P. Connelly, Jr. ("Connelly") served as Executive Vice President of Alger Inc. at all times relevant hereto and as Vice Chairman of the Boards of the Funds from 2001 until October 2003, when he was discharged from his positions due to his admitted role in sponsoring and overseeing market timing and late trading in the Funds.

20.     Defendant John T. Sargent ("Sargent") served as a trustee of the Funds from 1998 through 2000.

21.     Defendant Arthur M. Dubow ("Dubow") served as a trustee of the Funds from 1998 through 2000.

22.     Defendant Stephen E. O'Neil ("O'Neil") has served as a trustee of the Funds at all times relevant hereto.

23.     Defendant Nathan E. Saint-Amand ("Saint-Amand") has served as a trustee of the Funds at all times relevant hereto.

24.     Defendant B. Joseph White ("White") has served as a trustee of the Funds since 1999.

25.     Defendant Charles F. Baird, Jr. ("Baird") has served as a trustee of the Funds since 2000.

26.     Defendant Roger P. Cheever ("Cheever") has served as a trustee of the Funds since 2000.

27.     Defendant Lester L. Colbert, Jr. ("Colbert") has served as a trustee of the Funds since 2000.

28.     Defendant Daniel C. Chung ("Chung") has served as a trustee of the Funds; Chief Investment Officer of Alger Management; and a director of each of Alger Associates, Alger Inc., Alger Management, and Alger Services since 2001.  Chung is the son-in-law of defendant Fred Alger.

29.     Collectively, the defendants identified in paragraphs 18-28 will be referred to herein as the "Trustee Defendants."

30.     Defendant Gregory S. Duch ("Duch") has served as Treasurer of the Funds; Executive Vice President of each of Alger Associates, Alger Inc., Alger Management, and Alger

Services; and a director of Alger Associates and of Alger Management at all times relevant hereto.

31.     Collectively, the defendants identified in paragraphs 13-30 will be referred to herein as "Alger" or the "Alger Defendants."

### Market Timers and Late Traders

32.     Defendant Aurum Capital Management Corporation ("Aurum") is an investment company with its principal executive offices located at 84 West Santa Clara Street, Suite 690, San Jose, California 95113.  Aurum engaged in market timing and/or late trading of shares of the Funds during the Class Period.

33.     Defendants Canary Capital Partners, LLC, Canary Investment Management, LLC, and Canary Capital Partners, Ltd. (collectively, "Canary") are investment companies with their principal executive offices located at 400 Plaza Drive, Secaucus, New Jersey 07094.  Defendant Edward J. Stern ("Stern") is the Managing Principal of Canary, which engaged in market timing and/or late trading of shares of the Funds during the Class Period.

34.     Defendant Peconic Partners, LLC ("Peconic") is an investment company with its principal executive offices located at 506 Montauk Highway, East Quogue, New York 11942.  Peconic engaged in market timing and/or late trading of shares of the Funds during the Class Period.

35.     Defendant Investments by Planners, Inc., f/k/a The Saginor Group, Inc. ("Saginor") is an investment company with its principal executive offices located at 2500 North Military Trail, Suite 285, Boca Raton, Florida 33431.  Saginor engaged in market timing and/or late trading of shares of the Funds during the Class Period.

36.     Defendant Veras Investment Partners, LLC ("Veras") is an investment company with its principal executive offices located at 19855 Highway 59, Sugar Land, Texas 77479. Veras engaged in market timing and/or late trading of shares of the Funds during the Class Period.

37.     Defendant Wilshire Associates Incorporated ("Wilshire Associates") is an investment company with its principal executive offices located at 1299 Ocean Avenue, Suite 700, Santa Monica, California 90401.  Wilshire Associates engaged in market timing and/or late trading of shares of the Funds during the Class Period.

38.     Collectively, the defendants identified in paragraphs 32-37 will be referred to herein as the "Market Timer and Late Trader Defendants."

### Brokers and Clearing Platforms

39.     Defendant Bank of America Corporation ("Bank of America") is a financial services company with its principal executive offices located at 100 North Tryon Street, Charlotte, North Carolina 28255.  Bank of America, acting for itself and/or as broker and/or clearing platform for, among others, Canary and Veras, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

40.     Defendant The Bear Stearns Companies, Inc. ("Bear Stearns") is a financial services company with its principal executive offices located at 383 Madison Avenue, New York, New York 10179.  Bear Stearns, acting for itself and/or as broker and/or clearing platform for, among others, Canary, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

41.     Defendant Kaplan & Company Securities, Inc. ("Kaplan") is a financial services company with its principal executive offices located at 150 East Palmetto Park Road, Suite 450, Boca Raton, Florida 33432.  Kaplan, acting for itself and/or as broker for, among others, Canary, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

42.     Defendant Kopstein, Van Alen, Nash & Co., Inc. ("KVN") is a financial services company with its principal executive offices located at 32 Cannon Street, Poughkeepsie, New York 12601.  KVN, acting for itself and/or as broker for other investors, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

43.     Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") is a financial services company with its principal executive offices located at 4 World Financial Center, New York, New York 10080.   Merrill Lynch, acting for itself and/or as broker and/or clearing platform for other investors, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

44.     Defendant Securities America, Inc. ("Securities America") is a financial services company with its principal executive offices located at 7100 West Center Road, Omaha, Nebraska 68106.  Securities America, acting for itself and/or as broker for other investors, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

45.     Defendant Salomon Smith Barney ("Smith Barney") is a division of Citigroup, Inc., a financial services company with its principal executive offices located at 399 Park Avenue, New York, New York 10043.  Smith Barney, acting for itself and/or as broker and/or clearing platform for other investors, engaged in market timing and/or late trading of shares of the Funds during the Class Period.

10

46.     Collectively, the defendants identified in paragraphs 39-45 will be referred to herein as the "Broker and Clearing Platform Defendants."

## ORGANIZATION, MANAGEMENT, AND GOVERNANCE OF THE FUNDS

47.     According to their public filings, each of the Funds is governed by a Board of Trustees which is responsible for protecting the interests of shareholders under Massachusetts law.  Each of the Funds issues and operates a series of portfolios (the "Portfolios").

48.     According to the Funds' public filings, "Alger Management is owned by Alger Inc., which in turn is owned by Alger Associates, Inc., a financial services holding company. Fred M. Alger III both directly and indirectly, is the controlling shareholder of Alger Associates, Inc. and may be deemed to control that company and its subsidiaries."

49.     According to the Funds' public filings, Alger Management serves as investment manager to each of the Funds pursuant to separate written agreements (the "Management Agreements") and is responsible for the overall administration of the Funds, subject to the supervision of the Board of Trustees. Alger Management makes investment decisions for the Portfolios, provides administrative services, places orders to purchase and sell securities on behalf of the Portfolios and selects broker-dealers that, in its judgment, provide  prompt and reliable execution at favorable prices and reasonable commission  rates.  Management fees incurred by each Portfolio, pursuant to the provisions of its Management Agreement with Alger Management, are payable monthly and computed based on the average daily net assets of each Portfolio

50.      According to the Funds' public filings, Alger  Inc. serves as the Funds' principal underwriter, or distributor, and receives payments and brokerage commissions from the Funds.

51.     According to the Funds' public filings, Alger Inc. serves as the Funds' broker in effecting substantially all of the Funds' transactions on securities exchanges and retains commissions in accordance with certain regulations of the SEC.

52.     According to the Funds' public filings, Alger Services, an affiliate of Alger Management, serves as transfer agent for the Funds.

## HOW MARKET TIMING HARMS MUTUAL FUND INVESTORS

53.     Market timing causes significant harm to mutual fund investors in a variety of ways.  For example, market timing causes "dilution" of returns, by not only depriving mutual fund investors of gains they would otherwise realize on their investments, but also by forcing them to incur a disproportionate share of the losses on days that the NAV declines.  The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less than it would have been had the timer not invested in the fund.  Conversely, if the timer sells shares on days that market prices are falling below the calculated NAV, the arbitrage has the effect of making the next day's NAV, as calculated on a per share basis, lower than it would otherwise have been, thus magnifying the losses experienced by other investors in the fund.

54.     The harm to mutual fund investors from market timing extends beyond dilution.  For example, successful market timing requires repeated, rapid trading of mutual fund shares with significant amounts of cash, which in turn dramatically increases transaction costs, such as commissions, that eat away at returns.  Trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market, which imposes costs on the fund's long term investors.

55.     Market timing also harms mutual investors by forcing mutual fund managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers are sometimes forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the ostensible, publicly stated investment strategy of their funds, and incurring further transaction costs.

56.     Experts estimate that mutual fund investors have lost billions of dollars annually as a result of market timing.  Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers.  Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, http://faculty -gsb.stanford.edu/ zitzewitz/ Research/arbitrage1002.pdf.; Money, October 2003, "The Great Fund Rip-Off" at p. 52. University of South Carolina law professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

## CONFIDENTIAL WITNESSES

57.     Several former Alger employees and others with knowledge of Alger's market timing and late trading activities have provided information to Plaintiffs on a confidential basis. Each of these confidential witnesses is separately referred to herein as "CW ___."

58.     CW 1 is a fund wholesaler who directly participated in negotiations of market timing and late trading agreements between Alger and certain market timers during the Class Period.  CW 1 has personal knowledge of market timing and late trading agreements between Alger and Veras.

13

59.     CW 2 was employed as a Regional Vice President at Alger Management for more than three years during the Class Period.  While employed at Alger CW 2 was responsible for wholesaling the Funds, i.e., selling shares of the Funds to institutional investors.  CW 2 has personal knowledge of Alger's policies and procedures with regard to market timing, Alger's database system and customer information.

60.     CW 3 was employed as a Regional Vice President at Alger Management during the Class Period.  While employed at Alger CW 3 was responsible for wholesaling the Funds. CW 3 has personal knowledge of Alger's policies and procedures with regard to market timing, Alger's database system and customer information.

61.     CW 4 was employed as a Transfer Agent Supervisor at Alger for more than five years spanning both before and during the Class Period.  While employed at Alger CW 4 was responsible for supervising employees who entered trades into Alger's databases. CW 4 has personal knowledge of Alger's policies and procedures with regard to market timing, Alger's database and trading systems and customer information.

62.     CW 5 was employed as a Contact Management Administrator at Alger Management for more than three years spanning both before and during the Class Period. While employed at Alger CW 5 was responsible for maintaining Alger's database system and generating sales reports for the Funds.  CW 5 has personal knowledge of Alger's policies and procedures with regard to market timing, Alger's database system and customer information.

63.     CW 6 was employed in the Trading and Operations Support department at Alger Management for more than three years during the Class Period.  While employed at Alger CW 6 was responsible for providing telephone and email support for customers and processing trades

14

received by telephone.  CW 6 has personal knowledge of Alger's policies and procedures with regard to market timing and late trading, Alger's trading system and customer information.

64.      CW 7 was employed as a Senior Commissions Representative and Relationship Manager at Alger Inc. for more than three years during the Class Period.  While employed at Alger CW 7 was responsible for meeting with customers and administering commissions paid on sales of the Funds.  CW 7 has personal knowledge of Alger's policies and procedures with regard to market timing and late trading and Alger's customer information.

65.      CW 8 was employed as a Shareholder Associate and Mutual Fund Senior Dealer Associate at Alger Inc. for more than three years during the Class Period.  While employed at Alger CW 8 was responsible for resolving back office and trading issues and supervising others on compliance and back office procedures.  CW 8 has personal knowledge of Alger's policies and procedures with regard to market timing and late trading and Alger's customer information.

66.      CW 9 was employed as an internal wholesaler at Alger Associates for approximately two years during the Class Period.  While employed at Alger CW 9 was responsible for wholesaling the Funds.   CW 9 has personal knowledge of Alger's policies and procedures with regard to market timing and late trading and Alger's customer information.

67.      CW 10 was employed as an internal wholesaler at Alger for approximately three years during the Class Period.  While employed at Alger CW 10 was responsible for wholesaling the Funds.   CW 10 has personal knowledge of Alger's policies and procedures with regard to market timing and late trading and Alger's customer information.

**THE SCHEME AT ALGER**

68.     During the Class Period, Alger had extensive market timing and late trading agreements with numerous broker-dealers, hedge funds, and other selected investment companies.  These agreements were made with the knowledge and approval of Alger's top management, including Connelly and Fred Alger, and generated tens of millions of dollars in fees for Alger.

69.     The Alger Defendants knew that their market timing and late trading agreements violated both the terms of Alger's Prospectuses and, with respect to late trading, applicable law, and that allowing selected investors to engage in market timing and late trading would dilute shareholder returns and increase fees and expenses for other Alger shareholders.

70.     In addition to their agreements with certain favored investors, the Alger Defendants knew, or through the exercise of reasonable diligence should have known, that numerous investors were engaging in market timing "under the radar," i.e., without entering into market timing agreements with Alger.  Nevertheless, in breach of their fiduciary duties and with intent to defraud shareholders, the Alger Defendants permitted this "under the radar" market timing activity to continue unchecked, even though they knew that it would  dilute shareholder returns and increase fees and expenses for other Alger shareholders.

71.     In breach of their fiduciary duties and with intent to defraud shareholders, the Alger Defendants put their own interests ahead of shareholders' interests and acted to enrich themselves at the expense of shareholders.

## MARKET TIMING AT ALGER

72.    According to CW 2, prior to 1996 large investors regularly market timed the Alger Portfolios.   According to CW 5, market timing had been an accepted practice at Alger for many years prior to the Class Period.  According to CW 5, certain clients were allowed to market time with any amount of assets, while other clients had a specified minimum amount of assets with which they were allowed to market time.

73.    According to CW 2, in 1996, when David Alger replaced his brother Fred Alger as President of the Fund, David Alger did not want any more market timers in the Fund because, among other things, the portfolio managers were complaining that market timing upset their portfolios.  Hence, David Alger stopped some new investors from market timing, but allowed older accounts that had been market timing to be "grandfathered in" and allowed to continue market timing.

74.    According to CW 3, in late 2000 Alger made another effort to crack down on market timers.  In late 2000, management sent out a directive that the Alger Portfolios were no longer going to tolerate market timing by certain clients because, among other things, portfolio managers were complaining to management that there was too much "churning" taking place. Pursuant to the directive, certain market timers, including Aurum, were told that they would no longer be permitted to engage in market timing in the Alger Portfolios.  Other market timers, however, were allowed to continue market timing.

75.    According to CW 2, after David Alger was killed in the terrorist attacks of September 11, 2001, Connelly wanted to increase the amount of assets in the Fund and looked to potential market timers as a source of new assets.  Connelly knew that the Alger Portfolios were

17

preferred by potential market timers because of their high volatility.  Connelly instructed his wholesalers to contact all of the potential market timers that had been banned from trading in the Fund and open new accounts for them in which market timing would be allowed.

76.     According to CW 2, to initiate and track market timing and late trading transactions, Connelly relied on other Alger employees, including his assistant Cheryl Kunstle ("Kunstle"); Sales Manager Glen Mohrmann ("Mohrmann"); and Valerie Kilpatrick ("Kilpatrick"), who headed Alger's internal wholesale department and reported directly to Connelly.  CW 3 confirms that Connelly relied on Kunstle to manage market timing and late trading transactions.  According to CW 3, "nothing happened that [Kunstle] didn't know." According to CW 2, and confirmed by CW 3, Kunstle set up a database system named "MARS" that kept track of all of Alger's customer information, including market timed trades.

77.     According to CW 2, by early 2002 Connelly wanted to limit market timing to certain select customers, and therefore he had Kunstle track market timing transactions on the MARS system so he could identify which customers were market timing.

78.     According to CW 5, who was responsible for, among other things, entering data into the MARS system and generating weekly, monthly, and quarterly sales reports for the mutual fund group, some trades were transmitted electronically from various agents to the MARS system, while trades received via telephone or mail were manually entered into MARS. According to CW 5, "anything that came in through market timing went over my head and went over to Roxanne [Culver] and she would put it into the spreadsheets without me knowing it." CW 5 saw many of the market timed trades anyway because, according to CW 5, they were so large that they couldn't be missed.

79.     According to CW 5, CW 9, and CW 10, market timing was a common occurrence at Alger.  According to CW 5, "We were taking in whatever we could possibly get.  We were just told that whatever money came in, whether it was market timing or not, that we were to accept it and that we were to credit our wholesalers for that.  So that's what we did.  From upper management, that's what we were told."  According to CW 9, market timing activity was "very regular" at Alger.

80.     According to CW 4, there were four market timers, including Wilshire Associates, that were extremely active traders.  According to CW 4, "There were about four timers that used to run at least three to four times a month.  When the timers would run, they would run back to back, maybe the entire week.  And they would go from the equities into the money market and vice versa."  According to CW 4, the market timers timed the Alger Small Capitalization, Capital Appreciation, and MidCap Growth Portfolios, as the market timers "flipped" money between these portfolios and the Alger Money Market Portfolio.

81.     According to CW 4, and confirmed by CW 6, Alger kept "timer sheets" that described who the timers were and the minimum amount of money, if any, that they were allowed to trade.

82.     According to CW 4, Alger's computer system was programmed to reject any order that was received from a client within 15 days of making a trade in the same portfolio. According to CW 4, this was done to "police" market timing.  In order to complete a timed trade that was ordered within the 15-day period, CW 4 or one of CW 4's colleagues would have to wait for the order to be rejected, manually override the system, and then manually re-enter the order. According to CW 4, "the reps would let us know that the timers might be coming in today,

19

sometimes we would get them by surprise and I remember we used to get them late and we would have to wait for the system to run the timers and then wait to get the report, whether or not they got kicked out, and then put them through manually."

83.     According to several witnesses, including CW 2, CW 3, CW 4, CW 6, CW 7, and CW 8, Wilshire Associates had one of the largest and most active market timing accounts at Alger.  According to CW 2, Wilshire Associates had more than $100 million invested in the Funds during the Class Period.

84.     According to CW 5, frequent market timers included Wilshire Associates, Securities America, Bear Stearns, Kaplan, and Smith Barney.  According to CW 9, and confirmed by CW 10, Merrill Lynch was another frequent market timer.

85.     According to CW 6, some accounts had notes indicating that the account was authorized for market timing.  The account note, which would appear on the computer screen, indicated to Alger employees that certain named people in addition to the representative on file could call into Alger to order pre-authorized market timed trades.

86.     According to CW 6, frequent market timers included KVN, Peconic, Wilshire Associates, Securities America, and Saginor.  According to CW 6, KVN traded in and out of the Alger Money Market Portfolio and various equity portfolios, including the Alger Capital Appreciation Portfolio; Securities America regularly bought into a portfolio one day and sold out of it the next day; and Wilshire Associates "flipped funds every other day."

87.     According to CW 7, and confirmed by CW 6, Saginor and Wilshire Associates routinely timed the Alger Portfolios.  According to CW 7, Wilshire Associates kept large amounts of money in portfolios that had lower net assets, which was done so that Alger could

improve the marketability of certain portfolios.  According to CW 7, market timers had to commit to putting a certain amount of assets into a certain portfolio in order to be allowed to market time another portfolio.

88.     According to CW 7, market timers utilized the Alger LargeCap Growth Portfolio and the Alger Small Capitalization Portfolio and "flipped" money between these portfolios and the Alger Money Market Portfolio.  According to CW 7, "Basically they just kept shifting the money from the Money Market into the other fund and back out.  It happened pretty often."

89.     According to CW 7, Wilshire Associates was one of Alger's biggest market timers, and many of its trades were in excess of $1 million.

90.     According to CW 7, Connelly and several other high-level managers, including Vice President of Broker Dealer Services Susan Stalzer ("Stalzer"), had actual knowledge of market timing at Alger, and Connelly himself approved "any large agreements."  According to CW 9, Connelly and the Funds' portfolio managers had actual knowledge of market timing at Alger.  CW 10 further confirms that Connelly had actual knowledge of market timing at Alger, and that it was common knowledge at Alger that certain brokers and investors were allowed to engage in market timing of the Funds.

**LATE TRADING AT ALGER**

91.     According to CW 7, and confirmed by CW 6, Alger had a policy known as "Price Protection" whereby certain investors were permitted to trade shares of the Alger Portfolios long after the U.S. markets closed at 4:00 p.m. Eastern time.  According to CW 7, pursuant to the "Price Protection" policy, certain investors were permitted to place orders as late as 11:00 a.m., and in some cases as late as 12 noon or 12:30 p.m., and have the trades executed at the previous

day's closing NAV.  According to CW 7, a late trader would call Alger and place an order "by
11:00 or so" and Alger would "put the trade through later in the day but put the 'As Of' date as
of last night so they would qualify for that closing price."

92.     According to CW 6, when an Operations employee received a "Price Protection"
order, the employee had to obtain, and always did obtain, authorization from a supervisor to
process the trade at the previous day's closing NAV.

93.     According to CW 7, and confirmed by CW 6, the "Price Protection" policy was
available only to certain select investors, including Merrill Lynch, other large investment firms
and brokers, and "most of the larger market timers."  According to CW 7, Connelly routinely
entered into verbal agreements with select investors to permit market timing and late trading.

94.     According to CW 7, and confirmed by CW 6, Merrill Lynch engaged in late
trading pursuant to the "Price Protection" policy "almost daily."

95.     According to CW 7, there were instances when a large investor placed a "Price
Protection" order and then cancelled the order because the NAV of the portfolio fell below the
previous day's closing NAV.  On these occasions Alger would cancel the order and then enter a
new order at the lower NAV.

96.     According to CW 7, Alger's computer system did not automatically enter the date
and time that an order was received.  Rather, those fields were entered manually, which enabled
data entry personnel to enter orders 'As Of' the previous day even though they were received that
morning.

97.     According to CW 4, orders that were received by telephone or fax were hand
carried by telephone representatives to CW 4's group for processing, and it was common for a

representative to hand CW 4 an order with instructions to use the previous day's date as the 'As Of' date for execution.

98.      According to CW 4, representatives would often hand CW 4 faxed orders with the fax date and time stamp cut off, and CW 4 frequently observed representatives photocopying faxed orders, deliberately cutting off the fax date and time stamp, and then discarding the original fax.  The representative would then verbally tell CW 4 to use the previous day's date as the 'As Of' date for execution.  Even when the fax date and time stamp was still intact and clearly showed that the fax had been received after 4:00 p.m. the previous day, CW 4 was often instructed to use the previous day's date as the 'As Of' date.

99.      According to CW 7, Connelly and several other high-level managers, including Stalzer, had actual knowledge of late trading at Alger.

100.      According to CW 8, in the first quarter of 2003 Alger employees received an email indicating that late trades should no longer be accepted.  In the spring of 2003, however, Connelly directed Alger employees to resume processing late trades for selected clients.

101.      According to CW 8, Merrill Lynch and Bank of America were allowed to engage in late trading.  According to CW 8, other brokers and smaller clients wanted similar late trading arrangements, but Alger had late trading agreements only with a few major clients.

102.      According to CW 8, Bank of America had three accounts at Alger, each of which had approximately $35 to $40 million in total funds, and Bank of America would, on average, make late trades in the amount of approximately $15 to $20 million one to three times a week.  According to CW 8, at least one of the Bank of America accounts was as custodian for Veras.

## ALGER'S MARKET TIMING AND
## LATE TRADING AGREEMENTS WITH VERAS

103.    According to CW 1, in February 2003 he telephoned Alger on behalf of Veras,

which was seeking market timing "capacity," i.e., the ability to use a certain amount of assets for

market timing transactions, in various mutual funds.  According to CW 1, his call was directed to

Michael Czajka ("Czajka"), Alger's Vice President of Institutional Marketing.

104.    According to CW 1, he proposed to Czajka that Alger agree to grant Veras access

to a certain amount of market timing capacity in one or more of the Alger Portfolios in exchange

for investing a certain amount of "sticky assets," i.e., assets that would remain in one or more of

the Portfolios for a substantial length of time.  According to CW 1, Czajka told him that Alger

had experienced problems with market timers in the past, but nevertheless he was interested in

CW 1's proposal.

105.    According to CW 1, within a few days of his initial proposal, Czajka, on behalf of

Alger, told CW 1 that Veras could have access to $25 million of market timing capacity in the

Alger Capital Appreciation Portfolio in exchange for an investment of $10 million in sticky

assets in the Alger Small Capitalization Portfolio.  On February 13, 2004, Czajka sent an email to

CW 1 which stated "I think I can get you access to $25MM in Cap App. . . .  We need to have

you come direct including buy and hold money.  We need to have 20% in the Small Cap fund

($5MM)."

106.    According to CW 1, Czajka told him that Alger had allocated market timing

capacity to other market timers and that Czajka was in a "race" with another Alger salesperson to

allocate the "last remaining" portion of market timing capacity at Alger.  On February 19, 2003,

Czajka sent an email to CW 1 which stated "I was able to find you the $25MM in Cap App.  This

is the last remaining allocation for timing in this fund." According to CW 1, he later learned that

at the time he was negotiating with Czajka for market timing capacity at Alger, another Alger

salesperson was attempting to reach a similar market timing agreement with Canary.

107.   According to CW 1, he and Czajka discussed how late in the day Veras would be

allowed to place orders to buy or sell Fund shares. CW 1 told Czajka that Veras needed to be

able to place trades at least until 4:22 p.m., several minutes after the 4:15 p.m. close of the

futures market. Czajka, on behalf of Alger, agreed to allow Veras to trade until at least 4:22 p.m.

108.   According to CW 1, he also discussed with Czajka was how many market timing

transactions, i.e., "round trip" buys and sells, Veras would be allowed to execute. In his February

13, 2004 email to CW 1, Czajka wrote "I can give you 50 round trips per year, and the money has

to stay with us a year. . . .   I don't want you to use all 50 round trips in one week and then leave."

CW 1 suggested that Veras be allowed to execute 15 round trips per quarter, for a total of 60 per

year. Czajka, on behalf of Alger, agreed to allow Veras 15 round trips per quarter.

109.   On February 21, 2003, Veras wired Alger $10 million for its investment of sticky

assets, and Czajka sent an email to CW 1 and others which stated:

> I just wanted to let everyone know the assets have been received. And a special
> thank you to everyone for working together to get this deal done. It was literally a
> matter of minutes before we lost this allocation. Lets touch base on Monday and
> figure out your timing assets and when you want to start moving.

110.   According to CW 1, within a few months after Veras reached the initial market

timing agreement with Alger, the agreement expanded to $75 million in market timing capacity

in the Alger Capital Appreciation and MidCap Growth Portfolios in exchange for an investment

of $25 million in sticky assets in the Alger Money Market, Small Capitalization, SmallCap &

MidCap, and Health Sciences Portfolios, and a new China Portfolio that Alger intended to launch.

111.    According to CW 1, Veras' sticky assets accounted for as much as 30% of the assets of the Alger SmallCap & MidCap and Health Sciences Portfolios, and Alger knew that other shareholders would be severely harmed if Veras suddenly pulled its sticky assets out of those Portfolios.

112.    According to CW 1, in or around September 2003, Czajka suggested that Veras phone in their market timing orders at approximately 3:40 p.m., and then they would be put "on hold" until 4:30 p.m., at which time the trades would be executed.  According to Czajka, by placing orders in that manner Alger's call log would show the call being made before the equities market closed at 4:00 p.m., but Veras would not actually have to make a decision on the trade until after the futures market closed at 4:15 p.m.

113.     According to CW 1, Czajka told him that he reported to, and received approval for the market timing agreements from, Ray Panelli, who reported to Connelly.  According to CW 1, Connelly and Fred Alger each knew of and approved Alger's market timing agreements with Veras.

114.    On April 17, 2003, Czajka sent an email to CW 1 which stated:

> Attached is the breakout we spoke of.  Please keep this to yourself or Q.  We normally do not distribute our firm's asset break out.  I actually had to have Fred (Alger) himself sign off on this chart.

115.    In an August 8, 2003 email to CW 1 regarding Veras' proposed investment of sticky assets in the planned China Portfolio, Czajka wrote "I actually got a call from Fred Alger himself asking about this."

26

116.    According to CW 1, the market timing agreements between Veras and Alger had not been memorialized in a written document, and in the summer of 2003 both parties expressed a desire to do so.  According to CW 1, in September 2003 Veras and Alger were in the process of discussing the terms of a letter agreement on market timing which was to include $100 million of market timing capacity in the Alger Capital Appreciation and MidCap Growth Portfolios in exchange for sticky asset investments of $10 million of in the Alger Small Capitalization Portfolio, $7 million in the Alger Healthcare Portfolio, and $5 million in the planned China Portfolio.

117.    According to CW 1, when the Spitzer and SEC investigations were publicly announced, Veras immediately pulled all of its assets, including the sticky assets, out of the Funds and abandoned its market timing agreements with Alger.  As Alger expected, the sudden liquidation of Veras' sticky assets had a devastating effect on other shareholders of the Alger SmallCap & MidCap and Health Sciences Portfolios, in which Veras' sticky assets accounted for as much as 30% of total assets.

## ALGER'S MARKET TIMING AGREEMENTS WITH CANARY

118.    As early as mid-2000, various brokers and others offered Canary market timing capacity in one or more of the Funds.  For example, in August 2000, Kaplan offered Canary $2.5 million of timing capacity in the Alger Capital Appreciation Portfolio; in March 2001, Kaplan offered Canary $1 million of timing capacity in the Alger Small Capitalization Portfolio; and in June 2001, Kaplan offered Canary $2 million of timing capacity in the Alger MidCap Growth Portfolio.

119.     In March 2002, Todd Everts ("Everts"), a broker at Wall Street Global, sent an

email to Thomas Butcher at Canary which stated that Alger would give Canary timing capacity

"as a favor to me as I have had a great relationship with them and they are vying for a large lump

sum from another client that does not trade."  According to Everts' email,

> [Alger] would only allow [timing in] the Large Cap and All Cap.  They have been told
> too many times that people will keep the [market timing] position under 2% [of the
> portfolio's assets] and it has crept up to 5% to 10%.  They own their own transfer agent
> and feel they can track it a little better.  My contact the Vice Chairman's [i.e., Connelly's]
> final statement was, "Todd I will do whatever you need because it is you."

120.     In August 2002, Stern met with Ray Pfeister ("Pfeister"), an Alger Vice President

who sold annuities.   Pfeister offered Canary timing capacity in the Alger Small Capitalization

Portfolio through a sub-account inside a CONSECO variable annuity.  Canary purchased the

annuity, and then sold it some time later.

121.     In early February 2003, Ryan Goldberg ("Goldberg"), a broker at Brean Murray,

Inc. ("Brean Murray") offered Canary a total of $50 million in timing capacity in five Alger

portfolios ($5 million in the Alger Small Capitalization Portfolio, $15 million in the Alger

MidCap Growth Portfolio, $10 million in the Alger Capital Appreciation Portfolio, $10 million

in the Alger LargeCap Growth Portfolio, and $5 million in the Spectra Fund) in exchange for an

investment of $15 million in sticky assets in the Alger Small Capitalization Portfolio.

122.     Stern subsequently held a conference call with Goldberg and Connelly to confirm

the terms of the agreement, including the amounts to be invested in each Portfolio, the number of

times per month Canary could trade in and out of each Portfolio, and the amount of sticky assets

to be invested.  Connelly confirmed the terms of the agreement, and in late February Canary

funded its market timing and sticky asset investments pursuant thereto.

123.     Through brokerage accounts at Bank of America and Security Trust Co., Canary

engaged in market timing of the Alger Portfolios from February 2003 until August or September

2003, when Canary ceased its activities in connection with the commencement of the state and

federal governmental investigations described below.

## THE BROKER AND CLEARING PLATFORM DEFENDANTS' PARTICIPATION IN THE SCHEME

124.     The Broker and Clearing Platform Defendants recklessly and/or knowingly

disregarded the excessive mutual fund trades being transacted through their trading systems, or

"platforms," by the Market Timer and Late Trader Defendants and substantially assisted and

participated in such excessive trading.  Moreover, the Broker and Clearing Platform Defendants

specifically engineered trading strategies that catered exclusively to market timers and late

traders.   For example, Bear Stearns and Bank of America actually installed special equipment

for market timers, including Canary, to allow them to execute market timing and late trading

transactions at their whim, while Bear Stearns and Bank of America captured the resulting fees

and commissions.

## Bank of America

125.     Bank of America provided Canary and at least one other major market timer with

an electronic trading system that permitted Canary to circumvent restrictions on the frequency

and timeliness of its trades.  Beginning in 2001, Bank of America:  (1) set Canary up with a state-

of-the-art electronic late trading platform, allowing it to trade late as late as 6:30 eastern time in

the hundreds of mutual funds that the bank offered its customers; (2) provided Canary with

approximately $300 million of credit to finance its late-trading and market timing activity in the

hundreds of mutual funds that Bank of America could access by virtue of its size and power; and

(3) sold Canary the derivative short positions it needed to time the funds as the market dropped.

As a result, Canary became one of Bank of America's largest customers.

**Bear Stearns**

126.    Bear Stearns knowingly facilitated market timing and late trading through a

network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing

platform.  Bear Stearns' network of broker-dealers included in-house personnel and outside

firms, including Brean Murray and Kaplan, which had core businesses of market timing mutual

funds on behalf of Canary and other market timers.

127.    Specifically, senior Bear Stearns employees approved the use of the firm's

clearing platform for market timing and late trading.  For instance, during the Class Period,

representatives of Brean Murray met with Michael Zackman of Bear Stearns to specifically

discuss arranging market timing and late trading capabilities through the Bear Stearns' clearing

platform.  This meeting resulted in Bear Stearns installing a computer in Brean Murray's offices

that accessed its clearing platform, known internally as the Bear Stearns Mutual Fund Routing

System ("MFR System").  Similar to the sophisticated equipment that Bank of America set up in

Canary's office, the MFR System provided Brean Murray with a direct link to Bear Stearns'

clearing platform, through which Brean Murray could enter automated market timing

transactions at will.

128.    Bear Stearns also provided its network of brokers with access to the MFR System

so they could engage in late trading.  For instance, Bear Stearns permitted its affiliated brokers at

Brean Murray to enter trades as late as 5:30 p.m. eastern time, but at the price set as of 4:00 p.m.

eastern time  Furthermore, Bear Stearns permitted its brokers to employ deceptive strategies to

avoid detection from regulators and internal monitors.  For example, the time stamp function on

the MFR System was disabled so that there was no record of the when the late trades were

placed.

## THE MISCONDUCT AT ALGER BEGINS TO BE REVEALED

129.    In September 2003, the Alger Defendants and others were served with subpoenas

by New York State Attorney General Eliot Spitzer (the "New York Attorney General") and the

SEC.

130.    On October 16, 2003, the SEC issued an Order instituting public administrative

and cease-and-desist proceedings against Connelly for his role in the market timing scheme at

Alger.  The October 16, 2003 Order stated, *inter alia*:

> Connelly approved agreements permitting select investors to "time" Alger mutual funds.
> "Timing" refers to the practice of short term buying and selling of mutual fund shares in
> order to exploit inefficiencies in mutual fund pricing. Timing can adversely affect mutual
> fund shareholders because it can dilute the value of their shares. Consequently, mutual
> fund managers such as Alger Management often maintain policies and procedures to
> detect and prevent timing. By allowing select investors to time Alger funds, Connelly
> violated the antifraud provisions of the federal securities laws.
>
> . . .
>
> Timing can dilute the value of mutual fund shares to the extent that a timer is permitted to
> buy and sell shares rapidly and repeatedly to take advantage of arbitrage opportunities. In
> addition, timing raises transaction costs for the fund. Consequently, mutual fund
> managers often maintain policies and procedures to detect and prevent timing, such as
> imposing early redemption fees or exercising discretion to cancel timers' purchases.
> Prospectuses for mutual funds often contain representations that the fund seeks to deter
> timers. The statement of additional information, which was incorporated by reference in
> the prospectus for one family of funds within the Alger complex (the "Alger Fund"),
> indicated that investors could make only six exchanges, or trades, of mutual funds per
> year. The February 28, 2003 statement of additional information indicated that "[y]ou
> may make up to six exchanges annually by telephone or in writing. . . . The [Alger] Fund

31

reserves the right to terminate or modify the exchange privilege upon notice to shareholders."

From the mid-1990s until 2003, Connelly was involved in allocating timing capacity in Alger mutual funds to timing investors. Connelly regularly authorized select investors to time the Alger Fund. Connelly did this even though he knew that the timers were making substantially more than the permitted six exchanges per year.

Investors seeking timing capacity usually offered to commit additional assets to other funds in the Alger complex. These additional assets were referred to as "buy and hold" positions. (Buy and hold positions are also referred to as "sticky assets.") Over time, Connelly developed a de facto practice of requiring that timers commit assets to buy and hold positions to earn access to timing capacity. In early 2003, Connelly formalized this practice by requiring that investors seeking timing capacity maintain at least 20 percent of their investment in buy and hold positions.

For example, in February 2003, Connelly was seeking to obtain additional assets for an Alger smallcap fund. Connelly approved an arrangement whereby Veras Investment Partners ("Veras") could time $50 million in the Alger Fund in exchange for a $10 million buy and hold position in the smallcap fund. In July 2003, Veras was granted an additional $30 million of capacity in exchange for an additional $12 million buy and hold position.

Connelly controlled timing activities at Alger by appointing an employee to serve as Alger's "timing police." The timing police would seek to identify investors that were timing without approval. Investors found to be timing Alger mutual funds without Connelly's approval were asked to redeem their investments in the Alger mutual funds, whereas investors who made timing agreements with buy and hold positions were permitted actively to trade Alger mutual funds. Alger Management thus treated investors differently based on whether they had a market timing agreement -- and buy and hold position commitment -- that Connelly had approved.

Alger's timing activity reached its peak during 2003, at which time there were more than one dozen timers with approximately $200 million of timing funds invested in Alger mutual funds. Thus, in return for providing timing capacity, Alger earned a fee on the funds invested equal to approximately 70 basis points, or 0.70 percent of the total assets invested.

Connelly understood that the Alger Fund prospectus and statement of additional information did not disclose that Alger Management permitted select investors to "time"

Alger mutual funds and to make significantly more than six exchanges per year. Connelly also understood that the Alger mutual fund prospectus did not disclose that Alger Management required investors seeking to time Alger funds to maintain buy and hold positions in other mutual funds managed by Alger Management. Connelly further understood that Alger Management did not disclose that it treated investors differently based on whether they had entered into timing agreements in exchange for buy and hold positions. Finally, Connelly understood that allowing investors to engage in market timing of Alger funds harmed other shareholders in the "timed" funds.

131.    In its October 16, 2003 Order, the SEC found that Connelly had violated Section

17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

Sections 206(1) and 206(2) of the IAA; and Section 34(b) of the ICA.

132.    On October 16, 2003, the New York Attorney General and the SEC jointly

announced that Connelly had pled guilty to tampering with evidence in the investigations of the

market timing scheme at Alger:

> Connelly pled guilty to the crime of Tampering with Physical Evidence, a class E felony punishable by up to four years in state prison. The charges against Connelly stem from his repeated efforts to tamper with an ongoing investigation of illegal trading practices in the mutual funds industry.

> In its administrative order, the SEC found that Connelly approved agreements that permitted select investors to "time" certain mutual funds managed by Alger, a practice that violates an adviser's fiduciary duties and adversely affects the value of the fund being timed. In this case, the timing arrangements were also inconsistent with Alger's public disclosures in prospectuses and statements of additional information filed with the SEC. Connelly is the first fund executive charged for permitting market timing.

> "The scope of the investigation into illegal trading practices in the mutual fund industry continues to expand," Spitzer said. "Any obstruction of this investigation will be dealt with swiftly."

> Stephen M. Cutler, Director of the SEC Division of Enforcement, said: "By approving timing arrangements with select investors, Mr. Connelly put his own firm's bottom line ahead of the interests of the fund shareholders he was entrusted to protect. Such conduct is a fundamental breach of an investment adviser's fiduciary duties and warrants tough

sanctions. Accordingly, we have sought and obtained from Mr. Connelly a lifetime bar from the securities industry as well as a significant monetary penalty."

According to the felony complaint, Connelly took a series of steps to thwart the investigation. Beginning Sept. 3, 2003, Connelly began deceiving his own firm's lawyers to prevent them from identifying and producing documents responsive to a subpoena from the Attorney General's office. Specifically, Connelly tried to conceal trading arrangements between Alger and Veras Investment Partners, LLP, a Texas hedge fund company.

133.    On October 26, 2003, Alger Management issued a press release which stated:

Mr. Connelly and two other mutual fund sales employees at an Alger subsidiary (Fred Alger & Co.) were suspended on September 29, 2003 for permitting a former client to engage in late trading activities.

Alger's independent review is being organized by Dorsey & Whitney under the supervision of Zachary Carter, a former United States Attorney for the Eastern District of New York and a senior partner at Dorsey & Whitney. Dorsey & Whitney has retained Deloitte to assist it in the review. Alger's independent review continues to focus on the activities of one hedge fund, which may have engaged in inappropriate late trading, for a time, in 2003.

134.    On January 17, 2004, the SEC issued a litigation release which stated:

The Securities and Exchange Commission announced that on December 17, 2003, James P. Connelly Jr. was sentenced to 1 to 3 years in prison for tampering with evidence. Connelly, the former Vice Chairman of Fred Alger Management Inc., had pled guilty on October 16, 2003, to one count of Tampering with Physical Evidence, a Class E felony, in violation of New York State law. Also on October 16, 2003, the Commission issued an order finding that Connelly had violated the federal securities laws by permitting select investors to "time" Alger mutual funds in exchange for maintaining at least 20% of their Alger investment in buy-and-hold positions, sometimes referred to as "sticky assets." The Commission directed Connelly to cease and desist from future violations of various provisions of the federal securities laws; barred him from association with any broker, dealer or investment adviser; barred him from serving in various capacities with respect to any registered investment company; and imposed a $400,000 civil penalty. Connelly consented to the Commission order without admitting or denying the findings.

The criminal charges against Connelly stemmed from his repeated efforts to tamper with an ongoing investigation by the New York Attorney General and the Commission of illegal trading practices in the mutual funds industry, including by directing subordinates to delete emails called for by subpoenas. Connelly had admitted his conduct under oath before the Hon. James Yates of the Supreme Court of New York State in Manhattan. New York's statute outlawing tampering with evidence calls for a maximum sentence of 4 years in state prison.

135.   Authorities from the states of New York, Massachusetts, and West Virginia are investigating the market timing scheme at Alger and have issued subpoenas to Alger seeking documents, some of which have been produced.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

136.   The Alger Fund's Prospectus and Statement of Additional Information dated February 25, 1998 (the "February 1998 Prospectus") stated:

> Except as limited below, shareholders may exchange some or all of their shares for shares of another Portfolio of the Fund. . . .
>
> You may make up to six exchanges annually by telephone or in writing.

137.   The statement set forth in the preceding paragraph was repeated in each of the Alger Fund's following SEC filings:

a.   Post-Effective Amendment filed with the SEC on December 24, 1998, which was signed by defendants Fred Alger, Duch, Sargent, Dubow, O'Neil, and Saint-Amand;

b.   Post-Effective Amendment filed with the SEC on February 26, 1999, which was signed by defendants Fred Alger, Duch, Sargent, Dubow, O'Neil, Saint-Amand, and White;

c.   Prospectus and Statement of Additional Information dated March 1, 1999;

d.      Post-Effective Amendment filed with the SEC on February 25, 2000, which was signed by defendants Fred Alger, Duch, O'Neil, Saint-Amand, and White;

e.      Post-Effective Amendment filed with the SEC on February 28, 2000, which was signed by defendants Fred Alger, Duch, O'Neil, Saint-Amand, and White;

f.      Prospectus and Statement of Additional Information dated February 25;

g.      Post-Effective Amendment filed with the SEC on May 24, 2000, which was signed by defendants Fred Alger, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, and Colbert;

h.      Post-Effective Amendment filed with the SEC on July  21, 2000, which was signed by defendants Fred Alger, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, and Colbert;

i.      Prospectus and Statement of Additional Information dated August 1, 2000;

j.      Post-Effective Amendment filed with the SEC on September 29, 2000, which was signed by defendants Fred Alger, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, and Colbert;

k.      Prospectus and Statement of Additional Information Supplement dated November 2, 2000;

l.      Post-Effective Amendment filed with the SEC on February 28, 2001, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, and Colbert;

m.      Prospectus and Statement of Additional Information dated February 28;

n.      Post-Effective Amendment filed with the SEC on January 18, 2002, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

o.      Prospectus and Statement of Additional Information dated February 28;

p.      Post-Effective Amendment filed with the SEC on March 1, 2002, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

q.      Post-Effective Amendment filed with the SEC on March 20, 2002, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

r.      Post-Effective Amendment filed with the SEC on May 1, 2002, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

s.      Prospectus and Statement of Additional Information dated May 1, 2002;

t.      Post-Effective Amendment filed with the SEC on May 8, 2002, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

u.      Prospectus and Statement of Additional Information Supplement dated October 16, 2002;

v.      Post-Effective Amendment filed with the SEC on February 28, 2003, which was signed by defendants Fred Alger, Connelly, Duch, O'Neil, Saint-Amand, White, Baird, Cheever, Colbert, and Chung;

w.      Prospectus and Statement of Additional Information dated February 28, 2003.

138.    The statement set forth in paragraph 136 and referred to in paragraph 137 was false and misleading and/or omitted material information necessary to make it not false and misleading each time it was made because Alger failed to disclose that:

     a.      In order to enrich themselves through increased fees and expenses, the Alger Defendants intentionally or recklessly allowed certain broker-dealers, hedge funds, and other selected investment companies to engage in market timing and make far more than six exchanges per year; and

     b.      Alger's allowing selected investors to engage in market timing diluted shareholder returns and increased fees and expenses for other Alger shareholders.

139.    The February 1998 Prospectus stated:

Purchases for Alger Money Market Portfolio will be processed at the net asset value calculated after your order is received and accepted. . . .

Purchases for the other Portfolios will be based on the next net asset value calculated for each class after your order is received and accepted.  If your purchase is made by check, wire or exchange and is received by the close of business of the NYSE (normally 4:00 p.m. Eastern time), your account will be credited on the day of receipt.  If your purchase is received after such time, it will be credited the next business day.

140.    The statement set forth in the preceding paragraph was repeated in each of the Alger Fund's SEC filings listed in paragraph 137.

141.    The statement set forth in paragraph 139 and referred to in paragraph 140 was false and misleading and/or omitted material information necessary to make it not false and misleading each time it was made because Alger failed to disclose that:

     a.      In order to enrich themselves through increased fees and expenses, the Alger Defendants intentionally or recklessly allowed certain broker-dealers, hedge funds, and other selected investment companies to enter orders as late as 12:30 p.m. and have the orders processed at the previous day's NAV; and

     b.      Alger's allowing selected investors to engage in late trading was illegal and diluted shareholder returns and increased fees and expenses for other Alger shareholders.

142.    The February 1998 Prospectus stated:

Each Portfolio will bear its own expenses.  Operating expenses for each Portfolio generally consist of all costs not specifically borne by Alger Management, including investment management fees, fees for necessary professional and brokerage services, costs of regulatory compliance and costs associated with maintaining legal existence and shareholder relations.  In addition, Class B and Class C of each Portfolio other than Alger Money Market Portfolio may pay Alger Inc. for expenses incurred in distributing shares of that class and each such Portfolio may compensate Alger Inc. for servicing shareholder accounts.  Fundwide expenses not identifiable to any particular portfolio or class will be allocated in a manner deemed fair and equitable by the Board of Trustees.

143.    The statement set forth in the preceding paragraph was repeated in each of the Alger Fund's SEC filings listed in paragraph 137.

144.    The statement set forth in paragraph 142 and referred to in paragraph 143 was false and misleading and/or omitted material information necessary to make it not false and misleading each time it was made because Alger failed to disclose that:

      a.      In order to enrich themselves through increased fees and expenses, the Alger Defendants intentionally or recklessly allowed certain broker-dealers, hedge funds, and other selected investment companies to engage in market timing and late trading of Fund shares; and

      b.      Alger's allowing selected investors to engage in market timing and late trading diluted shareholder returns and increased fees and expenses for other Alger shareholders.

## ADDITIONAL SCIENTER ALLEGATIONS

145.    As alleged herein, defendants acted with scienter in that each of them knowingly or recklessly participated in a scheme to defraud Plaintiffs and other purchasers and holders of the Funds and profited from their participation in said scheme, as alleged herein. Each of the

defendants knowingly or recklessly permitted and/or engaged in market timing and/or late trading of shares of the Funds, as alleged herein.

### Scienter of the Alger Defendants

146.    Alger knowingly entered into agreements with known market timers and late traders that explicitly permitted the wrongdoing complained of herein.  Alger had employees whose job was to enable, facilitate, and monitor trading by market timers and late traders, and was otherwise able to detect market timing and late trading through its trading and order entry systems, as alleged herein.

147.    Each of the Alger Defendants knew that market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiffs and the other members of the Class.  Moreover, each of the Alger Defendants knew that the public documents and statements issued or disseminated in the name of the Funds were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public.  Each of the Alger Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

148.    Each of the Alger Defendants knew of and participated in the fraudulent scheme alleged herein by virtue of: (i) their receipt of information reflecting the true facts regarding the Funds; (ii) their control over, receipt and/or modification of the Funds' materially misleading misstatements; and/or (iii) their associations with the Funds, which made them privy to confidential proprietary information concerning the Funds, e.g., information regarding market timing and late trading of the Funds.

149.    The Alger Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein.  Investors attracted to the Funds by market timing and/or late trading arrangements increased the amount of assets under management, and thereby permitted Alger to receive increased management fees, brokerage commissions, and other fees, which were based on the amount of assets under management and/or the size and volume of transactions in the Funds.

150.    According to the Alger Fund's public filings, during the Class Period the Portfolios in the Alger Fund paid Alger Management the following management fees:

| Year Ended | LargeCap Growth | Small Cap. | Balanced | MidCap Growth | Capital Appreciation | Money Market |
|---|---|---|---|---|---|---|
| 10/31/99 | $5,775,000 | $4,578,000 | $347,000 | $2,093,000 | $4,213,000 | $1,417,000 |
| 10/31/00 | $9,539,000 | $4,627,000 | $1,220,000 | $4,160,000 | $12,610,000 | $1,551,000 |
| 10/31/01 | $8,021,000 | $2,427,000 | $2,416,000 | $5,622,000 | $9,595,000 | $1,730,000 |
| 10/31/02 | $5,536,000 | $1,506,000 | $2,314,000 | $4,578,000 | $6,209,000 | $1,484,000 |
| 10/31/03 | $3,870,000 | $1,334,000 | $1,945,000 | $3,905,000 | $4,044,000 | $1,282,000 |

151.    According to the Alger Fund's public filings, during the Class Period the Portfolios in the Alger Fund paid Alger Inc. the following brokerage commissions:

| Year Ended | LargeCap Growth | Small Cap. | Balanced | MidCap Growth | Capital Appreciation |
|---|---|---|---|---|---|
| 10/31/99 | $2,167,331 | $863,081 | $76,086 | $776,224 | $1,040,840 |
| 10/31/00 | $1,934,509 | $891,329 | $187,039 | $662,316 | $1,597,714 |
| 10/31/01 | $1,905,984 | $719,985 | $330,188 | $1,245,923 | $1,901,175 |
| 10/31/02 | $3,393,707 | $419,984 | $857,834 | $3,380,117 | $2,531,702 |
| 10/31/03 | $3,201,431 | $397,669 | $916,161 | $2,386,938 | $1,900,561 |

152.    According to the American Fund's public filings, during the Class Period the Portfolios in the American Fund paid Alger Management the following management fees:

41

| Year Ended | Growth | Small Cap. | Income & Growth | Balanced | Midcap Growth | Leveraged Allcap |
|---|---|---|---|---|---|---|
| 12/31/99 | $19,706,786 | $6,401,767 | $610,561 | $301,241 | $5,967,972 | $1,585,846 |
| 12/31/00 | $25,556,290 | $6,844,021 | $808,682 | $664,600 | $8,793,790 | $4,252,969 |
| 12/31/01 | $12,409,264 | $4,779,637 | $899,141 | $1,201,281 | $2,583,718 | $3,700,084 |
| 12/31/02 | $8,770,630 | $3,810,001 | $711,969 | $1,887,444 | $2,409,650 | $2,988,448 |
| 12/31/03 | $7,273,659 | $3,702,497 | $560,496 | $2,172,573 | $2,495,822 | $2,777,390 |

153.    According to the American Fund's public filings, during the Class Period the

Portfolios in the American Fund paid Alger Inc. the following brokerage commissions:

| Year Ended | Growth | Small Cap. | Income & Growth | Balanced | Midcap Growth | Leveraged Allcap |
|---|---|---|---|---|---|---|
| 12/31/99 | $5,111,202 | $2,278,921 | $231,116 | $53,606 | $1,821,363 | $341,921 |
| 12/31/00 | $4,893,331 | $1,181,549 | $277,740 | $83,728 | $1,264,852 | $573,545 |
| 12/31/01 | $3,207,708 | $1,457,640 | $332,877 | $189,328 | $680,947 | $800,760 |
| 12/31/02 | $6,718,893 | $1,017,926 | $733,297 | $750,554 | $1,982,993 | $1,404,989 |
| 12/31/03 | $4,339,302 | $962,269 | $457,632 | $672,644 | $1,173,638 | $920,980 |

154.    According to the Institutional Fund's public filings, during the Class Period the

Portfolios in the Institutional Fund paid Alger Management the following management fees:

| Year Ended | LargeCap Growth | Small Cap. | MidCap Growth | Capital Appreciation | Balanced | Socially Responsible |
|---|---|---|---|---|---|---|
| 10/31/99 | $461,489 | $372,258 | $119,207 | $302,359 | | |
| 10/31/00 | $846,300 | $1,318,381 | $720,352 | $2,140,955 | | |
| 10/31/01 | $819,995 | $1,147,807 | $1,646,675 | $1,910,346 | $708 | $579 |
| 10/31/02 | $718,100 | $649,692 | $1,909,491 | $1,455,077 | $1,325 | $463 |
| 10/31/03 | $627,529 | $612,415 | $2,570,337 | $1,171,206 | $9,814 | $8,461 |

155.    According to the Institutional Fund's public filings, during the Class Period the

Portfolios in the Institutional Fund paid Alger Inc. the following brokerage commissions:

| Year Ended | LargeCap Growth | Small Cap. | MidCap Growth | Capital Appreciation | Balanced | Socially Responsible |
|---|---|---|---|---|---|---|
| 10/31/99 | $126,327 | $98,245 | $47,133 | $83,900 | | |
| 10/31/00 | $186,923 | $258,366 | $156,001 | $302,662 | | |
| 10/31/01 | $194,181 | $310,214 | $398,927 | $376,400 | $116 | $268 |
| 10/31/02 | $440,482 | $196,545 | $1,349,526 | $567,124 | $757 | $238 |
| 10/31/03 | $517,403 | $173,161 | $1,469,164 | $492,784 | $4,476 | $4,507 |

156.    According to the Spectra Fund's public filings, during the Class Period the Spectra Fund paid Alger Management and Alger Inc. the following management fees and brokerage commissions, respectively:

| Year Ended | Management Fees | Brokerage Commissions |
|---|---|---|
| 10/31/99 | $5,716,197 | $504,630 |
| 10/31/00 | $13,986,854 | $1,030,186 |
| 10/31/01 | $8,975,344 | $1,222,087 |
| 10/31/02 | $5,586,657 | $1,290,608 |
| 10/31/03 | $3,749,912 | $939,853 |

## Scienter of the Market Timer and Late Trader Defendants

157.    Each of the Market Timer and Late Trader Defendants knew of and participated in the fraudulent scheme alleged herein by entering into agreements to engage in, and/or by repeatedly conducting, market timing and/or late trading of the Funds.

158.    Each of the Market Timer and Late Trader Defendants knew that: (i) market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiffs and the other members of the Class; (ii) market timing and late trading was contrary to the language in Alger's Prospectuses, Statements of Additional Information,

Registration Statements, and amendments thereto, as alleged herein; and (iii) Alger had

mechanisms in place to prevent market timing and late trading, but knowingly or recklessly

circumvented such mechanisms for the benefit of the Market Timer and Late Trader Defendants.

159.     Each of the Market Timer and Late Trader Defendants was highly motivated to

participate in the wrongdoing alleged herein, pursuant to which they each made enormous profits

at the expense of long-term investors in the Funds, including Plaintiffs and the other members of

the Class.

**Scienter of the Broker and Clearing Platform Defendants**

160.     Each of the Broker and Clearing Platform Defendants knew of and participated in

the fraudulent scheme alleged herein by entering into and/or effectuating agreements to engage

in, and/or by repeatedly conducting, market timing and/or late trading of the Funds.

161.     Each of the Broker and Clearing Platform Defendants knew that: (i) market timing

and late trading activity was enormously harmful to long-term investors in the Funds, including

Plaintiffs and the other members of the Class; (ii) market timing and late trading was contrary to

the language in Alger's Prospectuses, Statements of Additional Information, Registration

Statements, and amendments thereto, as alleged herein; and (iii) Alger had mechanisms in place

to prevent market timing and late trading, but knowingly or recklessly circumvented such

mechanisms for the benefit of the Market Timer and Late Trader Defendants.

162.     Each of the Broker and Clearing Platform Defendants was highly motivated to

participate in the wrongdoing alleged herein, pursuant to which they each received enormous fees

and commissions, including brokerage fees and commissions, "wrap" fees, clearing fees, and other transaction fees, for their participation in the market timing and late trading schemes.

## CLASS ACTION ALLEGATIONS

163.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of themselves and the members of the Class, as defined herein.  Excluded from the Class are defendants, members of the immediate family of each of the individual defendants, any subsidiary, affiliate, director, officer, or employee of any of the defendants, any entity in which any excluded person or entity has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person or entity.

164.    The Class is so numerous that joinder of all members of the Class is impracticable.  Throughout the Class Period Fund shares were actively traded on the New York Stock Exchange.  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the Class.

165.    Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent because the damages of Plaintiffs and all of the members of the Class arise from and were caused by the same misconduct committed by defendants.  Plaintiffs do not have interests antagonistic to, or in conflict with, the members of the Class.

166.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in prosecuting class actions and securities litigation.

45

167.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual members of the Class. These common questions of law and fact include, among others:

a.    whether defendants violated the Securities Act, Exchange Act, ICA, and common law by their acts and omissions as alleged herein; and

b.    whether the members of the Class suffered damages, and if so, the proper measure thereof.

168.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The likelihood of individual members of the Class prosecuting separate individual claims is remote. Since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class individually to seek redress for the wrongs done to them.  No unusual difficulties are likely to be encountered in the management of this action as a class action.

## COUNT ONE
## <u>VIOLATION OF SECTION 11 OF THE SECURITIES ACT</u>

169.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

170.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against each of the Alger Defendants.

46

171.    The Alger Defendants violated Section 11 of the Securities Act in that the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto issued for the Funds contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.  The Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto failed to disclose and misrepresented the following material facts:

> a.      In order to enrich themselves through increased fees and expenses, the Alger Defendants intentionally or recklessly allowed certain broker-dealers, hedge funds, and other selected investment companies to engage in market timing and make far more than six exchanges per year;

> b.      Alger's allowing selected investors to engage in market timing diluted shareholder returns and increased fees and expenses for other Alger shareholders;

> c.      In order to enrich themselves through increased fees and expenses, the Alger Defendants intentionally or recklessly allowed certain broker-dealers, hedge funds, and other selected investment companies to enter orders as late as 12:30 p.m. and have the orders processed at the previous day's NAV; and

> d.      Alger's allowing selected investors to engage in late trading was illegal and diluted shareholder returns and increased fees and expenses for other Alger shareholders.

172.    The Alger Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto.

173.     The Alger Defendants had the duty of conducting investigation of the information contained in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto before disseminating them to Fund shareholders, and failed to satisfy that duty.  The Alger Defendants owed to the Funds' shareholders, including Plaintiffs and the Class, the duty to ensure that the statements contained in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto were true and complete and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.  By virtue of the misrepresentations and omissions contained in or omitted from the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as herein alleged, the Alger Defendants are liable to Plaintiffs and the Class.

174.     As a direct and proximate result of defendants' misconduct and material misstatements and omissions contained in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, Plaintiffs and the Class suffered substantial damages.

## COUNT TWO
## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT

175.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

176.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against each of the Alger Defendants.

177.    By means of the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, the Alger Defendants offered for sale and/or sold shares of the Funds to Plaintiffs and the other members of the Class.  Defendants' actions of solicitation consisted primarily of the preparation and dissemination of the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto.

178.    The actions of solicitation taken by the Alger Defendants included participation in the preparation and dissemination of false and misleading Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as herein alleged.  The written communications made in connection with the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to disclose material facts, as alleged herein.

179.    The Alger Defendants were obligated to, but failed to, make a reasonable and diligent investigation of the written statements made in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, in order to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

180.    Plaintiffs and the other members of the Class purchased or otherwise acquired shares of the Funds pursuant to the false and misleading Prospectuses, Statements of Additional

Information, Registration Statements, and amendments thereto.  Plaintiffs and the other members of the Class did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto.

181.    By reason of the conduct alleged herein, the Alger Defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of these violations of Section 12(a)(2), Plaintiffs and the other members of the Class sustained substantial damages.

182.    Pursuant to Section 12(a)(2) of the Securities Act, Plaintiffs and the other members of the Class are entitled to and hereby seek: (i) rescissory damages as to the shares of the Funds they purchased and have subsequently sold; and (ii) rescission as to the shares of the Funds they purchased and continue to hold.

183.    Less than three years has elapsed between the time that the securities upon which this claim for relief is brought were sold to the public and the time of the filing of this action. Less than one year has elapsed between the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this claim for relief is based and the time of the filing of this action.

## COUNT THREE
## <u>VIOLATION OF SECTION 15 OF THE SECURITIES ACT</u>

184.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Plaintiffs expressly

exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

185.     This claim is brought pursuant to Section 15 of the Securities Act against each of the Alger Defendants as control persons of the Funds.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto are the collective actions of the Alger Defendants.

186.     The Registrants are liable under Sections 11 and 12 of the Securities Act, as set forth herein.

187.     Each of the Alger Defendants was a "control person" of the Funds within the meaning of Section 15 of the Securities Act, by virtue of their position of operational control and/or authority over the Funds.  Each of the Alger Defendants directly and/or indirectly had the power and authority, and exercised the same, to cause the Funds to engage in the wrongful conduct complained of herein.  Each of the Alger Defendants issued, caused to be issued, and/or participated in the issuance of materially false and misleading statements in the Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto.

188.     Pursuant to Section 15 of the Securities Act, by reason of the foregoing, each of the Alger Defendants is liable to Plaintiffs and the Class to the same extent as the Registrants for their primary violations of Sections 11 and 12 of the Securities Act.

189.     By virtue of the foregoing, Plaintiffs and the members of the Class are entitled to damages against each of the Alger Defendants.

## COUNT FOUR

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND
## RULE 10b-5 PROMULGATED THEREUNDER

190.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for claims brought pursuant to the Securities Act.

191.     This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, against all defendants.

192.     During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Plaintiffs and other Class members, as alleged herein, and caused Plaintiffs and other members of the Class to suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

193.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers and holders of shares of the Funds, including Plaintiffs and other members of the Class, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully appropriated the Funds' assets in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

194.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Funds' operations, as specified herein.

195.     Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from the Funds' investments and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Class.

196.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197.     As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and the other members of the Class suffered damages.

## COUNT FIVE
## <u>VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT</u>

198.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter, except for claims brought pursuant to the Securities Act.

199.     This claim is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against each of the Alger Defendants.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Funds' Prospectuses, Statements of Additional Information,

Registration Statements, and amendments thereto are the collective actions of the Alger Defendants.

200.    The Alger Defendants acted as controlling persons of the Funds within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of the Funds' businesses and systematic involvement in the fraudulent scheme alleged herein, each of the Alger Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the Funds, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Each of the Alger Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

201.    In particular, each of the Alger Defendants had direct and supervisory involvement in the operations of the Funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

202.    As set forth above, each of the Alger Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Alger Defendants is liable pursuant to Section 20(a) of the Exchange Act.

203.    As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT SIX
## VIOLATION OF SECTION 34(b) OF THE ICA

204.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

205.     This claim is brought pursuant to Section 34(b) of the ICA, 15 U.S.C. § 80a - 33(b), against each of the Alger Defendants.

206.     Under Section 34(b) of the ICA, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a-30(a)].  It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

207.     Each of the Alger Defendants made untrue statements of material fact in the Funds' registration statements, applications, reports, accounts, records, and/or other documents filed or transmitted pursuant to title 15, or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a-30(a)].

208.     As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT SEVEN
## <u>VIOLATION OF SECTION 36(a) OF THE ICA</u>

209.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

210.    This claim is brought pursuant to Section 36(a) of the ICA, 15 U.S.C. § 80a-35(a), against each of the Alger Defendants.

211.    Under Section 36(a) of the ICA, defendants are deemed to owe a fiduciary duty to Plaintiffs and other Class members and are prohibited from engaging in misconduct with respect to the Funds.

212.    Each of the Alger Defendants, solely for their own benefit and to the detriment of Plaintiffs and the Class, and in violation of their fiduciary duties to Plaintiffs and the Class, devised and participated in a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of the Funds throughout the Class Period.  The Alger Defendants further failed to reveal material facts concerning their conduct, such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Funds.

213.    As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT EIGHT
## <u>VIOLATION OF SECTION 36(b) OF THE ICA</u>

214.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

215.    This claim is brought pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), against each of the Alger Defendants.

216.    Under Section 36(b) of the ICA, defendants are deemed to owe a fiduciary duty to Plaintiffs and other Class members with respect to the receipt of fees and compensation that defendants receive for services of a material nature.

217.    Each of the Alger Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates, solely for their own benefit, in violation of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members. Each of the Alger Defendants failed to reveal material facts concerning their conduct such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Funds.

218.    As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT NINE
## <u>VIOLATION OF SECTION 48(a) OF THE ICA</u>

219.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

57

220.    This claim is brought pursuant to Section 48(a) of the ICA, 15 U.S.C. § 80a-47(a), against each of the Alger Defendants.

221.    Under Section 48(a) of the ICA, it is unlawful for any defendant to do indirectly that which, under the ICA, it could not do directly.

222.    Each of the Alger Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates, solely for their own benefit, in violation of their fiduciary duties to their customers, i.e., Plaintiffs and other Class members. The Alger Defendants failed to reveal material facts concerning their conduct such that Plaintiffs and other Class members could have made informed decisions about the true value and performance of the Funds.

223.    As a direct and proximate result of defendants' foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages.

## COUNT TEN
## BREACH OF FIDUCIARY DUTIES

224.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

225.    This claim is brought pursuant to the common law of the states of Delaware, Massachusetts, New Jersey, and/or New York against each of the Alger Defendants.

226.    Each of the Alger Defendants owed fiduciary duties to Plaintiffs and the other members of the Class to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the Funds.  As part of their fiduciary duties to Plaintiffs

and the Class, each of the Alger Defendants also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing and late trading were complete and accurate, and to ensure that actions were taken to protect holders of shares of the Funds from damage caused by market timing and late trading.

227.    Each of the Alger Defendants intentionally or recklessly breached their fiduciary duties by allowing favored investors to engage in market timing and/or late trading of shares of the Funds, by misrepresenting and concealing the existence of such market timing and late trading, and by placing their own financial interests above those of Plaintiffs and the Class.

228.    The Alger Defendants' breaches of fiduciary duties tended to deceive, to violate public and private confidence, and to injure public interests.

229.    As a direct and proximate result of the Alger Defendants' breaches of fiduciary duties, Plaintiffs and other members of the Class suffered damages.

## COUNT ELEVEN
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

230.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

231.    This claim is brought pursuant to the common law of the states of Delaware, Massachusetts, New Jersey, and/or New York against each of the Alger Defendants.

232.    As alleged above, each of the Alger Defendants owed a fiduciary duty to Plaintiffs and the other members of the Class.

233.    The Alger Defendants breached their fiduciary duties, as alleged herein.

234. Each of the Alger Defendants knowingly aided, encouraged, cooperated, and/or participated in, and substantially assisted in, the other Alger Defendants' breaches of fiduciary duties.

235. As a direct and proximate result of the Alger Defendants' aiding and abetting of breaches of fiduciary duties, Plaintiffs and other members of the Class suffered damages.

## COUNT TWELVE
## BREACH OF CONTRACT

236. Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

237. This claim is brought pursuant to the common law of the states of Delaware, Massachusetts, New Jersey, and/or New York against each of the Registrants.

238. Each of the Registrants entered into a contract with Plaintiffs and the other members of the Class as to the terms of the management of investments in the Funds.  Each of the Registrants offered those terms to, *inter alia*, Plaintiffs and the other members of the Class, and Plaintiffs and the other members of the Class accepted.

239. The terms of the foregoing contract are manifested in the form of, among other things, the Prospectuses identified herein.

240. Plaintiffs and the other members of the Class performed under the contract by investing in the Funds.

241. In exchange for valuable consideration in the form of investments and payment of management fees by Plaintiffs and the other members of the Class, the Registrants covenanted to

protect Plaintiffs and the other members of the Class from the negative effects of market timing and late trading.

242.     As set forth above, the Registrants breached these covenants when they permitted certain favored investors to engage in market timing and late trading to the detriment of Plaintiffs and the other members of the Class.

243.     As a direct and proximate result of the Registrants' breaches of contract, Plaintiffs and the other members of the Class have suffered damages.

## COUNT THIRTEEN
## UNJUST ENRICHMENT

244.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

245.     This claim is brought pursuant to the common law of the states of Delaware, Massachusetts, New Jersey, and/or New York against all defendants.

246.     Defendants derived management fees, profits, and other benefits and were otherwise unjustly enriched from transactions connected with the Funds, to the detriment of Plaintiffs and the other members of the Class.

247.     Defendants' enrichment is directly and causally related to the detriment of Plaintiffs and the other members of the Class.

248.     The benefit was accepted by defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, defendants, among other

things, breached their fiduciary duties to Plaintiffs and the other members of the Class, and

therefore defendants are not justified to retain the benefits conferred upon them.

249.    To remedy defendants' unjust enrichment, the Court should order defendants to

disgorge their unjustly obtained benefits to Plaintiffs and the other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, pray for

relief and judgment, as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding Plaintiffs and the members of the Class compensatory damages in an amount which may be proven at trial, together with pre-judgment and post-judgment interest thereon;

c.    Ordering defendants to disgorge to Plaintiffs and the members of the Class their unjustly obtained benefits;

d.    Ordering rescission and rescissory damages as appropriate;

e.    Ordering equitable restitution and other equitable monetary relief as appropriate;

f.    Awarding Plaintiffs and the members of the Class punitive damages as appropriate;

g.    Awarding Plaintiffs and the members of the Class reasonable attorneys and expert witness fees and other costs;

h.    Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure plaintiffs have an effective remedy.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: <u>September 29, 2004</u>                    Respectfully submitted,

**SCHIFFRIN & BARROWAY, LLP**

By: <u> /s/                                         </u>
Richard S. Schiffrin
Robert B. Weiser
Eric L. Zagar
Thomas W. Grammar
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 677-7706
Fax: (610) 667-7056

**Lead Counsel for Plaintiffs
in the Alger Subtrack**

**MILBERG WEISS BERSHAD &**
  **SCHULMAN, LLP**
David J. Bershad
Kim E. Levy
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Fax: (212) 868-1229

**Counsel for Plaintiff Gerald Born**
**and Additional Class Counsel**