IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

| | |
|---|---|
| **IN RE MUTUAL FUNDS INVESTMENT LITIGATION**<br><br>**IN RE ALGER, COLUMBIA, JANUS, MFS, ONE GROUP, PUTNAM, PIMCO**<br><br>**This Document Relates To:**<br><br>**ALGER SUB-TRACK**<br><br>**Bernstein v. Fred Alger Management, Inc., *et. al.*** | **MDL DOCKET NO. 1586**<br><br>**Case No. 04-md-15863 (Hon. J. Frederick Motz)**<br><br><br><br><br><br>**Case Nos: 04-cv-861** |

## CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT

Plaintiffs David Grant, Jonathan Clain, James Laufer, Harry Schipper, Barbara Cordani, Joseph Cordani, and John Vining, derivatively on behalf of the mutual funds and trusts comprising the Alger family of mutual funds (the "Funds")[1], hereby complain against the defendants as follows:

## I.    SUMMARY OF THE ACTION

1.    This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including

---

[1]   As used herein, the term "Funds" or "Alger Fund Complex" refers to the entire family of Alger mutual funds which includes: 1) The Alger Funds, a Massachusetts business trust registered with the SEC as an investment company, offers the following eight mutual funds: Alger LargeCap Growth Fund, Alger MidCap Growth Fund, Alger SmallCap Growth Fund, Alger Capital Appreciation Fund, Alger SmallCap and MidCap Growth Fund, Alger Health Sciences Fund and Alger Balanced Fund, as well as Alger Spectra Fund; 2) The Spectra Fund; 3) the China – U.S. Growth fund; 4) The Alger Institutional Fund; 5) The Alger American Fund; and 6) the Castle Convertible Fund, Inc.  Each of the entities comprising the Alger Fund Complex is a registered investment company managed by Fred Alger Management, Inc. ("Alger Management"). The term "Trust", by itself, will refer to The Alger Funds.  The headquarters of the Funds are at 111 Fifth Avenue, New York, N.Y. 10003.

those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.     This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others, and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care. This Complaint also seeks redress for the harm caused by the Trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.     Market timing and late trading have been extremely harmful to the Funds.  Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds.  Market timing also causes serious, known disruptions to mutual funds and their operations.  Market timing forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position – cash that otherwise should be used to invest.  Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the Fund.  The effect of this is to reduce the returns earned by the Funds.

376651v3

4.      Market timing and late trading have harmed each and every Fund in the Alger family of mutual funds, whether or not the particular Fund was the direct victim of market timing or late trading.  This is so because some expenses, such service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and late trading may be shared among all Funds in the Alger family, including timed-funds and non-timed funds alike.  This is also so because investors have fled all the Funds in the Alger family of mutual funds, not just the timed funds,  following the public disclosure of the market timing and late trading scandal.

5.      Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter market timing, including redemption penalties.

6.      Conversely, market timing and late trading have been extremely profitable for market timers, and, moreover, impose little risk.  Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet.  Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

7.      Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves.  Thus, for example, a one day trade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off on the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

8.      Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities, which are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

9.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they permitted, facilitated, encouraged or participated in the improper activity.  At a minimum, the advisors failed to detect and/or prevent, market timing and late trading in the Funds – the types of abusive transactions they were obligated to prevent.  Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

10.      Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds.  As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles.  It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment advisers and their advised funds.  As fiduciaries, advisers owe their clients more than

mere honesty and good faith.  Recent experience suggests that all too many advisers were delivering much less.[2]

11.     The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds.  Those conflicts of interest have manifested themselves in widespread instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

12.     The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the Funds were not adequately disclosed to or understood by the trustees of the Funds, who nonetheless approved or ratified the Fund adviser's management agreements each year, despite the harm the adviser caused or permitted to the Funds and who approved or ratified plans permitting the adviser to charge and collect marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the trustees' own duties to the Funds.

13.     This action is brought by shareholders of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing.  These damages include, but are not limited to:

(a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

---

[2]     Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

(b)     damages to the Funds for profits earned by the Fund Adviser and its affiliates (including officers and employees of the Fund Adviser) from market timing or late trading arrangements;

(c)     damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)     damages to the Funds for 12b-1 fees paid to the Fund Adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.     This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the Funds, including but not limited to:

(e)     rescission of the adviser's management and other agreements with the Funds;

(f)     rescission of the 12b-1 Plans adopted by the Funds;

(g)     removal of the Fund adviser and its affiliates that manage and perform other services for the Funds; and

(h)     removal of each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees.

## II.   **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein because they arise out of and are part of the same case or controversy as plaintiffs' federal claims.

6

17.     Venue is proper in the transferor districts because some or all of the Defendants are incorporated or conduct business in and/or some of the wrongful acts alleged herein took place or originated in those judicial districts.  Venue is also proper in this District of Maryland because some of the wrongful acts alleged herein took place or originated in this judicial district.

18.     In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*, MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To preserve the filing dates of the original complaints for purposes of any applicable statutes of limitation and all other defenses based upon the passage of time, the plaintiffs herein expressly reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

III.     **PARTIES**

**Plaintiffs**

20.     Plaintiffs are as follows:

(a)     Plaintiff David Grant, a resident of New York, New York, is and was at all relevant times an owner and holder of Alger Spectra Fund.

(b)     Plaintiff James Laufer, a resident of New York, New York, is and was at all relevant times an owner and holder of Alger LargeCap Growth Fund.

7

(c)     Plaintiff Jonathan Clain, a resident of New York, New York, is and was at all relevant times an owner and holder of Alger Capital Appreciation Fund.

(d)     Plaintiff Harry Schipper, a resident of Teaneck, New Jersey, is and was at all relevant times an owner and holder of Alger Capital Appreciation Fund, through his IRA.

(e)     Plaintiff Barbara Cordani, a resident of Torrington, Connecticut, is and was at all relevant times an owner and holder of Alger Capital Appreciation Fund.

(f)     Plaintiff Joseph Cordani, a resident of Torrington, Connecticut, is and was at all relevant times an owner and holder of Alger Capital Appreciation Fund.

(g)     Plaintiff John Vining, a resident of Woburn, Massachusetts, is and was at all relevant times an owner and holder of Alger Midcap Growth Fund.

**The Adviser Defendant**

21.     The Adviser Defendant is as follows:

(a)     Defendant Fred Alger Management, Inc. (the "Adviser") is registered as an investment adviser under the Investment Advisers Act and managed and advised the Funds at all relevant times when the Funds were being timed and late traded.  The Adviser had ultimate responsibility for overseeing the day-to-day management of the Funds.

(b)     Alger Management has been in the business of providing investment advisory services since 1964 and, as of December 31, 2003, had approximately $10.88 billion under management, $6.59 billion in mutual fund accounts and $4.29 billion in other advisory accounts. Alger Management is owned by Alger Inc. which in turn is owned by Alger Associates, Inc., a financial services holding company.

(c)     The relationship between the Adviser Defendant and the Funds is governed by an Investment Management Agreement, discussed below.

8

**The Distributor Defendant**

22.     The Distributor Defendant is as follows:

(a)     Each of the Funds, other than the Money Market Funds, pays the distributor Fred Alger and Company, Incorporated (the "Distributor"), a shareholder servicing fee of .25% of the value of the Fund's average daily net assets.  The Distributor's headquarters is located at 30 Montgomery Street, Jersey City, NJ 07302.

(b)     The relationship between the Funds and the Distributor Defendant is governed by a Distributor Agreement, discussed below.

**The Trustee Defendants**

23.     The Trustees Defendant is as follows:

(a)     Defendant Fred M. Alger, III ("Mr. Alger") has been a trustee and/or officer of The Alger Funds, by various accounts according to The Alger Funds' SEC filings, since 1988 or 1986.  Mr. Alger has been a trustee and/or officer of Alger Spectra Funds, also by various accounts according to Alger Spectra Fund's SEC filings, since 1988, 1974 or 1972.  Mr. Alger also serves as Chairman of the Board of Alger Associates, Inc. ("Associates"),  Fred Alger & Company, Inc., Alger Management, Alger Properties, Inc. ("Properties"), Alger Shareholder Services, Inc. ("Services"), Alger Life Insurance Agency, Inc. ("Agency"), Fred Alger International Advisory S.A. ("International"), Alger SICAV, Analysts Resources, Inc. ("ARI"), The Alger Retirement Fund ("Retirement"), and five of the six investment companies in the Alger Fund Complex (22 funds total).  Mr. Alger is an "interested person" as defined in the Investment Company Act because of his affiliations with Alger Management and Alger Inc., the Fund's principal underwriter.

(b)      Defendant Dan C. Chung ("Chung") has been a trustee and/or officer of both The Alger Funds and Alger Spectra Fund since 2001.  Chung has also served as President since September 2003 and Chief Investment Officer and Director since 2001 of Alger Management; President since 2003 and President Director since 2001 of Associates, Properties, Services, Agency, International, and ARI.  Chung has served as a trustee of four of the six investment companies in the Alger Fund Complex (16 funds total) since 2001.  He was a senior analyst with Alger Management from 1998-2001.  Chung is an "interested person" as defined in the Investment Company Act because of his affiliations with Alger Management and Alger Inc., The Alger Fund's principal underwriter.  Mr. Chung is Mr. Alger's son-in-law.

(c)      Defendant Stephen E. O'Neil ("O'Neil") has been a trustee and/or officer of The Alger Funds, by various accounts according to The Alger Funds' SEC filings, since either 1986 or 1988.  O'Neil has been a trustee and/or officer of Alger Spectra Fund, by various accounts according to Alger Spectra Fund's SEC filings, since either 1972 or 1988.  O'Neil has been a trustee of all six investment companies in the Alger Fund Complex since the inception of each.  For FY:03, O'Neil received $8,000.00 in compensation for being a trustee for The Alger Funds, $8,000.00 for being a trustee of Alger Spectra Funds, and $38,000.00 in total compensation for being a trustee for all 23 of the funds in The Alger Funds Complex.  For FY:02, O'Neil received $8,000.00, $8,000.00 and $36,000.00, respectively.  For FY:01, O'Neil received $8,000.00, $8,000.00, and $36,000.00, respectively.  For FY:00, O'Neil received $8,000.00, $8,000.00, and 36,000.00, respectively.  For FY:99, O'Neil received $8,000.00, $6,250.00 and 34,250.00, respectively.  For FY:98, O'Neil received $8,000.00, $250.00, and 28,250.00, respectively.  O'Neil has been one of the three members of the only committee of The Alger Funds – the Audit Committee - since its inception in 2001.

(d)     Defendant Charles F. Baird, Jr. ("Baird") has been a trustee of the Funds since 2000.  Baird is a trustee of four of the six investment companies in the Alger Fund Complex.  For FY:03, Baird received $6,000.00 in compensation for being a trustee for The Alger Funds, $6,000.00 for being a trustee of Alger Spectra Fund, and $22,500.00 in total compensation for being a trustee for 16 of the funds in The Alger Funds Complex.  For FY:02, Baird received $6,000.00, $6,000.00, and $22,500.00, respectively.  For FY:01, Baird received $8,000.00, $8,000.00, and $30,000.00, respectively.   For FY:00, Baird received $4,000.00, $4,000.00, and $11,000.00, respectively.

(e)     Defendant Roger P. Cheever ("Cheever") has been a trustee of the Funds since 2000.  Cheever is a trustee of four of the six investment companies in the Alger Fund Complex.  For FY:03 Cheever received $8,000.00 in compensation for being a trustee for The Alger Funds, $8,000.00 for being a trustee of Alger Spectra Fund, and $30,000.00 in total compensation for being a trustee for 16 of the funds in The Alger Funds Complex.  For FY:02, Cheever received $8,000.00, $8,000.00, and $30,000.00, respectively.   For FY:01, Cheever received $8,000.00, $8,000.00, and $30,000.00, respectively.   For FY:00, Cheever received $4,000.00, $4,000.00, and $11,000.00, respectively.

(f)     Defendant Lester L. Colbert, Jr. ("Colbert") has been a trustee of the Funds since 2000.  Colbert is a trustee of five of the six investment companies in the Alger Fund Complex.  For FY:03, Colbert received $8,000.00 in compensation for being a trustee for The Alger Funds, $8,000.00 for being a trustee of Alger Spectra Fund, and $32,000.00 in total compensation for being a trustee for 17 of the funds in The Alger Funds Complex.  For FY:02, Colbert received $8,000.00, $8,000.00, and $30,000.00, respectively.   For FY:01, Colbert received $8,000.00, $8,000.00, and $30,000.00, respectively.   For FY:00, Colbert received

11

$4,000.00, $4,000.00, and $19,000.00, respectively.  Colbert has been one of the three members of the only committee of The Alger Funds – the Audit Committee - since its inception in 2001.

(g)    Defendant Nathan E. Saint-Amand ("Saint-Amand") has been a trustee and/or officer of The Alger Funds, by various accounts according to The Alger Funds' SEC filings, since either 1986 or 1988.  Saint-Amand has been a trustee and/or officer of Alger Spectra Fund, also by various accounts according to Alger Spectra Fund's SEC filings, since either 1986 or 1988.  Saint-Amand has been a trustee of each of the six investment companies in the Alger Fund complex since their inception.  Saint-Amand was one of the only three members of the only committee of The Alger Funds, the Audit Committee.  For FY:03, FY:02, FY:01 and FY:00, Saint-Amand received $8,000.00 in compensation for being a trustee for The Alger Funds, $8,000.00 for being a trustee of Alger Spectra Fund, and $36,000.00 in total compensation for being a trustee for all 23 of the funds in The Alger Funds Complex.  For FY:99, Saint-Amand received $8,000.00, $6,250.00, and $34,250.00, respectively.  For FY:98, Saint-Amand received $8,000.00, $250.00, and $28,250.00, respectively.

(h)    Defendant James P. Connelly, Jr. ("Connelly") was a trustee and/or officer of the Funds from 2000 to 2003.  Connelly served as executive vice president of Alger Inc., vice chairman of Retirement and Castle, and director of International and SICAV   Connelly also served as executive vice president of Alger Inc. and was a trustee of four of the funds in the Alger Fund Complex.

(i)    Defendant B. Joseph White ("White") was a trustee and/or officer of the Funds at all relevant times until 2003.  White served as Managing Director of Alger Management and was a trustee of four of the funds in the Alger Fund Complex.

12

24.     The Nominal Defendants are the Funds or The Alger Funds Complex as defined above.

[¶¶ 24 through 30 are intentionally left blank.]

**<u>Additional Defendants</u>**

31.     Additional defendants are as follows:

(a)     Defendant Aurum Securities Corp. ("Aurum"), a California corporation, is a registered investment advisor and Broker-Dealer, with offices at 120 Montgomery Street, San Francisco, California.  Aurum was an active participant in the unlawful scheme alleged herein.

(b)     Defendant Aurum Capital Management Corp. ("Aurum Capital"), a California corporation, is a registered investment advisory firm headquartered at 84 West Santa Clara Street, Suite 690, San Jose, California. Aurum Capital is an affiliate of Aurum.  Aurum Capital was an active participant in the unlawful scheme alleged herein.

(c)     Bank of America Corp. ("BOA") is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[3]  BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products.  BOA is the indirect parent of Banc of America Securities LLC.

(d)     Defendant Banc of America Securities LLC ("BAS"), a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is wholly owned by BOA.  BAS, a registered broker-dealer, is a full-

---

[3]   Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina. BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940. In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

(e)     Defendant Ryan Goldberg ("Goldberg") is a registered broker-dealer who was employed by Brean Murray, Inc. Goldberg introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds. Goldberg further engaged in the market timing scheme by arranging for the execution of timing trades on behalf of Canary and other timers. In addition, Goldberg sold "under the radar" timing to various brokers and hedge funds involved in market timing.

(f)     Defendant Conseco Securities, Inc. ("Conseco"), a Delaware Corporation, is a registered broker-dealer headquartered at 11815 North Pennsylvania Street, Carmel, Indiana. Among other things, Conseco is a broker-dealer selling variable life insurance or annuities and a mutual fund retailer. Conseco was an active participant in the unlawful scheme alleged herein.

(g)     Defendant Kaplan & Co. Securities, Inc. ("Kaplan"), a Florida corporation, is a registered investment adviser and broker-dealer headquartered at 150 East Palmetto Park Road, Suite 150, Boca Raton, Florida, 33432. Among other things, Kaplan is a retailer of mutual funds and variable life insurance or annuities. Kaplan introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds. Kaplan further engaged in the market timing scheme by executing timed

14

trades on behalf of Canary and other timers.  In addition, Kaplan sold "under the radar" timing to various brokers and hedge funds involved in market timing.  In addition, Kaplan offered, through its various clearers, late trading capacity both for negotiated and "under the radar timing."

(h)     Pritchard Capital Partners LLC ("Pritchard"), a Louisiana limited liability company, is a registered investment advisor and Broker-Dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana.  Pritchard was an active participant in the unlawful scheme alleged herein.

(i)     Defendant Salomon Smith Barney Inc. ("Salomon"), a New York corporation, is a division of Citigroup Global Markets, Inc. and a wholly owned subsidiary of Citigroup, is a registered investment advisor and broker-dealer headquartered at 333 West 34th Street, 7th Floor, New York, New York.  Among other things, Salomon is a retailer of mutual funds and variable life insurance or annuities.  Salomon introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds.  Salomon further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.

(j)     Defendant Trautman Wasserman & Company, Inc. ("Trautman"), a Delaware corporation, is a registered investment advisor and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.  Trautman was an active participant in the unlawful scheme alleged herein.

(k)     Defendant Wall Street Global ("Global") is a broker-dealer with headquarters at 25 Broad Street, 20th Floor, New York, NY 10004.

376651v3

**Timer Defendants**

(l)     Canary Capital Partners, LLC ("Canary"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds.  Canary Capital Partners, Ltd. ("CCP Ltd."), is a Bermuda limited liability company.  At all relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds.  Canary Investment Management, LLC ("CIM"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.  At all relevant times, CIM managed the assets of Canary and CCP Ltd. in exchange for a fee equal to 1.5 percent of the assets of Canary plus 25 percent of the profits above a certain threshold.  As of July 2003, CIM had received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

(m)     Edward J. Stern ("Stern") is a resident of New York County, New York and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM.  Noah Lerner ("Lerner") was at all relevant times an employee of Canary.  Andrew Goodwin ("Goodwin") was at all relevant times up to 2001 an employee of Canary.

(n)     Canary, CCP Ltd., CIM, and Stern are collectively referred to herein sometimes as "Canary."   In September 2003, Canary reached a settlement of charges filed against it by the Attorney General of the State of New York.

(o)     Defendant Veras Investment Partners, LLP ("Veras") is a Texas based hedge fund, who was an active participant in the unlawful acts alleged herein

16

**Nominal Defendants**

32.     The Nominal Defendants are the Funds or The Alger Funds Complex as defined above.

**IV.     STATEMENT OF FACTS**

      **A.     General Factual Allegations**

            **(1)     Introduction**

33.     Mutual funds enable small investors to invest long-term capital in the stock and bond markets.   Specifically, mutual funds were intended to enable small investors to (a) accumulate diversified stock portfolios for retirement or other long-term investing with smaller amounts of capital than otherwise would be required for such investing, (b) avoid the transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services of professional investment advisers whose services otherwise would not be available at affordable prices.

34.     Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.   Mutual fund shares are issued pursuant to prospectuses that must comply with the Securities Act of 1933 and the Investment Company Act.   The investor's cash is then used by the mutual fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual funds typically have no employees.   Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.   The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds and the creation of new funds in the series.

376651v3

37.     Whether corporation or trust, typically all of the trustees are the same individuals and have the same responsibilities, the only difference between trustees being the form of entity they serve.  Trustees have ultimate responsibility for the funds.

38.     Each of the funds is created and sponsored by the adviser and is managed under the supervision of approximately 8-10 trustees.  The same trustees have supervised all the funds at all times relevant hereto, and their meetings for all the Funds occur at or about the same time.  Each of the funds has the same adviser, who in turn appoints the same trustees, the same distributor, the same custodian, and the same transfer agent for all the funds, all of whom serve indefinite terms.  The agreements between the funds and each of these entities are substantially identical form agreements, with only minor differences only in fee percentages.  In many instances, the funds share costs among themselves.  In substance, all the funds are operated as a single *de facto* entity.  Plaintiffs therefore bring this action as a derivative action on behalf of the entire Alger family of funds, as well as on behalf of the particular Funds in which they invested.

39.     The trust or corporation contracts with an adviser or manager to handle the day-to-day operations of the fund including making investment decisions, although the trustees retain ultimate responsibility for the fund.  The adviser or the trust will enter into contracts with other entities, which in almost all instances are affiliates of the adviser, for investment advisory servicing (adviser, sub-adviser), selling or underwriting (distributors), shareholder relations and other back-office services (administrator).  Each of these affiliates typically will be paid a percentage of the adviser's fee, a percentage of the assets under management, or a transaction fee from the Net Asset Value of the fund.

40.     Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of

18

assets under management.  Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

(2)   **NAV Pricing**

41.     Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00 p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

42.     Because NAV is set just once at 4:00 p.m. every day under the forward pricing rule, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

43.     Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

19

(3)   **Market Timing Transactions**

44.     Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds – where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets – the duration of the round trip will be slightly longer.

45.     Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

46.     Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

47.     Many market timers purchase mutual funds when trading models analyzing performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

48.     By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and sale of stock, which costs are borne by the fund itself.

49.     Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio.  These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

50.     One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities.  Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time.  When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.   If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low.  A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

51.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes available

while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

52.     Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

53.     Yet another market timing scheme is "liquidity arbitrage."  Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies.  The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

### (4)     Late Trading

54.     Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading."  Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares *after* 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV.

55.     Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or

redeeming shares on bad news at prices that do not reflect those events and are therefore under-
or over-valued, respectively.  "Late trading can be analogized to betting today on yesterday's
horse races."[4]  The manipulative device virtually eliminates investment risk.

56.    The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund
that the late trader buys or redeems.  When the late trader redeems his shares and claims his
profit, the mutual fund manager has to either sell stock or use cash on hand – stock and cash that
belong to the fund and its shareholders and would otherwise remain invested – to give the late
trader his gain.  The late trader's profit is revenue withheld from the mutual fund.  The forward
pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R. §270.22c-1(a).

57.    Late trading can be accomplished in at least two different ways.  The first way
market timers are able to trade late is by making arrangements with a mutual fund adviser or a
third-party intermediary who has made arrangements with a mutual fund adviser to have access
to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS provided
trading terminals to at least three broker-dealers that engaged in market timing and Canary – in
effect, making them branch offices of BAS, but unencumbered by BAS's obligation to adhere to
the forward pricing rule – giving them the ability to place orders for mutual fund shares as late as
6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York
each day.

58.    Market timers are also able to trade late by making arrangements with
intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine the
market timers' trades with other mutual fund purchases or redemptions each day, which are
processed as batch orders.  These intermediaries net purchases against redemptions, and submit

---

[4]  *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

59.     Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.   The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

60.     Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.   For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents.   These intermediaries sometimes blended late trades with legitimate trades in the net order information submitted to FundSERV in order to conceal the late trading.   In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m.   Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m. Finally, some late traders were given trading platforms, integrated hardware-software systems that allowed them to trade mutual fund shares directly without using an intermediary to submit orders to FundSERV.   In some cases fund managers themselves permitted and aided late trading by fund investors.

61.     Late traders were not necessarily restricted to trading in any single fund family through these schemes.   Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."   It is not unusual for a single Supermarket to offer thousands

of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

62.    Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

### (5)    Mutual Fund "Short Selling" Strategy

63.    A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio.  Using this technique timers were able to profit in both rising and falling markets.  Generally, fund managers do not disclose the portfolio holding information of the funds they manage.  Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available.  In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar.  However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell short[5] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer

___

[5]  Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

would close out the short position, again earning a quick profit.  By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timers in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

**(6)   Market Timing Is Easy to Detect and Has Been Well-Known Since 1997**

64.    Market timing in mutual funds has occurred at least since the late 1980s.  During the 1980s and 1990s, a number of papers and reports were published by the media, by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the Putnam International Equities Fund No Action Letter, Fed. Sec. L. Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

65.    Prior to September 3, 2003, market timing and late trading had become common practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

66.    In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

26

67.     Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance. Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

68.     Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer. The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers. These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

69.     However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

70.     Market timing is easy to detect through shareholder turnover data. A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds. Because timers make frequent "round trips," when a timer is active in the fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

71.     A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of redemptions-to-shares outstanding.  Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

72.     Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

73.     By 1997, market timing in mutual funds was well-known and well-documented. During October, 1997, Asian markets were experiencing severe volatility.  On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market.  Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternate method to calculate NAV.  Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

74.     On November 5, 1997 the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil.  *See Mutual Funds Fight the 'Market Timers,'* Wall St. J., 11/5/97, C1.  For example, the article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual

funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

75.     The SEC's investigation of fund companies' responses to the October, 1997, turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.  Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."  *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI Securities Law Procedures Conference (Dec. 4, 1997).

76.     By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors.  *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

77.     One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers.  *See* Eric Zitzewitz, *Who Cares About Shareholders?  Arbitrage-Proofing Mutual Funds*, Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.

78.     By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated.  One firm, ITG, now

offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S." *See* http://www.itginc.com/research/fvm.html.

(7)     **Market Timing Arrangements**

79.     Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families.  The authority to time mutual funds is known as "capacity."  Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

80.     Timers, the intermediaries, and the Funds' managers and advisers entered into *specific negotiated agreements* to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades.  Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which *guarantees* profits.

81.     Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

82.     Market timers frequently offered mutual advisers, distributors, and their affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time.  In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

30

83.     As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003 before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Government Affairs:[6]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders:** 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing - *i.e.*, these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies, and in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations.  We are aggressively following up on these arrangements.

> **Quid pro quo arrangements:** Although the information provided in this area is limited, it appears that many of the person proposing a special arrangements to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex.  In most of the situations where sticky assts were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

84.     Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers.  Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

85.     Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and

---

[6]  *Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs*, 108th Cong. (Nov. 3,2003) (testimony of Stephen M. Cutler, Trustee(s), Division of Enforcement, U.S. Securities & Exchange Commission).  Mr. Cutler offered the same testimony on Nov. 4, 2003, before the *House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services.*

brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the other financial institutions as well as the market timers.

86.     Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing consisted of loans for market timing and late trading, and swaps for shorting.  The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit.

87.     Broker-dealers and other intermediaries who offered timing capacity received remuneration from both the mutual funds themselves and the market timers to whom they allocated capacity.

88.     Distributors and other service agents who permitted timing also benefited by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.  Distributors often receive fees based on assets under management and may earn commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.

89.     Intermediaries who facilitated market timing also received "wrap fees" from market timers.  Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager. Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis.  The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee – usually from 1 to 3 percent of assets.  Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

90.     Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's primary distributor, usually an affiliate of the adviser.  Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares.  The broker-dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds.  However, broker-dealers who offered timing capacity often received 12b-1 Fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

91.     Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes.  For example, market timers frequently traded through third parties, *i.e.*, broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies *en masse*.  By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts.  This is one example of market timing "under the radar."

92.     Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds

ostensibly to detect and prevent market timing.  Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors were exempt from the restrictions.

93.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.  These tactics included: (a) using multiple account numbers, registered representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families.  Some market timers employed these tactics directly, without relying on an intermediary broker.

### Banc of America Securities LLC

94.     Some time prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

95.     RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem.  In effect, those who had the box became branches of BAS.

96.     Those market timers and broker-dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m.

closing price up to 3-1/2 hours later.  BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

97.     The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

98.     In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

99.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and defendant Aurum, a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

100.     BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave the box to defendant Aurum in around late 1999 or early 2000, to defendant Trautman in or about early 2001, and to defendant Pritchard in early 2003.  Each of these broker-dealers was charged $10 for each trade that was entered through the box.

101.     BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws.  By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

35

102.     BAS also installed the box in Canary's offices in or around the summer 2001, but did not charge any fee to Canary for orders placed through the box.  Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

103.     On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies.  The SEC charged Siphol[7] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

> *"Manual" Late Trading at BAS*
>
> 15.     In or around May 2001, Canary began to late trade the Nations Funds.   At first, Canary conducted its late trading "manually."   In the manual stage, Canary was able to engage in late trading primarily because Sihpol and his team falsified BAS' books and records.  Prior to 4:00 p.m. ET, a Canary trader would send Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile.  Upon receipt, Sihpol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening.  Thus, Sihpol created false order tickets that made it appear as if the orders had been received prior to 4:00 p.m. ET.

---

[7]   Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

36

16.     Sometime after 4:00 p.m. ET, a Canary trader would telephone Sihpol or a member of his team, and would either confirm or cancel the "proposed" trades.  If confirmed, Sihpol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing.  As a result, Canary would receive that day's NAV.  If Canary cancelled the "order," Sihpol or a member of his team would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.     In the summer of 2001, BAS technicians installed the direct access system in Canary's offices.  Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.     After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered. The trader then faxed the document to Sihpol or a member of his team.  The following day, Sihpol or a member of his team would use this document to reconcile Canary's trades.  Once the trades were reconciled, Sihpol or a member of his team discarded the document.

19.     From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade.  Canary also late traded "manually" whenever there were technical problems with the electronic system.  BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.     The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.  By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

21.     Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link.  Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

104.    By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices. In addition, the Corporation announced that it will provide restitution for shareholders of **third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation** in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

105.    On March 15, 2004, the SEC and the New York Attorney General announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing. BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

106.    The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed as a result of market timing in Nations Funds and **other mutual funds through Bank of America**." (Emphasis added). In the same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading. Bank of America not only permitted timing in its own funds, **it provided the instruments for timing and late trading of numerous other funds through its broker-dealer. This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again**.

107.    BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to

38

Nations Funds shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades.  Thus, ***BOA itself attributed $350 million of its $375 million monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families***.

108.    In further recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

109.    Between late 1999 through 2003, BAS, either manually or by providing the box, allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

**BAS Facilitates Trading in Alger Funds For Aurum, Trautman and Pritchard**

110.    Defendant BAS, by providing the box to the Aurum defendants, Trautman, and Pritchard, facilitated their late trading and timing in the Funds, as follows:

| Fund Name: | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Alger LargeCap Growth A | 18,131,188 | 152,195,686 | 152,843,940 |
| Alger Small Cap A | 557,840 | 2,108,518 | 2,119,381 |
| Alger Balanced A | 36,345 | 700,000 | 706,542 |
| Alger MidCap Growth A | 17,482,737 | 115,306,948 | 115,303,751 |
| Alger Capital Apprec A | 4,996,254 | 41,771,269 | 41,662,099 |
| **TOTAL** | 41,174,365 | $312,082,421 | $312,635,713 |

111.    Defendant BAS, by providing the box to Canary, facilitated Canary's late trading and timing in the Funds, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Alger Small Cap A | 17,651,401 | 52,279,599 | 56,022,223 |
| Alger MidCap Growth A | 21,066,147 | 126,521,323 | 127,588,147 |
| Spectra A | 25,931,343 | 131,719,867 | 132,686,050 |
| Alger LargeCap Growth A | 4,415,459 | 36,036,887 | 36,069,145 |
| Alger Capital Apprec A | 5,052,576 | 35,961,289 | 35,931,107 |
| **TOTAL** | 74,116,926 | $382,518,965 | $388,296,672 |

## Canary

112.    In or about summer 2001, as part of a package deal with BAS that included late trading and timing capacity in the Nations funds, financing for late trading and timing trades in Nations funds and other mutual funds, and unlimited capacity to late trade and time hundreds of other mutual funds, defendant BAS installed the "box," free of charge, at Canary's offices in Secaucus, New Jersey.  The deal is memorialized in a letter dated May 1, 2001 by Stern to Siphol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a time of day that is a little bit earlier than Matt [Augliero, a mutual fund clearing specialist at BAS] specified in our first meeting.  As soon as we can work out our lending arrangement with the bank and begin transacting electronically via ADP [i.e., the box], we will draw down leverage against the capital we have deployed in the Nations funds, effectively increasing our trading capital with your firm to $32 million. If all goes well, this capital should grow larger as we get a sense of what trades can and cannot be done via the Banc of America Securities Platform.  We really would like to get going with ADP and begin trading electronically as soon as possible.

113.    Canary executed a total of $388,296,672 in late trading and timing trades in the Funds through its BAS box.

**Aurum, Trautman and Pritchard Trading in Alger Funds Through BAS**

114.    As set forth above, the Aurum Defendants, Trautman and Pritchard were brokers/timers that had agreements with BAS that enabled them to late trade and time mutual funds through the BAS "box."  These defendants late traded and timed mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

115.    The Aurum Defendants, which had the box since about late 1999 or early 2000, late traded and timed the Funds, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Alger Capital Apprec A | 566,820 | 5,061,216 | 5,087,731 |
| Alger LargeCap Growth A | 501,685 | 5,054,234 | 5,071,854 |
| Alger MidCap Growth A | 7,383,932 | 53,950,025 | 53,902,814 |
| **TOTAL** | 8,452,438 | $64,065,476 | $64,062,399 |

116.    Trautman, which had the box since about early 2001, late traded and timed the Funds as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Alger LargeCap Growth A | 17,629,503 | 147,141,452 | 147,772,086 |
| Alger Capital Apprec A | 4,399,434 | 36,710,053 | 36,574,368 |
| **TOTAL** | 22,028,937 | $183,851,505 | $184,346,454 |

376651v3

117.    Pritchard, which had the box since about early 2003, late traded and timed the Funds, as follows:

| Fund Name | Number of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales |
|---|---|---|---|
| Alger MidCap Growth A | 10,098,804 | 61,356,922 | 61,400,937 |
| Alger Small Cap A | 557,840 | 2,108,518 | 2,119,381 |
| Alger Balanced A | 36,345 | 700,000 | 706,542 |
| **TOTAL** | 10,692,989 | $64,165,440 | $64,226,861 |

118.    The late trading and timing orders that were processed through the box consisted of both "under the radar" late trading and timing, and late trading and timing arranged between the Aurum Defendants, Trautman, and Pritchard, or their intermediaries, on the one hand, and mutual fund advisers, on the other hand. Upon information and belief, these defendants, or their intermediaries, received wrap fees for providing under the radar or negotiated late trading/timing capacity in mutual funds.

119.    Even where late trading and timing was "under the radar," mutual fund advisers knew that funds were being timed by the sheer volume of asset turnover in the funds.  One advantage to the brokers and timers that late traded and/or timed "under the radar" – as the Aurum Defendants, Trautman and Pritchard sometimes did – was that they avoided paying wrap fees to the mutual fund families.  Where there was a negotiated timing arrangement with a mutual fund family, the defendants often shared wrap fees they received with the mutual fund family advisers.

**[¶¶120 THROUGH 250 ARE INTENTIONALLY LEFT BLANK]**

376651v3

(8)     **Impact of Market Timing**

251.    Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments.  Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts.  Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.    Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways.  The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.    Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the Funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.    Dead Weight includes, but is not limited to, the following:

(a)     increased service agent fees, such as transfer agent, compliance administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)     statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)     higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

43

(d)      lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)      inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (*e.g.*, buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)      transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)      interest on borrowing to maintain the mutual funds' position in the underlying portfolio securities; and

(h)      increased expenses for fixed costs (including trustee or Trustee(s) expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to

44

invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.   Dead Weight harms not only the funds that are timed, but can also harm non-timed funds.  Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.  Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.  Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.  This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.  If fees are calculated on a transactional basis, the costs are increased directly.  If fees are calculated as a percentage of assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions.   Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.   Non-timed funds were also harmed by increased expense ratios resulting from market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal.  Fixed costs, such as Trustee(s)'s fees, are shared among funds and are accrued daily.  When large numbers of investors redeemed their shares after discovering that the funds were implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.   Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.   In addition to exposing mutual funds to Dead Weight, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets.  When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises.  The timer therefore pays less than the true value of the fund share.  When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation."  The timer's unearned appreciation results in dilution of the fund's NAV dollar for dollar.

260.   Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.  Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.   Late trading in particular dilutes the assets of a mutual fund.  When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV.  However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased.  Since the timer's money is either invested at a non-stale price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities.  The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution.  The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices.  Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**B.    Fund Family Specific Facts**

264.    In September 2003, Alger was served with subpoenas by the NYAG and the SEC. On October 16, 2003, the NYAG and the SEC announced that their coordinated investigation had uncovered that defendant Connelly spearheaded a timing scheme at Alger dating back to the mid-1990's by establishing timing arrangements for defendant Veras and other favored investors. The agencies further announced that Connelly pleaded guilty to "tampering with physical evidence" for "his repeated tampering with an ongoing investigation of illegal trading practices

in the mutual funds industry," following the announcement of the filing of the Spitzer Complaint on September 3, 2003.

265.    The SEC, in an Order Instituting Public Administrative and Cease-and-Desist Proceedings, issued on October 16, 2003, detailed Connelly's practice of allowing certain investors, such as Veras, to market time the Funds in return for such investors parking sticky assets in various Alger financial vehicles, as follows:

> From the mid-1990's until 2003, Connelly was involved in allocating timing capacity in Alger mutual funds to timing investors. Connelly regularly authorized select investors to time the Alger Fund. Connelly did this even though he knew that the timers were making more than the permitted six exchanges per year. Defendant Veras Investment Partners was identified by the SEC as being allowed to "time $50 million in the Alger Fund in exchange for a $10 million buy and hold position in the smallcap fund."

> Connelly approved agreements permitting select investors to "time" Alger mutual funds. "Timing" refers to the practice of short term buying and selling of mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Timing can adversely affect mutual fund shareholders because it can dilute the value of their shares. Consequently, mutual fund managers such as Alger Management often maintain policies and procedures to detect and prevent timing. By allowing select investors to time Alger funds, Connelly violated the antifraud provisions of the federal securities laws.

> *        *        *

> Investors seeking timing capacity usually offered to commit assets to other funds in the Alger complex. These assets were referred to as "buy and hold" positions. (Buy and hold positions are also referred to as "sticky assets.") Over time, Connelly developed a de facto practice of requiring that timers commit assets to buy and hold positions to earn access to timing capacity. In early 2003, Connelly formalized this practice by requiring that investors seeking timing capacity maintain at least 20 percent of their investment in buy and hold positions.

> For example, in February 2003, Connelly was seeking to obtain additional assets for an Alger smallcap fund. Connelly approved an arrangement whereby Veras Investment Partners ("Veras") could time $50 million in the Alger Fund in exchange for a $10 million buy and hold position in the smallcap fund. In July 2003, Veras was granted an additional $30 million

376651v3

of capacity in exchange for an additional $12 million buy and hold position.

266.     The SEC also found that Connelly established a "timing police" to find and shut down "investors that were timing without approval," – *i.e.* those who did not pay to play.  By 2003, according to the SEC, the Funds were being timed by "more than one dozen timers with approximately $200 million of timing funds invested in Alger mutual funds."  The SEC also determined that Connelly's timing scheme constituted a "wilfull[] violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder . . ." and a "willfull[] violation of Sections 206 (1) and 206 (2) of the Advisers Act. . .," and other provisions of the federal securities laws.

267.     In an October 17, 2003 SriMedia article, Stephen M. Cutler, Director of the SEC Division of Enforcement, was quoted as saying:

> By approving timing arrangements with select investors, Mr. Connelly put his own firm's bottom line ahead of the interests of the fund shareholders he was entrusted to protect. Such conduct is a fundamental breach of an investment adviser's fiduciary duties and warrants tough sanctions. Accordingly, we have sought and obtained from Mr. Connelly a lifetime bar from the securities industry as well as a significant monetary penalty.

268.     A Business Week Online article dated January 12, 2004, commented on defendant Connelly's sentence:

> On Dec. 17, James P. Connelly Jr., the 40-year-old former vice-chair of Fred Alger & Co., became the first mutual-fund executive to be sentenced to jail (one to three years). That must have been particularly shocking to this roster of onetime luminaries now humbled.

269.     On March 3, 2004, the Boston Business Journal commented on the defendants' continuing problems with state regulators:

> Massachusetts regulators are investigating trading practices at Fred Alger Management Inc., a New York based mutual fund company whose vice chairman was sentenced to prison in connection with improper mutual fund trading.

376651v3

270.   Joining Massachusetts in the investigation was West Virginia:

> Massachusetts Secretary of the Commonwealth William Galvin and officials in West Virginia have requested information about trading in the Alger funds, Alger reported in a filing with the Securities and Exchange Commission.

> Alger, which manages $10.8 billion, also is under investigation by New York Attorney General Eliot Spitzer and the Securities and Exchange Commission. Alger said in its filing that the inquiries concern rapid short-term legal but discouraged trades known as "market timing," and illegal after-hours trading.

271.   The Prospectus of The Alger Funds dated February 28, 2003 warned, in a section titled "Statement of Additional Information," that investors' trading activity would be limited as follows:

> You may make up to six exchanges annually by telephone or in writing. The Fund may charge a transaction fee for each exchange, although it does not intend to do so at present.  You will be notified at least 60 days in advance if the Fund decides to impose this fee.  The Fund reserves the right to terminate or modify the exchange privilege upon notice to shareholders.

272.   Nevertheless, the Adviser Defendant disregarded the Prospectus by allowing the timing of the Funds.  In so doing, the Adviser was enriched at the expense of the Fund Shareholders.

(a)     Contrary to the express representations in the prospectuses, the Funds enforced their policy against frequent traders selectively, *i.e.*, they did not enforce it against favored investors and waived the redemption fees, at the expense of ordinary investors in the Funds, that the favored investors should have been required to pay, pursuant to stated polices of the Funds;

(b)     The Adviser Defendant regularly allowed favored investors to engage in trades that were disruptive to the efficient management of the Funds and/or increased the Funds' costs and thereby reduced the Funds' actual performance; and

(c)     The amount of compensation paid by the Funds to Fred Alger Management because of the secret agreement with favored defendants and others provided additional undisclosed compensation to Fred Alger Management by the Funds and their respective shareholders, including plaintiffs.

**C.     Fee Structure of the Alger Funds**

**(1)     Investment Management Agreement**

273.     By permitting selective market timing, the Adviser Defendant was liable for willful malfeasance by knowingly violating the Investment Management Agreement.

274.     The Adviser Defendant breached its obligations under the Investment Management Agreement by facilitating and participating in the timing of the Funds by hedge funds and their brokers. Moreover, the Trustees violated both the Agreement and their fiduciary duties to the Funds by failing to restrain the Adviser Defendant from such timing activity.

275.     The relationship between the Adviser Defendant and the Funds is guided by an Investment Management Agreement. One such agreement was dated May 8, 2002 between the Adviser Defendant and The Alger Fund and the Alger Smallcap and Midcap Portfolio. Under that agreement, which was "subject to the supervision and direction of the Board of Trustees of the Fund," the Adviser Defendant agreed to act "in strict conformity with the Fund's Agreement and Declaration of Trust, the Investment Company Act of 1940 … and the Investment Advisers Act of 1940." The Adviser Defendant also agreed to "manage the Portfolio [of the Funds] in accordance with the Portfolio's investment objectives and policies as stated in the Fund's Prospectus." The Adviser Defendant also agreed that it would be liable to the Funds for any "willful misfeasance, bad faith, or gross negligence on its part in the performance of its duties or by reason of Alger's [Adviser Defendant] reckless disregard of its obligations and duties under this Agreement." The Investment Management Agreement was to continue until October 31,

51

2003 and then "continue automatically for successive annual periods" so long as the Trustees approved the Agreement at least annually.

### (2)   Distribution Agreement

276.   The relationship between the Funds and the Distributor Defendant is governed by a Distribution Agreement. One such agreement was executed on October 24, 1986. Under its terms, the agreement was to remain in force until 1988 and then continue automatically for successive annual periods provided the Trustees specifically approve the agreement annually.

277.   Under the Distribution Agreement, the Distributor Defendant was obligated to "use its best efforts to solicit orders for the sale of the Shares [of the Funds] at the public offering price." The Distributor Defendant also agreed to "comply with all applicable laws, rules and regulations, including, without limitation, all rules and regulations made or adopted by the Securities and Exchange Commission …." The Distributor Defendant was also obligated to "prepare and deliver reports to the Treasurer of the Fund, for review by the Trustees, on a regular, at least quarterly, basis showing the distribution expenses expected to be incurred in the ensuing quarter pursuant to this Agreement and the Plan and the purposes therefore." The Distributor Defendant and the Funds, pursuant to the Distribution Agreement, also executed a distribution plan ("Distribution Plan") which set forth the details of the allowable costs of such distribution as foreseen in the Distribution Agreement which had to be approved by the Trustees.

278.   By facilitating the improper timing of the Funds, the Distributor Defendant violated the Distribution Agreement. Moreover, since the Trustees were kept informed by the Distributor Defendant, they were made aware of the improper facilitation of timing activity by the Distributor Defendant and failed to take action to protect the Funds in violation of their fiduciary duty to the Funds.

279.    The Distribution Agreement and the Distribution Plan relate to Rule 12b-1 fees, sometimes described as "asset-based sales charges," that allow the Distributor Defendant to compensate dealers that sell Class B or C Shares of the funds.  Reimbursable distribution expenses covered under the Class B Plan may include payments made to and expenses of persons who are engaged in, or provide support services in connection with, the distribution of the class's shares, such as answering routine telephone inquiries for prospective shareholders; compensation in the form of sales concessions and continuing compensation paid to securities dealers whose customers hold shares of the class; costs related to the formulation and implementation of marketing and promotional activities, including direct mail promotions and television, radio, newspaper, magazine and other mass media advertising; costs of printing and distributing prospectuses and reports to prospective shareholders of the class; costs involved in preparing, printing and distributing sales literature for the class; and costs involved in obtaining whatever information, analyses and reports with respect to marketing and promotional activities on behalf of the class that the Fund deems advisable.

280.    The Plan for Class C Shares annually pays a flat percentage (up to .75 percent) of the class's average daily net assets to the dealers, regardless of whether the associated distribution expenses incurred are higher or lower than the fee.  No excess distribution expense is carried forward to subsequent years under this Plan.

281.    Distribution services for which the Distributor Defendant is compensated under the Class C Plan includes organizing and conducting sales seminars, advertising programs, payment of finders' fees, printing of prospectuses and statements of additional information and reports for other than existing shareholders, preparation and distribution of advertising material and sales literature, overhead, supplemental payments to dealers and other institutions as asset-

53

based sales charges or as payments of commissions or service fees, and the costs of administering the Plan.

282.    The Distributor Defendant has acknowledged that payments under the Plans are subject to the approval of the trustees and that no fund is contractually obligated to make payments in any amount or at any time, including payments in reimbursement of the Distributor Defendant for expenses and interest thereon incurred in a prior year.  Under their terms, the Plans remain in effect from year to year, provided in each case that they are approved annually by vote of the trustees, including a majority of the trustees who are not interested persons.

283.    A Plan may not be amended to increase materially the amount to be spent for the services provided by the Distributor Defendant without the approval of shareholders of the applicable class, and all material amendments of a Plan must be approved by the trustees in the manner described above.

284.    A Plan may be terminated at any time, without penalty, by vote of a majority of the independent trustees or, with respect to the Class B or Class C Shares of any of the eight funds to which a Plan relates, by a vote of a majority of the outstanding voting securities of the class, on not more than thirty days' written notice to any other party to the Plan.  If a Plan is terminated, or not renewed with respect to one or more funds, it may continue in effect with respect to the Class B or Class C Shares of any fund as to which it has not been terminated, or has been renewed.

(3)    **Additional Fees**

285.    In addition to the Management Fees, computed daily and paid monthly at annual rates based on a percentage of the value of the relevant portfolio's average daily net assets, and the 12b-1 distribution fees which are generally .25% of total assets, the Funds paid significant transfer agent fees and other miscellaneous fees to the Adviser and its affiliates.  As the chart

54

below shows, the Funds paid a total of more than $46 million in fees for the most recent fiscal year during which timing took place in the Funds.

| Total For Most Recent Complete Fiscal Year | |
|---|---:|
| Management | $20,251,912 |
| 12b-1 | $15,283,985 |
| Custodian | $405,937 |
| Transfer Agent | $8,117,938 |
| Registration | $593,074 |
| Miscellaneous | $1,326,727 |
| Professional | $38,162 |
| Trustees' | $40,000 |
| **TOTAL:** | **$46,057,735** |

**Defendants' use of Timing Brokers and Capacity Consultants**

286.    According to a Fortune article published April 19, 2004, the necessity for market timers to secretly deal with brokers was created by a growing majority of fund complexes that were more aggressively trying to monitor and eliminate market timing. Also fueling the necessity to find market timers was the decline in the market which severely diminished the defendants ability to retain and find new legitimate investors. Canary Capital ("Canary") and many other Hedge Funds and Investment Companies who were well known in the mutual fund industry as "professional market timers" were solicited by the Defendants. Kaplan & Co. Securities Inc ("Kaplan"), Wall Street Global, Salomon Smith Barney ("Salomon") and non-defendant Brean Murray & Co., Inc. ("Brean") were some of the brokers defendants used most frequently between at least 2000 until 2003.

287.    As access to obtain timing capacity in mutual funds became more and more restricted, doing business in the year 2000 and the years to follow became increasingly dependant on brokers.   Brokers and "capacity consultants" who were viewed as "sleazy middlemen" in the emerging market timing industry became a necessary evil.   As a sign of the times, Canary used up to twenty brokers at six different financial institutions in an effort to maintain its diminishing ability to market time with favored investors.

**Defendants' Solicitation of Market Timers Through Defendant Salomon**

288.    The first known instance of defendants soliciting a timing agreement was through a broker at Salomon on May 18, 2000.   The broker communicated the defendants' express interest in obtaining "timing money" for the Alger SmallCap Portfolio to Canary.   The Alger SmallCap Portfolio at that time was part of a variable life annuity offered by General Electric Life. Even though annuities are favored long term investment vehicles, they were still fair game for the defendants and favored investors to engage in illegal market timing.   Defendants would repeatedly offer market timing capacity with the Alger SmallCap Fund throughout the following years.   The defendants would profit many times more with this fund through increased management fees while favored market timers would reap huge returns on their investment by skimming profits off the long term investors.   Even the broker would receive a substantial commission, while the only clear loser was the fund itself.

**Defendants' Solicitation of Market Timers Through Defendant Kaplan**

289.    Kaplan was one of the brokers most frequently offering timing capacity for the Defendants.   The next known offer made to market timing with Canary was with defendants' Alger American Growth Fund, Alger American MidCap Growth, and the AST Alger All Cap

56

fund.  Larry Leibowitz (Kaplan) stated in an e-mail to Canary: "We can immediately use the following funds for timing at $1 million per fund to start. These are domestic capacity primarily as the international funds are restricted."  "Restricted" was a code market timers would use to mean the fund was not available for market timing purposes.

290.    DJ Sta. Ana (Kaplan) would also offer timing capacity with the defendants. On February 23, 2003, Ana e-mailed Canary saying that "i wanted to follow up our brief discussion regarding some space in AMGAX. will you be interested in it?"  This e-mail was forwarded to Stern with the following message: "Kaplan has offered us a 5 million dollar ticket in Alger Mid Cap Growth (AMGAX).  Are you interested in this fund?"

291.    On August 11, 2000, the defendants through Kaplan, offered Canary $2.5 million in the Alger Capital Appreciation Portfolio.  In March of 2001, Larry Leibowitz again offered $1 million of negotiated space in the Alger Small Cap Portfolio.  Three months later, Kaplan offered approximately $2 million of negotiated timing space in Alger Mid Cap Growth Portfolio to Andrew Goodwin at Canary.

292.    Two years later, on February 27, 2003 Kaplan communicated to Canary the terms of a market timing agreement with defendants:

> The AMGAX [Alger MidCap Growth Portfolio] will only be given to us if we can put 20% to 'stick' in the small cap, ALSAX. I am working on getting the holdings of the fund to assist in your hedge. I have also worked on and will continue to work on getting the sticky to be placed in a fund other than small cap. However, until that time we would have to place it in the small cap. Please let me know if you are interested.

293.    Canary replied that they would take the capacity, even though in a series of correspondence Canary viewed the Alger Small Cap Fund as a "bum fund" with lack luster performance. Further, as a follow up on the transaction with the defendants, a Canary securities

57

employee sent an e-mail to Lerner that evening: "Calling in reference to Alger trade, everything is okay, and you're price protected ... just wanted to let you know what was going on."

**Defendants' Market Timing Through Defendant Ryan Goldberg**

294.    In 2002, Ryan Goldberg ("Goldberg"), a broker employed by Brean Murray, offered Canary timing capacity in the Alger Small Cap A mutual fund, which was a sub-account in a variable annuity offered by defendant Conseco.  Goldberg invited Noah Lerner, an employee of Canary, to lunch with Thomas Blackburn ("Blackburn"), a Senior Vice President and National Sales Director of Life Insurance and Annuity Products at Conseco, and defendant Ray Pfeister, the Vice Chairman and Chief Marketing Officer of Alger, to discuss the offer.

295.    The parties arranged to have lunch in early August 2002. A July 26, 2002 e-mail from Lisa Carnes at Conseco to Noah Lerner describes the arrangement:

> Noah, Tom Blackman has arranged a meeting next Thursday, August 1st with Ray Pfeister, Vice Chairman of Fred Alger Management to discuss the proposed allocation along with the administrative requirements and your investment style.  I hope you are available to meet.  Ray had a pretty tight schedule, but was anxious to meet.  It's a lunch meeting at Maloney and Porcelli in New York at 12 noon.  I am confirming the address, but I believe it is 37 E. 50th Street.  Please let me know what I can do for you in the interim.

296.    In an e-mail dated August 27, 2002, Blackburn wrote to Noah to follow up their lunch meeting in New York:

> Hello Noah, I wanted to follow up on a detail from our last meeting in NYC.  I have the financials for our acquirer in hand and a corporate overview.  I will get this info to you right away.  Also please let me know if you would like to join us for a game of golf on the 16th or 17th @ Sleepy Hollow.  Derrick Van Eck is a member.  Keith Fletcher advises it is great place.  Ryan and Michael will be joining us as well.  Best regards. Tom.

297.    As a result of these discussions, Canary purchased the annuity and late traded and timed the Alger fund in the sub-account.

298.    In early 2003, Goldberg offered Canary $50 million in timing capacity in five

Alger funds, in return for an investment of $15 million in sticky assets in the Alger Small Cap A

fund.  Stern had a conference call with Goldberg and defendant James Connelly, Executive Vice

President of Alger, to confirm the timing deal.  Canary invested its timing assets in later winter

2003, and timed the Alger fund until summer 2003.

299.    In a February 23, 2003 e-mail to Noah Lerner, Stern summarized Canary's new

timing arrangement with Alger and directed Lerner to confirm with Goldberg the amounts to be

invested:

> Alger:  The new Alger deal is $60 MM in capacity for $15 MM of
> sticky in ALSAX.   The capacity will be split as follows: $5
> ALSAX, $15 AMGAX, $10 ACAAX, $10 ALGAX, $10 SPEAX,
> $5.  ***(Better check these amounts with the Brean guys before
> sending money.)***  Total $50 in capacity.  Back-tests are attached.  I
> will have a completed per-trac analysis done this week, but you
> can see that the numbers will be pretty good, so this is worth the
> deal.  I agreed to run ALSAX slow and AMGAX medium fast.
> The others I think we trade all out.  I am not sure how long Alger
> will be around in its current state.  (Emphasis added.)

300.    In a February 25, 2003 e-mail to Noah Lerner, a Canary employee relayed a

telephone message left for Lerner by Goldberg: "It is preferred by Alger to have a separate

account for the sticky $$."

301.    In a May 16, 2003 e-mail to Stern, Noah Lerner set forth a plan to reduce by $15

million its timing capacity in Alger, and noted "Ryan [Goldberg] has told us in the past we have

an exclusive so we should be able to get the space back if needed."

302.    Goldberg charged Canary a wrap fee for brokering the timing agreements

between Canary and Alger, and, in the case of the Conseco annuity, between Canary, Alger and

Conseco, which Canary paid.

303.    Goldberg offered timing arrangements and "under the radar" timing capability in the Funds to other timers, including, upon information and belief, Tewksbury Capital Management Ltd. and Atlantique Hedge Fund.

**Canary's Solicitation and Knowledge of the Defendants' Market Timing**

304.    According to a Fortune article of April 14, 2004, James Nesfield was hired by Canary as a timing "capacity consultant" in August 1999.  Nesfield in his new capacity, would run for Canary what he described as a "spam camping on the goddam fund companies" which he equated to "selling viagra."

305.    Nesfield knew that Canary was looking to market time the defendants. Nesfield was quoted as saying "I knew what they wanted ...They wanted carte blanche.  And they wanted a system that could easily be manipulated to cover their tracks."  In an e-mail sent to Andrew Goodwin (Canary) on July 19, 2001, Susan Stalzer at Fred Alger & Co. Inc. was on his "A list."

306.    On February 7, 2003, Nesfield sent an e-mail to Stern with a brief message: "I also heard that Alger is accepting negotiated money from timers."

307.    Gail Weiss and Associates, Inc. developed clearing software that could be used to market time and late trade. On February 2, 2003, Nesfield e-mailed Lerner concerning a conversation he had with Gail Weiss about her market timing software:

> I did not mention it but Gail spoke about having timing clients that have purchased her system and come in as TPAs under her trust company arrangement. The timers or timer has negotiated deals with MFS, and Alger. The information was obtained because I was getting and giving information about Circle Trust.

308.    Nesfield sent an e-mail to Stern eight days later telling Stern that he had a contact at Fred Alger Management, Valerie Kilpatrick, and told Stern the terms of a market timing

agreement: "20% buy and hold money under one Rep id. Another Rep number for trading two funds that they are making available All Cap (ACAXX) and Large Cap (ALGAX)."

**Conseco Variable Insurance Company Negotiations with the Defendants**

309.   Noah Lerner (Canary) received an e-mail from Lisa Carnes (Conseco Internal National Sales Manager) dated November 21, 2001 that showed Alger's express desire to engage in market timing:

> I understand you were interested in actively managing assets inside some of the Van Eck funds.
>
> We are very interesting in meeting your investing needs. Tom mentioned you were interested in the total assets inside our products, and I have attached a spreadsheet of all of our funds.
>
> Please keep in mind, if you are interested in heavy treading, Van Eck, Rydex and Alger have all expressed an interest in receiving the assets...

310.   On July 26, 2002, Conseco sent Canary an e-mail expressing Alger's desire to allow market timing:

> Noah,
>
> Tom Blackburn has arranged a meeting next Thursday, August 1st with Ray Pfeister, Vice Chairman, of Fred Alger Management to discuss the proposed allocation along with the administrative requirements and your investment style. I hope you are available to meet. Ray had a pretty tight schedule, but was anxious to meet...

311.   At this meeting Tom Blackburn was present along with Noah Lerner and Edward Stern.  According to Stern, Canary agreed to purchase an annuity with the symbol "TK."

312.   On August 27, 2002 Lerner e-mailed Tom Blackburn about a tentative golfing date with a post script message: "It looks like I will be adding $20 million (4 Policies) over the next two weeks. $5 million for Van Eck and $15 million for Alger."

313.     In an internal Canary e-mail sent to Lerner dated September 30, 2002, instructions were given for the Alger Small Cap Fund: "You will need to wire some money in account 102-06901 - there is roughly 14.6 mill allocated on the long side, therefore you will need to fund about half of that into the account in order to put on the shorts."

314.     Thomas Butcher forwarded an e-mail to Lerner originally sent to Conseco on December 13, 2002: "As soon as you have been able to speak with Mr. Pfiester about the Alger accounts, please tell me and I'll deal with these contracts in a similar fashion."   Butcher was referring to the surrender contracts and the wiring instructions for Lorikeet Capital Associates, LCC which was a Canary entity.

315.     Three days later, on December 16, 2003, Conseco sent Canary a follow up e-mail: "The wires for the Van Eck related accounts are going out today.   As per our telephone conversation, I will watch for the surrender forms for the Alger policies."

316.     Eliot Spitzer filed a Complaint Against Conseco on August 9, 2004 alleging Conseco committed fraud and breached their fiduciary duty's in the sale of variable annuities. According to the complaint, Conseco negotiated and entered into timing capacity agreements with Van Eck and Alger mutual fund families. In reference to negotiated timing capacity at Conseco:

> ...Alger American Funds granted unlimited timing capacity in its small cap subaccount despite the advice in its prospectus that "based on the portfolio's investment style and objective, an investment in [the fund] may be better suited to investors who seek long-term capital growth and can tolerate fluctuation in their investment's values."
>
> * * *
>
> Ultimately Conseco entered into approximately 100 arrangements granting capacity in the Van Eck and Alger Funds.

317.    In a complaint against Conseco by the New York State Attorney General, it was alleged that, in February 2003, Invivia, Inc. (which purchased Conseco, in October 2002, held a board meeting and was informed that Invivia was successful in "continuing to attract market timers" and that there were "special fund allocations with Van Eck and Alger ... allowing timers to trade frequently with certain funds."

318.    As set forth above, Thomas Blackburn of Conseco offered to sell to Canary a Conseco variable annuity, which held shares of the Alger Small Cap A fund, specifically for the purpose of allowing Canary to time.

319.    Upon information and belief, Conseco charged Canary a wrap fee for providing the timing capacity, which Canary paid.

320.    Upon information and belief, Conseco offered timing arrangements involving the Funds to other brokers and hedge funds involved in market timing.

**[¶¶ 321 THROUGH 500 ARE INTENTIONALLY LEFT BLANK]**

**V.    DEMAND FUTILITY ALLEGATIONS**

501.    The allegations concerning demand futility do not apply to claims asserted by the plaintiffs under Section 36(b) of the ICA, which does not confer a direct right upon the Funds or the Trusts to bring such claims.

502.    Plaintiffs have not made a demand upon Trustees of the Funds to bring action against the Adviser, the Distributor, the officers of the Funds, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(a)    No demand is required with respect to plaintiffs' claims under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in

connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

       (b)     The trustees are not accountable to the Funds or the Funds' shareholders because they do not stand for regular reelection.  Each trustee serves until an event of termination, such as death or resignation, or until a successor is elected.  However, the trustee defendants have caused the Funds to trumpet the void of shareholder control in their SEC filings, asserting that the Funds are "not required by law to hold annual shareholder meetings." Defendants have also caused the Funds to state:

> Meetings of shareholders normally will not be held for the purpose of electing Trustees unless and until such time as less than a majority of the Trustees holding office have been elected by shareholders, at which time the Trustees then in office will call a shareholders' meeting for the election of Trustees.  Under the Act, shareholders of record of no less than two-thirds of the outstanding shares of the Fund may remove a Trustee through a declaration in writing or by vote cast in person or by proxy at a meeting called for that purpose.  Under the Trust Agreement, the Trustees are required to call a meeting of shareholders for the purpose of voting on the question of removal of any such Trustee when requested in writing to do so by the shareholders of record of not less than 10% of the Fund's outstanding shares.  Shares do not have cumulative voting rights, which means that holders of more than 50% of the shares voting for the election of Trustees can elect all Trustees.

       (c)     During the relevant time period, both Alger Spectra Fund and The Alger Funds held one shareholder meeting – on April 28, 2000 – for the purpose of holding an election of trustees.  In fact, according to SEC filings, the April 28th meeting was the only one of its kind since at least February 25, 1994 for Alger Spectra Fund and since January 9, 1994 for The Alger Funds.  Thus, the trustees were not and are not answerable to plaintiffs or the Funds for any of their conduct taken in their official capacities as trustees, such as market timing.  Because the trustees were effectively lifetime members of the board of trustees of the Funds, they had absolute power and any demand on them would have been a futile and useless act.

64

(d)      The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Fund, yet have failed to investigate or to do anything to recover for damages caused to the Fund by such activities.  Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the legal actions that have been brought by such authorities, the Trustees have failed to take any action to investigate and have failed to take any action to recover for the Funds the damages cause to it by such unlawful activity.

(e)      Market timing is a phenomenon that has been common knowledge in the mutual fund industry at least since the 1980s.  As early as 1989, the high-profile mutual fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a widely-publicized book entitled *The New Market Wizards* focused attention on market timing.

(f)      Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled "*Mutual Funds Fight the 'Market Timers,'*" the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the [Trustee(s)s] Trustees of the Funds.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

(g)      As stated in an article printed in FORTUNE on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become."  *See The Secrets of Eddie Stern*, FORTUNE (April 14, 2004).  The article also noted that

65

after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.

      (h)    Even though the Trustees have (or should have) had knowledge of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, the Trustees either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would have brought the existence of such unlawful practices in the Funds to their attention.

      (i)    Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser that related to the Adviser's management agreement, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby the Adviser facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading are and were, in fact, part of the Adviser's contract.

      (j)    Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15(c) of the Investment Company Act.  Consequently, the Trustees either failed to request all of the "reasonably necessary" information they needed to evaluate the Adviser's contract or they knew about or approved such arrangements with respect to the Fund.

376651v3

(k)     Indeed, given the Trustees' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon the Trustees to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds.  Had the Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds.  However, the Trustees failed to put any such necessary system or program in place, thus subjecting themselves to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(l)     The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action.  Their duties did not and do not come into play only when "kick-started" by a shareholder demand.  The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(m)     On September 3, 2003, the NYAG commenced the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world.  Before and after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Since the NYAG Complaint was filed, state and federal regulators have entered into consent enforcement actions with at least six different mutual fund families, representing recoveries of civil penalties and recoveries in excess of $2 billion.  The regulators' investigation, the filing of the NYAG Complaint, and the

subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.  Despite that, however, the Trustees have failed to take any action against the Adviser, the Distributor, or any persons responsible for causing harm to the Funds by market timing or late trading.

(n)      The purpose of a demand requirement is to bring matters to the attention of the Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees *already are aware* of the matters about which they should take action to recover damages for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(o)      Because the Trustees have failed for a lengthy time period to take action to recover for the Fund the damages it has suffered because of market timing and late trading, doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was required but not forthcoming, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

(p)      Given the Trustees' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined

68

above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds.  This exposure to a substantial likelihood of personal liability prevents the Trustees from being able to consider a demand impartially, if one had been made.

(q)     The likelihood of personal liability is even more pronounced in the case of those Trustees who served on the Audit Committee of the Funds, defendants O'Neill, Colbert and Saint-Amand, since those members had easy access to the internal documents that revealed the market timing and late trading that harmed the Funds yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

**[¶¶ 503 THROUGH 600 ARE INTENTIONALLY LEFT BLANK]**

## COUNT I

### VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT
### (Against The Adviser And Distributor Defendants)

601.    Plaintiff incorporates by reference paragraphs 1 through 500 above, but not paragraphs 501 and 600 relating to demand, as if set forth herein.

602.    The Trust, each of the Funds Trusts, and the Funds are registered investment companies within the meaning of the ICA.

603.    The Adviser Defendant is an investment adviser for the Funds as that term is defined in Section 2 of the ICA.

604.    The Distributor Defendant is an affiliate of the Adviser Defendant for purposes of Section 36(b) of the ICA.

605.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature

paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

606.   Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person.  Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

607.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the Trustees of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

608.   Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser's compensation.  Information concerning conflicts of interest, the nature and extent of market timing and late trading in the Funds, the nature and extent of capacity arrangements for market timing and late trading in the Funds, and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect

70

and prevent, market timing and late trading in the Funds, are particularly important to the Funds and to their independent trustees.

609.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Funds, the Adviser Defendant and its affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendant's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

610.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendant's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

612.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

376651v3

613.    Each of the Adviser Defendant and the Distributor Defendant, as its affiliate, breached his, her, or its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

614.    By agreeing and/or conspiring with the market timers to facilitate, permit, encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Adviser Defendant and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.    As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.    By virtue of the foregoing, the Adviser has violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT II

### VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT
### (Against The Trustee Defendants, Adviser Defendant, And Distributor Defendant)

618.    Plaintiff incorporates by reference all paragraphs 1 through 600 above.

619.    The Trust, each of the Funds Trusts, and each of the Funds are registered investment companies.

620.    The Adviser Defendant is an investment adviser under Section 36(a) as that term is defined in Section 2 of the ICA.

621.    The Distributor Defendant acts as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

622.    The Trustee Defendants are trustees under Section 36(a) as that term is defined in Section 2 of the ICA.

623.    Defendants Alger, Chung, O'Neill and Connelly, by virtue of their ownership and position and responsibilities for managing and directing the activities of the Adviser and the Distributor, are liable for the actions of those entities.

624.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendant, the Distributor Defendant, and the Trustee Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty of the advisers to seek approval of any advisory agreement with full disclosure of information material to the board's decision regarding their compensation and the duty of the trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the Trustees of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendant and the Distributor Defendant did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.    After a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendant's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party."  Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), any advisory agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.     Each of the Adviser Defendant, the Distributor Defendant, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

631.     By agreeing and/or conspiring with the Timer Defendants to permit and/or encourage the Timer Defendants to time the Funds, the Adviser Defendant and the Distributor Defendant placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.


## COUNT III

### VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT
### (Against the Adviser Defendant and Distributor Defendant)

633.     Plaintiff incorporates by reference all paragraphs 1 through 600 above as if set forth herein.

634.     Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

376651v3

635.     For the reasons alleged herein, the agreements between or among the Adviser, the Distributor, and the Funds and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

636.     Under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), the advisory agreements and the 12b-1 Plans may be voided and the Adviser Defendant and the Distributor Defendant are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

## COUNT IV

### VIOLATION OF SECTIONS 206 AND 215 OF THE INVESTMENT ADVISERS ACT
(Against The Adviser Defendant and the Distributor Defendant)

637.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

638.     The Adviser Defendant and the Distributor Defendant are investment advisers within the meaning of the IAA.

639.     The Funds are clients of the Adviser Defendant and the Distributor Defendant within the meaning of Section 206 of the IAA.

640.     Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

641.     The Adviser Defendant and the Distributor Defendant have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, plaintiffs believe the evidence will show that the Adviser Defendant and the

Distributor Defendant facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

642.     Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment adviser agreement made or approved in violation of any provision of the IAA, including the investment adviser agreements between the Adviser Defendant or the Distributor Defendant and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

643.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT V

### CONTROL PERSON LIABILITY UNDER SECTION 48 OF THE INVESTMENT COMPANY ACT
(Against The Adviser Defendant, The Distributor Defendant And The Trustee Defendants)

644.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

645.     Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

646.     Mr. Alger and Chung, control persons of the Adviser Defendant and the Distributor Defendant, directly or indirectly, caused the Adviser Defendant and the Distributor Defendant to engage in the unlawful conduct alleged herein.

647.     Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendants are liable for causing, directly or indirectly, the Adviser Defendant and the Distributor Defendant to engage in the unlawful conduct alleged herein.

648.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VI

### COMMON LAW BREACH OF FIDUCIARY DUTY
#### (Against The Adviser Defendant, The Distributor Defendant And The Trustee Defendants)

649.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

650.     The Adviser Defendant, the Distributor Defendant, and the Trustee Defendants (the "Fiduciary Defendants"), and each of them, owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

651.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

652.    As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

653.    As alleged above, each of the Fiduciary Defendants also breached his, her, or its fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

654.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VII

### BREACH OF CONTRACT
### (Against Adviser and the Distributor Defendants)

655.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

656.    The Funds and the Adviser Defendant have entered into Advisory Contracts which are renewed annually.

657.    The Funds have fully performed their obligations under the Investment Management Agreement.

658.    The Advisory Agreements required and require the Adviser Defendants to comply with the requirements of the ICA and all rules and regulations of the SEC promulgated thereunder.

659.    The Advisory Agreements required and require the Adviser Defendants to comply with the rules and regulations of the Trusts and the Funds, as set forth in the Prospectuses, the SAIs, and otherwise.

660.    The relationship between the Funds and the Distributor Defendant is governed by a Distribution Agreement. One such agreement was executed on October 24, 1986. Under its terms, the agreement was to remain in force until 1988 and then continue automatically for successive annual periods provided the Trustees specifically approve the agreement annually.

661.    Under the Distribution Agreement, the Distributor Defendant was obligated to "use its best efforts to solicit orders for the sale of the Shares [of the Funds] at the public offering price." The Distributor Defendant also agreed to "comply with all applicable laws, rules and regulations, including, without limitation, all rules and regulations made or adopted by the Securities and Exchange Commission …." The Distributor Defendant was also obligated to "prepare and deliver reports to the Treasurer of the Fund, for review by the Trustees, on a regular, at least quarterly, basis showing the distribution expenses expected to be incurred in the ensuing quarter pursuant to this Agreement and the Plan and the purposes therefore." The Distributor Defendant and the Funds, pursuant to the Distribution Agreement, also executed a Distribution Plan which set forth the details of the allowable costs of such distribution as foreseen in the Distribution Agreement and the fact that the Distribution Plan had to be approved by the Trustees.

662.     The Distributor breached the terms of the Distribution Agreement discussed above by soliciting and facilitating improper market timing of the Alger Funds in willful disregard of its obligations under the Distribution Agreement to "comply with all applicable laws, rules and regulations, without limitation…."

663.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Advisor, Sub-Advisor, and Distributor, Defendants are liable.

## COUNT VIII

## BREACH OF CONTRACT
## (Against Certain Additional Defendants)

664.     Plaintiffs incorporate by reference paragraphs 1 through 600 above as if set forth herein.

665.     Upon information and belief, throughout the relevant period, BAS and Fred Alger Management, Inc. were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

666.     The Funds, for whose benefit the Adviser entered into the Dealer Agreements, are intended third-party beneficiaries of the Dealer Agreements.

667.     There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

668.     Upon information and belief, under the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund SERV system and to transmit

orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2").  Under the Dealer Agreements, BAS and Fred Alger Management, Inc. agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades would be priced at the Day 2 NAV.

669.    BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

670.    In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers and timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted certain of the Funds to be late traded and timed to the detriment of the funds.

671.    Accordingly, BAS has breached its Dealer Agreements with the Adviser.

672.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT IX

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against The Timer Defendants And Additional Defendants)

673.    Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

674.     The Timer Defendants and the Additional Defendants knew of the existence and extent of the fiduciary duties owed by the Fiduciary Defendants to the Funds.  The Timer Defendants and the Additional Defendants knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

675.     The Additional Defendants, including BAS, allowed for the use of their instrumentalities, including the BAS box, for purposes of market timing and late trading.

676.     The Timer Defendants and the Additional Defendants maliciously, without justification and through unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

677.     The Timer Defendants and the Additional Defendants are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein.

678.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

### UNJUST ENRICHMENT
### (Against All Defendants)

679.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

680.   All Defendants received a benefit in the profits they earned as a result of their unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

681.   Justice and equity require that the Defendants not be allowed to retain those profits.

682.   Justice and equity require that the Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

**COUNT XI**

**COMMON LAW INTERFERENCE WITH CONTRACT**
**(Against Timers, Brokers, Banks, Clearing Houses, and Others)**

683.   Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

684.   The Adviser and the Funds are parties to the Investment Management Agreement.

685.   The Adviser breached the Investment Management Agreement in the manner and by the actions described in this Complaint.

686.   The Defendants knew of the existence of the Investment Management Agreement between the Adviser and the Funds and knew its terms.

687.   The Defendant Timers, Brokers, Banks, Clearing Houses and others knowingly and intentionally induced the Adviser to breach that contract and interfered with the Adviser's present and future performance of the Investment Management Agreement by its acts of wrongdoing as described in this Complaint, intending to and proximately causing the described breaches of the Investment Management Agreement.

688.   All Defendant Timers, Brokers, Banks, Clearing Houses and others carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment

Management Agreement and cause such breaches of the Investment Management Agreement and did in fact cause breaches of such contract.

689.     The conduct of the Defendant Timers, Brokers, Banks, Clearing Houses and others was improper and without justification or privilege.

690.     As a direct and proximate result of Defendant Timers, Brokers, Banks, Clearing Houses and others wrongful conduct, Defendant Timers, Brokers, Banks, Clearing Houses and others are jointly and severally liable to the Funds with the Adviser for injuries and damages the Funds have suffered and which they will continue to suffer and is liable for actual and punitive damages.

## COUNT XII

### CIVIL CONSPIRACY
### (Against All Defendants)

691.     Plaintiff incorporates by reference paragraphs 1 through 600 above as if set forth herein.

692.     The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

693.     The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

694.     The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

695.     The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by

376651v3

unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

696.     As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.     Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.     Removing the Adviser Defendant and the Distributor Defendant;

C.     Rescinding the management and other contracts for the Funds with the Adviser, Distributor and other Defendants;

D.     Rescinding the 12b-1 Plans adopted by the Funds;

E.     Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser and all profits earned on unlawful trading and all management and other fees earned during the period of such trading,

F.     Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

G.     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.     Granting Plaintiffs such other and further relief as the Court may deem just and proper.

376651v3

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 29, 2004

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP

By:     _____/s/_____
Daniel W. Krasner
Mark C. Rifkin
Demet Basar
Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

CHIMICLES & TIKELLIS, LLP

Nicholas E. Chimicles
Michael D. Gottsch
Denise Davis Schwartzman
Timothy N. Mathews
100 Haverford Centre
Haverford, PA  19085
(610) 642-8500

POMERANTZ, HAUDEK, BLOCK,
  GROSSMAN & GROSS, LLP

Stanley M. Grossman
H. Adam Prussin
100 Park Avenue
New York, NY  10017
(212) 661-1100

*Fund Derivative Executive Committee*

376651v3

CHITWOOD & HARLEY LLP

Martin D. Chitwood
Edward H. Nicholson, Jr.
David J. Worley
Tamera M. Woodard
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
 (404) 873-3900

FARUQI & FARUQI LLP

Nadeem Faruqi
Shane Rowley
David H. Leventhal
320 East 39th Street
New York, NY 10016
(212) 983 - 9330


***Fund Derivative Plaintiffs'***
***Steering Committee***

376651v3

## Exhibit A

**New Plaintiffs**
Barbara Cordani
Joseph Cordani
Harry Schipper
John Vining

**New Defendants**
Fred Alger and Company, Incorporated
Fred M. Alger, III
Dan C. Chung
Stephen E. O'Neil
Charles F. Baird, Jr.
Roger P. Cheever
Lester L. Colbert, Jr.
Nathan E. Saint-Amand
B. Joseph White
Aurum Securities Corp.
Aurum Capital Management Corp.
Bank of America Corp.
Banc of America Securities LLC
Conseco Securities Inc.
Kaplan & Co. Securities, Inc.
Pritchard Capital Partners LLC
Salomon Smith Barney Inc.
Trautman Wasserman & Company, Inc.
Canary Capital Partners, LLC
Canary Capital Partners, Ltd.
Canary Investment Management, LLC
Edward J. Stern
Ryan Goldberg

**Dropped Parties**
None

376651v2