## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION _____ | : : : : | **MDL DOCKET 1586** |
| In Re ALGER, COLUMBIA, JANUS, MFS, ONE GROUP AND PUTNAM | : : | **Case No. 04-md-15863 (JFM )** |
| This Document Relates To: | : : | |
| IN RE PUTNAM MUTUAL FUNDS DERIVATIVE LITIGATION | : : : : | |
| Zuber V. Putnam Invesment Management LLC, et al. | : : | **Case No. 04-md-00564** |

## CONSOLIDATED AMENDED FUND DERIVATIVE COMPLAINT

Plaintiffs, derivatively on behalf of the mutual funds comprising the Putnam family of mutual funds (the "Funds"), hereby complain against the defendants as follows:

## I. SUMMARY OF THE ACTION

1.      This derivative action seeks to recover damages for the Funds for harm inflicted upon them by their own fiduciaries, who breached their fiduciary duties to the Funds, including those arising under Sections 36(b) and 36(a) of the Investment Company Act of 1940 (the "ICA") and Sections 206 and 215 of the Investment Advisers Act of 1940 (the "IAA"), and by those who participated in a manipulative scheme to enrich themselves at the expense of the Funds through rapid in-and-out trading in the Funds, a practice commonly called "market timing" or "timing," and trading in shares of the Funds after the close of the financial markets each day, a practice commonly called "late trading."

2.      This Complaint seeks redress for harm caused by the managers and investment advisers of mutual funds who, in order to share in the substantial profits that market timing and late trading generate, combined with the market timers and others and allowed them to prey upon the Funds to which they owed the highest fiduciary duties of loyalty, candor, and due care.  This Complaint also seeks redress for the harm caused by the Trustees of the Funds who failed or refused to perform their fiduciary duties to manage and supervise the Funds and enforce the manager's duties in the best interests of the Funds.

3.      Market timing and late trading have been extremely harmful to the Funds. Market timing and late trading have caused hundreds of millions of dollars of harm to the Funds, primarily by inflating transaction costs and administrative costs, and adding unnecessary marketing and distribution costs, all of which are paid by the Funds. Market timing also causes serious, known disruptions to mutual funds and their operations. It forces portfolio managers to keep excess quantities of cash available in the funds to redeem market timers' shares when they sell out a position — cash that otherwise should be invested. Trading protocols are upset as capital available for investment fluctuates unpredictably, preventing portfolio managers from implementing their investment strategies for the Fund. The effect of all this is to reduce  the returns earned by the Funds.

4.      Market timing and late trading have harmed each and every Fund in the Putnam family of mutual funds, whether or not the particular Fund was the direct victim of market timing or late trading. This is so because some expenses, such service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market

timing and late trading and may be shared among all Funds in the Putnam family, including timed-funds and non-timed funds alike. This is also so because investors have fled all the funds in the Putnam family, not just the timed funds, following the public disclosure of the market timing and late trading scandal.

5.     Because of these and other problems caused by market timers, fund managers for years have had in place policies and practices designed to monitor and deter timing, including redemption penalties. Conversely, market timing and late trading have been extremely profitable for market timers, and impose little risk. Because the price movement of the underlying securities will almost certainly be followed, sometimes within a matter of hours, by a corresponding movement in the price of the funds' shares, the realization of profit on the pricing inefficiency is almost a sure bet. Market timers exploit price inefficiencies inherent in the forward pricing structure of mutual funds.

6.     Moreover, timed or late trades cost little or nothing to execute because most timed mutual funds do not charge commissions, or "loads," for trades, thus shifting the transaction costs for market timing from the market timers to the funds themselves.  Thus, for example, a one day tade can yield a net gain in excess of 100 percent, while the costs of timing are pushed off onto the Funds as the timers move in and out of no-load funds, parking their winnings in liquid cash funds between trades.

7.     Market timers and late traders could not reap these profits simply by investing in the securities held in the Funds' portfolios, because (a) the timers would bear significant transaction costs and tax consequences if they bought and sold individual securities, which

are foisted upon the Funds under the market timing and late trading scheme, and (b) the underlying securities trade in the open market and are efficiently priced, as opposed to the inefficient prices of mutual fund shares, which would deny market timers the opportunity to execute trades at unfair prices.

8.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, administrative, marketing, and distribution fees from the Funds without disclosing that they had permitted, facilitated, encouraged or even participated in the improper activities. At a minimum, the advisors failed to detect and/or prevent market timing and late trading in the Funds — the types of abusive transactions they were obligated to prevent. Simply put, the advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

9.      In addition to the market timers themselves, who reaped quick and easy profits at the expense of the Funds, the advisers to the Funds and their affiliates also reaped hundreds of millions of dollars in unearned advisory, management, marketing, and distribution fees from the Funds without disclosing their permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in the Funds – the types of abusive transactions they were obligated to prevent. The advisers abandoned their fiduciary duties to the Funds in order to inflate the already huge fees they received from the Funds.

4

10.     Market timing and late trading results from the wholesale abdication of the fiduciary obligations the defendants owed to the Funds.   As William H. Donaldson, Chairman of the SEC, recently observed in commenting upon the scandal that has engulfed the entire mutual fund industry:

> The relationship between an investment adviser and its clients is supposed to rest on a bedrock foundation of fiduciary principles.  It is extremely troubling that so much of the conduct that led to the scandals in the mutual fund industry was, at its core, a breach of the fiduciary relationship between investment advisers and their advised funds.  As fiduciaries, advisers owe their clients more than mere honesty and good faith.  Recent experience suggests that all too many advisers were delivering much less.[1]

11.     The market timing and late trading scandal results from the substantial and unresolved conflicts of interest between mutual funds and the investment advisers who create and manage the funds.  Those conflicts of interest have manifested themselves in widespread instances of improper market timing and late trading in the mutual funds, all to the detriment of the Funds.

12.     The nature and extent of those conflicts of interest, the market timing they led to, and the adverse impact they caused to the mutual funds were not adequately disclosed to or understood by the trustees of the Funds, who approved or ratified the fund adviser's management agreements each year despite the harm the adviser caused or permitted to the Funds and who approved or ratified plans permitting the adviser to charge and collect

---

[1]   Opening Statement at an open Commission meeting on May 26, 2004 (available at http://www.sec.gov/news/speech/spch052604.htm).

marketing and distribution fees under Rule 12b-1 of the SEC promulgated under the ICA in violation of the trustees' own duties to the Funds.

13.     This action is brought by shareholders of the Funds on behalf of the Funds to recover damages for the Funds from those who are responsible for the wrongdoing and from those who profited, directly or indirectly, from the wrongdoing.  These damages include, but are not limited to:

(a)     forfeiture and return of the management, administration, distribution, and marketing fees and all other compensation paid to the investment adviser and its affiliates during the period of market timing and late trading;

(b)     damages to the funds for profits earned by the fund adviser and its affiliates (including officers and employees of the fund adviser) from market timing or late trading arrangements;

(c)     damages to the Funds for direct and indirect injury, including increased transaction costs, liquidity costs, tax expenses, and lost investment opportunities, caused by market timing or late trading; and

(d)     damages to the Funds for 12b-1 fees paid to the fund adviser and its affiliates (including third-parties) in excess of the corresponding economic benefit to the Funds.

14.     This action is also brought by shareholders on behalf of the Funds to obtain injunctive relief for the funds, including but not limited to:

(a)     termination of the adviser's management agreement with the Funds;

(b)    termination of the 12b-1 plans approved without the appropriate and adequate finding of net economic benefit to the Funds;

(c)    preventing market timing and late trading in the Funds in the future;

(d)    removal of the fund adviser as the investment adviser and manager of the Funds; and

(e)    changes in the composition and structure of the Board of Trustees of the Fund as well as the role of the investment adviser and its relationship to the Funds to prevent conflicts of interest from giving rise to similar unlawful acts in the future.

## II.  JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43; Section 214 of the IAA, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

16.    This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as plaintiffs' federal claims.

17.    Venue is proper in the transferor district(s) because some or all of the defendants are incorporated or conduct business in, and/or some of the wrongful acts alleged herein took place or originated in those judicial districts.  Venue is also proper in this District of Maryland because some of the wrongful acts alleged herein took place or originated in this district.

18.    In connection with the acts and practices alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including, but not limited to, the

mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

19.     This is a consolidated amended complaint filed pursuant to an Order of the Judicial Panel on Multidistrict Litigation, captioned *In re Mutual Fund Investment Litigation*, MDL Docket No. 1586, centralizing pretrial proceedings in these actions in this Court.  To preserve the filing dates of the original complaints for purposes of any applicable statutes of limitation and all other defenses based upon the passage of time, the plaintiffs herein expressly reserve the right to seek transfer of these actions back to the transferor courts at the conclusion of pretrial proceedings.

## III.  PARTIES

### A.     Plaintiffs

20.     The plaintiffs are all currently investors in the Putnam Funds specified below, and maintained their investments during the transactions complained of herein:

(a)     Plaintiff Cynthia Puleo, a resident of Montville, New Jersey, invested in the Putnam International New Opportunities Fund prior to 1999. This fund is a series issued by the Putnam Investment Funds, a Massachusetts business trust. Other series (funds) offered by the Putnam Investment Funds include the Putnam Capital Opportunities Fund; the Putnam Growth Opportunities Fund; the Putnam International Capital Opportunities Fund (formerly Putnam International Voyager Fund); the Putnam International Growth and Income Fund; the Putnam Mid Cap Value Fund; the Putnam New Value Fund; the Putnam Research Fund; and the Putnam Small Cap Value Fund.

(b)     Plaintiff Diane Hutto, a resident of Fort Walton Beach, Florida, invested in the Putnam International Equity Fund and Putnam International New Opportunities Fund prior to 2000. The Putnam International Equity Fund is a Massachusetts business trust.

(c)     Plaintiff Dina Rozenbaum, a resident of Woodmere, New York, invested in the Putnam Europe Equity Fund prior to 1999. This Fund is a Massachusetts business trust.

(d)     Plaintiff Seth B. Marks, a resident of University Heights, Ohio, invested in the Putnam Research Fund, Putnam OTC & Emerging Growth Fund, and Putnam New Opportunities Fund prior to December, 1999.

(e)     Plaintiff Joanne S. Baseman, a resident of Jupiter, Florida, invested in the Putnam International Equity Fund and Putnam Voyager Fund prior to 1999.

(f)     Plaintiff John K. Clement, a resident of Devon, Pennsylvania, invested in the Putnam Money Market Fund C1-M in 2000.

(g)     Plaintiff Gail Craven, a resident of West Chester, Pennsylvania, invested in the Putnam OTC & Emerging Growth Fund in 1999, in Putnam Voyager Fund in 2000, and in the Putnam Growth & Income Fund.

(h)     Plaintiff Edward I. Segel, a resident of Haverford, Pennsylvania, invested in the Putnam International Equity Fund prior to 1999.

(i)     Plaintiff Simon J. Denenberg, Trustee of the Sarah L. Ross Trust, a resident of Montgomery County, Pennsylvania, invested in the Putnam U.S. Government Income Trust prior to 1999. He also invested in the Putnam American Government Income Trust.

(j)     Plaintiff Zachary Alan Starr, a resident of East Quogue, New York, invested in the Putnam International Equity Fund in 2000.

(k)     Plaintiff Anthony Antoniello invested in the Putnam New Value Fund.

(l)     Plaintiff John Asseta, Jr., invested in the Putnam Asset Allocation Balanced Portfolio Fund.

(m)     Plaintiff Doris Banas invested in the Putnam Income Fund.

(n)     Plaintiff  Thomas F. Bednarek invested in the Putnam International Equity Fund.

(o)     Plaintiff Raquel Benun invested in the Putnam New Opportunities Fund.

(p)     Plaintiff Larraine Blacker invested in the George Putnam Fund of Boston, Putnam International New Opportunities Fund, Putnam New Opportunities Fund, Putnam OTC & Emerging Growth Fund, Putnam Voyager Fund II, and Putnam International Voyager Fund.

(q)     Plaintiff Leonard Brazin invested  in the Putnam Vista Fund.

(r)     Plaintiff Alisa Brown invested in the Putnam International Equity Fund and Putnam Voyager Fund.

(s)     Plaintiff Brian Clark invested in the Putnam Health Sciences Trust.

(t)     Plaintiff  Edward Casey invested  in the Putnam Equity Income Fund, Putnam Vista Fund and Putnam Voyager Fund.

(u)     Plaintiffs John H. Diamond, Jr., and Elise M. Diamond invested in the Putnam Money Market Fund.

10

(v)     Plaintiff Ann Schneps Dubin invested in the Putnam Growth & Income Fund.

(w)     Plaintiff Norma Dweck invested in the George Putnam Fund of Boston.

(x)     Plaintiff William John Glebus, Jr., invested in the Putnam Voyager Fund.

(y)     Plaintiff Scott Howe invested in the Putnam Income Fund and Putnam Voyager Fund.

(z)     Plaintiff Antonio Ioakim invested in the George Putnam Fund, Putnam Equity Income Fund, Putnam Europe Growth, Putnam Global Fund, Putnam Growth Income Fund, Putnam Growth Opportunities Fund, Putnam Investors Fund, Putnam New Opportunities Fund, Putnam U.S. Government Trust Fund  Putnam Vista Fund and Putnam Voyager Fund.

(aa)    Plaintiff Charles Kalivas invested in the Putnam Discovery Growth Fund and Putnam International New Opportunities Fund.

(bb)    Plaintiff Peter Kavaler invested in the Putnam Income Fund.

(cc)    Plaintiff Todd Klein invested in the Putnam Global Equity Fund.

(dd)    Plaintiff Paolo LaFrancesca invested in the George Putnam Fund, Putnam Discovery Growth Fund and Putnam Investors Fund.

(ee)    Plaintiff Howard W. Mathews invested in the George Putnam Fund of Boston, Putnam Fund for Growth and Income.

(ff)    Plaintiff  Joseph  P.  McDonough  invested  in  the  Putnam  New

11

Opportunities Fund.

(gg)    Plaintiffs Craig J. McLaughlin and Debora J. McLaughlin invested in the  Putnam International New Opportunities Fund.

(hh)    Plaintiffs Michael J. Meehan and Teresa M. Meehan invested in the George Putnam Fund of Boston and Putnam Massachusetts Tax Exempt Income Fund (not listed).

(ii)    Plaintiff Charles F. Michaelman invested in  the Putnam Asset Allocation Growth and Putnam Global Equity Fund.

(jj)    Plaintiff John E. Morrissey invested in Putnam International Equity Fund.

(kk)    Plaintiff Edward L. Murphy invested in Putnam Voyager Fund.

(ll)    Plaintiff Mary G. Naples invested in Putnam Diversified Income Fund.

(mm)  Plaintiff Edward Newman invested in Putnam Equity Income Fund.

(nn)    Plaintiff George E. Pliska invested in Putnam Growth and Income Fund and Putnam Voyager Fund.

(oo)    Plaintiff Giacoma Ruggeri invested in Putnam Health Sciences Trust.

(pp)    Plaintiff Aurora Santos invested in Putnam Vista Fund.

(qq)    Plaintiff Glenn Silva invested in Putnam Diversified Income Fund.

(rr)    Plaintiff Jean Stigas invested in Putnam Capital Opportunities Fund, Putnam Discovery Growth Fund and Putnam International Equity Fund.

(ss)    Plaintiff Lawrence Stigas invested in Putnam Equity Income Fund,

Putnam International Equity Fund, Putnam International New Opportunities Fund and Putnam Vista Fund.

(tt)     Plaintiff Harriet Surks invested in Putnam New York Tax Exempt Opportunities Fund.

(uu)     Plaintiff William Walsh invested in Putnam Intermediate U.S. Government Fund.

(vv)     Plaintiff Helen Wasserman invested in Putnam Convertible Income Growth Trust an Putnam High Yield Trust.

(ww)    Plaintiff Steven Weigand invested in Putnam Classic Equity Fund.

(xx)     Plaintiff Lori N. Wiswell invested in Putnam Intermediate U.S. Government Fund.

(yy)     Plaintiff Evon Yameen invested in George Putnam Fund of Boston.

(zz)     Plaintiff James W. Yameen invested in Putnam Growth Opportunities Fund and Putnam Money Market Fund.

(aaa)   Plaintiff Kenneth Yameen invested in Putnam Global Equity Fund.

(bbb)   Plaintiff Lisa Yameen invested in Putnam Discovery Growth.

(ccc)   Plaintiff Michelle Yameen invested in Putnam Discovery Growth, Putnam International Equity Fund, Putnam OTC & Emerging Growth Fund, Putnam Tax Smart Equity Fund and Putnam Vista Fund.

(ddd)   Plaintiff Miranda Zuber invested in Putnam Voyager Fund, Putnam Capital Appreciation Fund, Putnam International New Opportunity Fund and Putnam Vista

Fund.

(eee)   Plaintiff Kliel Rose invested in Putnam Voyager Fund.

21.   **The Putnam Corporate Defendants**:

(a)      Defendant **Putnam, LLC ("Putnam Investments"),** a Delaware limited liability company located in Boston, Massachusetts, operates an integrated full-service mutual find and investment advisory business and is one of the largest mutual fund families in the United States.  Putnam Investments has nearly 13 million mutual fund shareholder accounts, and over 2,200 institutional and 401(k) clients.  Putnam Investments offers a full range of equity and fixed-income products, including mutual funds, variable annuities and alternative investments for institutions and high net worth investors, as well as investment advisory services for institutional portfolios, 401(k)s, IRAs, and other investment plans.  The centerpiece of Putnam Investment's investment products is its 60 mutual funds (the "Putnam Funds").  Assets managed by Putnam Investments aggregated approximately $251 billion and $315 billion as of December 31, 2002 and 2001, respectively.

(b)      Defendant **Putnam Investment Management, LLC ("Putnam Management")**, a Delaware limited liability company located in Boston, Massachusetts, is the investment adviser for Putnam's 60 mutual funds, and is paid fees by the Putnam Funds for the investment management services it performs.  It is one of the largest investment managers in the United States in terms of assets under management.  It is a wholly owned subsidiary of Putnam Management Trust, a Massachusetts Business Trust, which is in turn wholly owned by Putnam Investments.  It is referred to herein as the "Adviser Defendant."

14

(c)     Defendant **Putnam Retail Management, LP ("PRM"),** a Massachusetts limited partnership located in Boston, Massachusetts, is a wholly owned subsidiary of Putnam Investments.  Prior to March, 2001, PRM was known as Putnam Retail Management, Inc.  PRM performs sales and marketing (i.e. distribution) services for the Putnam Funds and is paid fees by the Putnam Funds,including 12b-1 fees, for these services.

(d)     Defendant **Putnam Retail Management GP, Inc. ("PRMGP")** is the general partner of Putnam Retail Management, LP.  PRMGP is located in Boston, Massachusetts.

(e)     PRM and PRMGP will be collectively referred to herein as the "Distributor Defendants".

(f)     Defendant Putnam Fiduciary Trust Co. ("PFTC") is a wholly owned subsidiary of Putnam Investments, and provides administrative and custodial services to the Funds.

(g)     Defendant **Marsh & McLennan Companies, Inc. ("MMC"),** a Delaware corporation located in New York,  is a global professional services firm with annual revenues exceeding $10 billion.  MMC's immediate subsidiary is Putnam Investment Management Trust, a Massachusetts business trust registered in 1971 and an investment adviser under the Investment Advisors Act of 1940. Putnam Investment Management Trust, in turn, is the parent company of  Putnam Investments, and, through that company, owns and controls the other Putnam defendants. Through its various subsidiaries MMC provides clients with analysis, advice, and transactional capabilities in the fields of risk and insurance

15

services, consulting, and investment management. Approximately one-third of MMC's operating income is derived from its mutual fund operations.

(h)     Defendants MMC and Putnam Investments will Sometimes be referred to collectively as the "Parent Defendants".

22.     **The Putnam Officer Defendants are**:

(a)     Defendant Lawrence J. Lasser, a resident of Brookline, MA, was President and Chief Executive Officer of both Putnam Investments and Putnam Management from 1982 to 2003.  As of September 2003, Lasser was the highest paid executive in the mutual fund business.   In October 2003, Lasser was terminated for cause from his employment with Putnam Investments and Putnam Management following institution of proceedings by the Securities and Exchange Commission and the Massachusetts Secretary of State's Office against Putnam Management and others.  Nonetheless, in June of 2004, MMC gave Lasser severance payments totaling $78 million.

(b)     Defendant Charles E. Porter is and at relevant times was the Executive Vice President, Treasurer, and Principal Financial Officer of both Putnam Investments and Putnam Management.

(c)     Defendant Patricia C. Flaherty is and at relevant times was the Senior Vice President of both Putnam Investments and Putnam Management.

(d)     Defendant Willliam H. Woolverton is and at relevant times was Vice President and Chief Legal Officer of Putnam Management and Putnam Investments. Woolverton was responsible for legal compliance by the Putnam Corporate defendants.

16

(e)     Defendant Justin M. Scott, a resident of Marblehead, Massachusetts, was at all relevant times the managing director and chief investment officer of the funds within the Putnam International Equities Group and, as such, was responsible for investment decisions and oversight of those funds. After institution of the regulatory actions, on October 24, 2003, Scott was one of four portfolio managers terminated by Putnam Management as a result of his participation in the market timing scheme.

(f)     Defendant Omid Kamshad, a resident of Weston, MA, was at all relevant times the managing director and chief investment adviser of the funds within the Putnam International Core Equity Group and, as such, was responsible for the investment decisions and oversight of those funds. After institution of the regulatory actions, on October 24, 2003, Kamshad was one of four portfolio managers terminated by Putnam Management as a result of his participation in the market timing scheme.

(g)     Defendant Geirulv Lode was at all relevant times portfolio manager of the funds within Putnam's Global Core Equity group.

(h)     Defendant Carmel Peters was at all relevant times Director of the funds within Putnam's Emerging Market Equities group and was also a member of International Core Team.

23.     **The Trustee Defendants**, who act as trustees of all the Putnam Funds, all have a business address at One Post Office Square, Boston, MA 02109. According to information disclosed in Fund Statements of Additional Information ("SAI's") they are:

(a)     Defendant George Putnam III has been a Trustee since 1984 and

17

President of the Board of Trustees from 2000 to 2003. Putnam's family founded Putnam Investments, and George Putnam is an interested Trustee, as defined by the Investment Company Act.

(b) Defendant A.J.C. Smith has been a trustee since 1986. Smith is Chairman of the Board of Directors and CEO of MMC and is an interested Trustee.

(c) Defendant Jameson A. Baxter has been a Trustee since 1994.

(d) Defendant Charles B. Curtis has been a Trustee since 2001.

(e) Defendant Ronald J. Jackson has been a Trustee since 1996.

(f) Defendant Paul L. Joskow has been a Trustee since 1997.

(g) Defendant Elizabeth T. Kennan has been a Trustee since 1992.

(h) Defendant John A. Hill has been a Trustee since 1985, and became President of the Board of Trustees in 2003.

(i) Defendant John H. Mullin, III has been a Trustee since 1997.

(j) Defendant Robert E. Patterson has been a Trustee since 1984.

(k) Defendant W. Thomas Stephens has been a Trustee since 1997.

(l) Defendant W. Nicholas Thorndike has been a Trustee since 1992.

24-30.

**B.    Additional Defendants**:

31.    Various financial institutions that are not affiliates of the Putnam Corporate Defendants were also active participants in late trading and market timing schemes that injured the Funds. These "Additional Defendants" are:

18

(a)      **Defendant Bank of America Corp. ("BOA")** is a Delaware corporation with its headquarters at Bank of America Corporate Center, 100 N. Tryon Street, Charlotte, North Carolina.[2]   BOA is a bank holding company and a financial holding company that provides a diversified range of banking and non-banking financial services and products.  BOA is the indirect parent of Banc of America Securities LLC.

(b)      **Defendant Banc of America Securities LLC ("BAS")**, a Delaware limited liability company, is a wholly-owned subsidiary of NationsBanc Montgomery Holdings Corporation, which is itself a wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is wholly owned by BOA. BAS, a registered broker-dealer, is a full-service United States investment bank and brokerage firm with principal offices in San Francisco, California; New York, New York; and Charlotte, North Carolina. BAS is also registered as an investment adviser pursuant to the Investment Advisers Act of 1940.  In its capacity as broker-dealer, BAS accepts, executes and clears orders for hundreds of mutual funds, including the Funds.

(c)      **Defendant Kirlin Securities Inc., ("Kirlin")**  Kirlin Securities Inc., ("Kirlin") a Delaware corporation, is a registered investment advisor and broker-dealer, headquartered at 6901 Jericho Turnpike, Syosset, New York.  Among other things, Kirlin is a mutual fund retailer and a broker-dealer selling variable life insurance or annuities.  Kirlin introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose

---

[2] Effective April 1, 2004, FleetBoston Financial Corporation ("Fleet"), a Rhode Island corporation, merged with and into BOA pursuant to an Agreement and Plan of Merger, dated as of October 27, 2003.

of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds.  Kirlin further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.  In addition, Kirlin sold "under the radar" timing capability to various brokers and hedge funds involved in market timing.

(d)     **Defendant Trautman Wasserman & Company, Inc.** ("Trautman"), a Delaware corporation, is a registered investment advisor and Broker-Dealer headquartered at 500 Fifth Avenue, Suite 1440, New York, New York.  Trautman was an active participant in the unlawful scheme alleged herein.

(e)     **Defendant Pritchard Capital Partners LLC** ("Pritchard"), a Louisiana limited liability company, is a registered investment advisor and Broker-Dealer headquartered at 2001 Lakeshore Drive, Mandeville, Louisiana.  Pritchard was an active participant in the unlawful scheme alleged herein.

(f)     The **Canary Defendants:**

(i)     **Canary Capital Partners, LLC** ("Canary") is a New Jersey limited liability company with its principal offices in Secaucus, new Jersey. At all relevant times, Canary was a hedge fund engaged in the business of late trading and timing mutual funds. **Canary Capital Partners, Ltd**. ("CCP Ltd.") is a Bermuda  limited liability company. At all relevant times, CCP Ltd. was also a hedge fund engaged in the business of timing mutual funds. **Canary Investment Management, LLC** ("CIM") is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey. At all relevant times, CIM managed the assets of CCP and CCP Ltd., in exchange for a fee equal to 1.5

percent of the assets of Canary plus 25 percent of the profits above a certain threshold. As of July 2003, CIM has received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund.

(ii)   **Edward J. Stern** ("Stern") is a resident of New York County, New York, and at all relevant times was the Managing Principal of Canary, CCP Ltd. and CIM. **Defendant Noah Lerner ("Lerner")** was at all relevant times an employee of Canary. **Defendant Andrew Goodwin ("Goodwin")** was at all relevant times up to 2001 an employee of Canary.

(iii)   Canary, CCP Ltd., CIM and Stern are sometimes collectively referred to herein as "Canary". In September 2003, Canary reached a settlement **of charges filed against** it by the Attorney General of the State of New York involving late trading and market timing.

**C.   <u>The Nominal Defendant Putnam Funds</u>.**

32.   Plaintiffs bring this action on behalf of the entire family of Putnam Funds, as well as on behalf of the specific funds in which they invested, which are Massachusetts business trusts.

(a)   The Putnam Funds Family consists of about 60 mutual funds identified in the Appendix.   Each of the Putnam Funds is created and sponsored by Putnam Investments, and is managed under the supervision of a board of Trustees. The Trustees of all the Funds, who are designated by the adviser and serve indefinite terms, not only are

essentially the same, they have been the same throughout the period covered by  this

complaint; and the Trustee meetings for the Funds occur en masse. Each of the Funds also

has the same adviser, the same distributor, the same custodian, the same transfer agent, and,

the same shareholder service provider. The agreements between the Funds and each of these

entities are identical form agreements, with differences only in the fee percentages; and in

many instances the funds share costs among themselves. In substance, then, all the Putnam

Funds are, de facto, operated as a single entity.  Plaintiffs therefore bring this action as a

derivative action on behalf of the entire Putnam Fund Complex.

(b)     Plaintiffs also bring this action on behalf of the particular funds in which

they invested.  In some instances plaintiffs invested in funds that were actually "portfolios"

of investments issued by a single master trust, in which case plaintiffs sue on behalf of the

entire master trust in which they invested.

## IV.  <u>STATEMENT OF FACTS</u>

### A.     <u>General Factual Allegations</u>

#### 1.     <u>Introduction</u>

33.     Mutual funds enable small investors to invest long-term capital in the stock and

bond markets.  Specifically, mutual funds were intended to enable small investors to (a)

accumulate diversified stock portfolios for retirement or other long-term investing with

smaller amounts of capital than otherwise would be required for such investing, (b) avoid the

transaction costs that ordinarily accompany stock and bond trades, and (c) utilize the services

of professional investment advisers whose services otherwise would not be available at

affordable prices.

34.     Investors contribute cash, buying shares in the mutual fund, the number of which is directly proportionate to the amount of the investment.  Mutual fund shares are issued pursuant to prospectuses that must comply with The Securities Act of 1933 and the Investment Company Act.  The investor's cash is then used by the Fund to purchase such securities as are consistent with the stated investment goals and objectives of the mutual fund in the Prospectus.

35.     Mutual funds typically hold no assets other than cash and the securities purchased for the benefit of their shareholders and engage in no investment activities of their own.

36.     Mutual Funds typically have no employees.  Although funds may have officers, the portfolio managers and all of the officers are employees of the investment adviser.  The adviser "sponsors" the funds and as a practical matter is responsible for the initial creation of the funds and creating new funds in existing series.

37.     Whether corporation or trust, typically all of the trustees are the same individuals and have the same responsibilities, the only difference between trustees being the form of entity they serve.  Trustees have ultimate responsibility for the management of the funds.

38.     Each of the funds is created and sponsored by the adviser and is managed under the supervision of its trustees.  The same trustees have supervised all the Funds at all times relevant hereto, and their meetings for all the Funds occur at or about the same time.  Each

of the Funds has the same adviser, who in turn appoints the same trustees, the same distributor, the same custodian, and the same transfer agent for all the Funds, all of whom serve indefinite terms.  The agreements between the Funds and each of these entities are substantially identical form agreements, with only minor differences only in fee percentages. In many instances, the funds share costs among themselves.  In substance, all the Funds are operated as a single *de facto* entity.  Plaintiffs therefore bring this action as a derivative action on behalf of the entire Putnam family of funds, as well as on behalf of the particular Funds in which they invested.

39.   Mutual fund advisers charge and collect substantial management, administration, marketing and distribution, and other fees and compensation from the funds as a percentage of assets under management.  Mutual fund advisers have a direct economic incentive to increase the amount of assets in the funds, and thus their own fees and compensation.

## 2.   NAV Pricing

40.   Mutual fund shares are priced once each day, usually following the close of financial markets in New York at 4:00 p.m. Eastern Time.  The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities in a particular fund's portfolio, plus the value of any uninvested cash that the fund manager maintains for the fund and minus any expenses accrued that day.  Although mutual fund shares are bought and sold all day long, the price at which the shares trade does not change during the course of the day.  Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:00

24

p.m. are priced at the next day's NAV.  This practice is known as "forward pricing" and has been required by law since 1968.

41.    Because NAV is set just once at 4:00 p.m. every day under the forward pricing rules, each day's NAV is inefficient.  This is because the NAV has not incorporated the material information affecting the prices at which the underlying securities will trade by 4:00 p.m.  Thus, the prices at which mutual funds trade are often "stale."  In addition, mutual fund prices do not always reflect the true value of the stocks or bonds, especially thinly-traded securities or securities with high price volatility, but low trading volume, such as especially mid-cap, small-cap, and sector stocks, or high-yield and municipal bonds.

42.    Forward pricing gives rise to a number of manipulative practices, all of which may be characterized as "market timing."  These manipulative practices exploit the inefficiency of forward pricing in a number of ways involving short-term "in-and-out" purchases and redemptions of mutual fund shares that are "timed" to precede small movements in the market prices of the securities in which a fund invests before the NAV reacts to the price changes.

### 3.    Market Timing Transactions

43.    Market timing transactions are frequently referred to as "round trips," because market timing involves a purchase made in anticipation of a near-term price increase that will trigger a quick sale.  For example, in the case of international funds that are inefficiently priced because, as a result of domestic and foreign markets operating at different times, the last-trade prices in the foreign markets have not yet incorporated movements in the United

States markets, the round trips will occur within a short time frame, often within one or two days.  In other cases, such as bond funds — where the price inefficiency lasts longer because the information that causes the security to be re-valued takes longer to be disseminated by the financial markets — the duration of the round trip will be slightly longer.

44.     Market timing frequently includes or consists of "late trading," in which market timers are permitted to purchase or sell mutual fund shares after the close of trading but at the same prices as other investors who must trade the shares during the day to get that day's NAV.

45.     Market timers employ a variety of trading strategies to profit from small increases in the market prices for stocks and bonds in which the mutual funds invest by purchasing mutual fund shares before increases in the underlying securities affect the fund's NAV and redeeming fund shares after the NAV has risen.

46.     Many market timers purchase mutual funds when trading models analyzing performance trends indicate that prices of the underlying securities (and consequently the fund's NAV) will rise in the short-term.  For example, when a market timer's trading model indicates that the stocks of companies with small market capitalization will rise in the short term, the trader acquires small cap mutual fund shares in order to capture the benefit of the price rise.  The market timer who purchases small cap fund shares then redeems those shares once the predicted rise occurs.

47.     By purchasing and selling mutual fund shares, rather than the underlying small cap stocks, market timers avoid transaction costs such as commissions on each purchase and

sale of stock, which costs are borne by the fund itself.

48.     Another market timing scheme is designed to take advantage of the fact that some NAVs are calculated using "stale" prices for the securities in the Fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated.

49.     One type of stale price market timing is "time zone arbitrage," which takes advantage of the fact that funds consisting primarily of foreign securities may calculate NAV based on stale prices.  A typical example is a U.S. mutual fund that invests in Japanese securities.  Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time.  When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.  If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low.  A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling those same shares once the NAV is adjusted to reflect the price increase.

50.     Predictable next-day price changes in foreign securities are not exploitable by trading in the securities themselves because those shares tend to re-price as soon as trading resumes the next day.  By the time a trader can buy the securities, the market price has risen to reflect the new information.  However, market timers can exploit the pricing of mutual fund shares because the funds are not re-priced in response to information that becomes

available while the foreign market is closed until the following day, effectively allowing market timers to buy stock at yesterday's prices.

51.    Another market timing scheme seeks to take advantage of inefficiency in the pricing of certain municipal, corporate, and mortgage bonds.  These bonds are not efficiently priced by the market, and consequently their prices tend to lag the prices at which more efficiently priced bond futures trade.  Market timers exploit this phenomenon by purchasing (or selling) shares of a municipal bond fund that invests in such bonds on days when the prices for bond futures rise (or fall), and do so at "stale" prices.  Market timers employing this trading scheme sell (or purchase) these mutual fund shares a day or two later once the prices of the bonds have "caught up" to the prices of the bond futures, thus earning huge profits with little or no corresponding risk.

52.    Yet another market timing scheme is "liquidity arbitrage."  Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies.  The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

**4.    <u>Late Trading</u>**

53.    Because of forward pricing, mutual funds are also susceptible to a manipulative practice known as "late trading."  Late trading, either in conjunction with market timing or as a separate manipulative trading scheme, is the unlawful practice of allowing some investors to purchase or redeem mutual fund shares ***after*** 4:00 p.m. at that day's NAV, even

28

though such after-hours trades should be priced at the next day's NAV.

54.     Late traders seek to take advantage of events that occur after the close of trading, such as earnings announcements, by purchasing shares of mutual funds on good news or redeeming shares on bad news at prices that do not reflect those events and are therefore under- or over-valued, respectively.  "Late trading can be analogized to betting today on yesterday's horse races."[3]  The manipulative device virtually eliminates investment risk.

55.     The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys or redeems.  When the late trader redeems his shares and claims his profit, the mutual fund manager has to either sell stock or use cash on hand — stock and cash that belong to the fund and its shareholders and would otherwise remain invested — to give the late trader his gain.  The late trader's profit is revenue withheld from the  mutual fund. The forward pricing rule was enacted to prevent precisely this kind of abuse.  *See* 17 C.F.R. §270.22c-1(a).

56.     Late trading can be accomplished in at least two different ways.  The first way market timers are able to trade late is by making arrangements with a mutual fund adviser or a third-party intermediary who has made arrangements with a mutual fund adviser to have access to a trading terminal after the close of trading at 4:00 p.m. each day.  Defendant BAS provided trading terminals to at least three broker-dealers that engaged in market timing and

---

[3]  *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

Canary — in effect, making them branch offices of BAS, but unencumbered by BAS's obligation to adhere to the forward pricing rule — giving them the ability to place orders for mutual fund shares as late as 6:30 p.m. Pacific Time, more than five hours after the financial markets closed in New York each day.

57.     Market timers are also able to trade late by making arrangements with intermediaries, such as broker-dealers, trust companies, and other clearing agents, to combine the market timers' trades with other mutual fund purchases or redemptions each day, which are processed as batch orders.  These intermediaries net purchases against redemptions, and submit the net orders to a mutual fund's transfer agent through the Mutual Fund Settlement, Entry and Verification Service ("FundSERV"), an automated system operated by the National Securities Clearing Corporation ("NSCC"), the only registered clearing agency that operates an automated system for processing mutual fund orders.

58.     Although orders must be submitted to the intermediary broker-dealers, banks, and retirement plans before 4:00 p.m. eastern time, SEC rules permit those intermediaries to forward the order information to FundSERV or transfers agents at a later time.   Often intermediaries process orders in the early evening.  The entire process, ending in processing of orders by the transfer agent, is typically completed in the middle of the night.

59.     Late traders have found numerous ways to exploit the forward-pricing regime to their advantage.  For example, some intermediaries allowed certain preferred investors to place orders after the 4:00 p.m. cutoff, but before orders were submitted to transfer agents. These intermediaries sometimes blended late trades with legitimate trades in the net order

information submitted to FundSERV in order to conceal the late trading.  In other cases, late traders placed orders before the 4:00 p.m. cutoff, but were permitted to cancel or retract the orders after 4:00 p.m.  Similarly, some intermediaries have permitted late traders to alter orders after 4:00 p.m.  Finally, some late traders were given trading platforms, integrated hardware-software systems, that allowed them to trade mutual fund shares directly without using an intermediary to submit orders to FundSERV.  In some cases, fund managers themselves permitted and aided late trading by fund investors.

60.     Late traders were not necessarily restricted to trading in any single fund family through these schemes. Often intermediary broker-dealers sell shares of many different fund families through "Supermarkets."  It is not unusual for a single Supermarket to offer thousands of mutual funds.  By gaining access to the trading platform of a fund Supermarket, a market timer could late trade all of the funds in that Supermarket.  Likewise, a market timer could late trade many different mutual funds through agreements with broker-dealers who operate a fund Supermarket.

61.     Market timing was not limited to third parties who acted either alone or in complicity with intermediaries to time mutual funds.  Fund insiders, like advisers, managers, and portfolio managers, sometimes unfairly availed themselves of the opportunity that market timing provided for quick profits at the expense of the mutual funds.

###     5.     Mutual Fund "Short Selling" Strategy

62.     A corollary to market timing used by some investors pursuing market timing strategies involved shorting the underlying securities that make up a fund portfolio.  Using

this technique timers were able to profit in both rising and falling markets. Generally, fund managers do not disclose the portfolio holding information of the funds they manage. Although this information is disclosed in semi-annual and annual reports, the information is not current when it becomes publicly available.  In fact, portfolio managers are generally protective of this information and will not disclose it to individual investors and fund trackers like Morningstar.  However, some fund insiders provided detailed information regarding the portfolio holdings of funds to market timers.  The market timers could then buy the fund and simultaneously sell short[4] a basket of stocks that mirrored the fund's holdings, leaving the timer overall market neutral.  If the value of the underlying securities increased, the timer would sell the shares of the fund earning a quick profit.  When the value of the underlying securities decreased the timer would close out the short position, again earning a quick profit.  By working with derivative dealers to create "equity baskets" of short positions that mimicked the effect of shorting every stock in the mutual fund, a timer can reduce transaction costs associated with this strategy.  Often the derivative dealers who assisted timers in creating short baskets were affiliates of banks that were loaning money to timers for timing purposes.

**6.      Market Timing Is Easy to Detect and Has Been Well-Known Since 1997**

63.      Market timing in mutual funds has occurred at least since the late 1970s. During the 1980s and 1990s, a number of papers and reports were published by the media,

---

[4]  Short selling involves selling a security that the seller borrows on the assumption that the value of the security will drop and the short seller will be able to replace the borrowed security at a lower price than the price the short seller sold it for.

by scholars, and by market timers themselves that described various market timing schemes and discussed the adverse impact of market timing on mutual funds.  The mutual fund industry became aware of potential problems from stale prices as early as 1981 by virtue of the *Putnam International Equities Fund No Action Letter*,  Fed.Sec.L.Rep. ¶ 76,816, 1981 WL 25522 (Feb. 23, 1981), which explicitly discussed the question of whether pricing methods used by United States international funds properly could reflect the "fair value" of underlying assets given that different nations' markets close at different times.

64.     Prior to September 3, 2003, market timing and late trading had become common, if not unlawful, practice.  For example, a website called www.hedgefund.net listed hedge funds whose trading strategy was mutual fund market timing.

65.     In 2000, the Society of Asset Allocators and Fund Timers, Inc. ("SAAFTI") held a conference in Chicago that was attended by brokers and capacity consultants who secured and offered negotiated timing capacity in mutual funds and in annuities that held mutual funds.  The meeting was attended by the investment advisers of many mutual fund families who were there for the specific purpose of soliciting timing business from the brokers and consultants.

66.     Mutual fund managers, including investment advisers and portfolio managers, were at all relevant times aware of market timing (including late trading) and the deleterious impact of market timing (including late trading) on mutual funds and fund performance. Some mutual fund managers adopted measures ostensibly to prevent or deter market timing and late trading, such as redemption penalties.

67.     Fund managers were able to detect timing transactions in their funds through well-developed mechanisms, such as tracking the number of buy-sell orders, or "round trips," in a single account or monitoring the size of transactions to determine if a trader was a timer. The fund manager could then exercise discretion to refuse to execute trades on that account, forcing the timer to resort to the subterfuge of multiple accounts or multiple brokers.  These subterfuges frequently required the assistance of third party intermediaries to execute trades for the timer in such a fashion that the timing might go undetected.

68.     However, mutual fund managers, including investment advisers and portfolio managers, permitted or encouraged market timing and late trading, notwithstanding the deleterious impact of market  timing and late trading on mutual funds and fund performance, and despite the measures they adopted ostensibly to prevent or deter market timing and late trading, including redemption penalties, because they profited handsomely from market timing and late trading and the arrangements they made with market timers and late traders.

69.     Market timing is easy to detect through shareholder turnover data.  A ratio of the number of shares redeemed to the number of shares outstanding is a useful means of detecting and identifying market timing in mutual funds.  Because timers make frequent "round trips",  when timers are active in a fund, the number of shares redeemed greatly exceeds the number of shares that ordinarily would be redeemed in the absence of market timing.

70.     A fund that has not been timed will have a low ratio of redemptions-to-shares outstanding, whereas a fund that has been timed will have a much higher ratio of

redemptions-to-shares outstanding. Timed funds have redemption ratios as many as five, ten, or even 100 or more times higher than the redemption ratios for funds that are not timed.

71.     Mutual fund managers, including advisers and portfolio managers, routinely monitored mutual fund redemption rates using a variety of mechanisms of detection that were well-developed, and thus were aware of, or recklessly disregarded indications of, market timing in the form of higher than normal redemption rates.

72.     By 1997, market timing in mutual funds was well-known and well-documented. During October, 1997, Asian markets were experiencing severe volatility. On Tuesday October 28, 1997, the Hong Kong market index declined approximately fourteen percent, following the previous day's decline on the New York stock market.  Later on Tuesday the 28th, the New York markets rallied.  Knowing that the Hong Kong market would rebound the next day, U.S. mutual funds invested in Hong Kong securities were faced with the dilemma whether to calculate NAV based on Tuesday's depressed closing prices in Hong Kong, or whether to calculate their NAV based on another method.  Several mutual fund companies determined that the closing prices in Hong Kong did not represent "fair value" and used an alternative method to calculate NAV.  Some investors (presumably market timers) who had expected to profit from the large price swings went so far as to complain to the SEC when Fidelity used fair value pricing.

73.     On November 5, 1997, the Wall Street Journal published an article by Vanessa O'Connell describing some of the responses by mutual funds to the October market turmoil. *See Mutual Funds Fight the 'Market Timers*,' Wall St. J., 11/5/97, C1.  For example, the

article described a "stock-market correction trading activity" policy announced by the Dreyfus mutual funds immediately following the drop and subsequent rebound of stock prices on October 28, 1997, which permitted Dreyfus to take an additional day to complete exchanges placed by telephone during a "severe market correction" in order to prevent harm to those funds from market timing.

74.     The SEC's investigation of fund companies' responses to the October, 1997 turmoil revealed that funds that used fair value pricing experienced less dilution than those that used market quotations.   Further, the number of investors who attempted to take advantage of the arbitrage opportunity was "fairly large."   *See* Barry P. Barbash, *Remembering the Past: Mutual Funds and the Lesson of the Wonder Years,* 1997 ICI SECURITIES LAW PROCEDURES CONFERENCE (Dec. 4, 1997).

75.     By 2001, academic research estimated that between February 1998 and March 2000 market timing caused dilution damages exceeding $420 million in a sample of only approximately 20 percent of the international funds then available to U.S. investors. *See* Jason T. Greene & Charles W. Hodges, *The Dilution Impact of Daily Fund Flows on Open-End Mutual Funds*, Journal of Financial Economics 131 (July 2002).

76.     One recent study estimated that U.S. mutual funds lose over $4 billion per year to timers.  *See* Eric Zitzewitz, *Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds,* Journal of Law, Economics & Organization 19:2 (Fall 2003), 245-280.

77.     By 2002 specialty firms began marketing fair value pricing programs to assist mutual fund companies in reducing arbitrage opportunity in international funds.  These firms

provide programs to mutual funds that eliminate arbitrage opportunity by bringing stale prices in international securities up to date as of the time when NAV is calculated. One firm, ITG, now offers a Fair Value Model providing "fair value adjustment factors for over 34,000 stocks in 43 markets outside the U.S." *See* http://www.itginc.com/research/fvm.html.

**7.    Market Timing Arrangements**

78.    Most market timing (including substantially all late trading) in mutual funds took place through negotiated written or oral agreements giving market timers authority to trade certain amounts within a given mutual fund family or a number of fund families. The authority to time mutual funds is known as "capacity." Market timing became so widespread that many mutual fund advisers operated "timing desks" to service market timers.

79.    Timers, the intermediaries and the Funds' managers and advisers entered into ***specific negotiated agreements*** to permit timing of certain funds in a fund family, often with prominent financial institutions lending money to timers to effect the trading and monitoring the trades. Through the misuse of sophisticated computer equipment used for clearing mutual fund trades, market timing soon morphed into late trading, a practice which ***guarantees*** profits.

80.    Mutual fund advisers, distributors, and their affiliates, whose fees are a percentage of fund assets, profited from capacity arrangements that encouraged market timing, as well as from timing "under the radar," by charging and collecting fees on the money deposited by market timers in the mutual funds.

81.    Market timers frequently offered mutual fund advisers, distributors, and their

37

affiliates static, non-trading assets, called "sticky assets," in exchange for the right to time. In other cases, timers simply moved their money between timed mutual funds and money market funds in the same fund family, thereby earning additional fees for the mutual advisers, distributors, and their affiliates.

82.     As Stephen M. Cutler, the Director of the SEC's Division of Enforcement, testified on November 3, 2003, before the Senate Subcommittee on Financial Management, the Budget and International Security Committee on Government Affairs:[5]

> **About half of the fund groups appear to have some kind of agreement or arrangement with frequent traders**: 50% of responding fund groups appear to have one or more arrangements with certain shareholders that allow these shareholders to engage in market timing -- *i.e.* these shareholders have been given "market timing capacity." The market timing of persons with these arrangements appears to be inconsistent with the groups' policies and, in some cases, the fund groups' prospectus disclosures and/or fiduciary obligations. We are aggressively following up on these arrangements.
>
> **Quid pro quo arrangements**: Although the information provided in this area is limited it appears that many of the persons proposing a special arrangement to get market timing space offered to invest so-called "sticky" or long-term assets in one or more funds in the complex. In most of the situations where sticky assets were discussed, the funds in which these assets were to be invested were not the same funds to be market timed by the person involved in the arrangement.

---

[5]  *Testimony Concerning Recent Commission Activity To Combat Misconduct Relating to Mutual Funds: Hearing Before the Senate Subcommittee on Financial Management, the Budget, and International Security, Committee on Governmental Affairs*, 108th Cong. (Nov. 3, 2003) (testimony of Stephen M. Cutler, Director, Division of Enforcement, U.S. Securities & Exchange Commission).  Mr. Cutler offered the same testimony on Nov. 4, 2003, before the *House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, Committee on Financial Services*.

83.     Market timers obtained capacity either directly through mutual fund advisers, distributors, and their affiliates, or indirectly through broker-dealers or other timers.  Many fund families had "Anchor Brokers" or "Anchor Timers," who were designated broker-dealers or timers who had timing capacity agreements with a fund's adviser or its affiliates, and who doled out market timing "capacity" to timers.

84.     Negotiated market timing arrangements often involved other financial institutions as participants in the timing schemes, and those financial institutions (such as banks and brokerage firms) had other business relationships with the mutual funds that encouraged the funds to accommodate the other financial institutions as well as the market timers.

85.     Banks who financed market timing negotiated loans and swaps that provided market timers with leverage at exorbitant rates to time and late trade mutual fund shares as well as short equity baskets.  The banks entered these financing arrangements knowing that the loans would be used for market timing, late trading, and short baskets.  The financing consisted of loans for market timing and late trading, and swaps for shorting.  The collateral for the loans were mutual fund shares, so the banks followed trading closely to ensure that their loans were fully secured.  Under swap arrangements, the swaps are in the bank's name as account holder, in which event the market timer manages the money, pays interest to the bank, and keeps the profit.

86.     Broker-dealers and other intermediaries who offered timing capacity received remuneration  from both the mutual funds themselves and the market timers to whom they

allocated capacity.

87.     Distributors and other service agents who permitted timing also benefitted by receiving increased fees based on the money deposited into the mutual funds for market timing purposes.  Distributors often receive fees based on assets under management and may earn commissions on sales of fund shares.  Such fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.

88.     Intermediaries who facilitated market timing also received "wrap fees" from market timers.  Wrap fees are customarily charged to investors as a single fee for a variety of investment services, such as commission trading costs and fees of an outside money manager.  Wrap fees are charged as a flat percentage of assets rather than on a transaction-by-transaction basis.  The name refers to the fact that these charges usually "wrap" a variety of investment services into a single fee — usually from 1 to 3 percent of assets.  Broker-dealers who offered timing capacity to market timers often charged a percentage of assets that they termed a "wrap fee," even though the brokers did not generally give investment advice.

89.     Typically, 12b-1 Fees are deducted from fund assets and paid to the fund's

primary distributor, usually an affiliate of the adviser.  Distributors usually pay a portion of those 12b-1 Fees to the broker-dealers who sell fund shares.  The broker-dealers continue to receive 12b-1 fees for as long as their client's money is invested in the funds.  However, broker-dealers who offered timing capacity often received 12b-1 fees directly from the funds themselves, which were paid in addition to the 12b-1 fees paid to the mutual fund distributors.

90.     Negotiated capacity arrangements by market timers also facilitated late trading through a variety of manipulative schemes.  For example, market timers frequently traded through third parties, *i.e.*, broker-dealers or other intermediaries who processed large numbers of mutual fund trades every day through omnibus accounts where net trades are submitted to mutual fund companies *en masse*.  By trading this way, market timers evaded detection of their activity amid the other trades in the omnibus accounts.  This is one example of market timing "under the radar."

91.     Timing under the radar is intended to avoid the "market timing police," a colloquial term used by market participants to describe persons employed by mutual funds ostensibly to detect and prevent market timing.  Market timing police often ignored or did not prohibit negotiated market timing, or were instructed by their superiors that certain favored investors wee exempt from the restrictions.

92.     Brokers who assisted in timing under the radar employed a number of tactics to avoid detection and to continue their illicit activities if a fund took steps to prevent their timing activity.  These tactics included:  (a) using multiple account numbers, registered

41

representative numbers, and branch numbers to conduct market timing trades; (b) creating and using two or more affiliated broker dealers; (c) using different clearing firms to clear trades; and (d) switching between mutual fund families. Some market timers employed these tactics directly, without relying on an intermediary broker.

### a.   Banc of America Securities LLC

93.   Sometime prior to late 1999, in order to facilitate late trading and timing of mutual funds by brokers and timers through BAS, BAS, in conjunction with ADP, which operates its "back office," created a special electronic trading system called "RJE" ("Remote Job Entry"), and colloquially referred to as "the box," which it provided to certain market timers and broker-dealers who acted as intermediaries for a large number of market timers.

94.   RJE is an electronic mutual fund entry order system that could be installed in different locations and was directly hooked up to ADP through a modem. In effect, those who had the box became branches of BAS.

95.   Those market timers and broker-dealers who received the box could enter mutual fund orders at 5:30 p.m., 7:00 p.m., or 7:30 p.m. Eastern Time directly into ADP's clearing system, and therefore had the capability to buy and sell mutual fund shares at the 4:00 p.m. closing price up to 3½ hours later. BAS's standard system, called "MFRS," allowed trades to be entered as late as 5:30 p.m., but only if trade tickets were time stamped prior to 4:00 p.m.

96.   The box allowed broker-dealers and others to circumvent BAS's standard system and the 4:00 p.m. deadline for buying and selling mutual fund shares at that day's

prices, in violation of the forward pricing rule.  17 C.F.R. § 270.22c-1(a).

97.     In addition, broker-dealers and others who had the box could "batch" mutual fund trades instead of executing them one at a time, which is the standard method of entering mutual fund orders through BAS.  The "batching" capability allowed brokers and timers who had the box to enter mutual fund trades *en masse* after the 4:00 p.m. deadline at that day's prices.

98.     Initially, the box was developed for use by the Broker-Dealer Services ("BDS") group of BAS and defendant Aurum, a broker-dealer who was known to be extensively involved in late trading and timing mutual funds.  At the time the box was developed, BDS was not very profitable, and it hoped to increase its margins by charging a per trade fee to brokers that had access to the box.

99.     BAS installed the box in the offices of three broker-dealers who routinely late-traded and timed mutual funds on behalf of their clients and themselves.  BAS gave the box to defendant Aurum in around late 1999 or early 2000, to defendant Trautman in or about early 2001, and to defendant Pritchard in early 2003.  Each of these broker-dealers was charged $10 for each trade that was entered through the box.

100.     BAS entered into clearing agreements with these brokers that, among other things, obligated them to comply with the securities laws. By virtue of these agreements, BAS sought to shift liability for its knowing violation of the forward pricing rule onto the broker-dealers.

101.     BAS also installed the box in Canary's offices in or around the summer 2001,

43

but did not charge any fee to Canary for orders placed through the box. Rather, the Private Client Services ("PCS") group of BAS provided the box free of charge to Canary, which was not a broker-dealer, as part of a special arrangement negotiated between Stern and Theodore Siphol III ("Siphol") of PCS, under which Canary was charged a wrap fee of 100 basis points (one percent) for late trading and timing funds offered by BOA and 50 basis points (0.5 percent) for late trading and timing funds offered by other mutual fund families.

102.   On September 16, 2003, the SEC instituted an administrative proceeding against Siphol charging him with violations of the Securities Act of 1933, the Securities Exchange Act of 1934, the ICA, and the IAA for his role in enabling Canary to engage in late trading shares of mutual funds offered by BOA and other mutual fund companies. The SEC charged Siphol[6] for his facilitation of Canary's late trading "manually" and through the box. As set forth in the SEC's order:

> "Manual" Late Trading at BAS
>
> 15.   In or around May 2001, Canary began to late trade the Nations Funds. At first, Canary conducted its late trading "manually." In the manual stage, Canary was able to engage in late trading primarily because Sihpol and his team falsified BAS' books and records. Prior to 4:00 p.m. ET, a Canary trader would send Sihpol or a member of his team a series of "proposed" mutual fund trades by e-mail or facsimile. Upon receipt, Sihpol, or a member of his team acting upon his instructions, would fill out an order ticket, time stamp it, and set it to one side until that evening. Thus, Sihpol created false order tickets that made it appear as if the orders had been received

---

[6] Siphol was also indicted on 40 counts in connection with late trading at BOA, including a scheme to defraud in the first degree, grand larceny in the first degree, violation of the Martin Act, and falsifying business records in the first degree.

prior to 4:00 p.m. ET.

16.   Sometime after 4:00 p.m. ET, a Canary trader would telephone Sihpol or a member of his team, and would either confirm or cancel the "proposed" trades.  If confirmed, Sihpol's team would fax the order (with its pre-4:00 p.m. time stamp and no post-4:00 p.m. time stamp) to the clearing department for processing.  As a result, Canary would receive that day's NAV. If Canary cancelled the "order," Sihpol or a member of his team would discard the ticket.

*Late Trading Through BAS' Electronic System*

17.  In the summer of 2001, BAS technicians installed the direct access system in Canary's offices.  Through this system, Canary was able to enter its trades directly into BAS' clearing function until 6:30 p.m. ET.

18.   After a Canary trader entered the trades directly into the system, the trader would print out a document confirming the trades and the time (after 4 p.m.) that the trades had been entered.  The trader then faxed the document to Sihpol or a member of his team.  The following day, Sihpol or a member of his team would use this document to reconcile Canary's trades. Once the trades were reconciled, Sihpol or a member of his team discarded the document.

19.  From the summer of 2001 until the summer of 2003, Canary used the electronic system to late trade.  Canary also late traded "manually" whenever there were technical problems with the electronic system.  BAS technicians also installed a second direct access system in the residence of a Canary trader.

20.   The electronic system enabled Canary to late trade with Nations Funds and in the many other mutual fund families with which BAS had clearing agreements.  By using the electronic system, Canary was able to send orders directly to BAS' clearing function, circumventing the normal trading process in which each brokerage order must be properly documented, including the time the order was received.

45

21.  Canary paid BAS a so-called "wrap fee" of one percent of the Canary assets in Nations Funds and one-half of one percent of the assets in other funds traded through the electronic link. Sihpol received a portion of this wrap fee.  In addition, Canary agreed to leave millions of dollars invested in BAC proprietary mutual funds on a long-term basis.  Canary also paid interest and other charges to BAS and its affiliates.  Canary also paid fees for the installation and maintenance of the electronic system.

103.   By March 2004, BOA admitted that, by allowing Canary and others to time and late trade mutual funds through its clearing platform, it caused harm not only to the Nations Funds, but to other mutual fund families as well:

> The Corporation has announced it will establish a restitution fund for shareholders of the Nations Funds who were harmed by Canary's late trading and market timing practices.  In addition, the Corporation announced that it will provide restitution for shareholders of ***third party mutual funds who were harmed by any late trading activities by Canary that are found to have occurred through the Corporation*** in the event restitution is not otherwise available from Canary, its affiliates, its investors or from any other third parties.

BOA Form 10-K for Fiscal year 2003, filed March 1, 2004 (emphasis added).

104.   On March 15, 2004, the SEC and the New York Attorney General announced a $675 million joint settlement in principle with BOA and Fleet in connection with their involvement in late trading and market timing.  BOA's monetary settlement was $375 million, comprised of restitution of $250 million and penalties of $125 million (and a fee reduction of $80 million over 5 years).

105.   The SEC Press Release announcing the settlement in principle states that the $375 million "will be distributed to the mutual funds and their shareholders that were harmed

46

as a result of market timing in Nations Funds and ***other mutual funds through Bank of America***." (Emphasis added). The same release quoted Mark Schonfeld of the SEC as saying:

> This settlement is a new benchmark in mutual fund market timing and late trading. Bank of America not only permitted timing in its own funds, ***it provided the instruments for timing and late trading of numerous other funds through its broker-dealer. This settlement will ensure compensation for all victims of the harm that resulted and prevent this misconduct from happening again***.

106. BOA's Press Release announcing the settlement states that, "subject to further discussions with the Nations Board of Trustees," approximately $25 million "would go to Nations Funds' shareholders" and the remainder to shareholders of other funds that were harmed by BAS' clearing of timing trades. Thus, ***BOA itself attributed $350 million of its $375 million monetary settlement to harm caused to other mutual fund families as a result of BAS' facilitation of late trading and market in other mutual fund families***.

107. In further recognition of BAS's misconduct in facilitating late trading through the box or otherwise, the BOA's settlement with the SEC and NYAG provides that BOA will exit the securities clearing business by the end of 2004.

108. Between late 1999 through 2003, BAS, either manually or by providing the box, allowed Aurum to late trade approximately $5.6 billion in third-party mutual funds, Trautman to late trade approximately $8.6 billion in third-party mutual funds, Canary to late trade $21.2 billion in third party mutual funds, and Pritchard to late trade approximately $4.9 billion in third party mutual funds.

47

109.    Defendant BAS, by providing the box to Trautman and Pritchard facilitated their others, caused late trading and timing in the Putnam Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Europe Growth A | $ 3,897,144 | $ 69,775,683 | $ 70,637,195 | $ 861,512 |
| International Equity A | 2,617,605 | 47,279,788 | 47,900,378 | 620,591 |
| American Government A | 3,104,796 | 27,279,788 | 27,774,807 | 140,174 |
| Global Equity A | 2,140,470 | 21,816,367 | 21,938,373 | 122,006 |
| International Growth A | 355,484 | 6,686,353 | 6,747,349 | 60,997 |
| Int'l Non U.S. Core Equity A | 886,616 | 8,544,672 | 8,604,202 | 59,529 |
| Int'l New Opportunities A | 1,315,915 | 12,526,045 | 12,590,203 | 26,158 |
| U.S. Government Inc. A | 117,763 | 1,526,000 | 1,530,169 | 4,169 |
| Asia Pacific Growth A | 14,335 | 150,519 | 149,515 | -1,003 |
| American Gov't Bond A | 160,308 | 1,514,000 | 1,507,527 | -6,473 |
| **TOTAL** | **$14,610,435** | **$197,492,059** | **$199,379,718** | **$1,886,659** |

110.    Defendant BAS, by providing the box to Canary, facilitated Canary's late trading and timing in the Putnam Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| International Equity A | $ 82,667 | $1,608,889 | $1,618,312 | $ 9,423 |
| U.S. Government Inc. A | 46,827 | 612,810 | 607,291 | -5,519 |
| Int'l New Opportunities A | 68,006 | 603,750 | 595,982 | -7,768 |
| **TOTAL** | **$197,500** | **$2,825,449** | **$2,821,585** | **$-3,864** |

## b.    **Canary**

111.    In or about the summer of 2001, as part of a package deal with BAS that included late trading and timing capacity in the Nations Funds, financing for late trading and timing trades in Nations Funds and other mutual funds, and unlimited capacity to late trade and time hundreds of other mutual funds, defendant BAS installed the "box", free of charge, at Canary's offices in Secaucus, New Jersey. The deal is memorialized in a letter dated May

1, 2001 by Stern to Siphol of BAS, in which, among other things, Stern writes:

> We plan on transacting our trades manually at first (via Fax), at a time of day that is a little bit earlier than  Matt [Augliero, a mutual fund clearing specialist at BAS] specified in our first meeting. As soon as we can work out our lending arrangement with the bank and begin transacting electronicall cia ADP [i.e. the box] we awill draw down leverage against the capital we have deployed in the Nations funds, effectively increasing our trading capital with your firm to $32 million. If all goes well, this capital should grow larger as we get a sense of what trades can and cannot be done via the Banc of American Securities Platform. We really would like to get going with ADP and begin trading electronically as soon as possible.

112.    Canary executed a total of $2,825,449 in late trading and timing trades in the Funds through its own BAS box and a BAS box provided to Trautman.

### c.    Aurum Defendants, Trautman, and Prichard

113.    The Aurum Defendants, Trautman, and Pritchard were broker-dealers or market timers who entered into express agreements with BAS enabling them to time and late trade mutual funds through the BAS box.  These defendants timed and late traded mutual funds both for their clients, who bought and sold hundreds of millions dollars worth of mutual funds, and for their own accounts.

114.    Trautman, which had the box since about early 2001, late traded and timed the Putnam Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Europe Growth A | 3,897,144 | $69,775,683 | $ 70,637,195 | $  861,512 |
| Global Equity A | 2,140,470 | 21,816,367 | 21,938,373 | 122,006 |
| Int Non US Core Eq A | 886,616 | 8,544,367 | 8,604,202 | 59,529 |

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| American Govt A | 889,372 | 7,755,9425 | 7,815,284 | 59,343 |
| Intl New Opport A | 1,315,915 | 12,564,045 | 12,590,203 | 26,158 |
| International Equity A | 115,396 | 2,256,682 | 2,274,531 | 17,849 |
| Asia Pacific Gr A | 14,335 | 150,519 | 149,515 | -1,003 |
| American govt Bond-A | 160,308 | 1,514,000 | 1,507,527 | -6,473 |
| **TOTAL** | **9,419,556** | **$124,377,910** | **$125,516,830** | **$1,138,920** |

115.    Trautman also late traded and timed the Putnam Funds on behalf of Canary, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| Putnam Europe Growth A | 203,278 | $3,504,780 | $3,551,825 | $47,045 |
| Putnam Intl New Opport A | 144,353 | 1,244,454 | 1,274,013 | 29,559 |
| Putnam American Govt A | 17,626 | 150,000 | 152,115 | 2,115 |
| **TOTAL:** | **365,257** | **$4,899,234** | **$4,977,953** | **$78,719** |

116.    Pritchard, which had the box since about early 2003, late traded and timed the Putnam Funds, as follows:

| Fund Name | No. of Shares Purchased and Sold | Dollar Value of Purchases | Dollar Value of Sales | Holding Period Realized Gain/Loss |
|---|---|---|---|---|
| International Equity A | 2,502,208 | $45,023,106 | $45,625,848 | $602,742 |
| American Govt A | 2,215,425 | 19,878,691 | 19,959,523 | 80,831 |
| Intl Growth M | 355,484 | 6,686,353 | 6,747,349 | 60,997 |
| U.S. Govt Inc A | 117,763 | 1,526,000 | 1,530,169 | 4,169 |
| **TOTAL:** | **5,190,880** | **$73,114,149** | **$73,862,889** | **$748,739** |

117.    The late trading and timing orders that were processed through the box consisted of both "under the radar" late trading and timing, and late trading and timing arrangements between the Aurum Defendants, Trautman, and Pritchard, or their intermediaries, on the one hand, and mutual fund advisers, on the other hand. These defendants, or their intermediaries, received wrap fees for providing under the radar or

negotiated late trading/timing capacity in mutual funds.

118.    Even where late trading and timing was "under the radar," mutual fund advisers knew that funds were being timed by the sheer volume of asset turnover in the funds.  One advantage to the brokers and timers that late traded and/or timed "under the radar" — as the Aurum Defendants, Trautman and Pritchard sometimes did — was that they avoided paying wrap fees to the mutual fund families.  Where there was a negotiated timing arrangement with a mutual fund family, the defendants often shared their wrap fees with the mutual fund family advisers.

### d.    Kirlin Securities Inc.

119.    Among other things, Kirlin is a mutual fund retailer and a broker-dealer selling variable life insurance or annuities.  Kirlin introduced timers, including Canary, to various mutual fund complexes, including the Funds, for the purpose of establishing market timing arrangements, including those that permitted Canary's market timing activity in the Funds. Kirlin further engaged in the market timing scheme by executing timed trades on behalf of Canary and other timers.  In addition, Kirlin sold "under the radar" timing capability to various brokers and hedge funds involved in market timing.

120.    Sometime between 1998 and March 2003, Kirlin offered Canary timing capacity in two of the Funds, which Canary accepted.  Kirlin secured this timing capacity from the Putnam Defendants.

121.    Under the arrangement, Canary was permitted to make two round-trips per month in the two Funds.  Canary timed the Funds four or five times on this basis.

122.    Kirlin charged Canary a wrap fee for brokering the timing arrangement between Canary and Putnam, which Canary paid.

123.    Upon information and belief, Kirlin offered negotiated timing arrangements and "under the radar" timing capability in the Funds to other brokers and timers.

124-250. [Intentionally Omitted]

**8.    Impact of Market Timing and Late Trading**

251.    Market timing and late trading are inconsistent with and inimical to the primary purpose of mutual funds as long-term investments.  Mutual funds are marketed towards buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts.  Nonetheless, certain market timers have been allowed to make frequent in-and-out trades to exploit the inefficiency of forward pricing and the cost structure of the mutual funds.

252.    Market timing and late trading harm mutual funds, directly and indirectly, in a variety of ways.  The types of adverse impact caused to mutual funds from market timing generally can be grouped into three categories: (a) Dead Weight, (b) Dilution, and (c) Concentration.

253.    Dead Weight losses result from frequent transactions in mutual fund shares by market timers.  Dead Weight harms not just the Funds targeted and traded by market timers, but also affects other funds in the same fund family that are not market timed.

254.    Dead Weight losses include, but are not limited to, the following:

(a)    increased service agent fees, such as transfer agent, compliance

52

administrator, custodian, portfolio accounting, shareholder servicing agent, adviser, auditor, and fund accounting fees, and other agency fees, all of which increase based on the frequency of transactions and thus increase with market timing;

(b)      statement costs (including costs of printing and postage for statements of account activity) for account statements relating to market timers' trades;

(c)      higher capital gains tax liability resulting from the sale of underlying securities to raise cash for redemption, including redemptions caused by investors who flee the fund after learning of the late trading and timing scandal;

(d)      lost investment opportunity on cash that portfolio managers must hold in reserve to redeem market timers' shares that cannot be invested in furtherance of the funds' investment strategies and objectives;

(e)      inefficient trading in the Funds' underlying portfolio securities when investment advisers must buy or sell securities at inopportune times (e.g., buying shares of stock in a rising market or selling them in a declining market) to cover market timers' trades (as well as to cover the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal);

(f)      transaction costs for transactions in the Funds' underlying portfolio securities that result from market timing (as well as from the redemption of fund shares for those innocent fund investors who have withdrawn their investments from mutual fund families implicated in the scandal), which include bid-ask spreads and brokerage fees;

(g)      interest on borrowing to maintain the mutual funds' position in the

underlying portfolio securities; and

(h)    increased expenses for fixed costs (including trustee or director expenses) resulting from shareholder redemptions from mutual fund families implicated in the scandal.

255.    Market timing lowers the expected returns of mutual funds by restricting the amounts the fund portfolio managers are able to invest in furtherance of their investment strategies.  Because the money deposited into mutual funds by market timers is not expected to remain in the funds for long periods of time but is deposited and redeemed frequently, portfolio managers must keep greater uninvested cash balances in the funds than would be required to meet ordinary redemption demand in the absence of market timing.  With less cash available to invest, the net return on all fund assets (including the transient cash deposited by market timers) is lower than it would be otherwise if the managers were able to fully invest the money deposited by market timers.

256.    Dead Weight losses harm not only the funds that are timed, but can also harm non-timed funds.   Non-timed funds are harmed by market timing when timing increases costs that are shared by timed and non-timed funds within the same fund family.  Certain costs, for example custodian fees, are shared by all funds in a mutual fund family.  Market timing in one fund can cause an increase in these costs, which is then spread across all funds in the fund family.  This is true regardless of whether those fees are calculated on a transactional basis or as a percentage of assets in the funds.  If fees are calculated on a transactional basis, the costs are increased directly.  If fees are calculated as a percentage of

assets, the relevant service agent must charge a higher percentage of assets when the agreement is renegotiated in a subsequent year in order to compensate for predicted future transactions. Any service agent fees, statement costs, transaction costs, and interest charges on borrowing that increase as a result of market timing and are shared among multiple funds cause damage to timed-funds and non-timed funds alike.

257.   Non-timed funds were also harmed by market timing when large numbers of innocent investors redeemed their shares in the wake of the scandal. Fixed costs, such as director's fees, are shared among funds and are accrued daily. When large numbers of investors redeemed their shares after discovering that the funds were implicated in the market timing scandal, the assets of the funds shrank and the fixed costs became a greater burden.

258.   Dead Weight is exacerbated when timing occurs in international and small capitalization funds because the underlying securities tend to be the most expensive to trade due to high bid-ask spreads.

259.   In addition to exposing mutual funds to Dead Weight costs, market timers who purchase mutual fund shares on the expectation of a short-term price rise and redeem those shares at a profit also dilute the fund's assets. When a timer purchases based on an anticipated rise in the prices of the underlying securities, the portfolio manager cannot invest the timer's cash before the price of those securities rises. The timer therefore pays less than the true value of the fund share. When the underlying securities increase in price (as anticipated), the fund's NAV increases and the timer participates in this "unearned appreciation." The timer's unearned appreciation results in dilution of the fund's NAV dollar

for dollar.

260.    Dilution occurs when a market timer buys a mutual fund that has a stale price incorporated into its NAV, such as a fund invested in Japanese securities that calculates NAV based on information that is fourteen hours old.  Dilution is compounded because the market timer repeatedly purchases mutual fund shares at a NAV that does not accurately reflect the value of the underlying securities.

261.    Late trading in particular dilutes the assets of a mutual fund.  When a market timer places an order to purchase mutual fund shares after the 4:00 p.m. close of the financial markets, the price at which the order should be executed is the following day's higher NAV.  However, late traders are able to purchase the fund shares at the current day's lower NAV, thus reducing the purchase price for the shares and depriving the funds of the NAV appreciation between the two days.  Late traders recapture this saving in the form of increased profits when they subsequently redeem their mutual fund shares.

262.    Dilution occurs because the fund manager cannot invest the timer's cash at the stale price on which the NAV was calculated.  In order to do so, in the example of Japanese securities, the fund manager would have to invest the timer's cash fourteen hours prior to knowing what trade is needed.  The timer's cash is either invested in the underlying securities at the next day's non-stale price, or else held in cash, but in both cases the timer receives a proportionate share of the increase in NAV that results from the rising value of the underlying securities even though the timer's money was not invested when the value of the underlying securities increased.  Since the timer's money is either invested at a non-stale

price or held in cash, it causes a dilution of NAV across all of the fund's shares.

263.    Concentration occurs when a market timer sells shares of the fund just prior to a negative price movement in the underlying securities. The exploitation of the down turn in the market is the reversal of the exploitation of the up turn in the market in dilution. The fund manager cannot liquidate the underlying securities prior to the next-day drop in prices, and instead must sell those securities at the reduced prices. Therefore, the market timer is able to redeem shares based on a stale, inflated NAV, which concentrates the negative returns to the existing fund shares the next day.

**B.      Fund Family Specific Facts**

      **1.       The Putnam Family Fund Organization**

          **(a)      The Funds**

264.    The Putnam Funds consist of Massachusetts business trusts that function as open-ended management investment companies with an unlimited number of authorized shares of beneficial interest. Such investment companies are commonly referred to as mutual funds. Their affairs are governed by the Investment Company Act of 1940 (the "ICA"). These Funds are all sponsored and managed by the Putnam corporate defendants.

265.    Some of these Funds sell a single class of shares, while others sell multiple classes of shares, which are invested in a common portfolio of securities but differ in the sales charges and operating expenses they impose. Some of these Funds are stand-alone Massachusetts business trusts. Others are not entities at all, but are portfolios of investments offered by other Putnam entities ("master trusts"). Thus, investors in various Putnam

portfolios in fact hold an equity interest in the master trust that issues these portfolios.  A list of these funds and master trusts is appended.

266.   The Putnam Funds are not required to hold annual meetings and, upon information and belief, do not regularly hold annual meetings.

### (b) Management of the Funds

267.   The Putnam Funds are managed by the Putnam Corporate Defendants, with whom each Fund has entered into a series of form contracts. All the Putnam Corporate Defendants are owned and controlled, directly or indirectly, by Marsh & McLennan Companies, Inc. ("MMC"), the ultimate parent company, and by Putnam, LLC ("Putnam Investments"), the immediate parent entity.  These entities perform the following services for the Putnam Funds:

- •   Investment Advisory Services – Putnam Management

- •   Distribution Services – Putnam Retail Management ("PRM") and PRMGP

- •   Investor and Custodial Services – Putnam Fiduciary Trust Company ("PFTC")

268.   Defendant Putnam, LLC ("Putnam Investments") operates an integrated full-service mutual find and investment advisory business and is one of the largest mutual fund families in the United States. It has nearly 13 million mutual fund shareholder accounts, and over 2,200 institutional and 401(k) clients.  Putnam Investments offers a full range of equity and fixed-income products, including mutual funds, variable annuities and alternative investments for institutions and high net worth investors, as well as investment advisory

58

services for institutional portfolios, 401(k)s, IRAs, and other investment plans.   The

centerpiece of Putnam Investment's investment products is its 60 mutual funds (the "Putnam

Funds").  Assets managed by Putnam Investments aggregated approximately $251 billion and

$315 billion as of December 31, 2002 and 2001, respectively.

269.    Defendant Putnam Investment Management, LLC ("Putnam Management"),

is the investment adviser for Putnam's 60 mutual funds, and is paid fees by the Putnam Funds

for the investment management services it performs.  It is one of the largest investment

managers in the United States in terms of assets under management.  It is a wholly owned

subsidiary of Putnam Management Trust, a Massachusetts Business Trust, which is in turn

wholly owned by Putnam Investments.

270.    Investment advisory services are performed for the Putnam Funds pursuant to

Management Contracts between each of the Putnam Funds and Putnam Management. For

each fund, the Management Contract requires Putnam Management to furnish continuously

an investment program for each fund, determine how the fund's assets should be invested,

and manage the affairs and business of the fund.

271.    For each fund, the Management Contract requires Putnam Management to

comply with the provisions of the fund's Declaration of Trust and Bylaws and their stated

investment objectives, policies and restrictions, exercise the same care and diligence

expected of the fund's trustees, and use its best efforts to safeguard and promote the welfare

of the fund.

272.    Each Management Contract contains a schedule of fees to be paid by the Fund

to Putnam Management for services performed by Putnam Management.  The fee amount typically is based on a sliding scale of assets under management, with the fee/asset ratio declining as the assets within the fund increase.  The fee is payable 30 days after the end of each quarter.

273.    Other affiliates of Putnam Management are also paid fees in connection with services provided to the Putnam Funds.  The distributor, PRM, for example, is paid distribution fees ("12b-1 fees"); the investor services provider, PFTC, is paid shareholder services fees.   In each case, the amount of assets under management plays a critical role in determining the level of fees received.

274.    Defendant Putnam Retail Management, LP ("PRM"), is a wholly owned subsidiary of Putnam Investments.  Prior to March, 2001, PRM was known as Putnam Retail Management, Inc.  PRM performs sales and marketing services for the Putnam Funds and is paid fees by the Putnam Funds, including 12b-1 fees, for these services.

275.    For each fund, marketing and sales of shares to new and existing fund shareholders are performed for the fund pursuant to a Distributor's Contract between PRM and each fund, all of which are dated May 6, 1994.  The  Distributor's Contracts are essentially identical for all the Putnam Funds.

276.    For each fund, under the Distributor's Contract, PRM serves as the principal underwriter of fund shares and is paid distribution fees consisting of 12b-1 fees, contingent deferred sales charges, and/or front-end sales charges, depending on the class of Fund shares in question. Defendant Putnam Retail Management GP, Inc. ("PRMGP") is the general

partner of Putnam Retail Management, LP.

277.     Defendant Putnam Fiduciary Trust Company ("PFTC") is a Massachusetts corporation located in Boston, Massachusetts.  PFTC, through its division Putnam Investor Services, performs transfer, plan, dividend disbursing, custodial, and other administrative services for the Putnam Funds and their shareholders, and is paid fees by the Putnam Funds for these services.  PFTC is a wholly owned subsidiary of Putnam Investments. For each Fund, investor services are performed pursuant to an  Investor Servicing Agreement with PFTC, all of which are dated June 1, 1991, and all of which are substantially identical for all Putnam Funds.

278.     Custodial services are performed for each Fund pursuant to a separate Custodian Agreement between the fund and PFTC. The Custodian Agreements, which are also essentially identical for all the Putnam Funds, requires PFTC, through sub-custodians that it appoints, to perform administrative services with respect to the securities of the fund, including the duty to hold, release, and deliver securities of the fund upon specified events and circumstances, collect and account for sums owed to the fund, create and maintain records concerning the securities of the fund, and report to the fund's trustees and shareholders with respect to subject matter of its responsibility.

279.     The Custodian Agreement also requires each Fund to pay PFTC a fee for its services  "as agreed upon from time to time". Each fund pays fees to PFTC for these services based on a number of shareholder accounts, the number of transactions, and the net assets value of the fund.

280.    Collectively, the fees paid to all these Putnam Corporate Defendants are astronomical.  Marsh & McClennan reports that fees of all types from the Funds aggregated $2.16 billion in 2002 and $2 billion in 2003.

281.    Defendant Marsh & McLennan Companies, Inc. ("MMC") is a global professional services firm with annual revenues exceeding $10 billion.  MMC's immediate subsidiary is Putnam Investment Management Trust, a Massachusetts business trust registered in 1971 and an investment adviser under the Investment Advisors Act of 1940.  Putnam Investment Management Trust, in turn, is the parent company of Putnam Investments, and, through that company, owns and controls the other Putnam defendants.

282.    Through its various subsidiaries, MMC provides clients with analysis, advice, and transactional capabilities in the fields of risk and insurance services, consulting, and investment management. Approximately one-third of MMC's operating income is derived from its mutual fund operations.

### (c)    The Trustees of the Funds

283.    The Trustees are responsible for the overall direction and operation of the Putnam Funds, and have a fiduciary duty to those Putnam Funds to maintain the safety of the assets of the Funds. They are, by law, responsible for selecting the investment advisers, sales and service companies, custodians and transfer agents for the Funds, and for negotiating the contracts with these entities, and determining the fees they will be paid.

284.    In fact, however, the Trustees have rubber-stamped the selection of all of these service providers, each of which is the Putnam entity created by Putnam Investments and

Putnam Management for that purpose. They have not put any of the agreements for any of these management services out for competitive bidding; nor have they ever considered hiring anyone else to perform any of these services. Moreover, the Funds' agreements with each of these entities are, and have been throughout the relevant period, essentially identical, boilerplate form contracts of adhesion, dictated by the Putnam Company Defendants. There is no arm's length bargaining concerning the terms of any of these agreements, which vary only with respect to the fee percentages designated for the various Funds. Because their role is essentially pro forma, the Trustees are required to meet for a total of only two days per month to fulfill all their responsibilities to all 60 Putnam Funds.

285.    For performing this rubber stamp role, the Trustees have paid themselves large and continually escalating fees and other benefits, which they establish for themselves. In addition to their basic trustee fees, they are also paid for attending meetings of the Trustees, fees for attending committee meetings, and payment for expenses associated with the attendance at meetings. Although the meetings of all the Funds occur simultaneously, they are paid separate attendance fees from each of the 60 Funds.

286.    As of the fiscal year ending July 2002, the Putnam Funds ranked sixth nationally among mutual fund families in total assets, third nationally among mutual fund families in advisory fees paid, and first among mutual fund families in fees paid to Fund Trustees. The Fund prospectuses reported that the Trustees were paid approximately $2.3 million in fiscal year 2002; but the annual reports for the Funds for this same period say that the Trustees were paid approximately $4.9 million. At the latter rate, each of the "non-

interested" Trustees receives about $500,000 per year from the Funds, for an average of about two days per month work.

| TRUSTEE | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
|---|---|---|---|---|
| Jameson A. Baxter | 191,000 | 200,000 | 205,750 | 216,750 |
| Charles B. Curtis | N/A | N/A | 92,000 | 206,250 |
| John A. Hill | 239,750 | 269,000 | 403,500 | 388,250 |
| Ronald J. Jackson | 193,500 | 200,000 | 205,750 | 207,250 |
| Paul L. Joskow | 191,000 | 200,000 | 201,250 | 203,750 |
| Elizabeth T. Kennan | 190,000 | 199,500 | 203,500 | 204,250 |
| Lawrence J. Lasser | 189,000 | 107,000 | N/A | N/A |
| John H. Mullin, III | 196,000 | 199,000 | 205,500 | 210,000 |
| Robert E. Patterson | 190,250 | 200,000 | 204,750 | 211,000 |
| George Putnam, III | 190,000 | 225,000 | 249,750 | 253,000 |
| W. Thomas Stephens | 188,000 | 198,500 | 201,000 | 203,250 |
| W. Nicholas Thorndike | 190,000 | 197,000 | 202,000 | 204,500 |
| A.J.C. Smith | 188,000 | 106,000 | N/A | N/A |
| Hans  H. Estin | 190,000 | 200,500 | 109,000 | N/A |

287.    The Trustees also are paid retirement benefits by the Putnam Funds. Under a Retirement Plan for Trustees of the Putnam Funds (the "Retirement Plan"), each Trustee who retires with at least five years of service as a Trustee of the Putnam Funds is paid an annual retirement benefit equal to one-half of the average compensation paid to such Trustee for the last three years of service prior to retirement.  The retirement benefit is payable during the Trustee's lifetime, beginning the year following retirement, for a number of years equal to such retiree's years of service.  The Retirement Plan also provides a death benefit for each of the Trustees, assuring that the Trustee and his or her beneficiaries will receive the benefit payments for the lesser of an aggregate period of (i) ten year or (ii) such Trustee's total years as a trustee.

65

288.    In substance, then, the Trustees act not as directors of the Funds in any traditional sense, but are in effect de facto employees of the Funds, and are compensated and treated as such even though they work only part time.

### 2.    Market Timing and Late Trading in Putnam Funds

#### (a)    Putnam's Stated Policies Prohibit Market Timing

289.    In 1996, in response to increasing damage to the performance and value of its mutual funds by market timers, Putnam Investments created a Market Timing Department ("MTD"), colloquially referred to as the "market timing police," whose purpose was supposedly to enforce the prohibitions against market timing articulated in the Putnam Funds prospectuses.  According to a document entitled Market Timing Department Functional Narrative, dated March 2003, the purpose of the Market Timing Department was to "review available data to determine if specific trading patterns fall within parameters of the definition of 'abusive or excessive'" trading and to communicate with the offenders "with regard to market timing issues."  Thus, the purpose of the Market Timing Department was to enforce Putnam Investments' policy of prohibiting market timing.

290.    The Functional Narrative identified four separate types of injury that market timing imposed on funds:  (i) increased transaction costs caused by high levels of trading; (ii) unwanted capital gains tax liabilities caused by liquidations of fund holdings to meet redemption needs of market timers; (iii) forcing managers to maintain higher cash positions to meet those redemption requirements, leaving substantial sums uninvested; (iv) disruption of stated portfolio management strategies; and (v) dilution of profits that would otherwise

66

go to long-term investors.

291.     The policies against market timing have been reflected and acknowledged in prospectuses issued by the Funds. For example, since 2000, the prospectus for the Putnam International Voyager Fund, now known as Putnam International Capital Opportunities Fund, has contained the following provision concerning exchange of mutual fund share which purports to reflect Putnam Investments' policy of prohibiting market timing:

> The exchange privilege is not a vehicle for short term trading. Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders. In order to limit excessive exchange activity and otherwise promote the best interest of the fund, the fund imposes a redemption fee of 1.00 % of the total exchange amount (calculated at market value) on exchanges of shares held less than 90 days. The fund also reserves the right to revise or terminate the exchange privilege, limit the amount or number of exchanges or reject your exchange. The fund into which you would like to exchange may also reject your exchange. These actions may apply to all shareholders or only to those shareholders whose exchanges Putnam Management determines are likely to have a negative effect on the fund or other Putnam funds.

Essentially the same statement appears in prospectuses of other Putnam Funds.

292.     These policies are reflected in Putnam's Code of Ethics as well, which prohibits employees from engaging in activities that place the employees' interest in conflict with Putnam Investments clients. The preamble to the Code of Ethics states:

> It is the personal responsibility of every Putnam employee to avoid any conduct that could create a conflict, or even the appearance of a conflict, with our clients, or to do anything that could damage or erode the trust our clients place in Putnam or its employees.

293.    The Code of Ethics expressly barred such conduct, providing: "No Putnam employee shall conduct herself in a manner which is contrary to the interests of, or in competition with, Putnam or a Putnam client, or which creates an actual or apparent conflict of interest with a Putnam client."

294.    In 2000, Putnam Investments understood that market timing by employees was precisely the type of conduct prohibited by the Code of Ethics, because it placed employees' interests in direct conflict with those of its clients.  In a series of Code of Ethics presentations to employees in the summer of 2000, Putnam Investments acknowledged that "market timing has a detrimental effect on fund performance" and that the "fiduciary responsibility of Putnam employees is to maximize return to fund shareholders."  Putnam Investments further instructed its employees that "market timing by employees hurts fund performance and raises issues under the Code of Ethics."  Accordingly, Putnam Investments expressly prohibited employees from engaging in market-timed trading.

295.    In 2002, Putnam Investments adopted an express prohibition against employee market timing.  At the time, Putnam Investments stated that the Code of Ethics already prohibited market timing, but sought to make the rule explicit to underline its commitment to prohibit market timing by employees in Putnam Funds. In May 2002, Putnam Investments amended its Code of Ethics to include an express prohibition on market timing strategies by employees of Putnam Investments and its affiliates as inconsistent with Putnam Investments' policy of supporting investing over the long term.

296.    Despite these policy pronouncements, gaping holes were left in the MTD

68

enforcement mechanism, through which massive violations of these policies could, and did, easily go undetected. Most notably, until March 2003 the MTD was not given authority to review participant transaction history and information in 401(k) plans, thereby creating an unregulated zone where market timing by plan participants could proceed unhindered. Only the PRM  Relationship Manager or other 401(k) investor servicing employees were able to view that information. If, perchance, the MTD became aware of any market timing activity triggered by a retirement plan, its procedure was to send the information to PRM and to the Relationship Manager for the plan.  There was no procedure for following up.

297.    There was also no procedure for effectively supervising the trading activity of Putnam Management professionals at all. Until 2000, there were minimal controls against market timing by Putnam Investments' own employees in their Putnam Fund retirement or compensation plans.  In particular, there was little or no direct control dedicated to preventing market timing by Putnam Management's investment professionals in funds over which they had management responsibility.

298.    Even after 2000, Putnam Investments' system for detecting and preventing market timing by its own employees was fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever. Employees were well aware of this limitation and took advantage of it. Until October 2003, no disciplinary action was taken against any Putnam Management employee for engaging in market timing.

299.    As will be described in detail below, these loopholes in the supervision of

employees and of trading in retirement plans were massively exploited, making a mockery of Putnam's anti-market-timing policies.

### (b)      Regulatory Proceedings Uncover Massive Market Timing

300.    On October 28, 2003, federal and state securities regulators commenced proceedings against Putnam Investments, alleging that it and its affiliates had permitted and facilitated market timing by favored employees and professionals, to the detriment of the Putnam Funds, in violation of federal and state securities laws. Regulators disclosed that Putnam Investments had permitted high-ranking investment professionals and participants in favored 401(k) plans to engage in market timing in the Putnam Funds for their own benefit and at the expense of the Putnam Funds. The regulators charged that defendants had known of this conduct since 2000, but had taken no action to disclose it or stop it.

### (i)      Market Timing By Putnam Investment Professionals

301.    The regulators discovered that, beginning in at least 1998, Justin M. Scott, managing director and chief investment officer of Putnam Management's International Equities Group, and Omid Kamshad, managing director and chief investment officer of Putnam Management's International Core Equity Group, engaged in repeated market-timed trading in Putnam Funds held in their personal accounts.

302.    Scott and Kamshad were both top-level portfolio managers who serviced multiple mutual funds and institutional accounts. For example, in 2000, Scott was a chief investment officer responsible for overseeing at least seven mutual funds with combined assets of approximately $18 billion. In 2000, Kamshad was also a chief investment officer,

and also servicing seven mutual funds with a total of at least $17 billion in assets.  He had been chief investment officer for Putnam Management's International Core Equity Group since early 2002, and was a portfolio manager for at least seven mutual funds whose portfolios contained foreign securities. Both Scott and Kamshad served many institutional clients with separately managed accounts, such as large retirement and pension funds.

303.   Scott and Kamshad were also two of Putnam Management's most highly valued and highly compensated managers.  In 2000, for example, Scott earned $14.3 million and Kamshad earned $8.7 million.  Both Kamshad and Scott engaged in market-timed trading in their personal accounts with respect to Putnam Funds over which they had investment decision-making responsibility and about which they had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions. Scott's trading continued until at least mid-2000.  Kamshad's trading continued into 2003.

304.   **Kamshad's Market Timed Trading**.  Between 1998 and 2003, Kamshad engaged in at least 38 short-term round-trip trades in Putnam Funds, including trading in at least four funds he participated in managing.  In these round trip trades, he sold shares an average of only 13 trading days after purchasing them, and often sold shares within three or fewer trading days of purchase.

305.   As a result of his market-timed trading, Kamshad realized hundreds of thousands of dollars in gains.  Kamshad typically traded hundreds of thousands of dollars worth of fund shares, and on at least one occasion, the value of his market-timed trade

exceeded $1 million.

306.    In January 2000, senior Putnam Investments executives learned of "large and frequent movement" of assets in Putnam Funds accounts held by Kamshad, who at the time served as lead portfolio manager on Putnam's International Equity and Europe Equity funds. At that time, Kamshad's trading came to the attention of senior managers in Putnam Investments' and PRM's retirement plan group.

307.    On January 25, 2000, Richard B. Tibbetts, the director of Putnam Management's employee relations and staffing unit, discussed with Kamshad his frequent trading.  Kamshad represented that he would cease that type and level of activity. On February 18, 2000, the director issued a memorandum to the file confirming this conversation.

308.    Following this discussion, Kamshad continued to engage in market timing in Putnam Funds. Between February and April 2000, Kamshad made at least nine more short term round trip trades.

309.    In mid-2000, a senior executive of Putnam Management held a meeting with investment professionals in which he stated that Putnam Investments employees must not engage in market timing in Putnam Funds and told them that their trading must be beyond reproach.  Kamshad, like other Putnam Management portfolio managers, attended this meeting.

310.    By May 2000, Tim Ferguson, the head of Putnam Management's Investment Division, was told that Kamshad, Scott, and other Putnam Management employees had been

market timing Putnam Funds.  Ferguson reported these facts to Lawrence Lasser, Putnam's CEO, and William Wolverton, Putnam's general counsel and chief compliance officer.

311.   Despite the warnings delivered at that meeting, Kamshad continued to engage in market timing.  Between August 2000 and September 2000, Kamshad made seven more round trip trades. As late as March 2003, Kamshad purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the lead manager. Four trading days later, he sold Europe Equity shares, garnering a profit of more than $79,000. In total, Kamshad engaged in at least 20 short-term round trip trades after he was warned about his conduct.

312.   **Scott's Market timed Trading**.  Scott was chief investment officer of the International Equity Group at Putnam Management.  During the relevant time period, he was a portfolio manager for at least five of the Putnam Funds whose portfolios contained international securities.

313.   Between 1998 and 2000, Scott engaged in approximately 35 short-term round-trip trades in Putnam Funds, including funds he participated in managing.  In 2000 alone, Scott engaged in at least 12 trades in which he bought and sold shares in Putnam Funds on consecutive days. As a result of his market-timed trading, Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of mutual fund shares.

314.   On February 18, 2000, Scott, a superior to Kamshad, was copied on the memorandum by Human Resources manager Richard B. Tibbetts regarding Kamshad's improper trading. The memorandum, which addresses the warning given to Kamshad in

January 2000 by Tibbetts, makes clear that short-term trading in large amounts was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam Investments' intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's Funds have had a detrimental effect on the long-term shareholders of those funds."

315.  Nonetheless, Scott continued to engage in short term trades. Between March and May of 2000, Scott made more than 20 round trip trades, including 10 next-day round trip trades in his personal accounts in Putnam Funds.

316.  **Market Timing By Other Putnam Management Professionals**. Geirulv Lode was a Portfolio Manager of Putnam Management's Global Core Equities. Carmel Peters was a Director of Emerging Market Equities and a team member of Putnam Management's International Core Team. Both Lode and Peters engaged in repeated market-timed trading in their personal accounts in Putnam Funds. Peters's improper trading commenced as early as 2000. Peters was supervised by Scott.

317.  According to statements attributed to persons close to the Massachusetts Secretary of State's Office Securities Division, and quoted in the financial press, former Putnam General Counsel William Woolverton is also alleged to have engaged in "active short-term trading." Woolverton subsequently resigned his post.

318.  Other Putnam Management investment professionals engaged in market-timed trades in Putnam Funds on their own account. In an Order issued November 13, 2003, the Securities and Exchange Commission identified six investment professionals, including

Scott, Kamshad, Lode, and Peters, who engaged in market timing. The identities of the other two were undisclosed. In December 2003, Putnam Management fired a total of 15 employees for "improper trading activity," including the aforementioned six. The identities of the others were undisclosed.

**(ii)    Market Timing By 401(k) Clients
of Putnam Retail Management**

319.    The regulators also discovered that Putnam Investments was aware of, and failed to stop, market timing by participants in two Taft-Hartley plans whose investments were managed by Putnam Management. The participants in these plans invested in Putnam Funds through defined contributions and 401(k) accounts as a result of agreements between the plans and PRM.

320.    **Local Lodge No. 5 ("Boilermakers")**. Boilermakers have been a client of PRM since 1991. From at least January 2000 until September 2003, participants in the Boilermakers plan have been trading excessively in their accounts through Putnam.

321.    Putnam Investments, Putnam Management, PRM, and PFTC, became aware of repeated market-timed trading in the Voyager International Fund (now known as the Putnam International Capital Opportunities Fund) by at least early 2000. By market timing, at least 28 Boilermaker plan participants made anywhere from 150 to 500 short-term round-trip trades over a three-year period. These participants profited from over $100,000 to $1 million in a three-year period. At least one individual made a million dollars in a retirement account over a three-year period by market timing the Putnam International Voyager Fund.

322.    In March 2000, in response to internal concerns, employees of Putnam Management reviewed trading activity in the Voyager International Fund.

323.    Beginning in at least September 2001, PFTC investor service representatives knew of the Boilermakers' excessive trading because of the number of late day telephone calls received.

324.    Some of the PFTC service representatives brought this activity to the attention of PRM, but PRM failed to do anything about it. Although in the spring of 2002, Putnam Management told other PFTC service representatives to track the activity of Boilermakers, the service representatives never received any feedback from Putnam Management in response to its reports, and the market timing continued unabated.

325.    Putnam Investments remained aware, however, of the significant market timing activity in the Boilermakers' 401(k) plan.  A Putnam Management email dated December 2002 regarding market timing activity states, "The population is now 28 people out of a total plan of 944.  This represents 2.9% of the total participants with a balance but represents 20% of the assets.  Now this population represents 99% of the exchanges in International Voyager, 99% of the International Growth Exchanges, and 98% of the money market exchanges."

326.    **Joint International Board of Electrical Workers (JIBEW)**. JIBEW had been a Putnam Investments client since October 1998.  JIBEW is also a Taft-Hartley plan.  In early 2000, PFTC investment service representatives became aware of excessive market timing by JIBEW plan participants in the Putnam New Opportunity Fund and Putnam OPTC Emerging Growth Fund.

327.   Despite its knowledge of JIBEW's market timing activity, at no time did Putnam Investments take any steps to restrict the excessive trading of the plan participants.

328.   The JIBEW plan participants' market timing activity stopped in 2001, apparently out of lack of continued success.

### (iii)   Conclusion of the Federal and State Enforcement Actions

329.   On November 13, 2003, the SEC issued an order finding that Putnam Investments (i) willfully violated sections 204A, 206(1) and 206(2) of the Investment Advisors Act of 1940; (ii) willfully violated section 17(j) of the Investment Company Act of 1940 and rule 17j-1(c) thereunder; and (iii) failed to supervise two high-ranking investment professionals and other employees within the meaning of section 203(e)(6) of the Investment Advisors Act of 1940.  The order followed submission by Putnam Investments of an Offer of Settlement that included, among other things, an agreement that Putnam Investments would accept the SEC's findings as true and would not contest them.

330.   On April 8, 2004, Putnam Investments entered into an agreement settling the charges brought by the SEC.  Pursuant to the agreement, reflected in an order issued by the SEC, Putnam Investments agreed to pay disgorgement in the amount of $5 million and a civil penalty in the amount of $50 million.  The agreement again included a provision that Putnam Investments would not contest the findings of the Commission.

331.   On April 8, 2004, Putnam Investments also accepted an Offer of Settlement with respect to charges brought by the Office of the Massachusetts Secretary of State's Securities Division.  Pursuant to this agreement, Putnam Investments agreed to pay

additional disgorgement in the amount of $5 million and an additional civil penalty in the amount of $50 million.  The Offer of Settlement contains a provision in which Putnam Management expressly admitted to the 55 paragraph Statement of Facts set forth in the Offer of Settlement filed by the Securities Division.  As a result, Putnam Management admitted, among other things, that it (a) recognized that market timing was harmful to the Putnam Funds and their long-term investors, (b) had represented that it would police and prohibit market timing in the Putnam Funds, (c) knew its insiders and favored clients had engaged in market-timed trading, and (d) failed to take action necessary to stop the harmful trading activity.

332.   The total fines and penalties paid by the Putnam defendants to settle the regulatory actions, $110 million, is a mere slap on the wrist for those defendants, because it represents a about 1%  of the roughly $2 billion per year the Funds have been paying these defendants for their services during the 5-year period when this misconduct has been going on.

333.   The market timing discovered by the regulators was in addition to the market timing by BAS, Canary, Kirkland, Aurum, Trautman and Pritchard discussed in Paragraphs 108-123 above.

### (iv)    The Fallout From the Regulatory Disclosures and Actions

334.   When defendants' misconduct was finally disclosed with the commencement of regulatory action, the market reacted as defendants had expected.  On November 7, November 14, and November 21, MMC filed Forms 8-K reporting dramatic reductions in

Putnam Investments' assets under management.  On January 26, 2004, MMC reported in a Form 8-K that "[n]et redemptions in the forth quarter [of 2003] were $54 billion."  In total, thousands of shareholders and investors withdrew their money as a result of defendants' concealment of market timing by favored clients and investors and violation of trust. Withdrawal was not limited to funds managed by the wrongdoers or in which there were market-timed transactions.  Withdrawal was across the board, reflecting a complete lack of confidence in Putnam Investments Putnam F and its subsidiaries.

335.    When Putnam's misconduct was finally disclosed, lawsuits by dozens of investors against Putnam were filed against defendants.  These lawsuits have exposed the defendants to significant additional regulatory scrutiny which, in turn, will result in administrative burdens to the Putnam Funds and disruption of the management and operation of the funds.

336-500. [Intentionally Omitted]

## V. DEMAND FUTILITY ALLEGATIONS

501.    The allegations concerning demand futility do not apply to claims asserted by the plaintiffs under Section 36(b) of the ICA, which does not confer a direct right upon the Funds or the Trusts to bring such claims.

502.    Plaintiffs have not made a demand upon the Trustees of the Funds to bring action against the Adviser, the Distributor, the officers of the Funds, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(a)    No demand is required with respect to plaintiffs' claims under Section

79

36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

    (b)  The Trustees are put into office by officers of the Adviser, and are not required to stand for election or reelection by shareholders of the Funds except on rare occasions, and thus are not accountable to the shareholders of the Funds.  Rather, the Trustees effectively serve at the pleasure of the Adviser. Additionally, the Trustees serve on the boards of virtually all of the Funds of the Fund Family, and are paid for this service with substantial Trustees' fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Adviser when the interests of the Adviser may conflict with the interests of the Funds.

    (c)  The Trustees have been well aware, for a very long period of time, of the existence of the types of activity complained of in this action, and of the potential that such activity might have been taking place in the Fund, yet have failed to investigate or to do anything to recover for damages caused to the Fund by such activities.  Indeed, despite the Trustees' awareness of investigations by state and federal law enforcement authorities, and of the legal actions that have been brought by such authorities, the Trustees have failed to take any action to investigate and have failed to take any action to recover for the Fund the damages cause to it by such unlawful activity.

    (d)  Market timing is a phenomenon that has been common knowledge in the mutual fund industry at least since the 1980s.  As early as 1989, the high-profile mutual

fund company Fidelity Investments began to impose and enforce heavy redemption fees on short term trades in its mutual fund shares.  In 1992, a widely-publicized book entitled *The New Market Wizards* focused attention on market timing.

(e)     Since at least as early as November 5, 1997, when an article appeared in THE WALL STREET JOURNAL entitled "*Mutual Funds Fight the 'Market Timers*,'" the unlawful practices complained of have been well-known to persons in the mutual fund industry, including the [Directors] Trustees of the Funds.  That article detailed the prevalence of market timing in major mutual funds, the types of harm that such activity visited upon the mutual funds, and the types of measures that some mutual funds had taken and were taking in order to discourage or prevent such market timing altogether.

(f)     As stated in an article printed in FORTUNE on April 19, 2004, "Clearly, by 2001 everyone connected with the fund industry had to know how crooked the business had become."  *See The Secrets of Eddie Stern*, FORTUNE (April 14, 2004).  The article also noted that after the current mutual fund scandal broke, the SEC surveyed 88 of the largest fund companies and discovered that half admitted to allowing market timing, and 25 percent allowed late trading.  See above, ¶83.

(g)     Even though the Trustees have (or should have) had knowledge of the existence and extensiveness of unlawful market timing taking place in the industry, and of the harm that results to mutual funds and fund shareholders, they either have failed to take action, despite their knowledge, with respect to such practices in connection with the Funds or they have failed to put in place the proper supervision and control mechanisms that would

have brought the existence of such unlawful practices in the Funds to their attention.

(h)     Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser that related to the Adviser's management agreement, including all terms and conditions applicable to the Adviser's performance of its duties.  Any terms, conditions, or arrangements whereby the Adviser facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading are and were, in fact, part of the Adviser's contract.

(i)     Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Adviser's contract, within the meaning of Section 15(c) of the Investment Company Act.  Consequently, the Trustees either failed to request all of the "reasonably necessary" information they needed to evaluate the Adviser's contract or they knew about or approved such arrangements with respect to the Fund.

(j)     Indeed, given the Trustees' knowledge of the prevalence and commonplace nature of late trading and market timing in the mutual fund industry, it was incumbent upon them to take the obvious, prudent measure of implementing some kind of audit system or program that would enable them to discover all aspects and all components of the advisory contract with respect to the Funds. Most notably, had they bothered to

monitor the turnover rate in Fund shares, they could have readily detected that the purchases and redemptions of the shares of certain funds were many times higher than the typical fund turnover rate. That is a red flag for market timing and late trading, both of which entail multiple "in and out" trades in fund shares, resulting in bloated trading activity. This tell-tale statistic is readily available to Fund Trustees and would have made it simple for them to detect market timing and late trading in specific funds, had they chosen to do so. Had the Trustees done this, they would have become aware of the existence of the specific late trading and market timing arrangements in place with respect to such funds. However, the Trustees failed to put any such necessary system or program in place, or even to conduct such a rudimentary and obvious check on their own. Their abdication of their fiduciary duties subjects them to a substantial risk of personal liability for breach of their fiduciary duty because of their gross negligence, and rendering themselves incapable of being able to impartially consider a shareholder demand, thereby compromising their independence.

(k)     The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(l)     On September 3, 2003, the NYAG filed the NYAG Complaint, thus bringing the market timing and late trading scandal to the attention of the world. Before and

after the commencement of the NYAG Complaint, state and federal regulators notified mutual funds of an investigation into market timing and late trading.  Subsequently, state and federal regulators have entered into consent enforcement actions with the advisers to at least six different mutual fund families, including Putnam Investments, representing recoveries of civil penalties and recoveries in excess of $2 billion. The regulators' investigation, the filing of the NYAG Complaint, and the subsequent enforcement actions have highlighted the existence of market timing and late trading as well as the magnitude and severity of the scandal throughout the mutual fund industry.  No Trustee could claim to be ignorant of the market timing and late trading scandal since September 3, 2003.  Despite that, however, the Trustees have failed to take any action against the Adviser, the Distributor, or any persons responsible for causing harm to the Funds by market timing or late trading. To the contrary, almost immediately after Putnam Investment's settlements with the governmental enforcement agencies, it paid Lawrence Lasser a severance amount of $78 million, despite the enormous harm he had brought to the Putnam Funds, and the Trustees failed to do anything to prevent that payment or capture the payment for the benefit of the Putnam Funds.

(m)     The purpose of a demand requirement is to bring matters to the attention of the Directors or Trustees so that they can determine what action, if any, to take regarding the matter about which the demand is made.  Here, the Trustees ***already are aware*** of the matters about which they should take action to recover damages for harm to the Funds caused by market timing and late trading.  Since the Trustees are already aware of the matters requiring their action, and of their duty to act, any demand under these circumstances would

be nothing but redundant surplusage and would serve as nothing but an unnecessary formality that would elevate form over substance.

(n)      Because the Trustees have failed for a lengthy time period to take action to recover for the Fund the damages it has suffered because of market timing and late trading, doing so at this point would be tantamount, from their perspective, to an admission that earlier action on their part was required but not forthcoming, thereby subjecting themselves to a substantial likelihood of personal liability for breach of their duty of care.

(o)      Given the Trustees' awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Directors or Trustees from being able to consider a demand impartially, if one had been made.

(p)      The Trustees' duties required them independently to act without a demand from a shareholder under the circumstance of this action. Their duties did not and do not come into play only when "kick-started" by a shareholder demand. The Trustees' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

(q)      The likelihood of personal liability is even more pronounced in the case of those   Trustees who served on the Audit Committee of the Funds, Paul L. Joskow (Chairman), Robert E. Patterson, W. Thomas Stephens, and W. Nicholas Thorndike, since those members had easy access to the internal documents that revealed the market timing and late trading that harmed the Funds, yet they took no steps to prevent such activity or to recover damages that the Funds suffered on account of such activity.

503.    For those Investment Companies that are organized under Massachusetts law, demand on the shareholders is excused because it would be unduly burdensome

504-600. [Intentionally Omitted]

## COUNT I

## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT

## (Against The Adviser and Distributor Defendants And PFTC)

601.    Plaintiffs incorporate by reference the preceding paragraphs, except for paragraph 502.

602.    The Putnam Fund Complex consists of registered investment companies within the meaning of Section 2 of the ICA.

603.    Putnam Management is an investment adviser for the Funds as that term is defined in Section 2 of the ICA.

604.    Putnam Fiduciary Trust Company is an affiliate of the Adviser Defendants for purposes of Section 36(b) of the ICA.

605.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment

86

adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

606.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person. Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

607.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

608.    Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees' decision regarding the Adviser's compensation.  Information

concerning conflicts of interest, the nature and extent of market timing and late trading in the Funds, the nature and extent of capacity arrangements for market timing and late trading in the Funds, and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in the Funds, are particularly important to the Funds and to their independent trustees.

609.   After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendants' permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading.

610.   Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

611.   After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and

late trading.

612.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

613.    The Adviser Defendants and the Distributor Defendant, as their affiliates, breached their fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, market timing and late trading, all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

614.    By agreeing and/or conspiring with the market timers to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, market timing and late trading, the Adviser Defendants and the Distributor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

615.    As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

616.    By virtue of the foregoing, the Adviser has violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

617.    As a direct and proximate result of the wrongful conduct alleged above, the

Funds were harmed by, among other things, the adoption and approval of the advisory agreements, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

618.   The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT II

## VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT

### (Against The Advisers, the Distributor, PFTC, the Trustees And the Officer Defendants)

619.   Plaintiffs incorporate by reference the preceding paragraphs.

620.   The Putnam Fund Complex consists of registered investment companies, as defined by Section 2 of the ICA.

621.   The Adviser Defendants are investment advisers under Section 36(a) as that term is defined in Section 2 of the ICA.

622.   The Distributor Defendants act as the principal underwriter for the Funds under Section 36(a) as defined in Section 2 of the ICA.

623.   The Trustee Defendants are directors under Section 36(a) as that term is defined in Section 2 of the ICA.

624.   Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser Defendants, the Distributor Defendants, and the Trustee and Officer Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care, including the duty

of the advisers to seek approval of any advisory agreement will full disclosure of information material to the board's decision regarding their compensation and the duty of the trustees to request and evaluate such information as may reasonably be necessary to evaluate advisory agreements.

625.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

626.    After a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

627.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

628.    After a reasonable opportunity to conduct discovery, plaintiffs believe the

evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

629.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory or distribution agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party."  Pursuant to that provision, any such agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

630.    Each of the Adviser Defendants, the Distributor Defendants, and the Trustee Defendants breached his, her, or its fiduciary duty to the Funds by the other acts alleged in this Complaint including, without limitation, allowing market timing and late trading all in exchange for their own benefit, including the receipt of "sticky assets" and other deposits on which they would and did receive fees and other compensation or by participating in insider timing themselves.

631.    By agreeing and/or conspiring with the Additional Defendants to permit and/or encourage them to time the Funds, the Adviser Defendants and the Distributor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

632.    As a direct and proximate result of the wrongful conduct alleged above, the

Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

633.    This conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT III

## VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT

### (Against the Adviser and Distributor Defendants and PFTC)

634.    Plaintiffs incorporate by reference the preceding paragraphs.

635.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), any contract made in violation, or the performance of which results in a violation, of the ICA is declared unenforceable.

636.    For the reasons alleged herein, the agreements between or among the Adviser, the Distributor, PFTC and the Funds and the 12b-1 Plans were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

637.    Under Section 47(b) of the ICA, 15 U.S.C. § 80a-4(b), the advisory agreements and the 12b-1 Plans may be voided and these defendants are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

638.    This conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT IV

## VIOLATION OF SECTIONS 206 AND 215 OF
## THE INVESTMENT ADVISERS ACT

### (Against The Adviser and Distributor Defendants)

639.    Plaintiffs incorporate by reference the preceding paragraphs.

640.    The Adviser and Distributor Defendants are investment advisers within the meaning of the IAA.

641.    The Funds are clients of the Adviser Defendants and the Distributor Defendants within the meaning of Section 206 of the IAA.

642.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

643.    The Adviser Defendants and the Distributor Defendants have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, Plaintiffs believe the evidence will show that the Adviser Defendants and the Distributor Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, market timing or late trading for their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be

94

material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, market timing and late trading in any of the Funds.

644.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment adviser agreement made or approved in violation of any provision of the IAA, including the investment adviser agreements between the Adviser Defendants or the Distributor Defendants and the Funds and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

645.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

646.    The Adviser's conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

## COUNT V

## CONTROL PERSON LIABILITY UNDER SECTION 48 OF THE INVESTMENT COMPANY ACT

### (Against The Parent and Officer Defendants)

647.    Plaintiffs incorporate by reference the preceding paragraphs.

648.   Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

649.   The Parent and Officer Defendants, directly or indirectly, caused the Adviser Defendants and the Distributor Defendants to engage in the unlawful conduct alleged herein.

650.   Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Parent Defendants are liable for causing, directly or indirectly, the Adviser Defendants and the Distributor Defendants to engage in the unlawful conduct alleged herein.

651.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT VI

## COMMON LAW BREACH OF FIDUCIARY DUTY

### (Against The Adviser Defendant, The Distributor Defendants And The Trustee Defendants)

652.   Plaintiffs incorporate by reference the preceding paragraphs.

653.   The Adviser Defendant, the Distributor Defendants, and the Trustee Defendants (the "Fiduciary Defendants"), and each of them, owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the

affairs of each of the Funds and in the use and preservation of the Funds' property and assets.  Further, said defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

654.   To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

655.   As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with the timing and late trading schemes and other manipulative devices as alleged in this Complaint.

656.   As alleged above, the Fiduciary Defendants also breached their fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the market timing and late trading scheme.

657.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

658.   The Fiduciary Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

97

## COUNT VII

## BREACH OF CONTRACT

## (Against The Adviser Defendant)

659.    Plaintiffs incorporate by reference the preceding paragraphs.

660.    The Funds have entered into Advisory Agreements with the Adviser Defendant, which are renewed annually.

661.    The Funds have fully performed their obligations under those agreements.

662.    These Advisory Agreements required the Adviser to comply with the requirements of the ICA and all rules and regulations of the SEC promulgated thereunder.

663.    These Advisory Agreements also required the Adviser to comply with all the rules, regulations and policies of the Funds, as set forth in the prospectuses, the SAIs and otherwise.

664.    As a direct and proximate result of the wrongful conduct alleged above, the Adviser has breached these Advisory Agreements.  The Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, Dead weight, Dilution and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which the Advisor Defendant is liable.

## COUNT VIII

## BREACH OF CONTRACT

## (Against Defendant BAS)

665.    Plaintiffs incorporate by reference the preceding paragraphs.

98

666.    Upon information and belief, throughout the relevant period, BAS and Putnam Management or PRM  were parties to written or oral sales agreements governing BAS's duties as broker-dealer in selling and processing trades of Fund shares (the "Dealer Agreements").

667.    The Funds, for whose benefit the Adviser entered into the Dealer Agreements, are intended third-party beneficiaries of the Dealer Agreements.

668.    There is implied in all agreements an obligation of good faith and fair dealing pursuant to which neither party make take any action that will deliberately frustrate the other party's purpose in entering into the contract.

669.    Upon information and belief, under the Dealer Agreements, information and belief, in the Dealer Agreements, BAS expressly agreed to clear mutual fund orders through the NSCC's Fund/SERV system and to transmit orders that are received prior to 4 p.m. by a certain time that day ("Day 1"), and those received after 4 p.m. by a certain time the next business day ("Day 2"). Under the Dealer Agreements, BAS and the Adviser Defendants agreed that Day 1 Trades would be priced at the Day 1 NAV and the Day 2 Trades at the Day 2 NAV.

670.    BAS had an express or implied obligation to comply with the federal securities laws, the ICA, the IAA, and all rules and regulations promulgated by the SEC, including the forward pricing rule.

671.    In breach of the express or implied terms of the Sales Agreements, and in violation of its obligation of good faith and fair dealing, defendant BAS permitted brokers

and timers, including defendants Aurum, Trautman, Canary, and Pritchard, to submit orders for the purchase and sale of shares of mutual funds, on BAS's RJE electronic trading platform or otherwise, after 4 p.m. on a given day (Day 2 Trade) at that day's NAV (Day 1 NAV), in violation of the forward pricing rule, and permitted the funds in the Putnam family of funds to be late traded and timed to the detriment of the funds.

672.    Accordingly, BAS has breached its Dealer Agreements with the Adviser.

673.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

**COUNT IX**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**(Against The Additional Defendants)**

674.    Plaintiffs incorporate by reference the preceding paragraphs.

675.    The Additional Defendants knew of the existence and extent of the fiduciary duties owed by the Fiduciary Defendants to the Funds.  The Additional Defendants knew that market timing and late trading the Funds were manipulative devices and knew that these acts were a breach of the fiduciary duties owed to the Funds by the Fiduciary Defendants.

676.    The Additional Defendants maliciously, without justification and through unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary

Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

677.   The  Additional Defendants are jointly and severally liable with the Fiduciary Defendants to the Funds for damages proximately caused by their aiding and abetting as alleged herein

678.   As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

## COUNT X

### UNJUST ENRICHMENT

### (Against All Defendants Except the Trustee Defendants)

679.   Plaintiffs incorporate by reference the preceding paragraphs.

680.   Defendants received a benefit in the profits it earned as a result of its unlawful conduct as described in this Complaint from trading on the Funds at the expense of the Funds.

681.   Justice and equity require that  Defendants not be allowed to retain those profits.

682.   Justice and equity require that Defendants unlawfully earned profits be disgorged and returned to Funds because such profits belong to the Funds.

683.   The Defendants' conduct constituted willful misfeasance, bad faith, or gross

negligence, or reckless disregard of its duties.

## COUNT XI

## COMMON LAW INTERFERENCE WITH CONTRACT

### (Against the Additional Defendants)

684.    Plaintiffs incorporate by reference the preceding paragraphs.

685.    The Adviser and the Funds are parties to the Investment Advisory Agreement

686.    The Advisers breached the Investment Advisory Agreement in the manner and by the actions described in this Complaint.

687.    The Additional Defendants knew of the existence of the Investment Advisory Agreement between the Adviser and the Funds and knew its terms.

688.    The Additional Defendants knowingly and intentionally induced the Adviser to breach that contract and interfered with the Adviser's present and future performance of the Investment Advisory Agreement by its acts of wrongdoing as described in this Complaint, intending to and proximately causing the described breaches of the Investment Advisory Agreement.

689.    The Additional Defendants carried out this wrongful conduct with knowledge that this conduct would interfere with the Investment Advisory Agreements and cause such breaches of the Investment Advisory Contract and did in fact cause breaches of such contract.

690.    The actions of the Additional Defendants were improper and without justification or privilege.

691.    As a direct and proximate result of the Additional Defendants' wrongful

conduct, Additional Defendants are jointly and severally liable to the Funds with the Adviser for injuries and damages the Funds have suffered and which they will continue to suffer and are liable for actual and punitive damages.

## COUNT XII

## CIVIL CONSPIRACY

### (Against All Defendants Except Trustee Defendants)

692.    Plaintiffs incorporate by reference  the preceding paragraphs.

693.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

694.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

695.    The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their office.

696.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds for which they are jointly and severally liable.

697.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, Dead Weight, Dilution, and Concentration, all of which reduced the assets and value (including the NAV) of the Funds, for which

defendants are liable.

698.    The Defendants' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Removing each of the Trustees of the Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Adviser Defendants and the Distributor Defendants;

C.    Rescinding the management and other contracts for the Funds with the Advisor, Distributor and other Defendants;

D.    Rescinding the 12b-1 Plans adopted by the Funds;

E.    Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser and all profits earned on unlawful trading and all management and other fees earned during the period of such trading;

F.    Awarding monetary damages against all of the Defendants, individually, jointly, or severally, in favor of the Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon;

G.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

H.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  September 29, 2004

POMERANTZ, HAUDEK, BLOCK,
GROSSMAN & GROSS, LLP


By: /s/_____
    Stanley M. Grossman
    H. Adam Prussin
    Jeremy A. Lieberman

100 Park Avenue, 26th Floor
New York, NY  10017
(212) 661-1100


WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP
    Daniel W. Krasner
    Mark C. Rifkin
    Demet Basar
    Christopher S. Hinton
    Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

CHIMICLES & TIKELLIS, LLP
    Nicholas E. Chimicles
    Michael D. Gottsch
    Denise Davis Schwartzman
    Timothy N. Mathews
100 Haverford Centre
Haverford, PA  19085
(610) 642-8500

*Fund Derivative Executive Committee*

HAGENS BERMAN, LLP
   David Nelvan
One Main Street, 4th Floor
Cambridge, MA 02142
(617) 482-3700

FARUQI & FARUQI
320 East 39th Street
New York, NY 10016
(212) 983-9330

LAW OFFICES OF KLARI NEUWELT
110 East 59th Street, 29th Floor
New York, NY 10022
(212) 593-8800

***Putnam Fund Derivative Plaintiffs'***
***Steering Committee***

CHITWOOD & HARLEY, L.L.P.
   Edward H. Nicholson, Jr.
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
(404) 873-3900

DEUTSCH WILLIAMS BROOKS
   DeRENSIS & HOLLAND, P.C.
99 Summer Street
Boston, MA 02110-1213

GOODKIND LABATON RUDOFF &
   SUCHAROW LLP
100 Park Avenue
New York, NY 10017
(212) 907-0700

***Putnam Fund Derivative***
***Plaintiffs' Counsel***

107

## APPENDIX

## PUTNAM FUNDS

### Massachusetts Business Trust

American Government Income Fund
Arizona Tax Exempt Income Fund
Asset Allocation: Balanced Portfolio
Asset Allocation: conservative Portfolio
Asset Allocation: Growth Portfolio
California Tax Exempt Income Fund
Capital Appreciation Fund
Classic Equity Fund
Convertible Income-Growth Trust
Discovery Growth Fund
Diversified Income Trust
Equity Income Fund
Europe Equity Fund
Florida Tax Exempt Income Fund
Fund for Growth and Income
George Putnam Fund of Boston
Global Equity
Global Income Trust
Global Natural Resources Fund
Health Sciences Trust
High Yield Advantage Fund
High Yield Trust
Income Fund
Intermediate U.S. Government Income Fund
International Equity Fund
Investors Fund
Massachusetts Tax Exempt Income Fund
Michigan Tax Exempt Income Fund
Minnesota Tax Exempt Income Fund
Money Market Fund
Municipal Income Fund
New Jersey Tax Exempt Income Fund
New Opportunities Fund
New York Tax Exempt Income Fund
Ohio Tax Exempt Income Fund
OTC & emerging Growth Fund
Pennsylvania Tax Exempt Income Fund
Tax Exempt Income Fund

Tax Exempt Money Market Fund
U.S. Government Income Trust
Utilities Growth and Income Fund
Vista Fund
Voyager Fund

## A Series of Putnam Investment Funds, a Massachusetts Business Trust

Capital Opportunities Fund
Growth Opportunities Fund
International Capital Opportunities Fund (Putnam International Voyager Fund)
International Growth and Income Fund
International New Opportunities Fund
Mid Cap Value Fund
New Value
Research Fund
Small Cap Value Fund

## A Series of Putnam Funds Trust, a Massachusetts Business Trust

Small Cap Growth Fund

## A Series of Putnam Tax Smart Funds Trust, a Massachusetts Business Trust

Tax Smart Equity Fund

## Series of Tax-Free Income Trust, a Massachusetts Business Trust

Tax-Free High Yield Fund
Tax-Free Insured Fund

## No SAI

Floating Rate Income Fund