## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE ALGER, COLUMBIA, JANUS, MFS, ONE GROUP, PIMCO AND PUTNAM | Civil Action No. 04-Md-15863 |
| ROBINSON v. ONE GROUP INTERNATIONAL EQUITY INDEX FUND, et al. ("Lead Case") | Civil Action No. 04cv00629 |
| | Honorable J. Frederick Motz |

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Linda B. Parker ("Lead Plaintiff" or "Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included a review of documents from proceedings initiated by the United States Securities and Exchange Commission ("SEC"), the Office of the New York State Attorney General, as well as regulatory filings and reports, press releases, and media reports. Lead Plaintiff's counsel have also interviewed and reviewed documents of certain former One Group employees as well as of current and former employees of brokerage firms and market timers and/or late traders that were offered capacity in and/or utilized that capacity to time and/or late trade One Group mutual funds. Among other things, Lead Counsel has conducted extensive interviews with a confidential witness who possesses direct knowledge of market timing and late trading activities at One Group, as well as throughout the mutual fund industry ("Timing Witness #1"). Additionally, Lead Counsel has conducted interviews with other confidential witnesses who worked as consultants to hedge funds seeking to market time mutual funds and who have intimate knowledge of market timing throughout the mutual fund industry and at One Group in particular. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.　　This federal class action, brought on behalf of persons who purchased or held shares in One Group mutual funds who were harmed by the market timing and/or late trading of One Group Funds, asserts claims for violations of the Securities Act of 1933 (the "Securities Act"); the Securities Exchange Act of 1934 (the "Exchange Act"); the Investment Company Act of 1940 (the "Investment Company Act"); and the common law.

2.　　Mutual funds, including the One Group Funds, are marketed to investors as prudent and comparatively risk-free long-term investments.  They are the favored savings vehicles for more than 95 million Americans and half of all the nation's households.  The enormous growth and success of the mutual fund industry in the last 20 years has been driven in part by the industries' heretofore untarnished reputation for honesty and fair dealing.  Based on this reputation, One Group saw phenomenal growth in its assets under management in the 1990's.

3.　　Unbeknownst to purchasers and holders of One Group funds, however, from at least as early as November 1, 1998 and until September 3, 2003, inclusive, defendants violated their fiduciary duties and disclosure obligations to One Group Funds' shareholders by allowing a select group of favored investors in the funds to engage in:  (i) "market timing" of certain One Group funds – a practice that improperly takes advantage of short-term inefficiencies in the pricing of mutual funds in order to reap millions and millions of dollars of short-term profit at the expense of long-term buy and hold investors; and (ii) illegal "late trading" – a practice that allows an investor to place an order to purchase mutual fund shares after 4:00 p.m. ET and have that order filled at that day's closing net asset value ("NAV").  This market timing and late trading came at the direct expense of the long-term investors in the affected funds.

4.      Market timing of One Group mutual funds was facilitated by large brokerage firms who also functioned as clearing agents, including defendants Bear Stearns (as defined herein), Bank of America Corporation, Security Trust Company (n/k/a AST Trust Co.), and Circle Trust, Inc. ("Circle Trust"), who gave market timers an additional edge by allowing their clearing platforms to be used by the timers to trade mutual funds after the market closed.  This late trading was patently illegal.

5.      Defendants never disclosed that favored investors were being permitted to time and/or late trade One Group mutual funds to the detriment of long-term shareholders.  The prospectuses provided to investors at the time of their purchases (together with the applicable Registration Statements, "Prospectuses") made no mention of these secret arrangements.  To the contrary, the Prospectuses indicated that One Group funds did not allow market timing and late trading and had mechanisms in place to detect and prevent such activity, in order to protect long-term investors from their negative effects.  In fact, however, as described in detail herein, One Group mutual funds' stated policies against market timing and late trading were not enforced and/or purposefully ignored with respect to certain favored investors who were allowed to effectively steal profits from long-term holders.

### JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 44 of the Investment Company Act (15 U.S.C. § 80a-43); and 28 U.S.C. §§ 1331, 1337, and 1367.

7.      Pursuant to 28 U.S.C. §1407, the Judicial Panel on Multidistrict Litigation (the "Panel") transferred the actions comprising this consolidated complaint to this District.  Venue in this District is therefore proper.

8.      Venue in the Northern District of Illinois is also proper.  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in the Northern District of Illinois.  Defendants conducted other substantial business within the Northern District of Illinois and many Class members reside within that District.  Defendant Bank One Corporation was an active participant in the wrongful conduct alleged herein and, at all relevant times, was headquartered within the Northern District of Illinois.

9.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

10.      Linda B. Parker was appointed Lead Plaintiff in this Action by Order dated May 25, 2004.  During the Class Period, Lead Plaintiff was a purchaser and/or holder of the following One Group Funds: One Group Large Cap Growth Fund, One Group Large Cap Value Fund, One Group Mid Cap Growth Fund, One Group Mid Cap Value Fund, One Group Investor Growth Fund, One Group Equity Index Fund and One Group Balanced Fund.  Particulars of Lead Plaintiff's purchases and holdings of One Group mutual funds are set forth in the Declaration of Peter E. Seidman in Support of the Omnibus Motions Submitted Pursuant to the Court's Direction As Issued From the Bench on April 2, 2004, for Appointment of Lead Plaintiffs for Each Mutual Fund Family, and Approval of Lead Plaintiffs' Selection of Lead Counsel filed in this District on April 19, 2004.

## Defendants

### The Registrant

11.     Defendant One Group Mutual Funds ("OGMF" or the "Registrant") is the registrant and issuer of each of the One Group mutual funds.  The Registrant issued shares purchased by Lead Plaintiff and other members of the Class during the Class Period pursuant to materially false and misleading Prospectuses as described herein.

### The Parent Company

12.     During the Class Period, Defendant Bank One Corporation, as predecessor-in-interest to J.P. Morgan Chase & Co. ("Bank One"), was the parent of many of the defendants named in this Consolidated Amended Complaint, including Banc One Investment Advisors Corporation and One Group Dealer Services, Inc.  During the Class Period, Bank One was a financial holding company and a multibank holding company registered under the Bank Holding Company Act of 1956.  Bank One provided domestic retail banking, finance and credit card services, worldwide commercial banking services, and trust and investment management services to mutual funds.

### The Investment Advisers

13.     Throughout the Class Period, Defendant Banc One Investment Advisors Corporation ("BOIA") was an indirect, wholly-owned subsidiary of Bank One, and a registered investment adviser under the Investment Advisers Act.  BOIA managed and advised the One Group mutual funds during the Class Period.  BOIA makes the day-to-day investment decisions for the One Group mutual funds and reviews, supervises, and administers each fund's investment program.  BOIA is also responsible for enforcing the policies of the funds, including restrictions on trading and other activities that could be detrimental to fund shareholders.  BOIA supervises and administers the One Group mutual funds'

investment program subject to the supervision of, and policies established by, the Trustees of One Group.  During the Class Period, BOIA (and ultimately Bank One) was paid for its services pursuant to an investment advisory agreement dated January 11, 1993 (the "Investment Advisory Agreement") between BOIA and the One Group mutual funds.  The Investment Advisory agreement provides for the One Group mutual funds to pay BOIA up to 1.25% of the average daily NAV of the fund, calculated on a daily basis and paid monthly, in return for their investment advisory services.  Thus, if a fund has an NAV of $1 billion over the course of the year, it will pay the Investment Advisor as much as $12.5 million annually, from investors' deposits, for its investment advisory services.

14.     Defendant Banc One High Yield Partners, LLC ("Banc One Partners") is registered as an investment adviser under the Investment Advisers Act and served as sub-advisor to the High Yield Bond and the Income Bond Fund during the Class Period.  Banc One Partners received fees calculated as a percentage of the average daily net assets of the High Yield Bond Fund and the Income Bond Fund.

15.     BOIA and Banc One Partners are referred to collectively herein as the "Investment Advisers."

**The Directors and Officers of BOIA**

16.     From November 2001 to October 2003, Mark A. Beeson ("Beeson") served as a Director and Senior Managing Director of BOIA and Manager, Chairman and Chief Executive Officer of defendant Banc One Partners.  From January 2000 to October 2003, defendant Beeson was also President and Chief Executive Officer of OGMF, and thus responsible for overseeing all of the One Group mutual funds.  Additionally, from October 1999 to October 2003, Beeson served as Chief Executive Officer and President of One Group Dealer Services.  Beeson was a control person of defendants BOIA, OGMF, Banc One Partners and One Group Dealer Services within the meaning of the

federal securities laws.  Beeson breached his fiduciary duties to the One Group mutual funds and their investors by knowingly and/or recklessly allowing the conduct complained of herein.  Beeson resigned in October 2003 in the wake of the mutual fund market timing scandal.

17.     During the Class Period, Defendant David J. Kundert ("Kundert") was a Director, President, Chairman and Chief Executive Officer of BOIA.  During the Class Period,  Kundert also served as an Executive Vice President of Bank One and a Director of One Group Dealer Services.  Kundert currently serves as President of OGMF.  Kundert was a control person of defendants BOIA and One Group Dealer Services within the meaning of the federal securities laws.  Kundert breached his fiduciary duties to the One Group mutual funds and their investors by knowingly and/or recklessly allowing the conduct complained of herein.

18.     During the Class Period, defendant Peter W. Atwater ("Atwater") was a Director and Chief Operating Officer of BOIA.  Atwater was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

19.     During the Class Period, defendant Richard R. Jandrain, III ("Jandrain") was a Director, Senior Managing Director and Chief Investment Officer of BOIA.  During the Class Period, Jandrain also served as a Manager of Banc One Partners.  Additionally, during the Class Period, Jandrain served as portfolio manager of the One Group International Equity Index Fund and the One Group Mid Cap Growth Fund.  Jandrain was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

20.     During the Class Period, defendant Gary J. Madich ("Madich") was a Director and Senior Managing Director of BOIA.  During the Class Period, Madich also served as a Managers of Banc One

Partners.  Madich was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

21.     During the Class Period, defendant John Abunassar ("Abunassar") was a Director and Senior Managing Director of BOIA.  While at BOIA, Abunassar was in charge of the institutional asset management group.  Abunassar resigned from Bank One in October 2003.  Abunassar was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

22.     During the Class Period, defendant Kenneth T. Stevens ("Stevens") was a Director of BOIA.  During the Class Period, Stevens also served as an Executive Vice President of Bank One.  Stevens was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or permitted the recklessly wrongful conduct described more fully herein.

23.     During the Class Period, defendant David R. Meuse ("Meuse") was a Director of BOIA.  Meuse was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

24.     During the Class Period, defendant William G. Jurgenson ("Jurgenson") was a Director of BOIA.  Until May 2000, Jurgenson also served as an Executive Vice President of Bank One.  Jurgenson was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

25.     During the Class Period, defendant William P. Boardman ("Boardman") was a Director of BOIA.  From December 1999 until the end of February 2001, Boardman also served as a Director and Vice Chairman of the Board of Bank One.  Boardman was a control person of BOIA within the meaning

of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

26.     During the Class Period, defendant Richard W. Vague ("Vague") was a Director of BOIA.  Until October 1999, Vague also served as an Executive Vice President of Bank One.  Vague was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

27.     During the Class Period, defendant Richard R. Wade ("Wade") was a Director of BOIA.  During the Class Period, Wade also served as an Executive Vice President of Bank One.  Wade was a control person of BOIA within the meaning of the federal securities laws and knowingly and/or recklessly permitted the wrongful conduct described more fully herein.

28.     The Defendants named in paragraphs 16 through 27 are referred to collectively herein as the "BOIA Directors and Officers."

29.     The Investment Advisers and the BOIA Directors and Officers are referred to collectively as the "Adviser Defendants."

**The Distributors**

30.     One Group Dealer Services, Inc. ("One Group Dealer Services") was the distributor of the One Group Funds beginning on April 1, 2002.  During the Class Period, One Group Dealer Services was an indirect wholly-owned subsidiary of Bank One and an affiliate of BOIA.  One Group Dealer Services was responsible for the sale of One Group Mutual Fund shares during the Class Period.  One Group Dealer Services is a broker-dealer registered with the Securities Exchange Commission and is a member of the National Association of Securities Dealers, Inc.

31.     The One Group Services Company, a wholly-owned subsidiary of The BISYS Group (a third-party administrator of mutual funds), was distributor of the One Group Funds from November 1, 1995 through March 31, 2002.

32.     One Group Dealer Services and One Group Services Company are referred to collectively herein as the "One Group Distributors."

**Trustees of the One Group Mutual Funds**

33.     During the Class Period, Defendant Peter C. Marshall ("Marshall") was Chairman of the Board of Trustees of OGMF.  Defendants Frederick W. Ruebeck, Robert A. Oden, John F. Finn, Marilyn McCoy, Julius L. Pallone, Donald L. Tuttle, and Charles I. Post (collectively, with Marshall, the "Trustee Defendants") were Trustees of OGMF.  The Trustee Defendants were control persons of OGMF within the meaning of the federal securities laws.

34.     Although the Trustee Defendants were purportedly "independent," in fact, they were firmly entrenched, with some having served as a Trustee for as many as ten years.  Indeed, with the exception of defendant Charles Post, who resigned in 2003, each of the Trustee Defendants remains a Trustee of the One Group mutual funds notwithstanding the disclosure of the wrongdoing alleged herein.  Moreover, each Trustee Defendant collected hundreds of thousands of dollars in annual salary.

35.     Defendants OGMF, Bank One, the Adviser Defendants, the One Group Distributors, and the Trustee Defendants are referred to collectively herein as the "One Group Defendants."

**The Market Timing Defendants**

36.     Defendants Edward J. Stern, Canary Capital Partners, LLC, Canary Capital Partners, Ltd. and Canary Investment Management, LLC (collectively, "Canary") participated in the wrongdoing described herein by, among other things, entering into an agreement with BOIA that allowed Canary to

time One Group Funds in exchange for Canary's agreement to invest in a One Group affiliate hedge

fund, Banc One Opportunity Fund.

37.     Defendant Kaplan & Company Securities, Inc. ("Kaplan") is a privately-held,

independent securities broker and advisor incorporated in Florida with its principal place of business in

Boca Raton, Florida.  Kaplan is a Bear Stearns correspondent and cleared market timing trades in One

Group Funds through defendants Bear Stearns and Circle Trust.  During the Class Period, Kaplan

participated in and enabled the wrongdoing described herein by, among other things, providing market

timers with capacity in One Group mutual funds, as well as permitting clients to late trade One Group

Funds, in violation of SEC Rule 22c-1.

38.     Defendant Trautman Wasserman & Company, Inc. ("Trautman") is a registered broker-

dealer based in New York, New York, and a Bank of America correspondent.  Defendant Trautman

participated in the wrongdoing described herein by, among other things, engaging in massive market

timing of One Group Funds, which it cleared through defendant Bank of America, on behalf of

numerous market timing customers.  Trautman's market timing clients traded at least the following One

Group Funds:  One Group International Equity Index Fund and One Group International Bond Fund.

39.     Defendant Pritchard Capital Partners, LLC ("Pritchard") is a registered broker-dealer

based in Mandeville, Louisiana and a Bank of America correspondent.  Defendant Pritchard participated

in the wrongdoing described herein by, among other things, engaging in massive market timing of One

Group Funds, which it cleared through defendant Bank of America, on behalf of numerous market

timing customers.  Pritchard's market timing customers traded at least the following One Group Funds:

One Group International Equity Index Fund and One Group Government Bond Fund.

40.     Defendant Aurum Securities Corp. ("Aurum") is a registered broker-dealer based in San Jose, California and a Bank of America correspondent.  Defendant Aurum participated in the wrongdoing described herein by, among other things, engaging in massive market timing of One Group Funds, which it cleared through defendant Bank of America, on behalf of numerous market timing customers.  Aurum's market timing customers traded at least the following One Group Funds:  One Group Mid Cap Growth Fund, One Group Equity Index Fund, One Group Equity Income Fund, One Group Investor Growth Fund, One Group Investor Growth & Income Fund, One Group Large Cap Value Fund and One Group Large Cap Growth Fund.

41.     Defendant Prudential Securities, Inc. ("Prudential") was, prior to July 1, 2003, a wholly-owned broker-dealer subsidiary of Prudential Financial, Inc.  On July 1, 2003, its ownership was transferred to Wachovia Securities, LLC, a joint venture subsidiary of Wachovia Corporation and Prudential Financial, Inc.  During the Class Period, Prudential actively encouraged and facilitated certain of its favored clients to engage in market timing of the following One Group mutual funds: One Group Mid Cap Growth Fund, One Group International Equity Fund, One Group Diversified International Fund, One Group High Yield Bond Fund and the One Group International Tax Free Fund.

42.     Defendants Canary, Kaplan, Trautman, Pritchard, Aurum and Prudential are referred to collectively herein as the "Market Timing Defendants."

**Clearing Defendants**

43.     Defendant Bank of America Corporation, through its subsidiary defendant Banc of America Securities LLC (collectively "Bank of America" or "BOA") is registered as a broker-dealer under the Exchange Act and an investment adviser under the Investment Advisers Act of 1940. Defendant Bank of America participated in and enabled the wrongdoing alleged herein by knowingly or

recklessly allowing market timers and market timing brokers including, but not limited to, Canary, Trautman, Pritchard and Aurum, to use its electronic platform to engage in timing and late trading of One Group Funds.

44.     Defendant Bear Stearns Securities Corporation is a Delaware corporation and a registered broker-dealer that cleared the securities transactions of its affiliate, defendant Bear Stearns & Co. Inc. and its customers during the Class Period.  Bear Stearns & Co. Inc. is a Delaware corporation, a registered broker-dealer and a global investment banking firm.  Defendants Bear Stearns Securities Corporation and Bear Stearns & Co. Inc. are referred to collectively herein as "Bear Stearns."  The clearing division of Bear Stearns is utilized by hundreds of smaller brokerages – known as "correspondents."  For example, at all relevant times, defendant Kaplan was a correspondent of defendant Bear Stearns.  Defendant Bear Stearns participated in and enabled the wrongdoing alleged herein by knowingly or recklessly allowing market timers, including Canary, to use its electronic platform to engage in timing and late trading of One Group.

45.     Defendant AST Trust Co. is the successor-in-interest to Security Trust Company, which, at all relevant times, was an unregistered financial intermediary.  Defendant Grant D. Seeger was Security Trust Company's Chief Executive Officer from 1998 until his resignation on October 5, 2003. (AST Trust Co., Security Trust Company, and Seeger are referred to collectively hereinafter as "STC".) Defendant STC participated in and enabled the wrongdoing alleged herein by knowingly or recklessly allowing market timers, including Canary, to use its electronic clearing platform to engage in timing and late trading of One Group Funds.

46.     Defendant Circle Trust is an investment advisory and portfolio management firm based in Stamford, Connecticut.  Defendant Circle Trust participated in and enabled the wrongdoing alleged

herein by knowingly or recklessly allowing market timers, including Canary, to use its electronic

platform to engage in timing and late trading of One Group Funds.

47.     Defendants BOA, Bear Stearns, STC and Circle Trust are referred to collectively herein

as the "Clearing Defendants."

48.     The activities of the Clearing Defendants were central to the success of the fraudulent

scheme alleged herein.  For example, Bear Stearns and BOA actually installed special computer

equipment for timers and their brokers that provided direct access to their clearing platforms and

allowed timers to execute market timing and late trading transactions at their whim, while the Clearing

Defendants captured the resulting fees and commissions.

## CLASS ACTION ALLEGATIONS

49.     The claims alleged herein are asserted on behalf of a Class consisting of all persons who

purchased and/or held shares in any mutual fund in the One Group fund family adversely affected by

market timing which funds and/or their registrant/issuer were advised by the Investment Advisers during

the period November 1, 1998 to September 3, 2003, inclusive (the "Class Period") (the "Class").

Excluded from the Class are defendants, members of their immediate families and their legal

representatives, parents, affiliates, heirs, successors or assigns, and any entity in which any defendant

has or had a controlling interest, and any other person who engaged in the unlawful conduct described

herein (the "Excluded Persons").  Also excluded are any officers, directors, or trustees of the Excluded

Persons, and all trustees and portfolio managers of the Funds.

50.     The members of the Class are so numerous that joinder of all members is impracticable.

While the exact number of members of the Class is unknown to Lead Plaintiff at this time and can only

be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or

thousands of members in the Class.  Record owners and other members of the Class may be identified from records maintained by the One Group Funds and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of law that is complained of herein.

52.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether defendants as alleged herein violated the law and/or their fiduciary duties;

b.     Whether statements made by defendants to the investing public during the Class Period omitted material facts about market timing and/or late trading of One Group Funds; and

c.     Whether, and to what extent, the members of the Class have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Overview of the Unlawful Conduct

55.     This action arises from a series of unlawful trading practices, commonly referred to in the mutual fund industry as "market timing" and "late trading."  These improper practices cost One Group mutual funds' investors millions of dollars.  The harm to the One Group Funds' investors took the form of: (i) dilution of profits and exaggeration of losses from their investments; (ii) payment of excessive transaction costs by investors as a result of the unlawful conduct; and (iii) improper management of their investments.  The One Group Defendants not only permitted, but actively facilitated this unlawful conduct, for the purpose of securing millions of dollars in management and distribution fees, all to the detriment of One Group Funds' investors.  The Market Timing Defendants and the Clearing Defendants actively participated in and aided and abetted the One Group Defendants' unlawful scheme, as described herein, for their own economic benefit.

56.     The various Prospectuses covering the issuance of shares of the One Group Funds failed to disclose that favored investors were being permitted to engage in timing and late trading of One Group Funds.  To the contrary, the Prospectuses indicated that market timing would not be permitted due to its harmful effect on the Funds.

### Market Timing And The Forward-Pricing Rule

57.     Unlike equity or debt securities that are valued and traded on stock exchanges, mutual funds continuously issue new shares as new investments are received and redeem shares as investors withdraw assets.  The value of these shares is calculated at 4:00 p.m. ET each day (the close of trading on the New York Stock Exchange), by determining the Net Asset Value ("NAV") of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For

example, if a mutual fund with 100,000 shares outstanding holds total assets with an NAV of $1 million, then it will be priced at $10 per share.  Thus, an investor seeking to invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

58.     Since mutual fund shares are priced only once per day (at 4:00 pm ET), the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information, and thereby make a quick profit.  For example, if an investor were able to purchase shares of a mutual fund at the NAV calculated before his purchase, with knowledge that the investments held within the fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

59.     To prevent this arbitrage opportunity, the SEC in 1979 enacted Rule 22c-1 under the Investment Company Act, which requires fund sales or redemptions to be based on prices calculated after the fund share is sold or redeemed.  This "forward-pricing rule" means that mutual fund investors who place orders during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV calculated after the order is received, at the 4:00 p.m. ET close of trading on the New York Stock Exchange.

60.     The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds.  This is due to the fact that the NAV of the funds, as calculated after the investor purchases his shares, still might not incorporate all public information.

61.     The following example illustrates how this can work.  Assume that on a Monday the New York Stock Exchange has a strong day, with various indices showing increased prices.  A market timer could conclude that based on the strong day in the American markets, the Asian markets (which, because of time zone differences, open after the New York market closes and close in the middle of the

night New York time) will similarly have a strong day.  Based on that conclusion, on that Monday the market timer buys U.S. mutual funds that invest heavily in companies that trade on Asian exchanges. Because of forward pricing, the timer's purchase price is based on the NAV for the fund calculated at 4:00 p.m. ET on Monday, which (because the Asian markets have not yet opened) does not incorporate any assumed increase in Asian markets.  Overnight, the Asian markets open and close with strong price increases.  By the time the fund's NAV is recalculated at 4:00 p.m. on Tuesday, the market timer will have achieved a significant return on its investment, which the timer can cash out.  If the timer chooses to hold its investment, then by timing its redemption of these shares to take advantage of foreknowledge of likely drops in Asian stock prices, the market timer minimizes any loss suffered on this investment.

62.     This kind of frequent trading to take advantage of information delay in the pricing of mutual funds to achieve short-term gains is called "market timing."  "Late trading" occurs when an investor is permitted to purchase a mutual fund's shares after the 4:00 p.m. ET market close and still receive the 4:00 p.m. price.  Market timing opportunities are not limited to mutual funds holding foreign investments, but also arise in mutual funds containing illiquid securities such as high-yield bonds or small capitalization stocks.  In such cases, the fact that some of the fund's securities may not have traded for hours before the New York closing time can render the fund's NAV stale, and thus subject to being timed.  Further, as alleged herein, several of the defendants successfully timed large cap funds in the One Group fund family.

63.     Both market timing and late trading cause significant harm to other mutual fund investors in a variety of ways.  First, by allocating market gains to themselves that should have been allocated among all fund holders (and by avoiding losses that should have been borne by all fundholders), market timers cause dilution of the value of long-term holders' investments, which increases over time.

Because of market timing activity, the NAV of the funds (and thus the price at which the funds are sold and purchased) becomes lower than what it would be absent market timing.  Effectively, market timers steal profits that rightfully belong to long-term fund holders.

64.     The harm to One Group Funds' investors from market timing extends beyond dilution. Successful market timing requires repeated, rapid trading of mutual fund shares with significant amounts of cash which in turn dramatically increases transaction costs, such as commissions, on the long-term investors that eat away at returns.  Trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market which imposes costs on the fund's long-term investors.

65.     Market timing also harms mutual funds investors by forcing mutual fund managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers are sometimes forced to enter into special investments as an attempt to "hedge" against timing activity, thus deviating altogether from the ostensible, publicly-stated investment strategy of their funds, and incurring further transaction costs.

66.     Experts estimate that mutual fund investors have lost billions of dollars annually as a result of market timing.  Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers.  Eric Zitzewitz, *Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds* (2002) (submitted to the Stanford Graduate School of Business), available at http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf; Money, October 2003, *The Great Fund Rip-Off*, MONEY, October 2003, at 51.  University of South Carolina law professor John Freeman has similarly estimated

that market timing trades may have drained more than $5 billion per year from long-term fund

shareholders.  http://www.srimedia.com/artman/publish/article_786.shtml.

67.     To compensate for the dilution and other harms caused by market timing, numerous

funds, including One Group, impose redemption fees on short-term trades.  However, although certain

Prospectuses stated that redemption fees of 2.00% would be imposed on short-term trades, Bank One

waived them as to favored market timers as detailed herein.

68.     Given the recognized harm to long-term investors from market timing activity described

above, BOIA assigned an employee to identify market timing activity in the funds.  The BOIA employee

manually reviewed fund activity for exchanges or redemptions greater than $50,000 in domestic funds

and greater than $10,000 in international funds (since December 2002).  The employee had the authority

to refuse any purchase order and restrict any account identified as engaging in market timing to

"redemptions-only" status.  In addition, in the international funds, the employee was required to impose

a 2% redemption fee if the trader redeemed within 90 days of the purchase.

69.     In fact, however, the purpose of One Group's market timing detection system was not to

protect investors from market timing, but rather to prevent investors who were not favored from taking

away the limited opportunities available to time One Group Funds from investors whom One Group

favored.  No mutual fund could permit unlimited market timing and survive because such activity comes

at the expense of, and decimates the returns for, long-term shareholders, who would otherwise flee the

fund.  One Group and other mutual fund complexes soon realized, however, that allowing a limited

amount of timing by wealthy investors and hedge funds could be extraordinarily profitable.  Although

the returns of long-term shareholders were diminished by such arrangements, the timers and their agents,

who were anxious to acquire as much capacity as they could given the relatively risk-free return they

could achieve through timing, competed with each other for the limited available capacity.  Thus, mutual fund complexes, including One Group, were able to negotiate increasingly lucrative agreements with the timers.  While One Group, the timers and their clearing agents earned enormous fees and profits from these arrangements, these earnings came at the direct expense of long-term buy and hold investors in One Group Funds such as Lead Plaintiff and members of the Class.

**Active Participation Of The One Group Defendants in Market Timing and Late Trading**

70.     BOIA entered into secret agreements with numerous market timers and market timing brokers that permitted timing of One Group Funds.  These agreements provided timers with a predetermined amount of timing "capacity" in identified target funds, and were made in the hope they would lead to additional business from the timers for various BOIA affiliates.  The One Group Defendants further facilitated the market timers' activities by sharing the precise contents of various One Group mutual funds' portfolios with the timers, which allowed the timers to profit in the declining markets of 2000-2002.

**1.      Canary's Market Timing and Late Trading Of One Group Funds**

71.     Beginning in 2000, Canary engaged in short-term trading and late trading of various One Group Funds as alleged below with the assistance of defendants Kaplan, STC, Bear Stearns and Bank of America.

72.     Pursuant to a written agreement dated February 29, 2000, Canary retained Kaplan "to execute non-discretionary transactions…in Mutual Funds at [Canary's] direction."  The agreement provided, among other things, that Canary would provide Kaplan with "[a] preliminary daily trade blotter specifying contemplated [t]ransactions to be executed by Kaplan & Co. for [Canary] for that day."  Pursuant to the agreement, this preliminary trade blotter specifying the name and dollar amount of

each mutual fund that might be bought or sold each day, was to be provided to Kaplan by fax or e-mail no later than 2:30 p.m. ET.  However, the agreement provided that final instructions for trades to be executed on behalf of Canary did not have to be provided until 4:30 p.m. ET, a half an hour after the 4:00 p.m. ET market close.  Canary used this late trading capability to engage in illegal late trades of One Group as well as other mutual funds.

73.     Kaplan was a correspondent broker of defendant Bear Stearns, whose enormous clearing division helped facilitate both market timing and late trading.  Bear Stearns' clearing platform was known to insiders as an open door for late trading because it routinely accepted orders from clearing customers after the 4:00 p.m. ET market close.  Although Bear Stearns originally sought to justify this practice as necessary to cope with a deluge of paperwork received at the end of the trading day, Bear Stearns continued to accept trades after the market close even after it switched to an electronic order system.  Even with the electronic system in place, orders were accepted up until 5:45 p.m. ET and processed at the 4:00 p.m. price.  A well known market timer who ran a market timing hedge fund confirmed that Bear Stearns was well aware that its platform was being used by timers.  This timer attended a meeting with a representative of Kaplan and a Mr. Acosta, the compliance officer at Bear Stearns' Boca Raton office, at which the timer's desire to utilize Bear Stearns' trading platform for market timing was openly discussed and approved.  Bear Stearns cleared trades for numerous publicly-identified timing brokers and hedge funds in addition to Kaplan and Canary, including Samaritan Asset Management, Brean Murray, Ritchie Capital Management, Inc., Empire Management and Ilytat, L.P.

74.     Between 2001 and late 2002, Canary also timed and late traded One Group Funds with the assistance of defendant Bank of America.  Canary had an extensive late trading and timing relationship with Bank of America and its broker-dealer subsidiary Banc of America Securities.  In June

2001, Bank of America installed computer equipment in Canary's offices that gave Canary direct access to the bank's clearing function.  This connection allowed Canary to buy and sell hundreds of mutual funds, including One Group's, until 4:30 p.m. ET.  Bank of America also provided Canary $300 million to finance this late trading and market timing of One Group and other funds.  Bank of America collected a so-called "wrap" fee of one-half of one percent of the assets in One Group and other mutual funds traded through the platform.  Bank of America also provided hundreds of millions of dollars in financing to Canary for which Canary paid the generous rate of LIBOR (London InterBank Offered Rate) plus 1.25%.

75.     Canary also used defendant STC's electronic trading platform to time and late trade One Group Funds.  In April 2000, representatives of Canary contacted defendant Seeger, CEO of STC, to discuss Canary's interest in using STC's electronic trading platform to engage in timing and late trading of mutual funds, including One Group Funds.  STC's legitimate processing of trades for third party administrators and custodial accounts allowed it to submit trades as late as 9:00 p.m. ET and still receive the 4:00 p.m. ET price.  Between May 2000 and July 2003, Canary used STC's platform to trade shares of approximately 397 different mutual funds, including One Group Funds.  Almost all of these trades were submitted to STC after 4:00 p.m. ET, and approximately 82% were sent to STC between 6:00 p.m. and 9:00 p.m. ET.  In return, STC was paid 4% of the profits Canary earned from its trading using STC's platform.

76.     In late 2001, defendant STC approached Bank One proposing that Stern borrow $25 million from Bank One, match the loan with $25 million of his own funds, and trade the total in what was described as an "asset allocation" strategy.  Defendant Beeson and the Operations Department at Bank One rejected this initial offer.

77.     In the Spring of 2002, while Stern was in Arizona visiting STC, Seeger set up a conference call with Beeson.  During the call, Stern explained to Beeson his timing strategy and his relationship with STC and requested permission to time up to 1% of the value of certain One Group Funds.

78.     In late March 2002, Beeson approved Stern's proposal to trade in several domestic and international funds.  The agreement included a $15 million loan from Bank One to Stern matched with $15 million in funds from Stern.  The entire $30 million was to remain exclusively within certain One Group mutual funds to provide security for the loan.  Any redemption fees that otherwise would have been applied to Stern's trading were waived.  Beeson confirmed the parties' agreement in an e-mail to Stern and requested that Stern meet with Connie Teska, the portfolio manager of a Bank One hedge fund, Banc One Opportunity Fund ("BOOF"), to discuss making an investment in the hedge fund stating:

> Our managers are willing to work with you on the equity funds.  They would like to start with ½ % of the fund's net assets as the maximum position and then evaluate moving to 1% later. Could you please send me a copy of an example of a letter of understanding you have used with other fund complexes.  We will be ready to start trading once the other banking arrangements are complete.  Also, the head of our hedge group will be in New York on April 2. Is it possible to meet with you or your hedge fund manager to discuss this opportunity more?  I look forward to working with your group.

79.     Stern responded to Beeson's e-mail in one of his own dated March 26, 2002, and indicated his interest in trading the following One Group Funds:  One Group Mid Cap Growth Fund, One Group Mid Cap Value Fund, One Group Diversified Mid Cap Fund, One Group Small Cap Growth Fund, One Group Small Cap Value Fund, One Group High Yield Bond Fund, One Group Large Cap Value Fund and One Group Diversified International Fund.  In his e-mail to Beeson, Stern estimated that

the agreed upon $30,000,000 in capacity would generate $1,387,000 in management, financing and other fees to One Group and Bank One.

80.     Stern formed Puffin Capital LLC ("Puffin") as the special purpose vehicle to be used in trading One Group Funds.  Bank One loaned Puffin $15 million at LIBOR (London Interbank Offered Rank) +225, a rate which was highly profitable to Bank One, but also acceptable to Stern given the market timing capacity that came along with it.  The loan was negotiated through Bill Kenyon, President of defendant STC.  Bank One's loan documentation leaves no doubt that the One Group Defendants were aware of and understood completely that Stern intended to time One Group Funds.  A Bank One Opportunity Memo summarizing the terms of the loan and its purpose states:

> Edward Stern was the third generation CEO of The Hartz Mountain Corporation….In late 2000 Hartz was sold to a fund managed by J.W. Childs Associates, LP, a private equity investment firm in Boston. Edward now manages the family's liquid assets (estimated to be over $1 billion) from a family office in New York….*A portion of the investments from the sale of Hartz has been used for market trading of mutual funds.  The market trading has been very successful.*
>
> *The investment portfolios are primarily mutual funds that are actively traded to take full advantage of market changes.  The securities are traded through and held in trust by Security Trust Company (STC)….*

[Emphasis added.]

81.     The memo went on to explain how Stern used leverage to increase the amount of money available for Canary's market timing activities:

> During 2000 Stern has increased their [Canary's] investment activity by credit relationships with Canadian Imperial Bank of Canada ($25MM) and JP Morgan ($75MM).  These two facilities are structured where Stern can invest in most mutual funds.  *STC has asked if Bank One would be interested in providing a line to a Stern family special purpose LLC.  As with the other two credit facilities, Stern will form a special purpose entity solely for the purpose of this activity and fund the LLC with $25,000,000 of equity.  Bank would then provide a $25,000,000 revolver.*

> ***Stern has proposed that the sum of $50,000,000 will be actively invested
> only in the various One Group mutual funds.***

[Emphasis added.]

82.     The memo also stated that One Group and defendant STC would provide Bank One with

daily reports of Stern's trading activity in order to allow the bank to monitor the amount of loan

collateral on hand:

> ***Daily STC and the One Group will provide a complete detail summary of
> investments that can be reviewed and monitored by the Bank….***

[Emphasis added.]

83.     The memo concluded by describing how profitable Stern's market timing activity had

been for Canary and his other lenders:

> Due to market conditions since September 11th we have been cautiously
> following Stern's investment performance.  The portfolios have been well
> managed.  ***For the quarter ending 12/31/01, following 9/11, the funds
> yield a 10% return (40% annualized).  The market timing trading has
> returned high yields in bull and bear markets.***  According to STC, the
> credit facilities of the other two banks have been performing as agreed and
> the JP Morgan line was recently raised from $50MM to $75MM.

[Emphasis added.]

84.     As part of their secret agreement, One Group provided Canary with monetary portfolio

holdings of the One Group Funds Canary was trading.  As Beeson knew, Canary used this information

in the declining market of 2002 to effectively sell mutual funds short and profit on declining NAVs.

Canary accomplished this by shorting the securities held by the fund at the same time that Canary

bought shares of the fund, so that Canary's "long" position with respect to the fund was balanced by its

"short" position with respect to securities held by the fund.  This balance effectively made Canary

"market neutral."  Then, when a market event drove down the fund's price, Canary used timing

strategies to redeem the fund shares at an artificially-high price (before the fund's NAV reflected the

downward market movement) and then close out its short position on the underlying securities with shares made cheaper by the downward market movement.  This enormously profitable short selling strategy in the declining market of 2002 was only possible because of One Group's willingness to provide Canary with detailed portfolio holdings of One Group Funds that were not available to Lead Plaintiff and other members of the Class.  By doing so, One Group blatantly ignored its own written policy, which provided that portfolio holdings were only to be disseminated to fund shares *via* semi-annual and annual reports filed with the SEC.  Canary received month-end portfolio holdings of eight One Group funds approximately five days after the end of each month from June 2002 until the relationship between Canary and One Group ended in April 2003.  The portfolio information was e-mailed to Canary by Gary Young of Bank One.

85.    Although Beeson did not demand an investment of sticky assets as part of BOIA's market timing agreement with Canary, the possibility of Stern conducting additional business with various BOIA affiliates was a repeated topic of discussion between Canary and One Group and a clear motivating factor in One Group's decision to permit Stern to time One Group Funds.    The loan documentation prepared in connection with the proposed loan to Puffin Capital LLC states in pertinent part:

> The subject facility provides profitability and ROA beyond normal returns.  ***The Stern family fully understands that we are a relationship Bank and that in order to continue the facility beyond one year a further relationship will be required.  The Stern family relationship is projected to provide significant other fee income to Bank One.***
>
> \* \* \*
>
> This facility is proposed for one year allowing time to expand the Stern relationship.  Stern understands our desire to be a relationship Bank and the requirement to continue the facility beyond maturity is conditioned on developing a further relationship.  Potential services would include

Investment Management, Private Client Services, and Capital Market services. ***The Stern family is very wealthy and active so opportunities should be in abundance.*** In addition we have a large and profitable relationship with STC.

[Emphasis added.]

86.     As set forth above, in his initial negotiations with Stern, Beeson requested that Stern meet with Connie Teska, the portfolio manager of the Banc One Opportunity Fund to discuss a possible investment by Canary in the fund.  Stern met with Teska in New York in March 2002.  From the time of that meeting until May 2003, Stern and Teska discussed various options for the investment, which was never finalized.

87.     In the Fall of 2002, Canary successfully negotiated an expansion of its market timing agreement with One Group.  Tom Wojcik and Dave Rossiter, Bank One Private Bankers, contacted Stern about expanding Canary's business with Bank One.  In response, Canary indicated that it had new investment models and would be interested in (i) trading additional One Group Funds, (ii) raising the level of available capacity to $100,000,000 and (iii) increasing Canary's maximum position from 1/2% to 1% of a fund's net assets.  When, in response, Wojcik and Rossiter recommended that Canary make an investment in the Banc One Opportunity Fund, Canary agreed to make the investment if Bank One would help finance it.  After the meeting, Rossiter e-mailed Noah Lerner at Canary and stated:

[We] came away from our meeting extremely impressed with you, Eddie [Stern], the operation, and your philosophy of building long term business relationships that are mutually beneficial.  We very much look forward to becoming one of your valued business partners.

88.     Following this meeting, Canary provided Beeson with a new list of One Group Funds it was interested in trading.  Beeson approved trading in certain of these funds but indicated that Canary would have to stop trading One Group's international funds because these funds required Bank One to

charge a redemption fee, which was being improperly waived for Canary.  In total, BOIA had failed to charge Stern approximately $4.2 million in required redemption fees.  Following the meeting with Wojcik and Rossiter and Canary's agreement to invest in BOOF, Beeson struck a new secret agreement with Stern that gave Canary $65,000,000 in capacity in One Group Funds.  Bank One provided an additional $15,000,000 in financing as well at the reduced rate of LIBOR + 175.  Stern used this additional funding to invest in three One Group Large Cap Funds: Diversified Equity, Large Cap Growth and Large Cap Value.  According to Timing Witness #1, there was "no doubt" that Stern received this additional capacity because he had agreed to invest in BOOF.

89.     As the loan documentation quoted above makes clear, the daily reports of Canary's trades allowed Bank One to track precisely Stern's timing activity.  Indeed, in December 2002, Bank One notified Stern *via* STC that he had reached his limit for the year and should cease trading until the new year.  In total, between June 2002 and April 2003, Stern executed approximately 300 exchange transactions within One Group mutual funds, earning a net profit of approximately $5,200,000.

90.     Canary continued to time and late trade One Group Funds until at least April 2003.  According to documents provided to plaintiffs' counsel by Timing Witness #1, throughout the relationship between Canary and Bank One, Canary market timed and/or late traded, among others, the following funds: One Group Large Cap Growth, One Group Mid Cap Growth, One Group Diversified Equity, One Group Mid Cap Value, One Group Large Cap Value, One Group Diversified Mid Cap, One Group Small Cap Growth, and One Group Equity Income.

91.     Bank One continued to pressure Stern to make a "sticky asset" investment in BOOF.  As a result of this pressure, and Stern's dissatisfaction with the BOOF investment being proposed, Canary ended its relationship with One Group in May 2003.

**2.      Bank One Allows Timing of Its Funds By Other Investors**

92.      Canary was not the only investor afforded improper trading privileges by Bank One.  A former investor services representative with One Group during the Class Period "knew [One Group] had accounts that did market timing and nobody seemed to care."  The most popular funds for such activities were the international funds and the Market Expansion Funds, according to the former investor services representative.  Confirming that market timing detection was done selectively and only to stop persons other than favored investors from trading, this former investor services representative stated that One Group got suspicious of "the normal everyday individual who is just sitting at home watching the financial news networks who wants to do trades on their account," putting blocks on the person's account, while "other people [were] calling doing millions of dollars at a time - nobody seemed to blink an eye."

93.      Allowing select well-financed timers to move in and out of One Group's Funds in exchange for "sticky" assets or other valuable consideration created extreme volatility in the Funds.  Indeed, according to a former portfolio manager with Bank One during the Class Period, a fund manager stated during 2003 that he/she was very irritated because his/her fund became so volatile "that [he/she] had to bob and weave and correct the next day" as a result of fund flows in and out of the fund.  Similarly, fund managers complained to Beeson about the effects of market timing on the One Group funds, according to the New York State Complaint, and, as a result, Beeson asked Canary to reduce the frequency of its trading.  But rather than halting the market timing, Beeson instead offered Canary four new One Group funds to time.

94.      A former external wholesaler and regional vice president of Bank One recalls that "there were instances where I would come across a rep that would say that he wants to trade a million dollars in

one of the international funds and…Dave Thorpe, who was my primary contact essentially would come

back and say 'well if he wants to put in five to ten million into one of our Large Cap Growth Funds or

whatever the case then that would be fine.'"

95.     Defendants Aurum, Pritchard and Trautman, through defendant Bank of America,

engaged in market timing of One Group Funds on behalf of market timers other than Canary.  These

brokers engaged in round-trip market timing transactions valued at approximately $16,100,000 in at

least the following One Group Funds:  One Group Equity Income Fund, One Group Equity Index Fund,

One Group Government Bond Fund, One Group Intermediate Bond Fund, One Group International

Equity Index Fund, One Group Investor Growth Fund, One Group Investor Growth & Income Fund,

One Group Large Cap Growth Fund, One Group Large Cap Value Fund and One Group Mid Cap

Growth Fund.  Canary accounted for an additional $2,500,000 in round trip market timing through these

defendants.

96.     A Michigan market timer also received approval from BOIA in June 1999 to time the

One Group international funds.  The Michigan market timer was permitted to execute transactions of $3

million or less in two One Group international funds without his exchange privileges being revoked.

The market timer executed approximately 100 exchanges in the two One Group international funds,

from June 1999 to December 2001, netting a total profit of approximately $1.24 million.

97.     Similarly, Prudential also engaged in market timing activity on behalf of its customers

that harmed One Group Fund investors.  According to a recent complaint filed by the SEC, between

January 1, 2001, and September 15, 2003, market timing customers connected to Prudential's Boston

office, with Prudential's knowledge and assistance, purchased and exchanged mutual fund shares worth

more than $1.75 million from One Group.  According to the SEC's complaint, the market timing by

customers of Prudential's Boston Office affected the following One Group Funds: One Group Mid Cap Growth Fund, One Group International Equity Fund, One Group Diversified International Fund, One Group High Yield Bond Fund, and the One Group International Tax-Free Fund.

98.     The timing activity at Prudential's Boston office pales in comparison to what went on in its New York office.  According to a large mutual fund market timer, who ran a market timing hedge fund, Fred O'Meally, who worked at Prudential's office in New York, had a $500 million book of timing business.  O'Meally was fired by Prudential in September 2003 and is currently under investigation by both the SEC and the New York Attorney General.

99.     In response to the New York State Complaint, Bank One conducted an internal review of the trading of Bank One's mutual funds, according to an October 16, 2003 *New York Times* article.  As a result of Bank One's internal review, Beeson and John Abunassar, director and managing director of BOIA who supervised sales of funds to pension funds and other institutions, resigned in October 2003.

## ONE GROUP'S MATERIALLY
## FALSE AND MISLEADING PROSPECTUSES

100.     None of the Prospectuses issued for any One Group Fund during the Class Period contained any disclosure that BOIA had agreed to allow wealthy insiders, hedge funds and other market timers to steal mutual fund profits that rightfully belonged to long-term shareholders, an obviously material fact to mutual fund investors.

101.     The Prospectuses were materially false and misleading because they each failed to disclose the material and adverse facts set forth in paragraphs 55-99 above, including, *inter alia*, that:

a.     BOIA had entered into secret agreements with certain favored investors that permitted these investors to time their trading of the One Group Funds' shares;

b.      Pursuant to these agreements, certain favored investors regularly timed their trading in the One Group Funds' shares;

c.      The One Group Defendants regularly allowed certain favored investors to engage in trades that (i) stole profits from long-term fund shareholders, (ii) were disruptive to the efficient management of the One Group Funds, and (iii) increased the One Group Funds' costs and thereby reduced the One Group Funds' actual performance;

d.      The One Group Defendants regularly allowed certain favored investors to engage in late trading, in violation of One Group's established NAV pricing policy and the forward-pricing rule, giving those preferred investors an advantage not available to other investors; and

e.      Defendants benefited financially from this market timing and late trading activity at the expense of long-term buy and hold shareholders in One Group Funds.

102.    To make matters worse, each One Group Prospectus issued during the Class Period indicated that the One Group Funds did not allow market timing.  Among other things, each Prospectus states that:

> To prevent disruptions in the management of the Funds, One Group limits excessive exchange activity.
>
> ***
>
> In addition, One Group reserves the right to reject any exchange request (even those that are not excessive) if the Fund reasonably believes that the exchange will result in excessive transaction costs or otherwise adversely affect other shareholders.

103.    In 2000, One Group strengthened the language in its Prospectuses, adding that "[e]xcessive exchange activity will result in revocation of your exchange privilege."

104.     Moreover, since the end of 2001, the Prospectuses for the One Group International Equity Index Fund and the One Group Diversified International Fund implemented redemption fees of 2.00% on sales or exchanges of shares within 90 days of purchase.

## ADDITIONAL SCIENTER ALLEGATIONS

105.     As alleged herein, the One Group Defendants acted with scienter in that defendants knowingly or recklessly participated in a scheme to defraud Lead Plaintiff and other purchasers and shareholders of One Group mutual funds and profited from their participation in said scheme as set forth herein.

### A.     The One Group Defendants

106.     The One Group Defendants permitted market timing of One Group Funds as alleged herein.  Defendant BOIA entered into contracts with known market timers that explicitly permitted the wrongdoing complained of herein, and had employees whose job was to enable trading by market timing entities.

107.     In addition, each of the One Group Defendants knew that this market timing activity was enormously harmful to long-term buy and hold investors in One Group Funds.  Moreover, each of the One Group Defendants knew that the public documents and statements issued or disseminated in the name of One Group Funds were materially false and misleading because they did not disclose that favored investors were being allowed to time their trading of One Group Funds; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of their fiduciary duty and as primary violations of the federal securities laws.

108.    As set forth in detail elsewhere herein, the One Group Defendants, by virtue of their receipt of information reflecting the true facts regarding the One Group Funds, their control over, and/or receipt and/or modification of the One Group Funds' allegedly materially misleading misstatements and/or their associations with One Group Funds which made them privy to confidential proprietary information concerning the One Group Funds, participated in the fraudulent scheme alleged herein.

109.    The One Group Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.  In exchange for allowing the unlawful practices alleged herein, the One Group Defendants received, among other things, increased management fees and other hidden compensation paid in the form of inflated interest payments on loans to Canary.  Large investors attracted to the One Group mutual funds by market timing arrangements increased the amount of funds under management and permitted BOIA, among other things, to receive increased management fees.  BOIA earned advisory and management fees of up to 1.25% annualized of the average daily net asset value of the One Group Funds.  Thus, the large infusions of cash provided by market timers, while detrimental to other investors in the funds themselves, were a source of large profits to the One Group Defendants by dramatically increasing the amounts of assets under management, and thereby increasing the dollar amount of fees payable.

110.    This receipt of increased fees became particularly important for One Group when, in 2000, there were dramatic declines in the stock markets, which caused One Group's assets under management (and thus the fees earned on these assets) to decline dramatically as well.

2.      **The Market Timing Defendants**

111.    The Market Timing Defendants timed One Group Funds to the detriment of plaintiffs and members of the Class.  The Market Timing Defendants' scienter is evidenced by one or more of the following: (i) written agreements to time One Group Funds; (ii) their awareness of the Prospectuses' language prohibiting market timing and of the fact that their agreements to time One Group Funds were not disclosed; (iii) their awareness that this activity came at a long-term shareholders' expense, and (iv) their awareness that One Group had mechanisms in place to prevent market timing that were disabled as to the Market Timing Defendants.

3.      **The Clearing Defendants**

112.    The One Group Defendants were further motivated by the prospect of additional business from Stern and Canary.  Potential additional business included "sticky asset" investments in a Bank One hedge fund, as well as the potential for cultivating Stern and Canary as clients for other parts of the Bank One organization.

113.    The Clearing Defendants were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commissions they received for processing the market timer and late trading transactions.  The Clearing Defendants also benefited from their role as the executors of market timing and late trading by leveraging various *quid pro quo* benefits from market timers and timing brokers, including the ability to cross-sell other products and services they offered to the timers and brokers, including financing and private client services.  By collecting such fees and other benefits, the Clearing Defendants directly benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term

fund investors who bore the transaction costs and other harms, as described herein, of such excessive

trading.

114. For example, STC was motivated to facilitate and participate in the wrongful scheme by

the enormous profits they derived thereby. As explained above in ¶¶75-83, STC had a compensation

arrangement with hedge funds, including Canary, that included a custodial fee larger than it charged

most of its TPA clients, as well as a profit sharing arrangement with respect to most of Canary's trades.

STC systematically pursued the scheme with full knowledge of its consequences to other investors.

## CAUSES OF ACTION

## VIOLATIONS OF THE SECURITIES ACT

### FIRST CLAIM FOR RELIEF

**Violation of Section 11 of the Securities Act
(Against OGMF, the One Group Distributors and the Trustee Defendants)**

115. Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as

though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff expressly exclude

and disclaim any allegation that could be construed as alleging fraud or intentional or reckless

misconduct.

116. This claim is brought by the pursuant to Section 11 of the Securities Act, 15 U.S.C. §

77k, against OGMF, the One Group Distributors, and the Trustee Defendants on behalf of those Class

members who purchased any of the Funds subject to a Prospectus whose effective date was on or after

September 9, 2000.

117. Defendants violated Section 11 of the 1933 Act in that the Prospectuses issued for the

One Group mutual funds contained untrue statements of material fact and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.  The Prospectuses failed to disclose, *inter alia*, the following material and adverse facts:

a.      Contrary to the representation that it was One Group's policy and practice to monitor and take steps to prevent timed trading because of its adverse effects on fund investors, in fact, such timed trading was taking place and the policy was only enforced selectively;

b.      One Group regularly allowed, and had entered into agreements which allowed, certain favored investors to engage in trades that were disruptive to the efficient management of the One Group Funds and/or increased the One Group Funds' costs and thereby reduced the One Group Funds' actual performance;

c.      Contrary to the express language in the Prospectus that the NAV is calculated at 4:00 ET each day and that a purchase order must be received prior to 4:00 p.m. ET to receive that day's NAV, market timers regularly engaged in late trading of One Group Funds' shares;

d.      The One Group Defendants regularly allowed Market Timing Defendants to engage in late trading, giving them an unfair advantage not available to other investors; and

e.      Pursuant to these unlawful agreements and practices, One Group benefited financially at the expense of the One Group Funds' investors.

118.    Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading written statements and/or omissions of material facts that were contained in the Prospectuses.

119.    Defendants, and each of them, had the duty to investigate the information contained in the Prospectuses and failed to satisfy that duty.  Defendants, and each of them, owed to the One Group Funds investors, including Lead Plaintiff, the duty to ensure that the statements contained in the

Prospectuses were true and complete and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.  By virtue of the misrepresentations and omissions contained in or omitted from the Prospectuses, as herein alleged, defendants, and each of them, are liable to Lead Plaintiff and the Class.

120.    Prior to purchasing and/or reinvesting in One Group Funds shares, Lead Plaintiff and Class members were provided with the appropriate Prospectuses, without the knowledge of the untruths and/or omissions contained herein.  Lead Plaintiff and the Class members purchased and/or reinvested in the shares of the One Group Funds traceable to the false and misleading Prospectuses.

121.    As a direct and proximate result of defendants' misconduct and material misstatements and omissions contained in the Prospectuses, Lead Plaintiff and Class members suffered substantial damages.

122.    This claim was brought within the applicable status of limitations.  At the time they purchased and/or reinvested in the One Group shares traceable to the defective prospectuses, Lead Plaintiff  and Class members were without knowledge of the facts concerning the false and misleading statements and omissions alleged herein and could not reasonably have possessed such knowledge.

## SECOND CLAIM FOR RELIEF

**Violation Of Section 12(a)(2) Of The Securities Act**
**(Against One Group Dealer Services)**

123.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth herein, except that for purposes of this claim, Lead Plaintiff excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

124.    This claim is brought against One Group Dealer Services pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) on behalf of those Class members who purchased any of the One Group Funds on or after September 9, 2000.

125.    One Group Dealer Services was responsible for the preparation and dissemination of the Prospectuses referred to above.  Each Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.  The Prospectuses failed to disclose and misrepresented, *inter alia*, the following material and adverse facts:

a.      That Contrary to the representation that it was One Group's policy and practice to monitor and take steps to prevent timed trading because of its adverse effect on fund investors, in fact, such timed trading was taking place and the policy was only enforced selectively;

b.      That One Group regularly allowed, and had entered into agreements which allowed, certain favored investors to engage in trades that were disruptive to the efficient management of the One Group Funds and/or increased the One Group Funds' costs and thereby reduced the One Group Funds' actual performance;

c.      That contrary to the express language in the Prospectus that the NAV is calculated at 4:00 EST each day and that a purchase order must be received prior to 4:00 p.m. EST to receive that day's NAV, market timers regularly engaged in late trading of One Group mutual funds' shares;

d.      That the One Group Defendants regularly allowed Market Timing Defendants to engage in late trading, giving them an advantage not available to other investors; and

e.      That pursuant to these unlawful agreements and practices, One Group benefited financially at the expense of the One Group Funds' investors.

126.    One Group Dealer Services owed to Lead Plaintiff and other Class members the duty to make reasonable and diligent investigation of the statements contained in each Prospectus and other offering materials to insure that such statements were true and that there were no omissions of material fact required to be stated in order to make the statements contained therein not materially misleading.

127.    One Group Dealer Services sold and/or solicited the sale of shares in the One Group Funds pursuant to the Prospectuses referred to above for Bank One's financial gain.

128.    Lead Plaintiff and other Class members purchased shares in the One Group Funds pursuant to these false and misleading Prospectuses.  Lead Plaintiff and other Class members did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in or made in connection with the Prospectuses.

129.    By reason of the misconduct alleged herein, One Group Dealer Services violated Section 12(a)(2) of the Securities Act and Lead Plaintiff and other Class members who purchased shares in the One Group Funds have the right to rescind and recover the consideration paid for those shares and those whose shares have less value than at the time these shares were purchased hereby elect to rescind and tender their shares to One Group Dealer Services.  Lead Plaintiff and other Class members who have sold their shares are entitled to rescissory damages.

130.    This claim was brought within the applicable statute of limitations.  At the time they purchased and/or reinvested in the One Group Funds shares traceable to the defective Prospectuses, Lead Plaintiff and Class members were without knowledge of the facts concerning the false and misleading statements and omissions herein and could not reasonably have possessed such knowledge.

## **THIRD CLAIM FOR RELIEF**

### **Violation Of Section 15 Of The Securities Act**
### **(Against Bank One and the Investment Advisers)**

131.   Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

132.   This claim is brought pursuant to Section 15 of the Securities Act against Bank One and the Investment Advisers on behalf of those Class members who purchased any of the Funds on or after September 9, 2000.

133.   The One Group Mutual Funds and the One Group Dealer Services are each liable under Section 11 and/or 12(a)(2) of the Securities act as set forth herein.

134.   Bank One and the Investment Advisers were "control persons" of OGMF and the One Group Dealer Services within the meaning of Section 15 of the Securities Act, by virtue of their position of operational control and/or authority over such entities.  Bank One and the Investment Advisers directly and indirectly, had the power and authority, and exercised the same, to cause OGMF and the One Group Dealer Services to engage in the wrongful conduct complained of herein.  Bank One and the Investment Advisers caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

135.   Pursuant to Section 15 of the Securities Act, by reason of the foregoing, Bank One and the Investment Advisers are liable to Lead Plaintiff and the other Class members to the same extent as are OGMF and One Group Dealer Services for their primary violations of Section 11 or 12(a)(2) of the Securities Act.

136.    By virtue of the foregoing, Lead Plaintiff and the other Class members are entitled to damages against Bank One and the Investment Advisers.

## FOURTH CLAIM FOR RELIEF

### Violation Of Section 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder

### (Against BOIA, Bank One Partners, OGMF,
### One Group Distributors, Mark A. Beeson, the Market Timing
### Defendants and the Clearing Defendants)

137.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

138.    This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, against BOIA, Bank One Partners, OGMF, One Group Distributors, Mark A. Beeson, the Market Timing Defendants, and the Clearing Defendants on behalf of all Class members who purchased shares of One Group Funds during the Class Period.

139.    During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein and caused Lead Plaintiff and other members of the Class to purchase One Group Funds' shares or interests at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

140.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the One Group Funds' securities, including Lead Plaintiff and other

members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated One Group Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

141.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme alleged herein.

142.    Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading in One Group Funds and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and other members of the Class.

143.    Defendants knowingly participated in the manipulative scheme alleged herein and/or had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

144.    As a result of the manipulative scheme alleged herein and/or defendants' dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of One Group Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of the fact that market prices of the shares were distorted, and relying directly or indirectly on the false and

misleading statements made in the Prospectuses, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the members of the Class were damaged by acquiring the shares or interests in the One Group Funds during the Class Period at distorted prices.

145.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class known of the truth concerning the One Group Funds' operations, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their shares at the distorted prices which they paid.

146.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

147.   As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages.

### FIFTH CLAIM FOR RELIEF

**Violation Of Section 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder**

**(Against BOIA, Bank One Partners, OGMF,
One Group Distributors, Mark A. Beeson, the Market Timing
Defendants, and the Clearing Defendants)**

148.   Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

149.   This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, against BOIA, Bank One Partners, OGMF, One Group Distributors, Mark A. Beeson, the Market

Timing Defendants, and the Clearing Defendants on behalf of all Class members who held funds during the Class Period and were injured in connection with the purchase and/or sale of One Group Funds by market timers, as alleged herein.

150.     During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including Lead Plaintiff and other members of the Class, as alleged herein and caused Lead Plaintiff and other members of the Class to hold One Group Funds' shares or interests at distorted prices and to otherwise suffer damages.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

151.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the One Group Funds' securities, including Lead Plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated One Group Funds' assets and otherwise distorted the pricing of One Group Funds' shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

152.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme alleged herein.

153.     Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly-timed trading in One Group Funds and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and other members of the Class.

154.     Defendants knowingly participated in the manipulative scheme alleged herein and/or had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

155.     As a result of the manipulative scheme alleged herein and/or defendants' dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of One Group Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of the fact that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made in the Prospectuses, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class were damaged by One Group's allowing market timers to effectively steal profits properly belonging to them.

156.     At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and other members of the Class known of the truth concerning the One Group Funds' operations, which were not

disclosed by defendants, Lead Plaintiff and other members of the Class would not have continued to hold their shares.

157.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

158.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class have suffered damages.

## SIXTH CLAIM FOR RELIEF

### Violation Of Section 20(a) Of The Exchange Act
### (Against Bank One, the BOIA Directors and Officers and the Trustee Defendants)

159.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

160.    This claim is brought by the Class pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Bank One, the BOIA Directors and Officers and the Trustee Defendants.

161.    Defendants BOIA, Banc One Partners, One Group Dealer Services and OGMF, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

162.    Defendants Bank One, the BOIA Directors and Officers and the Trustee Defendants were control persons of BOIA, Banc One Partners, One Group Dealer Services and OGMF within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operational and management control of BOIA's, Banc One Partners', One Group Dealer Services', OGMF's, respective businesses and systematic involvement in the fraudulent scheme alleged herein, defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of BOIA, Banc One Partners, One Group Dealer Services and OGMF, including the content and dissemination of the various statements which Lead Plaintiff

contends are false and misleading.  Bank One, the BOIA Directors and Officers and the Trustee Defendants had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

163.    By virtue of their position, as controlling persons, Bank One, the BOIA Directors and Officers and the Trustee Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the members of the Class suffered damages in connection with their purchases of One Group Funds securities during the Class Period.

## SEVENTH CLAIM FOR RELIEF

### Violation Of Section 34(b) Of The Investment Company Act
### (Against Bank One, the Adviser Defendants and the Trustee Defendants)

164.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

165.    This claim is brought on behalf of the Class pursuant to Sections 34(b) of the Investment Company Act, 15 U.S.C. § 80a-33(b), against Bank One, the Adviser Defendants and the Trustee Defendants.

166.    Under Section 34(b) of the Investment Company Act, it is unlawful for any person to make any untrue statement of a material fact in any registration statement application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a-30(a)].  It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

167.    Defendants Bank One, the Adviser Defendants and the Trustee Defendants made untrue statements of a material fact in the One Group registration statement, application, report, account, record, and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) [15 U.S.C. § 80a-30(a)].

168.    Lead Plaintiff and members of the Class have been injured as a result of the One Group Defendants' statements, conduct, and violations.

### EIGHTH CLAIM FOR RELIEF

**Violation Of Section 36(a) Of The Investment Company Act
(Against One Group Distributors, the BOIA Directors and Officers and the Trustee Defendants)**

169.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

170.    This claim is brought on behalf of the Class pursuant to Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a), against One Group Distributors, the BOIA Directors and Officers and the Trustee Defendants.

171.    Under Section 36(a), defendants are deemed to owe a fiduciary duty to Lead Plaintiff and other members of the Class with respect to the receipt of fees and compensation that the One Group Defendants receive for services of a material nature.

172.    Defendants devised and implemented a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in timing and/or late trading of the One Group Funds throughout the Class Period, solely for their own benefit, in violation of their fiduciary duties to their customers, *i.e.*, Lead Plaintiff and the other members of the Class.  Defendants failed to reveal material facts concerning their conduct, such that Plaintiff and members of the Class could have made informed decisions about the true value and performance of the One Group Funds.

173.     Lead Plaintiff and members of the Class have been injured as a result of the Defendants' statements, conduct, and violations.

## NINTH CLAIM FOR RELIEF

### Violations Of Section 36(b) Of The Investment Company Act
### (Against the Adviser Defendants, the One Group Distributors and the Trustee Defendants)

174.     Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

175.     This claim is brought on behalf of the Class pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), against the Adviser Defendants, the One Group Distributors and the Trustee Defendants.

176.     Under Section 36(b) of the Investment Company Act, the defendants are deemed to owe a fiduciary duty to Lead Plaintiff and the other members of the Class with respect to the receipt of fees and compensation that the One Group Defendants receive for services of a material nature.

177.     Defendants devised and implemented a scheme to obtain substantial and excessive fees and other income for themselves and their affiliates by allowing others to engage in timing and/or late trading of the One Group Funds throughout the Class Period and in violation of their fiduciary duties to their customers, *i.e.*, Lead Plaintiff and members of the Class.  Defendants failed to reveal material facts concerning their conduct, such that Lead Plaintiff and members of the Class could have made informed decisions about the true value and performance of the One Group Funds.

178.     Lead Plaintiff and other members of the Class have been injured as a result of the defendants' statements, conduct, and excessive fees.

## TENTH CLAIM FOR RELIEF

### Violation Of Section 48(a) Of The Investment Company Act
### (Against Bank One)

179.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

180.    This claim is brought on behalf of the Class pursuant to Section 48(a) of the Investment Company Act, 15 U.S.C. §80a-47, against Bank One.

181.    Under Section 48(a) of the Investment Company Act, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

182.    Bank One devised and implemented a scheme to obtain substantial fees and other income for itself and its affiliates by allowing others to engage in timing and/or late trading of the One Group Funds throughout the Class Period and in violation of its fiduciary duties to its customers, *i.e.*, Lead Plaintiff and members of the Class.  Bank One failed to reveal material facts concerning its conduct, such that Lead Plaintiff and the other members of the Class could have made informed decisions about the true value and performance of the One Group Funds.

183.    Lead Plaintiff and members of the Class have been injured as a result of Bank One's statements, conduct, and excessive fees.

## ELEVENTH CLAIM FOR RELIEF

### Breach Of Fiduciary Duty/Constructive Fraud
### (Against The Adviser Defendants and the Trustee Defendants)

184.    Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

185.    This claim is brought on behalf of the Class against the Adviser Defendants and the Trustee Defendants.

186.    Defendants owed fiduciary duties to Lead Plaintiff and Class to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the One Group family of funds.  As a part of their fiduciary duties to Lead Plaintiff and the Class, defendants also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing and late trading were complete and accurate, and to ensure that actions were taken to protect long-term holders of mutual fund shares in the One Group family of funds from damage caused to their investments from market timing and late trading.

187.    Defendants intentionally or recklessly breached their fiduciary duties by allowing favored investors to conduct timed and/or late trading in the One Group family of funds, by misrepresenting and concealing the existence of such market timing and late trading, and by placing their own financial interests above those of Lead Plaintiff and members of the Class.

188.    Defendants' breaches of their fiduciary duties to Lead Plaintiff and the Class tended to deceive, to violate public and private confidence and to injure public interests.

189.    Lead Plaintiff and members of the Class suffered injury as a result of defendants conduct in the form of, *inter alia*, the following:  increased transaction costs; requiring the family of funds to keep excessive cash on hand to pay out timers' redemptions; lower NAVs; and management fees.

190.    Defendants' breaches of their fiduciary duties proximately caused the damages suffered by Lead Plaintiff and members of the Class.

## TWELFTH CLAIM OF RELIEF

**Aiding And Abetting Breach Of Fiduciary Duty**
**(Against Bank One, the Market Timing Defendants and the Clearing Defendants)**

191.    Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

192.    This claim is brought on behalf of the Class against Bank One, the Market Timing Defendants and the Clearing Defendants.

193.    As alleged above, the defendants named in the Eleventh Claim for Relief owed a fiduciary duty to Lead Plaintiff and members of the Class.  That duty was breached when those defendants permitted favored investors to late trade and/or market time in the One Group family of funds.

194.    Bank One, the Market Timing Defendants and the Clearing Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted in the defendants named in the Eleventh Claim for Relief in breaching their fiduciary duties.

195.    As a result of defendants' conduct, Lead Plaintiff and members of the Class suffered damages.

## THIRTEENTH CLAIM FOR RELIEF

**Unjust Enrichment**
**(Against All Defendants)**

196.    Lead Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

197.    This claim is asserted by the Class against all defendants.

198.    Lead Plaintiff and members of the Class conferred a benefit on the defendants.

Defendants derived management fees and other benefits and were otherwise unjustly enriched from

transactions connected with the One Group family of funds, to the detriment of Lead Plaintiff and

members of the Class.

199.    Defendants' enrichment is directly and causally related to the detriment of Lead Plaintiff

and members of the Class.

200.    The benefit was accepted by defendants under such circumstances that it would be

inequitable for it to be retained without payment.  As alleged above, defendants, *inter alia*, breached

their fiduciary duties to Lead Plaintiff and members of the Class and breached contracts with Lead

Plaintiff and members of the Class, and therefore defendants are not justified to retain the benefits

conferred upon them.

201.    As a result of all of the defendants' conduct, Lead Plaintiff and members of the Class

suffered damages.

202.    There is no adequate remedy at law to compensate for the injuries of Lead Plaintiff and

members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.    Determining that this action is a proper class action and certifying Lead Plaintiff

as Class representative and her counsel as Class counsel under Rule 23 of the Federal Rules of Civil

Procedure;

b.      Awarding compensatory damages in favor of Lead Plaintiff and members of the

Class against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Lead Plaintiff and members of the Class restitution, disgorgement of

unjustly earned profits of defendants, and punitive damages;

d.      Awarding Lead Plaintiff and members of the Class their reasonable costs and

expenses incurred in this action, including counsel fees and expert fees;

e.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:   September 29, 2004                     Respectfully submitted,


**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**


By:   _____/s/_____

Melvyn I Weiss
David J. Bershad
Deborah Clark-Weintraub
Clifford S. Goodstein
Kim E. Levy
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:     (212)594-5300
Facsimile:     (212) 868-1229

**Counsel for Lead Plaintiff Linda B. Parker
and Lead Class Counsel for the One Group
Subtrack**

DOCS\228188v1