# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION<br><br>This Document Relates to:<br>In re RS Funds | MDL 1586<br>Case No. 04-MD-15863<br>(Judge J. Frederick Motz) |
| Parthasarathy v. RS Investment Management, L.P., *et al.* | Case No. 04-cv-3798-JFM |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.   Nature of the Action .................................................................................................. 1

II.   Jurisdiction and Venue............................................................................................ 4

III.   Parties...................................................................................................................... 5

   A.   Lead Plaintiff .................................................................................................... 5

   B.   Defendants And Significant Non-Parties .......................................................... 6

      1.   Non-Party RS Funds ..................................................................................... 6

      2.   The Parent Company..................................................................................... 7

      3.   The Investment Advisors ............................................................................... 7

      4.   The Administrator.......................................................................................... 9

      5.   Registrants/Issuer Defendant ...................................................................... 10

      6.   The Distributor Defendant ........................................................................... 10

      7.   The RS Individual Defendants...................................................................... 11

      8.   The Trustee Defendants ............................................................................... 12

      9.   The Market Timer Defendants ..................................................................... 16

      10.   The Facilitator Broker Defendants ............................................................. 16

      11.   The Clearing Broker Defendants ................................................................ 21

      12.   The Financier Defendants ........................................................................... 23

IV.   Factual Allegations ............................................................................................... 24

   A.   Overview Of Market Timing/Late Trading Practices....................................... 24

      1.   Background Information And The Forward-Pricing Rule............................ 24

      2.   Subverting The Forward-Pricing Rule Through Market Timing And Late Trading.... 26

   B.   Material Misstatements And Omissions In The RS Prospectuses Concerning Market Timing........................................................................................................................ 27

   C.   The Defendants' Knowledge And Direct Participation In The Wrongful Conduct ......... 29

      1.   Market Timing and Late Trading at RS........................................................ 29

         a.   Overview................................................................................................... 29

            (1)   Sharing of Confidential Portfolio Holdings Information.................. 32

         b.   Specific Examples Of Timing At RS ........................................................ 33

            (1)   Canary ................................................................................................. 33

i

2.   Facilitator Broker Defendants' Participation In The Wrongful Conduct ..................... 39

 a.   Overview ...................................................................................................... 39

 b.   Examples Of The Wrongful Conduct ........................................................... 40

  (1)   Cantella ............................................................................................. 40

  (2)   Kaplan ................................................................................................ 41

  (3)   Brean Murray ..................................................................................... 42

  (4)   CIBC .................................................................................................. 44

3.   The Clearing Broker Defendants' Participation In The Wrongful Conduct ................. 45

 a.   Overview ...................................................................................................... 45

 b.   Examples Of The Wrongful Conduct ........................................................... 47

  (1)   STC .................................................................................................... 47

  (2)   Bear Stearns ...................................................................................... 49

  (3)   Bank of America ................................................................................ 50

4.   The Financier Defendants' Participation In The Wrongful Conduct ........................... 52

D.   Harm To RS Funds Investors ................................................................................................ 53

E.   The Failure Of The Trustee Defendants ............................................................................... 55

 1.   12b-1 Fees ................................................................................................................... 57

 2.   Advisory and Management Fees .................................................................................. 59

V.   Class Allegations ........................................................................................................................ 60

VI.   Causes of Action ......................................................................................................................... 62

Count I ...................................................................................................................................................... 62

Count II ..................................................................................................................................................... 64

Count III ................................................................................................................................................... 65

Count IV ................................................................................................................................................... 67

Count V ..................................................................................................................................................... 69

Count VI ................................................................................................................................................... 72

Count VII .................................................................................................................................................. 73

Count VIII ................................................................................................................................................. 74

Count IX ................................................................................................................................................... 75

Count X ..................................................................................................................................................... 76

Count XI ........................................................................................................................... 77

Count XII .......................................................................................................................... 78

Count XIII ......................................................................................................................... 79

VII.    Prayer For Relief ........................................................................................................ 80

Lead Plaintiff, the Krouse Group, alleges the following based upon the investigation of Lead Counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories regarding RS Funds, press releases, media reports, the complaints filed by the SEC and the New York State Attorney General ("NYSAG"), and a confidential witness with direct knowledge of the market timing and late trading activities in RS Funds and throughout the mutual fund industry ("Confidential Witness #1" or "CW1").

## I.  NATURE OF THE ACTION

1.  Lead Plaintiff, the Krouse Group, brings this action on behalf of all persons who purchased and/or held shares of RS mutual funds advised by RS Investment Management, L.P. during the period from October 6, 1999 to October 5, 2004, inclusive (the "Class Period"), and were harmed by a pattern of trading practices known as "market timing" and/or "late trading." The wrongful acts and misconduct alleged herein, much of which has been admitted by defendants, are the subject of administrative actions and investigations by various regulatory agencies, including the SEC and the NYSAG.

2.  The RS fund family consists of ten mutual funds into which retail investors could contribute cash for the purpose of creating a pool of assets with which to invest (the "RS Funds"). These mutual funds hold no assets apart from investors' deposits, nor do they conduct any investment or operating activities on their own. Instead, the funds' operations are primarily controlled by RS Investment Management, LP ("RS"). For performing these services, RS is paid fees from the funds' deposits in an amount equal to a percentage of the assets under management. Accordingly, the larger the assets under management, the greater the fees RS receives.

3.      Market timing is a practice whereby certain investors take advantage of inefficiencies in the pricing of mutual fund shares by rapidly trading in and out of these funds on multiple occasions within a short period of time.  By executing a significant number of these trades quickly, market timers profit by capitalizing on the differential between the price of the mutual fund itself, and the value of the underlying securities that comprise the mutual funds. Late trading is a variation of market timing, in which certain investors are permitted to trade mutual fund shares at the prior day's prices, in violation of federal law.

4.      Throughout the Class Period, RS knew or, but for its recklessness, should have known that market timing and late trading caused significant monetary harm to other fund investors.  By quickly trading in and out of mutual funds, market timers dilute the investment gains that would otherwise be realized by long-term investors, without sharing any of the losses incurred.  Market timers also impose additional transaction costs upon innocent fund investors, due to the huge inflows and outflows of cash resulting from their rapid "in and out" trading.  To pay out these market timers on short notice, portfolio managers must invest disproportionate amounts of their funds' assets in cash and other highly liquid assets, paying a significantly lower rate of return than other assets consistent with the fund's investment guidelines.  These huge inflows and outflows also required portfolio managers to adopt highly sophisticated and expensive hedging techniques to protect the fund's assets against timing activity, thereby increasing expenses borne by innocent investors in the funds.

5.      Due to the harm to investors caused by market timing, RS purported to maintain policies that prohibited market timing activity by limiting trading in and out of the mutual funds it advised.  The details of these policies were provided in registration statements and prospectuses filed with the SEC throughout the Class Period.

6.       Contrary to the representations in the various prospectuses, however, RS permitted market timing to occur during the Class Period, and innocent investors were harmed as a result of this activity.  Indeed, RS encouraged and facilitated this conduct, despite its knowledge of the harm that market timing caused to long-term investors, primarily to increase the size of the asset portfolios under management and, in turn, RS' fees for managing these portfolios.  As a result of its unlawful conduct, RS consented to the SEC's entry of an order on October 6, 2004 finding that it had violated anti-fraud provisions of the federal securities laws. RS also has settled investigations conducted by the NYSAG. Pursuant to these settlements, RS has agreed to pay $11.5 million in disgorgement and $13.5 million in civil penalties, for a total of $25 million.  Furthermore, RS agreed to cut its management fees by a total of $5 million over the next five years.

7.       RS did not act alone, however, in the perpetration of this scheme which cost innocent investors hundreds of millions of dollars in investment losses and improper fees.  For example, in addition to selling the right to engage in market timing (generally known as "timing capacity") directly to certain select investors, RS also engaged various brokerage firms, including defendants Cantella, Brean Murray, and Bank of America, Bear Stearns, and Canadian Imperial Bank of Commerce, to sell timing capacity on its behalf.  As detailed below, these brokerage firms negotiated for timing capacity in various funds controlled by RS, and then sold this capacity to the market timers.  These brokers received substantial fees from both the timers to whom they sold the capacity, and from the funds controlled by RS, calculated as a percentage of the amounts traded by the market timers.  These same brokers increased their fees further by steering their own clients into these funds in return for additional fees from RS, without disclosing to their clients that the funds permitted market timing, or the harm to long-term

investors that resulted from this activity.

8.      The wrongful conduct of the brokers was not limited to negotiating for and selling timing capacity in the funds.  Certain of these brokers also executed, or "cleared," timing transactions with full knowledge of the harmful effects of timing on the performance of mutual funds, in return for fees paid by both the funds managed by RS, as well as the market timers themselves.  These same brokers implemented a variety of deceptive devices and schemes for the purpose of facilitating market timing.  Additionally, other large brokerage firms provided sophisticated financing arrangements to market timers that included the creation of swap and/or short accounts to facilitate the timing scheme, all in return for substantial fees and other compensation

9.      Although the RS Funds were nominally governed by their own Board of Trustees (the "Board") throughout the Class Period, these trustees were selected and nominated, in most cases, not by the shareholders of the funds themselves, but by RS.  These individuals owed their positions, along with the substantial compensation they received as a result thereof, to RS.  As a result, these trustees suffered from inherent conflicts of interest that precluded them from discharging their fiduciary duties of care, loyalty and good faith, which should have included prohibiting market timing, enforcing the terms of the various prospectuses, and otherwise acting to safeguard the best interests of innocent investors in the funds.

## II.      JURISDICTION AND VENUE

10.      This Court has jurisdiction over the subject matter of this action pursuant to:  § 22 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C.§ 77v); § 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa); § 44 of the Investment Company Act of 1940 (the "ICA") (15 U.S.C. § 80a-43); and, 28 U.S.C. §§ 1331, 1337.  This

4

Court also has supplemental jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367.

11.     The claims alleged herein arise under:  §§ 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77(o); §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §§ 240.10b-5); §§ 34(b), 36(a), 36(b) and 48(a) of the ICA (15 U.S.C. §§ 80a-33(b), 80a-35(a)-(b), 80a-47(a)); and state and common law.  In connection with the acts, conduct and other wrongs complained of herein, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities exchange.

12.     Venue is proper in the District of Maryland pursuant to § 22 of the Securities Act (15 U.S.C. § 77v), § 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1391(b) and 1391(c).  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in the District of Maryland.  Defendants conducted other substantial business within the District of Maryland, and many Class members reside within the District of Maryland. Venue is also proper in the District of Maryland pursuant to the multi-district litigation provisions under 28 U.S.C. § 1407.

## III.   PARTIES

### A.     Lead Plaintiff

13.     Lead Plaintiff, the Krouse Group, consists of Paul C. Krouse, Ann W. Krouse, Anthony S. Cacciola, Harold D. Skripsky, Carolyn L. Clark, Joseph L. Goldman, and John Hegstrom.  During the Class Period, the Krouse Group purchased and held shares of certain of the RS Funds.  As a result of the conduct alleged herein, the Krouse Group suffered damages both in connection with its purchases of shares of RS Funds and by virtue of holding shares of

the RS Funds during the Class Period.

        **B.**        **Defendants And Significant Non-Parties**

        **1.**        **Non-Party RS Funds**

    14.    (a)    Non-Party RS Funds are open-end mutual funds in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities.  In return for their deposits, investors receive shares in the RS Fund in an amount directly proportionate to the amount of their investments (*i.e.* the larger the amount invested, the more shares the investor receives in the fund).  This cash is then used to purchase stocks or other securities, consistent with the investment goals and objectives of the fund.  The RS Funds' shares are issued to fund investors pursuant to registration statements and prospectuses that must comply with the Securities Act and the ICA.

        (b)    The RS Funds hold no assets apart from the deposits of their investors, nor do they conduct any operating or investment activities on their own.  Instead, the RS Funds are part of a structure in which separate legal entities, which are nonetheless related to RS, perform and control all necessary activities related to the sale and redemption of securities, as well as the management of investments.  Indeed, as detailed below, these related entities not only nominate their own representatives to the Board of Trustees charged with the fiduciary duty of protecting the interests of investors in each individual fund, but as a practical matter, also control the appointment of the purportedly "independent" members of these boards.  In exchange for the performance of these services, these same related entities receive substantial fees, calculated as a percentage of the value of the total deposits under management, as set forth below.  Thus, the larger the amount of deposits under management, the more that these related entities stand to collect in fees from mutual fund investors.  This means that, even in the case in which a mutual

fund loses money on its investments, the related entities can still increase the fees they earn by simply steering more investor deposits into the funds.

### 2.     The Parent Company

15.     Defendant RS Investment Management Co., LLC, ("RSIMC") is the ultimate corporate parent of RS and controls each of the RS entities.  RSIMC is a Delaware Limited Liability Company with its primary office located at 388 Market Street, Suite 200, San Francisco, California.  RSIMC is a holding company and the General Partner of RS, owning 99.9% of the outstanding beneficial interest in RS.

### 3.     The Investment Advisors

16.     Defendant RS, (or defendant "Advisor"), is an employee-owned California limited partnership located at 388 Market Street, Suite 1700, San Francisco, California.  RS served as an investment advisor to the RS Funds.  RS had ultimate responsibility for overseeing the day-to-day management, administration, and operation of the RS Funds.  Throughout the Class Period, RS permitted select investors to engage in the market timing and late-trading of the RS Funds at the expense of ordinary, long-term shareholders, such as Lead Plaintiff and the other members of the Class, in return for substantial fees calculated as a percentage of the average daily net assets of the RS Funds.

17.     RS was paid for its services during the Class Period pursuant to investment advisory agreements negotiated between RS and the trustees of the funds, on behalf of the RS Funds themselves.  The RS advisory agreements provides for the RS Funds to pay RS monthly fees, calculated on a daily basis as a percentage of the net assets under management, in return for its investment advisory services.  In 2003, for example, the Diversified Growth Fund, Emerging Growth Fund, and Internet Age Fund paid management fees to RS of $7,553,158; $28,356,477;

7

and $888,199 respectively.

18.     Defendant RS Investment Management, Inc. acted as the investment adviser for RS' then largest fund, the Emerging Growth Fund, at all relevant times until February 2002. Since February 2002 RS has acted as investment adviser for the Emerging Growth Fund.  RS Investment Management, L.P. and RS Investment Management, Inc. are functionally the same entity with the same management.

19.     Defendant AIC Asset Management, LLC ("AIC") (formerly Elijah Asset Management, LLC), is located at 100 Pine Street, Suite 420, in San Francisco, California.  Elijah Asset Management, LLC ("Elijah") served as an advisor to the RS Information Age Fund and the RS Value + Growth Fund at all relevant times until July 2001.

20.     Defendant Eastbourne Capital Management, LLC ("Eastbourne"), located at 1101 Fifth Avenue, Suite 160, San Rafael, California, served as a subadvisor to the RS Contrarian Fund at all relevant times until February 2002.  RS paid Eastbourne forty percent of the advisory fees collected from the RS Contrarian Fund in respect of RS Contrarian Fund assets allocated to Eastbourne.

21.     Defendants RS, RS Investment Management, Inc., AIC (formerly Elijah), and Eastbourne are at times referred to herein as the "Investment Advisor Defendants." Defendants AIC and Eastbourne are at times referred to herein as the "Investment Subadvisor Defendants" The Investment Advisor Defendants were responsible both for the creation of the individual mutual funds (including the determination of their investment goals and strategy), as well as for managing the day-to-day activities and individual investments of the RS Funds.  The various Investment Advisor Defendants performed virtually all critical functions of the RS Funds, including: (i) hiring and employing portfolio managers; (ii) selling shares in the funds to the

8

public; (iii) performing all "back-office" operations; (iv) determining the net asset value

("NAV") of the funds on a daily basis; (v) directing and controlling the investments in the funds;

(vi) ensuring that the investment policies of the funds are observed; (vii) enforcing the policies

of the funds, including restrictions on trading and other activities that could be detrimental to

fund shareholders; and (viii) otherwise managing the day-to-day activities of the funds.

Beginning in February 2002 RS was responsible for the management and day-to-day operations

for all of the RS Funds.

### 4.   The Administrator

22.     Defendant RS also served as an Administrator for the Diversified Growth Fund,

Global Natural Resources Fund, RS Internet Age Fund, MidCap Opportunities Fund, the

Information Age Fund, and the Smaller Company Growth Fund.  Pursuant to their

Administrative Services Agreement, RS provided business management services to the Funds

and generally managed all of the business and affairs of the Funds, subject to the general

oversight of the Trustees.

23.     Defendant PFPC, Inc. ("PFPC"), located at 301 Bellevue Parkway in Wilmington,

Delaware, served as an Administrator for each of the RS Funds.  RS Trust, on behalf of each

Fund, entered into a Sub-Administration and Accounting Services Agreement with PFPC,

pursuant to which PFPC performed accounting, bookkeeping, and other administrative services

for the Funds. For its services under the Agreement, PFPC received accounting and sub-

administration service fees.

### 5.   Registrants/Issuer Defendant

24.     Defendant RS Investment Trust ("RS Trust"), or the ("Fund Registrant") is a

Massachusetts business trust. RS Investment Trust is the registrant and issuer of the shares of the

following funds: RS Diversified Growth Fund, RS Emerging Growth Fund, RS Growth Fund (previously RS Value + Growth Fund), The Information Age Fund, RS Internet Age Fund, RS MidCap Opportunities Fund, RS Smaller Company Growth Fund, RS Value Fund (previously RS Contrarian Value Fund), RS Global Natural Resources Fund, and RS Partner Fund.  RS Investment Trust maintains its principle place of business at 388 Market Street, Suite 1700, San Francisco, CA 94111.

25.     RS Trust is a corporate affiliate of RS and is the legal issuer of the RS Funds within that registrant's portfolio.  As such, the Registrant issued such shares to the public during the Class Period pursuant to registration statements and prospectuses issued under § 10 of the Securities Act, and are therefore absolutely liable to purchasers of the shares for any material misstatements and omissions in these prospectuses.

### 6.      The Distributor Defendant

26.     Defendant PFPC Distributors, Inc., located at 760 Moore Road, King of Prussia, Pennsylvania 19406, ("PFPC Distributors") acted as the distributor for the mutual funds within the RS family of funds.  PFPC Distributors also served as the principal underwriter of each of the funds within the RS family of funds during the Class Period (PFPC Distributors acquired Provident Distributors, Inc., the RS Funds former distributor and principal underwriter, on January 2, 2001). As the underwriter, PFPC Distributors is strictly liable for any material misstatements or omissions contained in the registration statement and prospectus under the Securities Act.

### 7.      The RS Individual Defendants

27.     Defendant George Randall Hecht ("Hecht") is the Chief Executive Officer and Chairman of RS and a control person of RS and RS Investment Management Co., LLC.  He also

served as a Trustee for RS Trust at all relevant times except for the period from March 2001

through May 2001. In his capacity as President, Principal Executive Officer, and Trustee (unless

otherwise noted, the filing was done on behalf of all RS Funds): the Post-effective amendment

filed on March 2, 2004; the Post-effective amendment filed on May 22, 2003; the Post-effective

amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on

behalf of RS Aggressive Growth Fund; the Post-effective amendment filed on August 30, 2002,

amending the post-effective amendment of May 1, 2002; the Post-effective amendment of May

10, 2001; the Post-effective amendment of January 9, 2001 on behalf of the RS Money Market

Fund; the Post-effective amendment of April 26, 2000; the Post-effective amendment of March

21, 2000; the Post-effective amendment of February 18, 2000 re: RS Aggressive Growth Fund;

the Post-effective amendment of October 8, 1999 re: RS Internet Age Fund.  Hecht signed the

Post-effective amendment of May 10, 2001 on Behalf of the RS Money Market Fund; the Post-

effective amendment of May 1, 2001; the Post-effective amendment of May 3, 1999; and, the

Post-effective amendment of March 4, 1999 as President and Principal Executive Officer.

   28.  Defendant Steven M. Cohen ("Cohen") served as the Chief Financial Officer of

RS and the Treasurer of RS Trust at all relevant times. In his capacity as Treasurer, defendant

Cohen signed the following SEC filings (unless otherwise noted, the filing was done on behalf of

all RS Funds): the Post-effective amendment of May 10, 2001 on Behalf of the RS Money

Market Fund; the Post-effective amendment of May 1, 2001; the Post-effective amendment of

January 9, 2001 on behalf of the RS Money Market Fund; the Post-effective amendment of April

26, 2000; the Post-effective amendment of March 21, 2000; the Post-effective amendment of

October 8, 1999 re: RS Internet Age Fund.  In his capacity as Chief Financial and Accounting

Officer, Defendant Cohen signed the following documents: the Post-effective amendment filed

on March 2, 2004; the Post-effective amendment of May 1, 2002; the Post-effective amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on behalf of RS Aggressive Growth Fund; and, the Post-effective amendment filed on August 30, 2002, amending the post-effective amendment of May 1, 2002.  In his capacity as Chief Financial Officer, defendant Cohen signed the Post-effective amendment of May 3, 1999.

29.     Defendant James L. Callinan ("Callinan") was, at all relevant times, the fund manager of the RS Emerging Growth Fund.

30.     Defendant Peter Keith ("Keith") served as the Vice President of Sales for RS.

31.     Defendants Hecht, Cohen, Callinan, and Keith are at times collectively referred to herein as the "RS Individual Defendants."

### 8.      The Trustee Defendants

32.     Defendant George Randall Hecht, as noted above, was a Trustee of RS Trust throughout the Class Period except for the period from March 2001 through May 2001.  In his capacity as Trustee, defendant Hecht signed various SEC forms, as noted above.

33.     Defendant Michael G. McCaffery ("McCaffery") was a Trustee of RS Trust from May 2002 through the end of the Class Period. Defendant McCaffery signed the following SEC filings (unless otherwise noted, the filing was done on behalf of all RS Funds), in his capacity as Trustee: the Post-effective amendment filed on March 2, 2004.  Although defendant McCaffery was listed as a signatory on the following forms, the EDGAR submission does not show him as having signed them: the Post-effective amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on behalf of RS Aggressive Growth Fund; and, the Post-effective amendment of May 1, 2002

34.     Defendant Leonard B. Auerbach ("Auerbach") was a Trustee of RS Trust

throughout the Class Period. Defendant Auerbach signed the following SEC filings (unless otherwise noted, the filing was done on behalf of all RS Funds), in his capacity as Trustee: the Post-effective amendment filed on March 2, 2004; the Post-effective amendment filed on May 22, 2003; the Post-effective amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on behalf of RS Aggressive Growth Fund; the Post-effective amendment filed on August 30, 2002, amending the post-effective amendment of May 1, 2002; the Post-effective amendment of May 1, 2002; the Post-effective amendment of May 10, 2001 on Behalf of the RS Money Market Fund; the Post-effective amendment of May 10, 2001; the Post-effective amendment of May 1, 2001; the Post-effective amendment of January 9, 2001 on behalf of the RS Money Market Fund; the Post-effective amendment of April 26, 2000; the Post-effective amendment of March 21, 2000; the Post-effective amendment of February 18, 2000 re: RS Aggressive Growth Fund; the Post-effective amendment of October 8, 1999 re: RS Internet Age Fund; the Post-effective amendment of May 3, 1999; the Post-effective amendment of March 4, 1999.

35.     Defendant Jerome S. Contro ("Contro") was a Trustee of RS Trust from June 2001 through the end of the Class Period.  Defendant Contro signed the following SEC filings (unless otherwise noted, the filing was done on behalf of all RS Funds), in his capacity as Trustee: the Post-effective amendment filed on March 2, 2004; the Post-effective amendment filed on May 22, 2003; the Post-effective amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on behalf of RS Aggressive Growth Fund; the Post-effective amendment filed on August 30, 2002, amending the post-effective amendment of May 1, 2002; the Post-effective amendment of May 1, 2002.

36.     Defendant John W. Glynn Jr. ("Glynn") was a Trustee of RS Trust throughout the

Class Period.  Defendant Glynn signed the following SEC filings (unless otherwise noted, the filing was done on behalf of all RS Funds), in his capacity as Trustee: the Post-effective amendment filed on March 2, 2004; the Post-effective amendment filed on May 22, 2003; the Post-effective amendment filed on May 1, 2003; the Post-effective amendment filed on November 26, 2002 on behalf of RS Aggressive Growth Fund; the Post-effective amendment filed on August 30, 2002, amending the post-effective amendment of May 1, 2002; the Post-effective amendment of May 1, 2002; the Post-effective amendment of May 10, 2001 on Behalf of the RS Money Market Fund; the Post-effective amendment of May 10, 2001; the Post-effective amendment of May 1, 2001; the Post-effective amendment of January 9, 2001 on behalf of the RS Money Market Fund; the Post-effective amendment of April 26, 2000; the Post-effective amendment of March 21, 2000; the Post-effective amendment of February 18, 2000 re: RS Aggressive Growth Fund; the Post-effective amendment of October 8, 1999 re: RS Internet Age Fund; the Post-effective amendment of May 3, 1999; the Post-effective amendment of March 4, 1999.

37.    Defendant James K. Peterson ("Peterson") was a Trustee of RS Trust from the beginning of the Class Period through 2000.  Defendant Peterson signed the following SEC filings (unless otherwise noted, the filing was done on behalf of all RS Funds), in his capacity as Trustee: Post-effective amendment of January 9, 2001 on behalf of the RS Money Market Fund; the Post-effective amendment of April 26, 2000; the Post-effective amendment of March 21, 2000; the Post-effective amendment of February 18, 2000 re: RS Aggressive Growth Fund; the Post-effective amendment of October 8, 1999 re: RS Internet Age Fund; the Post-effective amendment of May 3, 1999; the Post-effective amendment of March 4, 1999.

38.    Throughout the Class Period, Hecht, McCaffery, Auerbach, Contro, Glynn, and

Peterson (the "Trustee Defendants") breached their fiduciary duties and failed to adequately protect the interests of RS Funds shareholders, to whom they owed duties of care, candor, and loyalty throughout the Class Period. All of the wrongful activity alleged herein that harmed RS Funds investors was permitted to occur notwithstanding the presence of a Board of Trustees that at various times consisted of two interested Trustees, including Hecht, and four "outside" or "independent" Trustees – all of whom were charged with protecting the interests of the RS Funds shareholders. Hecht failed to fulfill his duties as a Trustee by facilitating and/or acquiescing in market timing and/or late trading, to the detriment of Fund shareholders, and by favoring interests of RS without due consideration for the interests of the shareholders of the Funds. The so-called "independent" Trustee defendants, as well as the interested Trustee defendant McCaffery, also failed to fulfill their duties by failing to detect and put an end to the unlawful practices and dealing that pervaded the RS Funds over the Class Period.

### 9. **The Market Timer Defendants**

39.     Defendant Edward J. Stern ("Stern"), a resident of New York County, New York, was at all relevant times herein, the Managing Principle of defendants Canary Capital Partners, LLC, Canary Investment Management, LLC and Canary Capital Partners, Ltd. (referred to collectively herein as "Canary").

40.     Defendant Canary Capital Partners, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

41.     Defendant Canary Investment Management, LLC is a limited liability company organized and existing under the laws of the State of New Jersey, with offices at 400 Plaza Drive, Secaucus, New Jersey.

15

42.    Defendant Canary Capital Partners, Ltd. is a Bermuda limited liability company.

43.    Market Timer John Does 1-100 are additional Market Timer Defendants whose identities have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

44.    Throughout the Class Period, the RS defendants and its subsidiaries entered into agreements with Canary and Market Timer John Does 1-100, either directly or through intermediaries, that permitted them to engage in the improper market timing and late-trading of the RS Funds at the expense of ordinary long-term RS investors such as Lead Plaintiff and the other members of the Class.

**10.    The Facilitator Broker Defendants**

45.    Defendant Cantella & Co., Inc. ("Cantella") is a broker-dealer located at 2 Oliver Street, 11th Floor in Boston, Massachusetts.  Cantella negotiated capacity in the RS Funds for the purpose of selling it to market timers, including Canary.

46.    Defendant Damon LaTanzi ("LaTanzi") was employed by Cantella and was actively involved in the market timing activities alleged herein.  Specifically, in November 2001 an account was opened in the names of Cantella and defendant LaTanzi for the purpose of market timing RS Funds.

47.    Defendant Kaplan & Co. Securities, Inc. ("Kaplan") was a registered broker-dealer located in Boca Raton, Florida which assisted institutional investors, mainly hedge funds, in purchasing and redeeming shares of third party mutual funds.  Kaplan negotiated capacity in the RS Funds for the purpose of selling it to market timers, including Canary.  Kaplan was established and co-headed by defendants Delano N. Sta.Ana ("Sta.Ana") and Lawrence S. Powell ("Powell").  Through Sta.Ana and Powell, Kaplan was engaged in activities related to the

market timing and late trading of mutual fund shares on behalf of institutional customers.

48.     Defendant Sta.Ana established and co-headed Kaplan and was actively involved in the market timing and late trading activities alleged herein.  In December 2001 defendant Sta.Ana offered Canary market timing capacity in RS Funds and continued to negotiate capacity on behalf of RS Funds throughout the Class Period.  During the Class Period, Sta.Ana facilitated the fraudulent market timing activities of his customers, including Canary, by establishing accounts through clearing platforms that permitted market timing and late trading activities in various mutual funds, including the RS Funds.  As a result of his illegal activity, defendant Sta.Ana was the subject of an SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and Desist Order Pursuant to Section 15(b) And 21c Of The Securities Exchange Act Of 1934, Section 203(f) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940.

49.     Defendant Larry Leibowitz ("Leibowitz") was employed by Kaplan and was actively involved in the market timing activities alleged herein.  Specifically, in December 2001 defendant Leibowitz offered Canary market timing capacity in RS Funds.

50.     Defendant Powell established and co-headed Kaplan and was actively involved in the market timing and late trading activities alleged herein.  During the Class Period, Powell facilitated the fraudulent market timing activities of his customers, including Canary, by establishing accounts through clearing platforms that permitted market timing and late trading activities in various mutual funds, including the RS Funds.  As a result of his illegal activity, defendant Sta.Ana was the subject of an SEC Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and Desist

Order Pursuant to Section 15(b) And 21c Of The Securities Exchange Act Of 1934, Section

203(f) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment

Company Act of 1940.

51.     Defendant Brean Murray & Co., Inc. ("Brean Murray") is a registered broker-

dealer located at 570 Lexington Avenue in New York, New York.  Through defendants Ryan

Goldberg ("Goldberg") and Michael Grady ("Grady"), Brean Murray approached mutual fund

complexes directly to solicit timing capacity on behalf of their customers and obtained

permission to time certain funds under certain agreed upon conditions.  Specifically, through

Goldberg and Grady, Brean Murray negotiated capacity in the RS Funds for the purpose of

selling it to market timers, including Canary.  Brean Murray also facilitated and executed market

timing trades as well as late trades on various clearing platforms, including Bear Stearns', on

behalf of its market timing clients, including Canary.  As a result of its illegal activity, Brean

Murray is the subject of an SEC Order Instituting Administrative and Cease-and-Desist

Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order

Pursuant to Section 15(b) of the Securities Exchange Act of 1934 and Section 9(f) of the

Investment Company Act of 1940 (the "SEC Brean Murray Order")

52.     Defendant Goldberg was employed by brokerage firm Brean Murray and was

actively involved in the market timing and late trading activities alleged herein.  In July 2001,

Brean Murray hired defendants Goldberg and Grady and appointed them co-heads of Brean

Murray's newly formed timing group to facilitate market timing on behalf of hedge fund

customers.  Thereafter, Goldberg offered market timing capacity in the RS Funds to various

market timers, including Canary.  In the summer of 2001, defendant Goldberg opened an account

for Canary at Brean Murray for the express purpose of market timing mutual funds, including the

RS Funds.  Furthermore, Goldberg processed trades for his customers, including Canary, on clearing platforms that permitted market timing and late trading activities.

53.     Defendant Grady was employed by brokerage firm Brean Murray and was actively involved in the market timing and late trading activities alleged herein.  In July 2001, Brean Murray hired defendants Goldberg and Grady and appointed them co-heads of Brean Murray's newly formed timing group to facilitate market timing on behalf of hedge fund customers.  Thereafter, Grady offered market timing capacity in the RS Funds to various market timers, including Canary.  In the summer of 2001, defendant Grady opened an account for Canary at Brean Murray for the express purpose of market timing mutual funds, including the RS Funds.  Furthermore, Grady processed trades for his customers, including Canary, on clearing platforms that permitted market timing and late trading activities.

54.     Defendant Canadian Imperial Bank of Commerce ("CIBC") is a Canadian financial institution with significant operations based in New York.  CIBC provided defendant Canary financing for the express purpose of market timing the RS Funds.  At all relevant times, CIBC controlled defendant Canadian Imperial Holdings, Inc.

55.     Defendant Canadian Imperial Holdings, Inc. ("CIHI") is a subsidiary of CIBC. CIHI provided the financing used by Canary and the other hedge funds to market time and late trade the RS Funds.  CIHI is located at 425 Lexington Avenue in New York, New York.

56.     Defendant Paul A. Flynn ("Flynn") was a Managing Director of Canadian Imperial Holdings, Inc.'s equity investments, which was part of the Equity Arbitrage Department of CIHI, a subsidiary of CIBC.  Defendant Flynn worked for CIHI, and CIBC at their New York offices.  Defendant Flynn negotiated and provided financing from CIBC to defendant Canary for the express purpose of timing the RS Funds.  Additionally, Flynn was actively involved in the

19

monitoring and oversight of the short and swap positions required by CIBC as a condition to providing funding to Canary for use in market timing.  On February 3, 2004 he was charged criminally by the New York State Attorney General for first degree grand larceny and engaging in a scheme to defraud in the first degree.  Also that day, the SEC instituted an administrative proceeding against Flynn.

57.     Facilitator Broker John Does 1-100 are additional Facilitator Broker Defendants whose identities have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

## 11.     **The Clearing Broker Defendants**

58.     Defendant Security Trust Company, N.A. was based in Phoenix, Arizona ("STC").  STC was an uninsured national banking association that provided trust and custody-related services to high net-worth individuals, private trusts and entities, and retirement plans and their administrators.  STC maintained a proprietary trading platform created specifically to allow its customers to engage in late trading and market timing activities in a well controlled environment.  STC was instrumental in market timing of the RS Funds by certain hedge funds, including Canary, which were permitted to use the firm's electronic trading platform to execute late trades and engage in market timing.  In November 2001, Canary established an account through defendants LaTanzi and Cantella to market time and late trade RS Funds on STC's proprietary platform.  On October 29, 2003, the Federal Reserve ordered STC to cease operations.  On November 24, 2003, the SEC filed a complaint in the United States District Court for the District of Arizona alleging that STC committed securities fraud, in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and violated Rule 22c-1 promulgated under Section 22(c) of the ICA.

STC was brought by American Stock Transfer & Trust Company of New York and is now called the AST Trust Co.

59.     Defendant Grant D. Seeger ("Seeger") was STC's CEO from 1998 until his resignation on October 5, 2003. Seeger established relationships with various hedge funds, including Canary, negotiated increased fees for STC, actively promoted STC's proprietary late trading and market timing platform, and otherwise facilitated late trading and market timing activities in various mutual funds, including the RS Funds.

60.     Defendant Bank of America Corporation, through its subsidiary Banc of America Securities LLC (collectively "Bank of America"), is registered as a broker-dealer under the Exchange Act and an investment advisor under the IAA. Throughout the Class Period, Bank of America facilitated market timing in RS Funds, including timing by Canary, among others. For example, as early as 2001, Bank of America: (1) provided Canary with a state-of-the-art electronic late trading platform, allowing it to trade late and market time in the hundreds of mutual funds that the bank offers to its customers, including RS Funds; (2) provided Canary with credit to finance this late trading and market timing activity in the hundreds of mutual funds that the bank offers its customers; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped, including RS Funds. All of this activity was coordinated through Bank of America broker, defendant Theodore C. Sihpol, III.

61.     Defendant Theodore C. Sihpol, III ("Sihpol") was employed as a broker in the New York office of defendant Bank of America Securities' Private Client Services ("PCS") high net-worth group and was actively involved in the market timing activities alleged herein. Specifically, defendant Sihpol facilitated the market timing and late trading transactions through Bank of America. In March 2004, defendant Sihpol was indicated on 40 counts of fraud, larceny

and falsifying statements in connection with his late trading and market timing activities.

62.     Defendant Bear Stearns & Co., Inc. ("BSC") is a global investment bank and securities trading and brokerage firm, with its principal executive offices located at 383 Madison Avenue, New York, New York 10179.

63.     Defendant Bear Stearns Securities Corp. ("BSS") is a Delaware corporation with its principal offices located at 383 Madison Avenue, New York, NY 10179.  BSS is a broker-dealer and affiliate of BSC.

64.     Defendants BSC and BSS are collectively referred to herein as the "Bear Stearns" defendants.

65.     Bear Stearns provided a trading platform to other broker-dealers, including defendants Kaplan and Brean Murrray, for the execution of trades in various mutual funds, including RS Funds, on behalf of market timers and late traders, including Canary.

66.     Clearing Broker John Does 1-100 are additional Clearing Broker Defendants whose identities have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

67.     Defendants Bank of America, STC, Bear Stearns, and Clearing Broker John Does 1-100 are collectively referred to herein as the "Clearing Broker Defendants."  As explained in detail below, the Clearing Broker Defendants participated in market timing and late trading by transacting wrongful engineering and implementing market timing and late trading strategies and schemes for the Market Timer Defendants, and their brokers.  The Clearing Broker Defendants earning substantial fees and other compensation for their participation in the wrongful mutual fund trading schemes described in detail herein.

### 12.   The Financier Defendants

68.    Defendants JP Morgan Chase and Co. ("JPM") is a Delaware corporation, with its principal offices located at 270 Park Avenue, New York, New York 10017.  JPM provided funding to the market timers, including Canary, for market timing activities.  Moreover, JPM provided these funds with full knowledge of the intended use by market timers, including Canary, of the funds for their market timing and late trading activities.

69.    Financier John Does 1-100 are additional Financier Defendants whose identities have yet to be ascertained.  Lead Plaintiff will seek to amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

70.    Defendants JPM and Financier John Does 1-100, together with previously named defendants Bank of America, and CIBC (in their capacities as financiers of market timing and late trading), are referred to collectively herein as the "Financier Defendants."  As explained in detail herein, during the Class Period the Financier Defendants were lenders to market timers and late traders, including Canary, for the purpose of market timing and shortening mutual funds, including RS Funds.

### IV.   FACTUAL ALLEGATIONS

### A.   Overview Of Market Timing/Late Trading Practices

### 1.   Background Information And The Forward-Pricing Rule

71.    Market timing/late trading opportunities stem from inefficiencies in the manner in which shares of individual mutual funds are priced.  Shares of open-end mutual funds are priced daily, based on their NAV at the time of the valuation.  Unlike equity or debt securities that are valued and traded on stock exchanges, open-end mutual funds continuously issue new shares as new investments are received, and redeem shares as investors withdraw assets.  The value of

these shares is calculated at 4:00 p.m. Eastern Time ("ET") each day (the close of trading on the New York Stock Exchange ("NYSE")), by determining the NAV of the fund (the value of assets less liabilities), and then dividing that amount by the number of shares outstanding.  For example, if a mutual fund with 100,000 shares outstanding holds total assets with an NAV of $1 million, then it will be priced at $10 per share.  Thus, an investor seeking to invest $1,000 in this fund would receive 100 newly issued shares, valued at $10 per share.

72.     Since RS Funds shares are only priced once per day, the potential exists for an investor to purchase shares at a "stale" price that does not incorporate the latest information, and thereby make a quick profit. For example, if an investor were able to purchase shares of a mutual fund at the NAV calculated before his purchase, with knowledge that the investments held within the fund had risen in value before the next NAV calculation, he could make a risk-free profit by simply buying the shares and then selling them the next day at the new, higher NAV.

73.     To prevent this arbitrage opportunity, the SEC enacted Rule 22c-1 under the ICA, which provides as follows:

> No registered investment company issuing any redeemable security, no person designated in such issuer's prospectus as authorized to consummate transactions in any such security, and no principal underwriter of, or dealer in, any such security shall sell, redeem, or repurchase any such security except as a price based on the current net asset value of such security ***which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security . . .***

(Emphasis added)

74.     Under Rule 22c-1, (also known as the "forward-pricing rule"), RS mutual fund investors who place orders to purchase fund shares during trading hours do not know the exact price at which their orders will be executed; instead, these orders are executed at the NAV

calculated after the order is received, at the 4:00 p.m. close of trading on the NYSE.  Thus, all investors should have the opportunity to digest "pre-4:00 p.m. information" before they buy or sell, and no investor should have the benefit of "post-4:00 information" prior to making an investment decision.  Further, an investor who can avoid forward pricing and buy at the prior NAV has a significant trading advantage, since he can wait until after the market closes for significant news such as a positive earnings announcement to come out, and then buy the fund at the old, lower NAV that does not yet reflect the positive news.

**2.      Subverting The Forward-Pricing Rule Through Market Timing And Late Trading**

75.      The forward-pricing rule alone, however, does not eliminate the arbitrage opportunity for frequent traders in mutual funds.  This is due to the fact that the NAV of the fund, as calculated after the investor purchases his shares, still might not incorporate all public information.

76.      A typical example is a U.S. mutual fund that holds Japanese shares.  Due to time zone differences, the Japanese market may close at 2:00 a.m. ET.  If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his fund to calculate a NAV at 4:00 p.m. ET, he is relying on market information that is fourteen hours old.  Any positive market moves during the New York trading day that will likely cause the Japanese market to rise when it later opens will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low.

77.      "Market Timing" is the practice of trying to take advantage of this information delay in the pricing of mutual funds.  Specifically, a market timer who purchases the Japanese fund described above, the "stale" price is virtually assured of a profit that can be realized the

next day by selling.  Taking advantage of this kind of short-term arbitrage repeatedly in a single

mutual fund is called "timing" the fund.

78.     Market timing opportunities are not limited to mutual funds holding foreign

investments, but instead also arise in mutual funds containing relatively illiquid securities such

as high-yield bonds or small capitalization stocks.  In such cases, the fact that some of the fund's

securities may not have traded for hours before the NYSE closing time can render the fund's

NAV stale, and thus open to being timed.

### B.     Material Misstatements And Omissions In The RS Prospectuses Concerning Market Timing

79.     Throughout the Class Period, in connection with the offering of RS Funds, the RS

Registrants filed with the SEC and released to the public registration statements, each

incorporating, either explicitly or by reference, prospectuses, prospectus supplements and/or

amendments thereto covering the sale of these RS Funds to the public (collectively, the "RS

Prospectuses"). Additionally, the RS Registrants filed supplemental statements of additional

information during the Class Period.

80.     From 1999 through 2004, the RS Funds issued a single prospectus to potential

investors. The prospectuses expressly limited the number of exchanges an investor could make

in and out of the Funds. During the relevant time period, the Funds' prospectuses made the

following disclosure:

> Exchanges
>
> Shares of one Fund may be exchanged for shares of another Fund. . . .
> However, you may not exchange your investment more than four
> times in any 12-month period (including the initial exchange of your
> investment from that Fund during the period, and subsequent
> exchanges of that investment from other Funds or the RS Money
> Market Fund during the same 12-month period).

26

81.     The prospectus further disclosed that "[e]xchange privileges may be terminated, modified, or suspended by a Fund upon 60 days prior notice to shareholders."

82.     The SEC Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act Of 1940 and Sections 9(f) and 9(f) of the Investment Company Act Of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("SEC Consent Order") noted that:

> RS admonished investors to discontinue their market timing activities and stated that market timing was not permitted in its Funds.  For example, in February 2001, RS's sales department informed several investors that: "Our Firm's policy on market timing is as follows: The frequent trading of large dollar amounts in our group of Funds is disruptive to the asset base and ultimately can damage the performance of the portfolio.  We do not tolerate market timers in our Funds, and we want all accounts that are market timing our Funds to be banned from market timing our Funds."

83.     The SEC Consent Order further stated that RS took action against some customers who engaged in market timing and that RS's sales department frequently used the four-exchange limitation language from the prospectuses as the basis for prohibiting market timing.  According the SEC Consent Order, in response to a questionnaire about RS's policies and practices, RS stated: "RS Investments does not allow market timing in any funds. You may not exchange your investment more than four times in any 12-month period."

84.     Each of the representations referred to above was materially false and misleading, or omitted to state facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.  Specifically, RS failed to disclose that: (a) RS had entered into agreements permitting selected investors to engage in market timing of the RS Funds; (b) pursuant to these secret agreements, the select investors regularly timed the RS Funds shares; (c) defendants regularly allowed, and had entered into agreements which allowed, certain

investors to engage in trades that were disruptive to the efficient management of the RS Funds

and/or increased the RS Funds' costs, thereby harming the RS Funds' actual performance; (d)

the amount of compensation paid by the RS Funds to RS, because of the increased net assets

under management due solely to the illegal market timing funds deposited by the timers into the

RS Funds, provided substantial additional compensation to RS by the RS Funds and its

shareholders, including Lead Plaintiff and other members of the class; and (e) pursuant to these

agreements, RS and the other defendants benefited financially at the expense of the ordinary RS

Fund investors, including Lead Plaintiff and other members of the Class.

### C. The Defendants' Knowledge And Direct Participation In The Wrongful Conduct

85.     Investigations by Lead Plaintiff, federal and state regulators, and journalists

across the country, as well as Lead Plaintiff's interviews with CW1, have uncovered a well-

organized, systematic approach to market timing and late trading in the RS Funds throughout the

Class Period involving the most senior levels of RS management.  Ordinary investors were never

informed of these arrangements nor the preferential treatment granted to certain investors.

Rather, RS expressly represented that such arrangements were prohibited and publicly marketed

the RS Funds as long-term investments.  Specifically, RS never disclosed that throughout the

Class Period it expressly permitted numerous investors to market time hundreds of millions in

RS funds.  RS was well aware of the market timers' practices, routinely communicating with

brokers and known timers about the specific details of the timing activity.  As detailed below,

numerous documents and interviews with CW1 reveal that brokers, timers, and financiers

maintained an open and continuing dialogue with RS which demonstrates RS' precise

knowledge of the market timing and late trading activities. As described above, RS knew that the

market timing and late trading was "disruptive" and "ultimately can damage the performance of the portfolio."

### 1. Market Timing and Late Trading at RS

#### a. Overview

86.     The market timing and late trading at RS was the direct result of the RS defendants' deliberate plan to increase fees by increasing assets under management in both RS mutual funds as well as hedge funds.  RS's most senior managers, including defendants Hecht, Cohen, Callinan, and Keith approved and monitored the market timing arrangements.  As numerous documents and witnesses revealed, the RS defendants negotiated the terms of the market timing capacity with broker-dealers and select investors, and then monitored and managed the arrangements throughout.  Further, to ensure the increase in net assets under management, and the resulting increase in fees, RS required that the timers maintain their assets in an RS money market fund when not being used for market timing, enabling RS to draw millions of dollars to its funds, thereby increasing the fees RS was paid out of the deposits of the innocent investors.  Moreover, RS required that timers maintained a certain level of long-term, or "static," assets in the timed fund which further increased the management fees collected by the RS defendants.  In addition to providing capacity in the RS Funds, the RS defendants also provided brokers with portfolio information that the brokers' clients used to profit from hedging against the funds.  As frequently as once a month, the RS defendants provided brokers with highly confidential information.

87.     Despite the exchange limitation provisions in the prospectuses and the internal practices described above, RS entered into at least four arrangements with three customers allowing the customers to engage in multiple trades in and out of RS funds on a monthly basis.

These arrangements resulted in annual trades for these RS customers that far exceeded the four-exchange limitation permitted under the terms of the prospectuses.  Along with the rights to market time, these arrangements typically included the customers' simultaneous investment of static assets in an RS mutual fund and/or hedge fund.  The long-term assets invested generated additional management fees for RS.

88.     According to the NYSAG, the first of these negotiated arrangements was made in or about October 2001.  At that time an RS sales representative entered into a written agreement with a brokerage firm allowing an investor to make unlimited trades of up to $20 million per transaction (provided that advance notice was given to RS).  Simultaneously, the investor made a long-term asset commitment of $1 million to be invested in one of the RS Funds.  The asset generated approximately $46,000 in management fees for RS.

89.     By late 2002, according to the NYSAG, RS had at least two other market timing arrangements with investors in place.  These arrangements allowed the investors to engage in unlimited trading in amounts ranging from $15 million to $33 million per trade while at the same time investing long-term assets ranging from approximately $2.3 million to $5 million.

90.     In the fall of 2002, large market timers had approximately $80 million of market timing assets in the RS Emerging Growth Fund.  Callinan decided to eliminate the market timing activity in his fund, and informed RS of his decision.  RS began to notify its large market timing customers that they would no longer be welcome to market time the RS Emerging Growth Fund.  Several of these market timing traders proposed to RS that they be allowed to continue their market-timing trading in the RS Emerging Growth Fund if they put additional long-term assets into the fund.  One timer proposed a ratio of two static dollars invested for every one dollar of timing capacity.

91.     Despite having made a decision to not allow any large market timers in the RS Emerging Growth Fund, RS decided to permit those large timers who would be willing to invest two dollars of static assets for each dollar of timing capacity to continue to time the Fund.  As discussed in more detail below, one of the timers, Canary Capital, acting through broker-dealer Brean Murray, agreed to this arrangement, and RS agreed to permit Canary to make multiple trades per month of up to $65 million per transaction in return for Canary's static investment of $130 million in the Emerging Growth Fund.  As to the other large timers, defendant Keith was instructed to make sure that large timers unwilling to accept a 2:1 static investment to timing capacity ratio would no longer be permitted to market time the RS Emerging Growth Fund by year end.  According to the NYSAG, as of February of 2003, the timers unwilling to accept the new terms had removed their assets from the Fund.

92.     Between 2000 and 2003, the investors who had timing privileges from RS netted millions of dollars in profits from timing transactions at the expense of other shareholders.  Canary alone made millions between October 2002 and July 2003, again at the expense of other shareholders, from approximately 80 exchanges.  RS also reaped benefits from timers: netting at least $1.7 million in additional fees as a result of its arrangements with them.

93.     RS also created arbitrage opportunities for certain of its market timers by allowing late trading in RS funds, in violation of the forward-pricing rule and its stated policies.  As explained above, the forward-pricing rule requires that in order to receive the NAV calculated as of 4:00 p.m., ET, an order had to be placed before the NYSE closing.  RS, however, permitted certain market timers to trade the RS funds after the NYSE close, but at the 4:00 p.m. NAV, with the benefit of information that would impact the following day's NAV.

### (1)     Sharing of Confidential Portfolio Holdings Information

94.     In addition to providing capacity in the RS Funds, the RS defendants also provided brokers with portfolio information that the brokers' clients used to profit from hedging against the funds.  As described in more detail below, the RS defendants provided brokers with highly confidential information, as frequently as once a month.

### b.     Specific Examples Of Timing At RS

### (1)     Canary

95.     According to CW1 and internal Canary documents, Canary obtained over $100 million in timing capacity in RS Funds through at least three broker-dealers, including Kaplan and Brean Murray.

96.     From 2000 to late 2001, Canary market timed RS Funds on an unnegotiated basis at various brokerages, according to CW1.  During this time, RS ignored the obvious market timing activity that was occurring right under their noses.  In November and December of 2001, Canary negotiated three separate deals for capacity in RS Emerging Growth through three separate brokers.  By late 2001, RS recognized the need to take advantage of the value of the market timing capacity that it had been permitting its customers to exploit.  RS subsequently informed broker-dealers of their interest in negotiating for the "sale" of market timing capacity.

97.     In October/November of 2001 RS authorized defendant Damon LaTanzi of Cantella to offer $20 million of market timing capacity in the RS Emerging Growth Fund to Canary. The terms included permission to execute eight trades, or four "round turns" per month, far exceeding the four round turns per year permitted by the RS prospectuses.  In exchange, Canary agreed to invest $4 million of static assets in the RS Emerging Growth Fund.  This investment was funded at and executed on the STC trading platform, partially funded by

financing from JPM.  Cantella and LaTanzi received a 1% annual wrap fee on the capacity assets.  The wrap fee was calculated and paid monthly at 1/12% of the amount of timing assets in the account.  This resulted in at least tens of thousands of dollars in wrap fee payments to LaTanzi and Cantella during the Class Period.

98.     In December of 2001, RS offered Canary the opportunity to market time an additional $5 million in the RS Emerging Growth Fund by defendants Leibowitz and Sta.Ana of Kaplan.  This deal was brokered by Kaplan and traded through Kaplan on defendant Bear Stearns' platform.  The funds for this arrangement were provided JPM and CIBC.  Kaplan, Leibowitz and Sta.Ana received a 1.20% annual wrap fee on the capacity assets, calculated and paid monthly. This resulted in at least tens of thousands of dollars in wrap fee payments to LaTanzi and Cantella during the Class Period.

99.     Also in December of 2001 RS made $20 million of additional market timing capacity in the RS Emerging Growth Fund available to Canary through defendants Goldberg and Grady of Brean Murray.  In exchange Canary agreed to invest $2.5 million static assets in the Emerging Growth.  This deal was brokered by Brean Murray and traded through Brean Murray on defendant Bear Stearns' platform.  Brean Murray, Goldberg, and Grady received a 1.0% wrap fee on the capacity assets, calculated and paid monthly. This resulted in at least tens of thousands of dollars in wrap fee payments to Brean Murray, Goldberg, and Grady during the Class Period. This deal was later increased to $30 million of market timing assets in Emerging Growth for $4 million of static assets in Emerging Growth.  The wrap fees paid to Bean Murray increased accordingly.

100.     During the subsequent year RS decided to curtail the allowance of market timing activity.  It became apparent, however, that market timers were willing to pay a higher price for

their market timing access.  By December 2002, RS had informed Brean Murray, Kaplan and Cantella that other customers were willing to pay $2 in static assets for every $1 of timing capacity, a substantially higher static investment than RS had previously required.  Moreover, RS was planning on cutting off Canary's timing capacity.  Canary, desperate to retain the profitable arrangement with RS, agreed to meet the terms of RS' offer.  The deal, brokered by Brean Murray, provided Canary with $65 million in market timing capacity in exchange for a $130 million in static asset investment in RS Emerging Growth Fund.  Canary gave up the RS market timing arrangements they had made through Kaplan and at Cantella.

101.    In order to fund new deal with RS, which was the largest static investment Canary had ever agreed to with any mutual fund at any time, Canary was forced to seek an extraordinary level of outside funding.  The size of the funding requirement also required favorable financial terms from the fund provider to maintain the profitability of the endeavor.  Canary made arrangements with CIBC to provide the extra leverage it needed, but to maintain a low financing rate, CIBC required "insurance" to minimize its risk of exposure.  Therefore, CIBC demanded that Canary keep the static position in the Emerging Growth Fund "matched" with a separate similarly sized short investment in the basket of stocks that make up the Emerging Growth Fund.

102.    For example, if Canary invested $130 million "long position" in the Emerging Growth Fund as part of the market timing agreement with RS, the terms of the CIBC funding arrangement required that they maintain a corresponding $130 million short position in a group of stocks that exactly mirrored those in the Emerging Growth Fund.  Matching the long and short investments theoretically protected the market timing funds CIBC provided to Canary by ensuring that whatever losses occurred due to the detrimental effect the timing activity had on the Fund's NAV (and, therefore, Canary's static investment), the corresponding short investment

would make up for those losses.

103.    Under this formula Canary was permitted to "put up," or market time, $1 for every $12 of gross exposure ($6 long and $6 short).  In order to secure favorable terms for the money provided by CIBC and gain access to the timing capacity at RS Funds, Canary was forced to maintain these hedging positions.  Canary was thus free to profit from their market timing trading while insuring that their large static investment in the Emerging Growth Fund was protected from the losses that the activities of it and the other market timer activities would eventually cause to the Fund.  Canary eventually used this format to fund a number of static positions.

104.    All of this was occurring with the knowledge, approval and participation of RS, while RS ignored the damage such activities would inflict on investors not privy to the special arrangement   For example, according to CW1, during the winter of 2002-03, he and defendant Grady of Brean Murray had dinner with defendant Keith in New York City, during which Keith expressed RS' happiness with Canary and the relationship between the two firms, specifically concerning Canary's close adherence to the terms of the market timing deal.  Later that winter, CW1 participated in a conference call with Keith and defendant Hecht, during which additional Canary investments in RS funds were discussed.  CW1 referred to these discussions as representing possible "line extensions."

105.    Furthermore, in a December 5, 2002 e-mail from defendant Keith to defendant Stern of Canary, Keith wrote:

> Meeting you, Ryan [Goldberg], and Michael [Grady] in person confirmed my beliefs that we can have a mutually beneficial relationship that Hill be able to grow over time.  I have added both you and Noah to our e-mail list and I will begin sending both of you the portfolio holdings on a quarterly basis.

> To date we have received approximately $63 mil. into our money
> market.  I know you plan on making incremental allocations to RS
> Emerging Growth over the next 4-6 weeks, but I recent spoke to the
> porfolio manager, Jim Callinan, and he said he would be able to put
> the case to work at whatever rate you choose.

106.    Other communications between RS and Canary show the level of mutual

cooperation in the scheme.  When it came time in December 2002 for Canary to place the bulk of

its negotiated static investment into the Fund, RS became concerned about the effect that such a

large inflow of cash would have on the Funds financial picture.  If the money due RS under the

agreement were to come from Canary on the last day of the year, then the inflow would have the

effect of increasing the amount of the Funds' uninvested cash at year end because the Fund

would be unable to invest that cash in securities until after the New Year.  According to the

NYSAG, to prevent this, an RS sales employee asked Canary's broker not to move cash into the

Fund until after the end of the year so that "our Cash position won't be inflated for our year-end

reporting to shareholders."  An e-mail dated December 30, 2002 describing the conversation

stated:

> FYI, I spoke to [a Canary employee] today approximately 1 hour
> before the close of the market.  He wasn't anticipating a shift in their
> cash positions from Money Market to RS Emerging Growth, so I
> asked him to stay put until we get into 2003.  That way, our Cash
> position won't be inflated for our year-end reporting to shareholders.
>  He said it would be no problem.  We don't want to restrict your
> trading, but we just get a little sensitive to it at the end of each
> quarter.

107.    Subsequently, in early 2003, over a period of approximately one month, Canary

gradually brought its long-term investment in the Emerging Growth Funds to the agreed-upon

level.

108.    By March 2003 Canary had grown concerned about the size of the Static

investment that RS was demanding in exchange for the market timing capacity.  Through

defendants Goldberg and Grady at Brean Murray, CW1 contacted Keith and informed him that

the size of the mutual fund investment was too large, and the parties negotiated a smaller

investment in a hedge fund in lieu of a large investment in RS Emerging Growth.

109.    Keith responded that if Canary reduced its long-term asset investment it would

have to reduce its timing assets proportionally, with one adjustment: to the extent Canary

invested static assets in a particular hedge fund, RS Emerging Growth Pacific Partners ("Pacific

Partners"), a hedge fund run by defendant Callinan, RS would agree that each static dollar

invested in the hedge fund would entitle Canary to two dollars of market timing capacity in the

RS Emerging Growth Fund.  In addition, when Canary expressed concern that the hedge fund

had a discretionary lock-up right that would be triggered if Canary's investment grew to beyond

25% of the fund's assets, defendant Keith agreed to not exercise the discretionary right in the

event that it was ever triggered. Thus in June Canary and RS agreed to $40 million of  timing

capacity in the RS Emerging Growth Fund  in exchange for a $50 million static investment in the

Fund, along with a $10 million investment in the Pacific Partners hedge fund run by Callinan.

110.    In July 2003 Canary invested $10 million in Pacific Partners; the next day Canary

ceased its timing activities and withdrew all of its assets from the RS Emerging Growth Fund.  In

August of 2003 Canary redeemed its $10 million investment in Pacific Partners and paid an early

redemption fee incurred by investors in cases of early redemption.

111.    In addition to providing capacity in the RS Funds, the RS defendants also

provided brokers with portfolio information that the brokers' clients used to profit from hedging

against the funds.  As mentioned above, the RS defendants provided brokers with highly

confidential information, as frequently as once a month.  To its other non-timing investors,

however, RS provided information about the Funds' portfolio holdings pursuant to the following policy:  RS reported its ten largest holdings ("top tens") each quarter on a 30-day lag basis (i.e., 30 days after the last day of the quarter) and its entire portfolio holdings semi-annually on a 60-day lag basis.  The time lag was important to ensure that the information was stale and could not be used to the Funds' disadvantage.

112.    The policy towards its timing investors was different.  For example, following its timing agreement with Canary, RS decided to provide Canary with the RS Emerging Growth Fund's entire portfolio holdings on a more current basis than it furnished such information to other investors.  Specifically, in February 2003, RS determined it would send the Emerging Growth Fund's entire portfolio holdings to Canary quarterly with a 30-day lag instead of on a semi-annually basis with a 60-day lag.  A February 4, 2003 e-mail from defendant Keith to Lerner of Canary indicated "attached are the RS Emerging Growth Portfolio holdings as of December 31, 2002.  As we agreed in November, I will send these to you every quarter with a one month lag."  In April 2003, this policy was changed to a policy of sending Canary entire portfolio holdings monthly, with a 45 day lag.  For example, on April 15, 2003, defendant Keith again wrote to Lerner, attaching portfolio holdings for RS Emerging Growth as of February 28, 2003.  Keith stated "we will continue to send you monthly holdings with a 45 day lag period."

### 2.    **Facilitator Broker Defendants' Participation In The Wrongful Conduct**

#### a.    **Overview**

113.    Throughout the Class Period, the Facilitator Broker Defendants acted as "middlemen" between the RS Funds and the market timers, collecting substantial fees from both sides.  Specifically, these brokers negotiated for and obtained timing capacity from RS, and then

sold this capacity to market timers.  In return, the brokers received substantial fees and other

compensation both from the timers and from RS, as a percentage of the assets invested in the

timed funds.  These same brokers then leveraged their relationship with RS by steering

additional, long-term investors into the timed funds, without disclosing to these investors either

the market timing and late trading activity, or the adverse impact that these activities had on

long-term investors.

### b.    Examples Of The Wrongful Conduct

### (1)    Cantella

114.    LaTanzi was a broker-dealer who negotiated capacity in the RS funds for the

purpose of "selling" it to known timers.  As compensation for the timing capacity negotiated,

Cantella charged wrap fees to those timers totaling in the tens of thousands of dollars per month

during the Class Period.  As discussed above, CW1 indicated that LaTanzi of Cantella negotiated

and obtained timing capacity for Canary in the RS Emerging Growth Fund in exchange for a

wrap fee of one percent of the capacity assets invested in RS.  A July 1, 2002 e-mail from

LaTanzi to Noah attaches a "wrap fee invoice for June" in the amount of $14,000.  Further,

documents show that LaTanzi had an open dialogue with RS regarding their timing activities.

For example, a November 23, 2001 e-mail from Lerner of Canary to defendant Stern of Canary

refers to the November 2001 timing deal struck between Canary and RS and brokered by

Cantella, and discusses its essential terms:

> I want to point out that based on my conversation with Damon
> [LaTanzi] and Suzanne from RS funds, we will not be able to reinvest
> the gains for the time being and are working with a hard cap of $20
> million.  Additionally there is a limit of 8 trades per month (a buy or
> sell is a trade) per month.

115.    Further, e-mails throughout the Class Period show RS' awareness and approval of

the timing capacity agreements entered into through Cantella.  For example, an e-mail from

LaTanzi to Lerner dated January 9, 2002 states:

> Noah:  I spoke to Suzanne at RS Investments and she said they'd
> work out procedures w/ Security Trust, so in the future we can avoid
> the problem caused by that late-day trade cancel from after
> Christmas.  The other thing she mentioned was just to make sure we
> stayed at the trade maximum of $20 million that they set.  I noticed
> the account had grown over $20 million, which is good, but the trades
> have to stay at $20 or below.

116.    In exchange for the capacity, Cantella required that their clients deposit long-term

"sticky assets", or static investments, into RS funds.  For instance, in his March 2003 letter to

Lerner of Canary, LaTanzi stated:

> I just spoke to RS Investments and they are willing to accept timing
> money again, but the ratio of timing to sticky money they're looking
> for is 1:2 (that's 1 timing to 2 sticky). I know that's not very
> favorable, but they said they had some short term traders using it

### (2)    Kaplan

117.    Defendants Sta.Ana and Leibowitz, of defendant Kaplan, were broker-dealers

who negotiated capacity in the RS funds for the purpose of "selling" it to known timers.

Sta.Ana, Leibowitz, Powell and Kaplan knowingly steered market timers to the RS Funds for the

purpose of market timing, and received compensation for the timing capacity negotiated in the

form of wrap fees.  As discussed above, CW1 and e-mails confirm Kaplan's activities, as well as

RS' knowledge of and complicity in Kaplan's market timing activities.

118.    For instance, in December 2001, as noted above, defendant Kaplan, through

defendants Sta.Ana and Leibowitz, negotiated $5 million in market timing capacity in the RS

Funds on behalf of Canary, to be traded on their own platform.  For its services Kaplan received

a wrap fee of 1.20% of the total capacity, as well as fees for the execution of the market timing

trades throughout the Class Period.

119.     In February of 2002, when Canary was seeking an additional $8 million in RS capacity (which had already been funded by defendant CIHI) it turned to Kaplan to negotiate the potential deal. Canary went as far to forward the CIHI-funded $8 million to Kaplan in advance. As a February 8, 2002 e-mail exchange between Sta.Ana and Lerner show, Kaplan did all that it could to accommodate Canary's request, and RS was an active and knowing participant in the negotiation.  As part of the e-mail exchange, Sta.Ana informed Lerner that RS was waffling on the additional $8 million in capacity.  Lerner responded "That doesn't sound too good.  Do you have any other big ticket possibilities?  If not, I'll probably need to send CIHI back the $8 million they just sent you.  Let me know what wares you have."  Sta.Ana wrote:

> [R]ight now, the only other fund we can send you that size is kinetics. [W]e are continually working to get you big tickets, but do not have any more at the moment.  [T]he change of heart of rs came as very much of a surprise to us, but apparently they have someone else that is timing the fund with significantly more assets than we and it is precluding us from sending any more assets right now.  [A]s always, we will keep you apprised of any new developments.

### (3)     **Brean Murray**

120.     Like defendants LaTanzi of Cantella and Sta.Ana, Powell and Leibowitz of Kaplan, broker-dealer defendants Goldberg and Grady of Brean Murray negotiated capacity in the RS Funds and other mutual funds and sold it to timers receiving similar wrap fees as compensation.  The wrap fees Brean Murray charged to these timers totaled as much as $50,000 per month during the Class Period.  For example, the September 2001 wrap fees charged to Canary by Goldberg and Grady, through Brean Murray, were $54,824 on total assets of $127,325,625, including significant assets in the RS Funds.

121.     Goldberg, Grady and Brean Murray performed their capacity brokering function

with the full knowledge and cooperation of RS.  For example, the May 6, 2005 direct

examination of Lerner during the criminal trial of defendant Sihpol included the following

testimony:

> Q: RS, did you have a capacity agreement?
>
> A: Yes, we did.
>
> Q: With each of those funds, [RS included] you had an understanding with the people who ran those funds that they would give you so much capacity, so many times per year, so many dollar amounts, each of those funds you had an agreement about that?
>
> A: In much of the cases there was an intermediary, yes, but the understanding was on both sides.
>
> Q: You had people look for capacity for you?
>
> A: That's correct.
>
> Q: You had a company named [B]reen (sic) Murray?
>
> A: Yes.
>
> Q: Part of their job was to go and see if they can go negotiate capacity with the funds so you could time a certain amount of that fund?
>
> A: That was part of the relationship, yes.

122.    More specifically, CW1 confirms the activities of Brean Murray and the

knowledge and active participation of RS.  As discussed above, CW1 provided details of the deal

in which RS made $20 million of market timing capacity in the Emerging Growth Fund available

to Canary through Goldberg and Grady of Brean Murray.  In exchange Canary agreed to invest

$2.5 million static assets in the RS Emerging Growth Fund.  Brean Murray, Goldberg, and Grady

received a 1.0% wrap fee on the asset.  This deal was later increased to $30 million of trading

assets in RSEGX for $4 million of static assets in Emerging Growth.  The wrap fee paid to Bean

Murray increased accordingly.  The December 2002 deal brokered by Golberg, Grady, and

Brean Murray, as described above by CW1, provided Canary with $65 million in market timing

capacity in exchange for a $130 million Canary static asset investment in RS Emerging Growth

Fund.  The $130 million static investment, which was the largest static investment Canary had

ever entered into at the time, was made at the insistence of RS in order to increase management

fees at the expense of innocent shareholders.

### (4)    <u>CIBC</u>

123.    CIBC facilitated the market timing and late trading in the RS Funds.  In

particular, defendant Flynn arranged for CIBC to lend Canary large sums of money for the

express purpose of market timing the RS Emerging Growth Fund.  More specifically, as

discussed above, CW1 confirms that Flynn negotiated and structured swap and loan agreements

to provide Canary with financing to trade mutual fund shares with financial leverage. In fact, the

December 2002 $65 million capacity/$130 million static deal made with RS was only possible

from Canary's standpoint based upon availability of CIBC funding, for, as CW1 points out, this

was the largest static investment Canary had ever agreed to and Canary required assistance in

leveraging the deal to make it happen.

124.    Further, these financial arrangements were made with the full knowledge and

participation of CIBC.  For example, a February 22, 2002 e-mail from Danielle DeGeorge at

CIBC to defendant Flynn at CIBC and Lerner at Canary attaches an "Amendment to the Account

Management Agreement", which, according to the e-mail, "amends the diversification

constraints for RS Emerging Growth Funds."  The Management Agreement sets out strict

guidelines and limitations concerning the market timing, swap and short trading to be carried out

in and in connection with the Emerging Growth Fund, and seeks to provide some level of

comfort to CIBC concerning its large level of Canary funding.

125.    Documents show that CIBC continued to fund Canary's RS market timing activities throughout the Class Period.  For example in February of 2002, when Canary was seeking an additional $8 million in RS capacity and had turned to Kaplan to negotiate the potential deal, CIHI, at Canary's request, forwarded the additional $8 million to Kaplan prior to any actual negotiation. During this process, when defendant Sta.Ana of Kaplan informed Lerner of Canary that RS was waffling on the additional $8 million in capacity, Lerner responded via a February 8, 2002 e-mail as follows: "That doesn't sound too good.  Do you have any other big ticket possibilities?  If not, I'll probably need to send CIHI back the $8 million they just sent you.  Let me know what wares you have."

126.    Documents also show that throughout the Class Period defendants Flynn and CIBC regularly monitored the swap and short trading being carried out by Canary in connection with its RS market timing activity e-mail exchanges in 2002 and 2003 between various CIBC personnel, including defendant Flynn, portray a deep involvement in the day-to-day trading activities, including the composition of the "short basket", the level of investment in the "short basket", the value of the "hedgable long position" versus the value of  the "short basket," and ultimately whether they are and remain of similar value.

      **3.**      **The Clearing Broker Defendants' Participation In The Wrongful Conduct**

      **a.**      **Overview**

127.    The active collaboration in and facilitation of market timing and/or late trading by financial institutions, acting as clearing platforms for market timing and late trading, was central to the success of the Trader and Broker defendants' scheme.  During the Class Period, many of

the largest financial firms in the country, including defendants Bank of America, Bear Stearns, and STC acted as key conduits of the market timing/late trading activities described herein.  The Clearing Broker Defendants serviced both brokers who specialized in timing (including brokers from within the ranks of the Clearing Broker Defendants, who often earned as much as $15 million a year in commissions from timing activities alone) and timers directly.

128.    The Clearing Broker Defendants disregarded the excessive mutual fund trades being transacted through their trading systems, or "platforms" by the market timers and they substantially assisted and participated in such excessive trading.  Moreover, the Clearing Broker Defendants specifically engineered trading strategies that catered exclusively to timers and late traders.  Some Clearing Broker Defendants, such as Bear Stearns STC, and Bank of America, actually installed special equipment for timers and their brokers to allow them to execute market timing and late trading transactions themselves, while the Clearing Broker Defendants captured the resulting fees and commissions.

129.    The Clearing Broker Defendants were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commission (including contingent deferred sales charges, or "CDSCs") they received for processing the market timer and late trading transactions.  The Clearing Broker Defendants also benefited from their role as the executors of market timing and late trading by leveraging various quid pro quo benefits from market timers and timing brokers, including the ability to cross-sell other products and services they offered to the timers and brokers, including financing and private client services.  By collecting such fees and other benefits, the Clearing Broker Defendants directly benefited from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction

45

costs and other harms, as described herein, of such excessive trading.

   **b.**  **Examples Of The Wrongful Conduct**

   **(1)**  **STC**

  130. STC enabled market timing and late trading in numerous mutual fund complexes, including RS.  STC actively facilitated the illegal trading of mutual funds by knowingly permitting broker-dealers to execute market timing and late trades over its trading platform.  STC employees expressly approved this trading, and actively communicated with various market timers and mutual fund firms to further the illegal trading via the firm's platform.

  131. STC was originally established in 1991 by defendant Seeger as Security Investment Management & Trust to engage in securities sales to private custodial accounts.  In 1998, however, STC's business shifted to serving as a custodian for retirement plans and their third party administrators ("TPAs").  Ultimately, STC developed an electronic trading platform that allowed retirement plan participants to trade mutual funds in a single day.  The platform relied upon STC's access to an interface sponsored by the NSCC that enabled simultaneous trading in thousands of mutual funds through an NSCC subsidiary corporation known as Contribution Clearance & Settlement.  This electronic trading platform became critical to the market timing and late trading activities of STC and others throughout the Class Period.

  132. An October 12, 2001 memorandum from defendant Flynn of defendant STC to various CIBC executives details the market timing and late trading capabilities of STC's proprietary same day/late day trading platform.  CIBC was apparently conducting a due diligence meeting concerning the potential future relationship between STC and CIBC.  In his memo Flynn extols the virtues of the STC trading platform:

     Firstly our clients are able to submit trades for same day value to

12:00 p.m. Eastern Standard Time based upon published Net Asset Values (NAVs).  A pricing list is prepared by the company and submitted to our clients who are then able to run their timing models against actual closing prices instead of the previous day before they submit trades.  Standard platforms require trades to be into before 4:00 p.m. submitted by specific account number and broker reference. Secondly, the company allows our clients to submit trades in a number of methods to reduce the chance that they would appear to be timing a specific mutual fund.

133.    As discussed above, according to CW1, the November 2001 market timing deal between RS and Canary, brokered by LaTanzi and Cantella, was traded on STC's proprietary platform.  During the Class Period, the RS defendants knew that STC was involved in the market timing trading of their mutual funds because the two firms had an open dialogue to further their trading scheme and ensure that the trading was within the negotiated parameters.  For instance, soon after the November 2001 deal between Canary and RS that provided for $20 million in timing capacity which, as described above by CW1, was funded and traded at STC, Stephanie Gloria sent Lerner the following e-mail dated November 15, 2001:

> Just wanted to follow up and let you know that the account with both funds, rsixx and rsegx [Robertson Stephens Money Market and Emerging Growth Funds, respectively], has been established, and Damon [LaTanzi] is on the account.  We are ready whenever you are. The account number as you referenced below is going to be n1221d. Please let me know when you are going to send your first trades so we can communicate that with RS Investments

134.    A November 23, 2001 e-mail from Lerner to Andrew Goodwin of Canary further illustrates the knowing involvement and cooperation between defendants RS, STC and Canary:

> I am wiring $5.5 million from the JP Morgan credit line to Cockatoo's STC account[1] number n1222d for use in trading the RS Emerging Growth Fund.  As discussed last week, you were going to transfer the $6.5 million from the best of to that same account so the total available for trading net of the $4 million sticky amount is $20

---

[1]     Cockatoo was a trading subsidiary of Canary, also under the management and control of Stern and Lerner.

million.  Please check later with STC to confirm that they received the funds and if so buy the RS money market fund with it as well as with the funds you are transferring.

I want to point out that based on my conversation with Damon and Suzanne from RS [F]unds, we will not be able to reinvest the gains for the time being and are working with a hard cap of $20 million. Additionally, there is a limit of 8 trades (a buy or a sell is a trade) per month. Accordingly, you might want to consider moving a little less than the $6.5 million, say maybe $5 million, so that the appreciation can be reinvested and we can reduce conflicts with the short side.

135.     Moreover, a January 9, 2002 e-mail from defendant LaTanzi to Lerner stated:

I spoke with Suzanne at RS Investments and she said they'd worked out procedures w/Securities Trust, so in the future we can avoid the problem caused by that late-day trade cancel from after Christmas.

The other thing she mentioned was just to make sure we stayed at the trade maximum of $20 million that they set.  I noticed the account has grown over $20 million, which is good, but the trades have to stay at $20 or below.  Thanks, Damon.

### (2)     Bear Stearns

136.     Throughout the Class Period, Bear Stearns in its role as a clearing broker-dealer facilitated market timing throughout the mutual fund industry.  Bear Stearns actively facilitated the illegal trading of mutual funds by knowingly permitting its affiliated broker-dealers to execute market timing and late trades over its clearing platform.  Bear Stearns' employees expressly approved this trading, and actively communicated with various market timers and mutual fund firms to further the illegal trading via the firm's platform.

137.      Bear Stearns knowingly facilitated the market timing and late trading through a network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing platform. Bear Stearns' network of broker-dealers included Brean Murray and Kaplan, which had core businesses of market timing mutual funds on behalf of hedge fund clients.

138.     Bear Stearns provided its network of correspondent brokers, including Brean

Murray and Kaplan, with access to its trading platform so that they could engage in market timing and late trading.  For instance, Bear Stearns permitted its correspondent brokers at Brean Murray to enter trades as late as 5:30 p.m. ET, but at the NAV set as of 4:00 p.m. ET.

139.    Bear Stearns profited from its participation in the wrongful conduct through the receipt of commissions and fees generated from timers trading over the firm's platform.  Bear Stearns also profited from the various other arrangements extended to timers, including financing of the wrongful conduct.

140.    More specifically, throughout the Class Period a significant portion of Canary's RS market timing trades were cleared on Bear Stearns' platforms.  In a February 23, 2003 e-mail from defendant Stern to Lerner providing an overview of Canary's market timing book of business, Stern suggested  that Lerner should consider getting the RS and Waddell market timing capacity "off of the Bear platform, so that we can trade them correctly."

141.    In fact, the documents and confirmation from CW1 show that Canary had been clearing at least $40 million of RS market timing capacity on Bear Stearns trading platforms, with full knowledge and consent of RS and Bear Stearns.  For example, on June 13, 2003, Lerner wrote to defendant Goldberg of Brean Murray concerning an imminent June 16 Canary "restructuring plan" that would "impact capacity" which Goldberg had supplied.  Lerner informed Goldberg that Canary was to "sell $41,260,000 of value in RSEGX account through you at Bear Stearns and request you execute with 1 day settlement override".

### (3)    Bank of America

142.    Bank of America and its affiliates provided various timers, including Canary, with an electronic trading system that facilitated the market timing and late trading scheme. Beginning in 2001, Bank of America: (1) installed a state-of-the-art electronic late trading

platform at various timers, including Canary, allowing them to trade as late as 8:30 p.m. ET in the hundreds of mutual funds that the bank offered its customers at the 4:00 p.m. ET NAV; (2) provided Canary with credit to finance its late-trading and market timing activity in the hundreds of mutual funds that Bank of America could access by virtue of its size and power; and (3) sold Canary the derivative short positions it needed to time the funds as the market dropped.  As a result, Canary became one of Bank of America's largest customers.

143.    Bank of America profited greatly from the fees generated by market-timing, including millions of dollars in "finder's fees" from RS. According to Timing Witness #1, these so-called finder's fees were equal to as much as 100 basis points (1%) of a timer's assets under management. All of this activity was coordinated through the Bank of America broker who brought Canary in as a client, defendant Sihpol.

144.    In addition, Bank of America facilitated illegal trading by providing brokers with access to its trading platform.  According to CW1, these brokers included those engaged with Canary in the market timing of RS Funds.

145.    Moreover, the Bank of America defendants were intimately involved in arranging and controlling capacity traded on their platform.  This capacity was marketed by a number of in-house Bank of America broker-dealers, including defendant Sihpol.

146.    For example, in a November 1, 2002 e-mail from defendant Sihpol to Lerner listed nine funds and the "sizes they were trading" for each. RS was listed as "5.1MM."  Sihpol wrote that "Greg wanted to me to be sure and tell you that he's not sure if any of this was negotiated space, as he can't tell from the run he's looking at."

147.    Further, a February 19, 2003 e-mail from Andrea Wenner of Bank of America to Lerner and others at Canary showed receipt of a $3,466,253.62 payment from Canary as an "RS

Emerging Growth swap payment."

148.     Moreover, a June 13, 2003 e-mail from Lerner to defendant Goldberg stated that:

"RS-We will go live in accounts 131-20001 and 131-20033 at Banc of America.  We will sell

$41,260,000 of value in RSEGX account through you at Bear Stearns and request you execute

with 1 day settlement override."

### 4.     The Financier Defendants' Participation In The Wrongful Conduct

149.     During the Class Period, market timing and/or late trading constituted a niche-

business catered to by investment banks, including defendants JPM, Bank of America, and

CIBC.  The investment banking defendants provided market timers and/or late traders with

financing specifically designed for this purpose.

150.     In some cases, the mutual fund family permitting the market timing and/or late

trading arranged the financing by the investment banks for the market timers and/or late traders.

In other cases, the market timers and/or late traders approached the investment banks for

financing.  Market timers and/or late traders openly discussed with the investment banks the

purpose of the loans, to market time and/or late trade mutual funds, and often disclosed such

purpose expressly in the financing documents.  CW1 confirms this.  Loan agreements regularly

specified collateral, sometimes fund concentration and market exposure, demonstrating that the

investment banks knew they were providing financing to market timers and/or late traders.  As

discussed above, CIBC had such an arrangement in connection with the financing of Canary's

December 2002 market timing agreement with RS.  Many financing agreements even required

the timers to provide the Financier Defendants with daily reports on their collateral and trading

activity and/or open access to such records.

151.     CW1 confirms that JPM provided financing to Canary throughout the Class

Period specifically intended to fund its market timing activities, including those activities involving RS.

152.    For example, in an August 31, 2001 e-mail from defendant Stern of Canary to Goodwin of Canary, Stern stated that the "$70 million financing from Morgan to close and the QQQ trade to take care of."

153.    Further, a November 23, 2001 e-mail from Lerner of Canary to Goodwin of Canary demonstrates how Canary put the JPM financing to work fund its market timing activities:

> "I am wiring  $5.5 million from the J.P. Morgan credit line to Cockatoo's STC account number n1222d for use in trading the RS Emerging Growth Fund.  As discussed last week, you were going to transfer $6.5 million from the best of that to that same account so the total available for trading net of the $4 million sticky amount is $20 million.  Please check later with STC to confirm that they received the funds and if so buy the RS money market fund with it as well as the funds you are transferring".

154.    According to CW1, JPM continued to fund Canary's RS market timing activities until such activities ceased in July of 2003.

### D.    Harm To RS Funds Investors

155.    Market timing caused significant harm to ordinary long-term RS mutual fund investors in a variety of ways.  For example, market timing caused "dilution," by not only depriving non-timer RS mutual fund investors of gains they would otherwise realize on their investments, but also by forcing them to incur a disproportionate share of the losses on days that the NAV declines. The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV, as calculated on a per share basis, is less that it would have been had the timer not invested in the fund.

Conversely, if the timer sells shares on days that market prices are falling below the calculated NAV, the arbitrage has the effect of making the next day's NAV, as calculated on a per share basis, lower than it would otherwise have been, thus magnifying the losses experienced by other investors in the fund.

156.     The harm to RS mutual fund investors from market timing extends beyond dilution.  For example, as detailed above, successful market timing requires repeated, rapid trading of RS shares with significant amounts of cash which, in turn, dramatically increases transaction costs, such as commissions, that eat away at long-term investors' returns.  Trades necessitated by market timer redemptions can also lead to realization of taxable capital gains, or may result in managers having to sell stock into a falling market which impose costs on the fund's long-term investors.

157.     Market timing at RS also harmed mutual fund investors by forcing portfolio managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers.  Fund managers were therefore forced to enter into special investments as an attempt to "hedge" against timing activity (instead of simply refusing to allow it), thus deviating altogether from the ostensible, publicly stated investment strategy of their funds, and incurring further transaction costs while at the same time leading to decreased investment performance and additional expenses.

158.     Experts estimate that mutual fund investors, including RS shareholders, have lost billions of dollars annually as a result of market timing.  Indeed, one recent study estimated that U.S. mutual funds lose $4-$5 billion per year to timers.  Eric Zitzewitz, <u>Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds</u> October 2002, http://faculty-gsb.stanford.edu

/zitzewitz/Research/arbitrage1002.pdf.  University of South Carolina law professor John Freeman has similarly estimated that market timing trades may have drained more than $5 billion a year from long-term fund shareholders.

159.    The RS defendants knew throughout the Class Period that the market timing and late trading in the RS Funds caused significant damage to its innocent long-term investors.  As detailed above, the RS defendants knew that "[t]he frequent trading of large dollar amounts in our group of Funds is disruptive to the asset base and ultimately can damage the performance of the portfolio."  In fact, RS's public disclosures purported to prohibit market timing, and RS claimed to police against timing, precisely because of its harmful effects.

### E.    The Failure Of The Trustee Defendants

160.    The ICA requires individual mutual funds to be governed by a Board of Trustees (the "Board"), and further requires, in most cases, that as many as 40% of the members of the Board be independent from and unaffiliated with the investment adviser or its parents, subsidiaries or affiliates.  The purpose of this independence requirement is to ensure that the management of the mutual funds is not dominated by the Fund Sponsor/Investment Adviser and that, instead, the fund is managed in the best interests of its shareholders.  This responsibility not only includes retaining and monitoring the performance of the Investment Adviser and Administrator, but negotiating controls with these parties and ensuring that the fees paid are reasonable in relation to the services performed.  Indeed, the Investment Company Institute ("ICI"), recently described the duties of mutual fund boards:

> Unlike the directors of other corporations, mutual fund directors are responsible for protecting customers, in this case, the funds' investors.  The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisors who

manage and service their investments.

In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the mutual fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment advisors or management company.

161.     Further, Section 15(c) of the ICA provides:

It [is] the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

162.     Notably, Hecht filled dual roles subject to the obligations of ICA § 15(c), having acted both as a Trustee of the RS funds and an officer of RS, the investment adviser to the RS Funds.  Accordingly, Hecht was specifically obligated to disclose the market timing and late trading activity at RS to the outside Trustees, and the outside Trustees were likewise obligated to request such relevant information, in violation of the provisions of 15(c) of the ICA.

163.     In reality, the Board of the RS Funds was dominated throughout the Class Period by RS and its affiliates, who not only, as a practical matter, controlled the nomination and appointment process, but also the fees that the purportedly independent Trustees earned from serving on the fund boards.  Indeed, the Board of the RS funds did not even accept nominations from shareholders for membership until near the end of the Class Period.  Further, the "independent" Trustees were well-compensated for their service.  Although these fees were purportedly set by the compensation committee of the board of each individual RS fund, the compensation levels were actually usually based upon the recommendations of RS.  The fees themselves, however, were paid from deposits within the funds themselves.

164.    Throughout the Class Period, the Trustee Defendants failed to adequately protect the interests of the RS Funds shareholders, to whom they owed duties of care and loyalty.  As detailed herein, each of the Trustee Defendants failed to fulfill his or her duties as a Trustee of the RS Funds by failing to protect the interests of the RS Funds shareholders by neglecting the market timing and late trading activities that were being marketed, negotiated and permitted by RS, all to the detriment of the shareholders the Trustees were entrusted to protect.  Rather, the Trustees favored their own interests, in return for compensation received by RS without adequate consideration of the interests of the RS Funds investors.  The Trustee Defendants also failed to fulfill their duties by neglecting to detect and stop the illicit trading activities that pervaded the RS Funds throughout the Class Period.

165.    In fact, the Trustee Defendants stood to gain financially from deferring to RS and the RS defendants.  They benefited from their commitment and relationship with RS by serving on the board of RS Trust.  For example, Auerbach, Contro, and Glynn each received $60,000 compensation from RS Trust in 2003.

### 1.    12b-1 Fees

166.    In 1980, the SEC promulgated Rule 12b-1 under the ICA, which permits an open-end mutual fund to pay expenses in connection with the distribution of its shares, "provided that any payments made by such company . . . are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing . . ."  Rule 12b-1 further requires such a plan to be approved by a majority of the fund shares, as well as a majority of the "independent" Trustees of the fund.  The written plan must include not only not only the total dollar amount and percentage of the average net assets under management used for distribution

expenses, but also the manner in which such amount was spent on the following areas: (i)
advertising; (ii) printing and mailing of prospectuses; (iii) compensation to underwriters; (iv)
compensation to dealers; (v) compensation to sales personnel; and (vi) other uses for which
funds were spent.  As set forth in its release adopting Rule 12b-1, the SEC reasoned that mutual
fund investor would benefit from the use of their funds to expand distribution, since such
expenditures would encourage growth in the assets under management which, in turn, would
foster economies of scale and ultimately reduce the expenses borne by individual investors.

167.    Throughout the Class Period, the Trustee Defendants authorized, and PFPC
Distributors charged and collected, millions of dollars in Rule 12b-1 marketing and distribution
fees. In fact, in furtherance of the market timing and late trading scheme detailed above, RS
Trust paid 12b-1 fees at an annual rate of 25 basis points (0.25%) of a fund's average daily net
assets.  These fees were paid to PFPC Distributors, a portion of which was then paid by PFPC
Distributors to RS.

168.    As a direct result of the market timing and late trading activity detailed herein, the
percentage of average annual assets under management was significantly increased by the influx
of the timing assets into the RS Funds.  In fact, during the Class Period, millions of dollars in
timing assets were invested throughout the RS Funds, at any one time, resulting in a substantial
increase in the percentage of average annual assets under management.  The Trustee Defendants
and RS did not, however, reduce the 12b-1 fees.  Rather, the Trustee Defendants continued to
authorize, and PFPC Distributors and RS continued to charge and collect, the same percentage of
12b-1 fees.

**2.        Advisory and Management Fees**

169.    Throughout the Class Period, the Trustee Defendants authorized, and the

Investment Advisor Defendants charged and collected, millions of dollars in fees for the management and advisory services provided by the Investment Advisor Defendants to the RS Funds.   The RS Prospectuses disclosed that the advisory fees and management fees were charged as a percentage of a fund's average daily net assets. The rates charged to the RS Funds ranged from 100 to 125 basis points (1.00% to 1.25%) of the funds' average daily net assets. The fees were computed daily and paid monthly.

170.     As detailed above, the influx of the illegal market timing and late-trading assets increased the average daily net assets under management, thereby increasing the fees authorized by the Trustee Defendants and charged and collected by the Investment Advisor Defendants. The services provided by RS on the timing and late-trading assets did not, however, justify the payment of advisory fees on those timing assets.  In fact, as further incentive to the Investment Advisor Defendants, the fees collected as a result of the increased assets under management were collected without any additional advisory services being provided.

171.     In particular, from 1999 to 2003, RS's revenue from fees totaled over $180 million due charged to the RS funds.

172.     By facilitating the market timing and late trading activities alleged herein, the Investment Advisor Defendants were able to profit substantially from the receipt of increased fees, based upon the inclusion of the cash infusions from the illegal trading into the calculation of assets under management.

## V.     **CLASS ALLEGATIONS**

173.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and entities who purchased and/or held shares in any mutual fund in the RS fund family adversely affected by market timing and/or

late trading that was advised by RS during the period from October 6, 1999 and October 5, 2004. Excluded from the Class are defendants, members of their immediate families and their legal representatives, parents, affiliates, heirs, successors or assigns, the family members of the RS Individual Defendants and any other person who engaged in the unlawful conduct described herein (the "Excluded Persons"). Also excluded are any officers, directors or trustees of the Excluded Persons, and all trustees and portfolio managers of the Funds.

174.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at the present time and can only be ascertained from books and records maintained by RS and/or its agent(s), Lead Plaintiff believes that Class members number in the hundreds of thousands.

175.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether federal, state and/or common law was violated by defendants' acts and omissions as alleged herein;

b.    whether the registration statements and prospectuses set forth, contained substantially the same misstatements of material facts or omitted to state substantially the same material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.    whether defendants breached their fiduciary duties to Lead Plaintiff and the members of the Class; and

d.    whether Lead Plaintiff and the other members of the Class have sustained

damages and, if so, the appropriate measure thereof.

176.    Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Lead Plaintiff has retained competent counsel experienced in class and securities litigation and intends to prosecute this action vigorously.  Lead Plaintiff is a member of the Class and does not have interests antagonistic to, or in conflict with, the other members of the Class.

177.    Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and all members of the Class purchased and/or held shares in any mutual fund in the RS fund family adversely affected by market timing and/or late trading that was advised by RS, and sustained damages arising out of the uniform course of wrongful conduct alleged herein.

178.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## VI.    **CAUSES OF ACTION**

### COUNT I

**Against Defendants RS Trust, PFPC Distributors, the
Trustee Defendants and the RS Individual Defendants
For Violations Of § 11 Of The Securities Act**

179.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or

intentional or reckless misconduct.

180.    This claim is brought pursuant to Section 11 of the Securities Act (15 U.S.C.

§ 77k) against defendants RS Trust, PFPC Distributors, the Trustee Defendants and the RS

Individual Defendants

181.    The defendants named in this Count violated Section 11 of the Securities Act in

that the registration statements and prospectuses issued for the RS Funds contained untrue

statements of material fact and omitted to state material necessary in order to make the

statements made, in light of the circumstances in which they were made, not misleading.  The

Prospectuses failed to disclose and misrepresented, *inter alia*, the following material and adverse

facts:

> a.    that defendants regularly allowed, and had entered into agreements which
>
> allowed, certain investors to engage in trades that were disruptive to the
>
> efficient management of the RS Funds and/or increased the RS Funds'
>
> costs and thereby reduced the RS Funds' actual performance; and
>
> b.    that, pursuant to these unlawful agreements, defendants benefited
>
> financially at the expense of the RS Fund investors.

182.    The defendants named in this Count issued, caused to be issued, and participated

in the issuance of the materially false and misleading written statements and/or omissions of

material facts that were contained in the RS Prospectuses.

183.    The defendants named in this Count, and each of them, had the duty of

investigating the information contained in the RS Prospectuses before the dissemination to RS

Fund shareholders, and failed to satisfy that duty. The defendants named in this Count, and each

of them, owed to the RS Fund shareholders, including Lead Plaintiff and the Class, the duty to

ensure that the statements contained in the RS Prospectuses were true and complete and that

there was no omission to state material facts required to be stated in order to make the statements

contained therein not misleading. By virtue of the misrepresentations and omissions contained in

or omitted from the prospectuses, as herein alleged, defendants, and each of them, are liable to

Lead Plaintiffs and the Class.

184.    Prior to purchasing and/or reinvesting in RS Fund shares, Lead Plaintiff and Class

members were provided with the appropriate prospectuses, without the knowledge of the

untruths and/or omissions contained herein.  Lead Plaintiff and Class members purchased and/or

reinvested in the shares of the RS Funds traceable to the false and misleading prospectuses.

185.    As a direct and proximate result of defendants' misconduct and material

misstatements and omissions contained in the prospectuses, Lead Plaintiff and the Class suffered

substantial damages.  The true value of the RS Funds during the Class Period was less than the

NAV paid by plaintiffs in the Class due to defendants' violations.

186.    This claim was brought within the applicable statute of limitations.  At the time

they purchased and/or reinvested in the RS Funds shares traceable to the defective prospectuses,

Lead Plaintiff and Class members were without knowledge of the facts concerning the false and

misleading statements and omissions alleged herein and could not reasonably have possessed

such knowledge.

## COUNT II

### Against Defendants RS Trust and PFPC Distributors
### For Violations Of § 12(a)(2) Of The Securities Act

187.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth

above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff

expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

188.     This claim is brought pursuant to Section 12(a)(2) of the Securities Act against defendants RS Trust and PFPC Distributors for Violations of § 12(a)(2) of The Securities Act. Lead Plaintiff does not assert that the defendants named in this Count are liable for fraudulent or intentional conflict.

189.     Each of the defendants named in this Count was a seller of a security, specifically RS mutual funds sold pursuant to the RS Prospectuses.

190.     By means of the RS Prospectuses, the registrant defendants sold the RS mutual funds to Lead Plaintiff and the members of the Class.  Each of the defendants' named in this Count's actions of solicitation consisted primarily of the preparation and dissemination of the RS Prospectuses.

191.     The RS mutual funds sold pursuant to the RS Prospectuses by defendants named in this Count were sold through the use of interstate communication, the use of interstate commerce, and the use of the United States mail.

192.     The RS mutual funds were sold through the use of the RS Prospectuses which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

193.     The defendants named in this Count cannot prove that they did not know or, in the exercise of reasonable care, could not have known of the untruth or omission described in the preceding paragraphs.

194.     By reason of the conduct alleged herein, each defendant violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of defendants' conduct, Lead Plaintiff and

the other members of the Class suffered substantial damage in connection with the purchase of

RS mutual funds, and are entitled to rescission.

## COUNT III

### Against Defendants RSIMC, RS, the Investment Subadvisor Defendants
### the RS Individual Defendants, and the Trustee Defendants
### For Violations Of § 15 Of The Securities Act

195.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth

above as though fully set forth hereafter, except that, for purposes of this claim, Lead Plaintiff

expressly excludes and disclaims any allegation that could be construed as alleging fraud or

intentional or reckless misconduct.

196.    This claim is brought pursuant to Section 15 of the Securities Act Against

Defendants RSIMC, RS, the Investment Subadvisor Defendants the RS Individual Defendants,

and the Trustee Defendants as control persons of RS Trust.  It is appropriate to treat these

defendants as a group for pleading purposes and to presume that the false, misleading and

incomplete information conveyed in the Prospectuses, public filings, press releases and other

publications are the collective actions of RSIMC, RS, the Investment Subadvisor Defendants the

RS Individual Defendants, and the Trustee Defendants.

197.    The Registrants are each liable under Sections 11 and 12(a)(2) of the Securities

act as set forth herein.

198.    Defendants RSIMC, RS, the Investment Subadvisor Defendants the RS Individual

Defendants, and the Trustee Defendants were "control persons" of the registrants within the

meaning of Section 15 of the Securities Act, by virtue of their position of operational control

and/or authority over such funds. Defendants RSIMC, RS, the Investment Subadvisor

Defendants the RS Individual Defendants, and the Trustee Defendants directly and indirectly,

had the power and authority, and exercised the same, to cause RS Trust to engage in the wrongful conduct complained of herein.  Defendants RSIMC, RS, the Investment Subadvisor Defendants the RS Individual Defendants, and the Trustee Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Prospectuses.

199.    Pursuant to Section 15 of the Securities Act, by reason of the foregoing, Defendants RSIMC, RS, the Investment Subadvisor Defendants the RS Individual Defendants, and the Trustee Defendants are liable to plaintiffs to the same extent as are RS Trust and PFPC Distributors for their primary violations of Sections 11 and 12(a)(2) of the Securities Act.

200.    By virtue of the foregoing, Lead Plaintiff and other Class members are entitled to damages against the Defendants RSIMC, RS, the Investment Subadvisor Defendants the RS Individual Defendants, and the Trustee Defendants.

## COUNT IV

**Against All Defendants
For Violations of § 10(b) Of The Exchange
Act And Rule 10b-5 Promulgated Thereunder**

201.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter, except for Claims brought pursuant to the Securities Act.

202.    This claim is brought pursuant to Section 10(b) of the Exchange Act (15 U.S.C. § 78j) against all defendants on behalf of all persons who purchased shares in any mutual fund in the RS fund family adversely affected by market timing and/or late trading that was advised by RS during the period from October 6, 1999 through October 5, 2004.

203.    During the Class Period, each of the defendants named herein carried out a plan,

scheme and course of conduct which was intended to and, throughout the Class Period, did

deceive the investing public, including Lead Plaintiff and the other Class members, as alleged

herein and caused Lead Plaintiff and other members of the Class to purchase RS Funds shares or

interests at distorted prices that they would not have paid had they known of the unlawful

conduct alleged herein.  In addition, in connection with the unlawful purchases and sales of

securities described above, members of the Class suffered damages from, among other things,

the dilution of their investment in the RS mutual funds.  In furtherance of this unlawful scheme,

plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

204.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the RS Funds' securities, including Lead

Plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed

manipulative trading tactics by which they wrongfully appropriated RS Funds' assets and

otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange

Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal

conduct and scheme charged herein.

205.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the RS Funds'

operations, as specified herein.

206.    Defendants employed devices, schemes and artifices to defraud and a course of

conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed

trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

207.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

208.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the RS Funds securities were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein.  In ignorance of these facts that market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the RS defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of materially adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired the shares or interests in the RS Funds securities during the Class Period at distorted prices and were damaged thereby.

209.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth concerning the RS Funds' operations, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period, they would not have done so at

the distorted prices which they paid.

210.    By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT V

**Against All Defendants**
**For Violations of § 10(b) Of**
**The Exchange Act And Rule 10b-5 Promulgated Thereunder**

211.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth

above as though fully set forth hereafter, except for Claims brought pursuant to the Securities

Act.

212.    This Claim is brought pursuant to Section 10(b) of the Exchange Act (15 U.S.C.

§ 78j) against all defendants on behalf of all persons who held shares in any mutual fund in the

RS fund family adversely affected by market timing and/or late trading that was advised by RS

during the period from October 6, 1999 through October 5, 2004.

213.    During the Class Period, each of the defendants named herein carried out a plan,

scheme and course of conduct which was intended to and, throughout the Class Period, did

deceive the investing public, including Lead Plaintiff and other Class members, as alleged

herein, and cause Lead Plaintiff and other members of the Class to hold RS shares or interests.

In connection with the unlawful purchases and sales of RS Funds by the market timers and late

traders described above, members of the Class suffered damages from, among other things, the

dilution of their investment in the RS mutual funds.  In furtherance of this unlawful scheme, plan

and course of conduct, Defendants, and each of them, took the actions set forth herein.

214.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the holders of the RS Funds' securities, including Lead Plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative trading tactics by which they wrongfully appropriated RS Funds' assets and otherwise distorted the pricing of their securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.

215.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse information about the RS Funds' operations, as specified herein.

216.    Defendants employed devices, schemes, and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and members of the Class.

217.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

218.    Lead Plaintiff and the other members of the Class were also damaged by virtue of their status as holders of the various mutual funds in the RS fund family adversely affected by market timing and/or late trading that was advised by the Investment Adviser Defendants. In

connection with the unlawful purchases and sales of securities by market timers and late traders,

as alleged herein, Lead Plaintiff and the other members of the Class suffered substantial

damages, including but not limited to the dilution of the value of their investment stemming from

the activity of the market timers and late traders.  But for these unlawful purchases and sales,

Lead Plaintiff and the other members of the Class would not have suffered damages from the

dilution of their investment alleged herein.

219.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT VI

**Against Defendants RSIMC, RS, the Investment Subadvisor Defendants,
the RS Individual Defendants, and the Trustee Defendants
For Violations of § 20(a) Of The Exchange Act**

220.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth

above as though fully set forth hereafter, except for Claims brought pursuant to the Securities

Act.

221.    This Claim is brought pursuant to Section 20(a) of the Exchange Act (15 U.S.C.

§ 78t) against Defendants RSIMC, RS, the Investment Subadvisor Defendants,

the RS Individual Defendants, and the Trustee Defendants.

222.    The defendants named herein acted as controlling persons of the RS Funds within

the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their

operational and management control of the RS Funds' respective businesses and systematic

involvement in the fraudulent scheme alleged herein, the defendants named in this Count each

had the power to influence and control and did influence and control, directly or indirectly, the

decision-making and actions of the RS Funds, including the content and dissemination of the

various statements that Lead Plaintiff contends are false and misleading.  RS had the ability to prevent the issuance of the statements alleged to be false or misleading or cause such statements to be corrected.

223.    In particular, each of the defendants named herein had direct and supervisory involvement in the operations of the RS Funds and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

224.    As set forth above, each of the defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with the purchase or holding of RS Funds during the Class Period.

## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940

## COUNT VII

### Against Defendants RS, the Investment Subadvisor Defendants, RS Trust, the RS Individual Defendants, and the Trustee Defendants For Violations Of § 34(b) Of The Investment Company Act

225.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

226.    This claim is brought pursuant to Sections 34(b) of the ICA (15 U.S.C. § 80a 33(b)) against defendants RS, the Investment Subadvisor Defendants, RS Trust, the RS Individual Defendants, and the Trustee Defendants.

227.    Under Section 34(b) of the ICA, it shall be unlawful for any person to make any

untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this title or the keeping of which is required pursuant to section 31(a) of the ICA (15 U.S.C. § 80a 30(a)).  It is also unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

228.    Defendants RS, the Investment Subadvisor Defendants, RS Trust, the RS Individual Defendants, and the Trustee Defendants have made untrue statements of a material fact in its registration statement, application, report, account, record, and/or other document filed or transmitted pursuant to this title, or the keeping of which is required pursuant to section 31(a) of the ICA (15 USCS § 80a-30(a)).

229.    Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct and violations.

## COUNT VIII

### Against Defendants RS, the Investment Subadvisor Defendants, PFPC Distributors, the RS Individual Defendants, and the Defendant Trustees For Violations Of § 36(a) Of The Investment Company Act

230.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

231.    This claim is brought pursuant to Section 36(a) of the ICA against defendants (15 USCS § 80a-35(a)), against defendants RS, the Investment Subadvisor Defendants, PFPC Distributors, the RS Individual Defendants, and the Defendant Trustees.

232.    Under Section 36(a), the defendants named in this Count are deemed to owe fiduciary duties to Lead Plaintiff and other Class members and are prohibited from engaging in

72

misconduct with respect to the RS Funds.

233.     The defendants named in this Count devised and participated in a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing others to engage in market timing of RS mutual funds throughout the Class Period, solely for their own benefit and to the detriment of Lead Plaintiff and the Class, in violation of their fiduciary duties to Lead Plaintiff and other Class members.  RS, the Investment Subadvisor Defendants, PFPC Distributors, the RS Individual Defendants, and the Defendant Trustees further failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of RS mutual funds.

234.     Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct and violations.

## COUNT IX

### Against RS Trust, RS, the Investment Subadvisor
### Defendants, PFPC Distributors, and the Defendant Trustees
### For Violations Of § 36(b) Of The Investment Company Act

235.     Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

236.     This claim is brought pursuant to Section 36(b) of the ICA against defendants (15 USCS § 80a-35(b)), against defendants RS Trust, RS, the Investment Subadvisor Defendants, PFPC Distributors, and the Defendant Trustees.

237.     Under Section 36(b) of the ICA, the defendants named in this Count are deemed to owe a fiduciary duty to Lead Plaintiff and other Class members with respect to the receipt of fees and compensation that defendants received for services of a material nature.

238.     RS Trust, RS, the Investment Subadvisor Defendants, PFPC Distributors, and the

Defendant Trustees devised and implemented a scheme to obtain substantial and improper fees and other income for themselves and their affiliates by allowing others to engage in timing and/or late trading of RS Funds throughout the Class Period and in violation of their fiduciary duties to Lead Plaintiff and other Class members.  The defendants named in this Count failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of the RS Funds.  Moreover, the investment advisory contract between RS and the RS Funds was not the product of arm's-length bargaining and the fees charged under the contract did not bear a reasonable relationship to the services rendered under it, especially with respect to RS's participation in market timing and late trading activities.

239.    Lead Plaintiff and other Class members have been injured as a result of defendants' statements, conduct and improper fees.

## COUNT X

### Against Defendants RSIMC, RS, the Investment Subadvisor Defendants, the RS Individual Defendants, and the Trustee Defendants For Violations Of § 48(a) Of The Investment Company Act

240.    Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.

241.    This claim is brought pursuant to Section 48(a) of the ICA (15 USCS § 80a 47), against RS, the RS Individual Defendants, and the Trustee Defendants.

242.    Under Section 48(a) of the ICA, it is unlawful for any defendant to do indirectly that which, under the Act, it could not do directly.

243.    RSIMC, RS, the Investment Subadvisor Defendants, the RS Individual Defendants, and the Trustee Defendants devised and implemented a scheme to obtain substantial

fees and other income for themselves and their affiliates by allowing others to engage in market timing and/or late trading of RS Funds throughout the Class Period and in violation of their fiduciary duties to Lead Plaintiff and other Class members.  RSIMC, RS, the Investment Subadvisor Defendants, the RS Individual Defendants, and the Trustee Defendants failed to reveal material facts concerning their conduct, such that Lead Plaintiff and other Class members could have made informed decisions about the true value and performance of the RS Funds.

244.    Lead Plaintiff and other Class members have been injured as a result of RSIMC, RS, the Investment Subadvisor Defendants, the RS Individual Defendants, and the Trustee Defendants' statements, conduct and improper fees.

## VIOLATIONS OF STATE AND COMMON LAW

## COUNT XI

**Against Defendants RSIMC, RS Trust, RS, the Investment Subadvisor Defendants, PFPC Distributors,the RS Individual Defendants, and the Trustee Defendants For Breach Of Fiduciary Duty/Constructive Fraud**

245.    Lead Plaintiff hereby incorporates by reference the allegations set forth above as though fully restated herein.

246.    Defendants named in this count owed fiduciary duties to Lead Plaintiff and the Class to use reasonable care and skill in operating, administering, issuing, underwriting, distributing and managing the RS family of funds.  As a part of their fiduciary duties to Lead Plaintiff and the Class, defendants named in this court also owed a duty to make a full and truthful disclosure of all material facts, to ensure that their representations regarding market timing and late trading were complete and accurate, and to ensure that actions were taken to protect long-term holders of mutual fund shares in the RS family of funds from damage caused to their investments from market timing and late trading.

247.     Defendants named in this count intentionally or recklessly breached their fiduciary duties by allowing favored investors to conduct timed and/or late trading in the RS family of funds, by misrepresenting and concealing the existence of such market timing and late trading, and by placing their own financial interests above those of Lead Plaintiff and members of the Class.

248.     Defendants named in this count breached their fiduciary duties to Lead Plaintiff and the Class, tended to deceive, violated public and private confidence and injured public interests.

249.     Lead Plaintiff and members of the Class suffered injury as a result of defendants' conduct in the form of following, *inter alia*: increased transaction costs and expenses; reduced investment performance; and, Lead Plaintiff and members of the Class paid a higher price for RS mutual fund shares than they would have paid had the mutual funds been priced accurately to reflect the dilution of profits and increased costs and expenses that were caused by the breaches of duty by defendants alleged herein.

250.     Defendants RSIMC, RS Trust, RS, the Investment Subadvisor Defendants, PFPC Distributors,the RS Individual Defendants, and the Trustee Defendants' breaches of their fiduciary duties proximately caused the damages suffered by Lead Plaintiff and the Class.

## COUNT XII

### Against All Defendants For Aiding And
### Abetting Breach of Fiduciary Duty

251.     Lead Plaintiff hereby incorporates by reference the allegations set forth above as though fully restated herein.

252.     As alleged above, the defendants named in Count XI owed a fiduciary duty to

Lead Plaintiff and members of the Class.  That duty was breached when those defendants permitted favored investors to late trade and/or market time in the RS family of funds.

253.    Defendants named in this count knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the defendants named in Count XI above in the breach of their fiduciary duties.

254.    As a result of Defendants' aiding and abetting of the breaches of fiduciary duty, Lead Plaintiff and members of the Class suffered damages.

**COUNT XIII**

**Against All Defendants For Unjust Enrichment**

255.    Lead Plaintiff hereby incorporates by reference the allegations set forth above as though fully restated herein.

256.    Lead Plaintiff and members of the Class conferred a benefit on the defendants named in this Count.  Defendants derived management fees and other benefits and were otherwise unjustly enriched from transactions connected with the RS family of funds, to the detriment of Lead Plaintiff and members of the Class.

257.    Defendants' enrichment is directly and causally related to the detriment of Lead Plaintiff and members of the Class.

258.    The benefit was accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As alleged above, defendants named in this Count, *inter alia*, breached their fiduciary duties to Lead Plaintiff and members of the Class and therefore defendants named in this Count and are not justified to retain the benefits conferred upon them.

259.    As a result of all of the defendants' conduct, Lead Plaintiff and members of the

Class suffered damages.

260.     There is no adequate remedy at law to compensate for the injuries of Lead

Plaintiff and members of the Class.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff, on behalf of itself and the members of the Class, prays for

judgment as follows:

1.      Declaring this action to be a proper class action maintainable pursuant to Rule 23

of the Federal Rules of Civil Procedure and declaring Lead Plaintiff to be a proper Class

Representative;

B.      Awarding Lead Plaintiff and the other members of the Class compensatory

damages as a result of the wrongs alleged herein, including interest thereon;

C.      Awarding Lead Plaintiff and the other members of the Class their costs and

expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs

and disbursements; and

D.      Granting Lead Plaintiff and the other members of the Class such other relief and

further relief as the Court deem just and proper.

## VIII.  <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: May 16, 2005

**STULL, STULL & BRODY**

    /s/ Bradley P. Dyer

Jules Brody
Aaron Brody
Bradley P. Dyer
6 East 45th Street
New York, New York 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

***Lead Counsel for Plaintiffs***

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
551 Fifth Avenue
New York, New York 10176
Tel:    (212) 682-3025
Fax:    (212) 682-3010

***Of Counsel***