IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN RE MUTUAL FUNDS                *
INVESTMENT LITIGATION             *        MDL-1586
                                  *
                                  *
(In re Janus Subtrack)            *        Civil No. 04-MD-15863
                                  *
                                  *
                               *****

## INVESTOR CLASS OPINION

This MDL proceeding encompasses actions arising from late trading and market timing

in the mutual funds industry.[1]  Class investor actions and derivative actions brought on behalf of

affected mutual funds have been filed against three types of defendants: the funds' investment

advisers, traders who allegedly engaged in late traded or market timed transactions, and

broker/dealers who facilitated the transactions.  In the fund derivative actions, the fund's

---

[1]Market timing is a form of arbitrage.  As described by plaintiffs, "[m]arket timing is the frequent buying and selling of mutual fund shares to exploit any lag between changes in the value of the fund's portfolio of securities and the reflection of that change in a mutual fund's share price."  Class Pls.' Omnibus Mem. at 3.  "Late trading" is a particular form of market timing.  It is "the practice of placing orders to buy or sell mutual fund shares after 4:00 p.m. ET, but receiving the price based on the prior NAV [Net Assets Value] already determined as of 4:00 p.m. that same day.  Late trading enables the trader to profit from knowledge of market-moving events that occur after 4:00 p.m. and are not reflected in that day's fund share price."  *Id*. at 5  Market timing and late trading are alleged to adversely affect the value of fund shares in various ways, including (1) "diluting" the value of shares by "depriving other mutual fund investors [other than the late traders and market timers] of gains they would otherwise realize on their investments . . . [and] by forcing them to incur a disproportionate share of the losses on days that the NAV declines"; (2) causing "rapid trading of mutual fund shares with significant amounts of cash which, in turn dramatically increases transaction costs, such as commissions"; (3) leading "to realization of taxable capital gains at an undesirable time"; (4) causing "managers . . . to sell stock into a falling market"; and (5) requiring "managers to invest heavily in highly liquid, short-term investments that carry a lower rate of return than other securities, to ensure their ability to redeem shares sold by market timers."  Consol. Am Compl. ¶¶ 85-87.

trustees/directors have also been named as defendants.[2]

Three judges have been appointed by the MDL Panel to preside over this proceeding: Judge Catherine C. Blake, Judge Andre M. Davis, and me.  The cases have been divided, by judge, into three tracks and into numerous subtracks for each family of funds.  Consolidated amended complaints for the class investor actions and the fund derivative actions have been filed in each subtrack.  Defendants have moved to dismiss the consolidated amended complaints.

The parties have submitted omnibus memoranda addressing the common issues presented in all the class investor and fund derivative actions, and oral argument on those motions has been held.  The parties have also submitted numerous supplemental memoranda addressing issues particular to individual defendants.  This opinion addresses the common issues presented in the class investor actions in the context of the motions that have been filed to dismiss the class investor consolidated amended complaint in the Janus Fund subtrack.[3]  I am simultaneously

---

[2]Several ERISA actions and several derivative actions instituted on behalf of the parents of the investment advisors have also been filed.  The issues raised by motions to dismiss filed in the parent derivative cases have been fully briefed and will be addressed in a separate opinion.  By the agreement of the parties, consideration of ERISA actions has been temporarily postponed.

[3]There are nineteen named defendants in the Janus subtrack.  The "Janus Defendants" (also called the "fund defendants" in this opinion) are Janus Capital Group, Inc., Janus Capital Management LLC, Janus Distributors LLC, Janus Investment Fund, and Janus Adviser Series. The trader defendants are Edward J. Stern, Canary Capital Partners, LLC, Canary Capital Partners, Ltd., s Investment, LLC, Gregory Trautman, Trautman Wasserman & Co., Rydex Investments, and Round Hill Securities, Inc.  The broker/dealer defendants are Bank of America Corp., Bear Stearns & Co., AST Trust Co., Prudential Securities, Inc., and Wachovia Securities, LLC.  The Canadian Imperial Bank of Commerce ("CIBC") appears to be included as both a trader and a broker/dealer defendant.  *See infra* note 12.
Two of the Janus Defendants, Janus Investment Fund ("JIF") and Janus Advisor Series ("JAS"), are trusts that hold assets belonging to shareholders of the fund.  According to an allegation in the complaint, JIF and JAS do not "conduct any operating or investment activities on their own,"  Consol. Am. Compl. ¶ 65.  Nevertheless, plaintiffs have named them as defendants because as registrants they filed allegedly deceptive forms with the SEC, including

issuing a separate opinion addressing the common issues presented in the fund derivative

actions, again in the context of the motions that have been filed to dismiss the fund derivative

consolidated amended complaint in the Janus Fund subtrack.  As time permits, I will issue a

series of short memoranda applying the rulings I am making today to the consolidated amended

complaints filed against the other families of funds in cases assigned to me.

In due course Judge Blake and Judge Davis, with whom I have conferred about these

opinions, will issue opinions of their own, adopting, modifying, or rejecting my rulings on the

common issues.  They will either address all of the cases assigned to them in a single opinion or,

after ruling on the common questions, issue a series of short memoranda applying their rulings to

the different cases assigned to them.

## I.  CLAIMS UNDER THE 1934 EXCHANGE ACT

Plaintiffs assert claims under Section 10(b) of the 1934 Securities Exchange Act

("Exchange Act") and Rule 10b-5 promulgated pursuant to the Act.  15 U.S.C. § 78(j) (2005); 17

C.F.R. § 240.10b-5 (2005).  They plead an omissions case against the fund defendants under

Rule 10b-5(b) and a fraudulent scheme case against all the defendants under Rule 10b-5(a) and

---

the misleading prospectuses, and issued the actual mutual fund shares.  Plaintiffs contend that persons who have committed such acts are subject to liability under Section 10(b), 15 U.S.C. § 78(j).  *See, e.g., Dunn v. Borta*, 369 F.3d 421, 434 (4th Cir. 2004); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 40-41 (1st Cir. 2002); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 588 (S.D. Tex. 2002).  Assuming that contention to be true in the abstract, here the gravamen of plaintiffs' claims is that JIF and JAS are *victims* of the allegedly fraudulent scheme.  Moreover, defendants assert (and plaintiffs have alleged no facts suggesting the contrary) that JIF and JAS have no assets separate and apart from those they hold for shareholders.  Therefore, as plaintiffs concede, no relief against JIF and JAS would be appropriate because a recovery would simply impose on present shareholders of the funds (entirely innocent parties) liability for a payment to shareholders of the funds during the class period.  Accordingly, plaintiffs' claims against JIF and JAS will be dismissed.

3

(c).  The motions to dismiss raise issues of holder standing, the reach of scheme liability, reliance, causation, and scienter.[4]

*A.  Holder Standing*

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Supreme Court held that only purchasers or sellers of securities may bring a private action for damages under Rule 10b-5.[5]  The Fourth Circuit has held that persons who held shares and allegedly delayed their sale on the basis of misinformation lack standing under the rule.  *See Gurley v. Documation, Inc.*, 674 F.2d 253, 257 (4th Cir. 1982), *abrogated on other grounds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).  Other courts have applied *Blue Chip Stamps* in deciding removability and preemption issues under the Securities

---

[4]Defendants contend that plaintiffs who own shares in a particular fund lack Article III standing to assert claims in connection with other funds in the same family.  The contention may have merit.  *See, e.g., In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 41 (D. Mass. 2003).  Thus, if a timely claim has not been filed regarding losses in a particular fund by a shareholder of that fund, recovery on behalf of the shareholders of that fund may be barred.  However, in the interest of efficient management of this litigation, I will defer ruling on the standing issue.  I also note that because I am dismissing plaintiffs' claims under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., and because I find that as to their claims under Section 10(b) of the Exchange Act plaintiffs may rely upon the *Affiliated Ute* presumption, s*ee infra* Section I.C, multiple plaintiffs are not required for funds for which multiple prospectuses were issued during the class period.

[5]Rule 10b-5 states that it is unlawful, directly or indirectly:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 78a et seq. *See, e.g., Kircher v. Putnam Funds Trust*, 403 F.3d 478, 482-83 (7th Cir. 2005); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 43-44 (2d Cir. 2005) (citing *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1343-45 (11th Cir. 2002); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130-31 (9th Cir. 2002); *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598 (8th Cir. 2002).

For the reasons I stated in *In re Alger, Columbia, Janus, MFS, One Group, and Putnam Mutual Fund Litigation*, 320 F. Supp. 2d 352, 355 (D. Md. 2004) (*In re Mutual Fund Litig. I*), I question whether *Blue Chip Stamps* bars suits under Rule 10b-5 by persons who held (but did not purchase or sell) mutual fund shares during a relevant class period when profits were being siphoned off from the funds by market timers and late traders. In my view, to so hold might, as is too often done, elevate rule over principle. A court-made rule that is created in one context to implement a fundamental precept should not be mechanically applied in a new context without asking the threshold question whether the same principled considerations that gave rise to the rule dictate a different rule under different circumstances. Here, the prudential consideration that led the Supreme Court to adopt (in my view wisely) the *Blue Chip Stamps* rule—the risk of vexatious, manufactured litigation—does not exist because holder plaintiffs by definition held mutual fund shares during the period that the value of the shares was diluted by late trades and market timing. Their claims are not based upon an inherently speculative inquiry into their subjective state of mind but upon the concrete fact of their continued share ownership.[6]

_____

[6]In this respect, the present case differs not only from the *Blue Chip Stamps* paradigm—in which a plaintiff alleges he decided not to purchase a security because of a misrepresentation— but also from other holder actions in which a plaintiff alleges he would have

Moreover, as said in my earlier opinion:

> [p]rinciple, policy, and common sense all appear to dictate that if holders of mutual fund shares suffered dilution of the value of their shares from wrongdoing in a securities market, a national forum should be open to them, regardless of whether or not they purchased or sold shares during the class period, to assure that all who were similarly damaged are similarly treated.

*Id*. at 356.  Such a national forum would be denied if the effect of holding that *Blue Chip Stamps* bars a holder of mutual fund shares from suing under Rule 10b-5 is to permit the holder to pursue claims in state court.[7]

Just as in *In re Mutual Funds Litigation I*, however, I need not now decide the

---

sold but for a misrepresentation.  *See, e.g., Gurley*, 674 F.2d at 256 (holding that those who owned shares and delayed their sale based in part on misinformation lacked standing under 10(b)).  Here, plaintiffs do not seek damages for the non-consummation of a hypothetical transaction but for value diminution and associated damages they suffered while holding their shares.

I also note that to hold that *Blue Chip Stamps* permits suit by persons who bought and sold shares during the class period but not by persons who held their shares throughout the class period would have the supremely ironic effect in this case of discriminating against victims who suffered the greater injury.  Plaintiffs' theory of damage is that late trading and market timing diminished the value of shares day by day.  Therefore, those who held their shares continuously suffered more loss than did those who bought or sold during the class period since they were subject to the actions of the late traders and market timers for the entire period rather than just a portion of it.

[7]As I also suggested in *In re Mutual Funds Litigation I*, if the "buyer/seller" rule of *Blue Chip Stamps* is found to apply in the context of this case, it might be satisfied by virtue of the fact that the *defendants'* late trades and market-timed activities constituted purchases and sales of securities.  320 F. Supp. 2d at 355.  Finding that transactions engaged in by defendants rather than transactions engaged in by plaintiffs meets the "in connection with" prong of the 10b-5 test would be different from the approach that has been taken in other cases.  However, there is certainly nothing in the rule that prevents such an approach.  To the contrary, its express language countenances it.  Moreover, taking the approach here would not open whole new vistas of 10b-5 litigation or have far-ranging unforeseen consequences.  Plaintiffs' loss was suffered in the securities market as a result of the fact that they had purchased (and continued to hold) mutual fund shares.  Thus, although the defendants' activities would provide the "in connection with" nexus, plaintiffs could be held to all other elements required for a 10b-5 claim.

holder/standing issue.  Plaintiffs have asserted claims on behalf of a class that includes

purchasers, as well as holders, and on that basis alone their claims survive defendants' *Blue Chip*

*Stamps* contention.  I also note that in light of the fact that many shareholders of mutual funds

participate in dividend reinvestment programs, it is likely that many persons who purchased their

initial shares prior to the class period nevertheless would be included in a class of purchasers

during the class period.

### B.  The Reach of Scheme Liability

Subsections (a) and (c) of Rule 10b-5 make it "unlawful for any person, directly or

indirectly . . . (a) to employ any device, scheme, or artifice to defraud, . . . or (c) to engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any

person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a) and

(c).  Claims under subsections (a) and (c) "are subject to the heightened pleading requirements of

Rule 9(b) and the PSLRA and, as a result, the plaintiffs must specify, 'what manipulative acts

were performed, which defendants performed them, when the manipulative acts were performed,

and what effect the scheme had on the market for the securities at issue.'"  *In re Royal Ahold N.V.*

*Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 372 (D. Md. 2004) (quoting *In re Blech Sec. Litig.*, 961

F. Supp. 569, 580 (S.D.N.Y. 1997)).

There are two fundamental questions raised by defendants' motions to dismiss.  First,

have plaintiffs alleged facts sufficient to support their averment that a fraudulent scheme existed

and/or that a practice or course of business operating as a fraud or deceit was engaged in?

Second, assuming a "yes" answer to question one, have plaintiffs alleged facts sufficient to

demonstrate that the role played by a particular defendant would subject that defendant to

liability?[8]

(1)

Late trading is itself illegal,[9] and therefore, as alleged by plaintiffs, a scheme, practice, or course of business effectuating late trading is inherently fraudulent.[10]   Market timing, however, is not illegal *per se*.  Defendants therefore contend that acts committed for the purpose of effecting market-timed transactions cannot, as a matter of law, constitute a fraudulent scheme, practice, or course of business.  The contention is unpersuasive.  Although market timing itself may be

---

[8]Plaintiffs assert a claim for control person liability against Janus Capital Group, Janus Capital Management, Janus Investment Fund, and Janus Adviser Series under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  To prevail on such a claim, a plaintiff must prove control by the defendant over a primary violator of Section 10(b).  *In re Royal Ahold*, 351 F. Supp. 2d at 407; *In re MicroStrategy Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 661 (E.D. Va. 2000).  Whether or not plaintiffs here can meet that burden will be put to the test of discovery.

[9]Several defendants assert that after-hours trading is not illegal if it is done before a mutual fund actually sets its NAV for the day.  They therefore contend that plaintiffs' allegations are insufficient because they do not specify the exact time that the late trades were made.  I believe that a factual record must be established before this issue can properly be decided.  Presumably, if a defendant's after-hours trading was entirely innocent, there would be no apparent reason, for example, for the time stamp function on a trading platform to be disabled, as plaintiffs allege was done.

[10]Both the broker/dealer defendants and the trader defendants argue that late trading in violation of Rule 22c-1 ("the forward pricing rule") cannot give rise to a 10b-5 claim because Rule 22c-1 cannot support a private right of action, express or implied.  The difficulty with this contention is that Rule 10b-5 has numerous other requirements beyond the existence of a fraudulent device—such as proving reliance and scienter.  Therefore, contrary to Defendants' contention, not all violations of Rule 22c-1 would necessarily give rise to a 10b-5 claim.  It would certainly seem odd to say that late trading—a demonstrably illegal act—does not fit within a rule that forbids the use of *any* manipulative or deceptive device.  *See In re Royal Ahold*, 351 F. Supp. 2d at 372.

The trader defendants also contend that Rule 22c-1 does not apply to them because it only forbids late-trading by those actually *selling* the securities.  If that is so, the trader defendants did *not* engage in conduct that violates Rule 22c-1 and thus the lack of a private right of action based upon a violation of that rule is irrelevant even assuming (despite my ruling to the contrary) that the first argument made by the broker/dealer defendants and trader defendants is sound.

8

lawful, it nevertheless is prohibited by Rule 10b-5 if it is engaged in by favored market insiders at

the expense of long-term mutual fund investors from whom it is concealed and who have a right

to rely upon its prevention by fund advisers' and managers' good faith performance of their

fiduciary obligations.[11]   Market timing then becomes a "scheme or artifice to defraud" or, at least,

"a practice . . . or course of business which operates as a fraud or deceit" upon those who have

been misled or lulled into purchasing mutual fund shares in ignorance of its occurrence.  *See, e.g,*

---

[11]Defendants argue that market timing has been endemic in the mutual fund industry for many years and has been widely known both to Wall Street and its regulators.  Indeed, during oral argument counsel for one of the defendants asserted that SEC staff members have been authorized to engage in market-timed transactions (although not specifically in mutual fund shares).  Defendants concede, however, that "Mom and Pop in Baltimore" were unaware that the value of their mutual fund shares was being diluted daily by arbitrage activities that were only available to financial professionals with substantial assets.

Thus, if it demonstrates anything, defendants' argument shows the importance of conferring a federal private right of action upon those who were personally harmed by insiders' abuse of the mutual fund industry.  Hamiltonian and Jeffersonian visions of society often are in irreconcilable conflict.  Here they converge.  A strong national economy requires national securities markets, and in order for those markets to function efficiently, uniform rights and obligations enforceable in a national court system are necessary.  At the same time, in order for the securities markets to remain healthy and vibrant, the public must have confidence in them.  This confidence will erode if average citizens in the heartland of America, who have been drawn into the securities markets through mutual fund investments, are required to relinquish all oversight of the markets to regulatory bodies.  In other instances, where class actions are brought to recover damages for injuries that are diffuse, remote, and speculative, deference to enforcement of the public interest by governmental authorities might be appropriate.  Where, however, the injuries suffered by consumers as a group are identifiable, there is no reason that ordinary investors should be deprived of the essentially democratic right personally to seek legal redress for a loss they have suffered.  In such a case, private "litigation is apt to do more good than harm," *Kircher*, 403 F.2d at 483, particularly in an age when serious arguments are being advanced that long-term private investment in the securities markets will help solve the looming public crisis in pension funding.

Of course, all of this said, the SEC and state regulatory authorities have been actively pursuing enforcement proceedings and achieving regulatory settlements.  If the settlements provide full restitution to those who were harmed, plaintiffs are entitled to no further recovery.  Judges Blake, Davis, and I identified this issue at the very outset of these proceedings and it needs to be promptly addressed as the proceedings go forward.

*SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 464-65 (S.D.N.Y. 2004) (finding a failure to disclose market timing arrangement, particularly against background of blanket statement indicating hostility to market timing, may give rise to liability under Rule 10b-5); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972) (upholding Rule 10b-5 claim against fiduciaries who failed to disclose their potential financial gain not only in connection with their own trades but also in connection with trades by others with whom they were associated).

(2)

The second question—whether plaintiffs have alleged facts sufficient to demonstrate that the role played by a particular defendant would subject that defendant to liability—must be considered against the background of *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994).  In *Central Bank*, the Supreme Court held that private claims may not be asserted against mere aiders and abettors under Rule 10b-5.  The fund defendants do not argue that  *Central Bank* is of benefit to them because the centrality of the fund defendants' activities to the alleged scheme is self-evident.  The trader and broker/dealer defendants, however, strenuously contend that they fall within the ambit of *Central Bank*'s protection.

*a.  Trader Defendants*

The trader defendants, like the broker/dealer defendants, characterize themselves as "secondary actors" in the alleged fraudulent scheme.  Of course, as the trader defendants assert, they did not have a direct relationship with plaintiffs.  However, the trader defendants are unlike the defendant in *Central Bank* who was alleged only to have acted in its capacity as indenture trustee in delaying an independent review of an appraisal of properties that bond covenants

10

required to be of a certain value.  Although there was evidence that the defendant had acted recklessly and that its delay rendered substantial assistance to a fraudulent scheme resulting in a default under the bonds, it was not itself the designer of the scheme or a recipient of the bond proceeds.

Here, in contrast, the trader defendants are alleged to have been involved in the fraudulent scheme from the outset and to have been at least one of its architects.  Moreover, unquestionably it is the trader defendants who received the profits that were siphoned off from the mutual funds as a result of late trades and market timed transactions.  These are not the activities of a mere aider and abettor but those of a primary participant in the unlawful conduct.  *Cf. In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004) (finding primary scheme violation where defendant "masterminded" sham transactions and was the "chief architect and executor" of the scheme);  *In re Blech Sec. Litig.*, 961 F. Supp. at 584-85 (holding viable claim stated against broker who allegedly instigated unlawful trading, "conceived of and participated in the initiation and clearing of sham transactions," and "contrived and funded" those transactions).

### b.  Broker/Dealer Defendants

The broker/dealer defendants, AST Trust Co., Prudential Securities, Inc., Wachovia Securities, LLC, CIBC, Bank of America, and Bear Stearns & Co., stand in a different position.[12]

---

[12]AST Trust Co. is the successor in interest to Security Trust Co. which allegedly facilitated market timing of Janus funds during the class period.

Wachovia Securities, LLC, ("Wachovia") is a joint venture subsidiary of Wachovia Corp. and Prudential Financial, Inc. that took over the operations of Prudential Securities, Inc. ("PSI") on July 1, 2003.  Prudential Securities and Wachovia Securities are referred to in the complaint collectively as Prudential.  Consol. Am. Compl. ¶¶ 33-39.  The claims against Wachovia are insufficient for reasons in addition to those discussed in the text.  Although it acquired the assets of PSI, Wachovia did not assume any liabilities relating to the PSI financial advisors that accrued prior to July 1, 2003.  These liabilities are retained by Prudential Equity Group, Inc., the formal

They are not alleged to have been the direct beneficiaries of the scheme's proceeds. Their mere knowledge that their activities might assist in the accomplishment of a fraudulent scheme is not sufficient to render them liable under Rule 10b-5. Rather, they must themselves have been co-designers of the scheme or have "committed a manipulative or deceptive act in furtherance of the scheme." *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). *See also Central Bank*, 511 U.S. at 191 ("Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device . . . may be liable as a primary violator under 10b-5.")

Unsurprisingly, different courts have viewed the demarcation between what constitutes a mere facilitating act and a manipulative act somewhat differently. *Compare In re Homestore.com, Inc. Sec. Litig.,* 252 F. Supp. 2d 1018, 1037-42 (C.D. Cal. 2003) *with Quaak v. Dexia S.A.,* 357 F. Supp. 2d 330, 342 (D. Mass. 2005) *and Newby v. Enron Corp.*, 310 F. Supp. 2d 819, 829 (S.D. Tex. 2004). Nevertheless, precedents are helpful in drawing the line. *See, e.g., In re Blech Sec. Litig.*, 961 F. Supp. at 584 (distinguishing between a clearing broker's routine clearing transactions and its direction or contrivance of allegedly fraudulent trades and finding

---

successor to PSI. *See* Prudential Financial, Inc. Form 10-K, Mar. 14, 2003 (attaching the joint venture agreement). No allegations are made that Wachovia itself committed any wrongs prior to July 1, 2003, and, if plaintiffs are claiming that after July 1, 2003, Wachovia continued wrongful activity in which PSI engaged prior to that date, their allegations are insufficient under Fed. R. Civ. P. 9(b) because the consolidated amended complaint makes no distinction between pre- and post-July 1, 2003 conduct.

    CIBC is alleged to have managed Canary's market timing accounts, financed their market timing accounts, and negotiated on Canary's behalf for timing capacity in the Janus funds. Consol. Am. Compl. ¶ 165. CIBC is also alleged to have "engaged in at least 49 market timing transactions . . . involving almost $1 billion dollars in volume, and reap[ing] over $2.7 million in gross proceeds. *Id.* at ¶ 170. This is the sum total of all allegations of direct trading on the part of CIBC. They are too general to state a claim (particularly in light of the ambiguity created by the allegations concerning CIBC's role as a broker/dealer), and if plaintiffs want to pursue claims against CIBC as a trader, they will have to file a second consolidated amended complaint making more specific allegations against it.

that the latter, but not the former, are manipulative acts); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 336-37 (holding that those who masterminded sham transactions or other deceptive practices are primary violators); *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d at 1040 (dismissing claims against those who actively participated but did not direct the scheme).[13]

In the present case, plaintiffs generally aver that "[m]arket timing of Janus Funds was facilitated by large brokerage firms, including defendants . . . , which functioned as clearing brokers. These defendants acted as key conduits of the market timing activities . . . and serviced both brokers who specialized in timing (including brokers from within the ranks of the defendants) and timers directly." Consol. Am. Compl. ¶ 33. Plaintiffs go on to make two additional general allegations against the broker/dealers as a group:

> The Clearing Broker defendants recklessly and/or knowingly disregarded the excessive mutual fund trades being transacted through their trading systems, or "platforms," by the market timers and substantially assisted and participated in such excessive trading.

---

[13]Additionally, the SEC filed an amicus brief in the *Homestore* case including various examples of what would and what would not constitute primary violations:

> [A] bank that makes a loan, even knowing that the borrower will use the proceeds to commit securities fraud, is at most an aider and abettor. The bank itself has not engaged in any manipulative or deceptive act.
>                                    . . .
> [I]f an investment bank provides services to arrange financing for a client, knowing the client will use the proceeds to commit securities fraud, then it is at most an aider and abettor. If, however, the investment bank engages in the creation of a sham entity as part of the services . . . the investment bank may be a primary violator . . . [because it] engaged in a deceptive act.

Brief of the SEC, *amicus curiae Simpson v. Homestore.com, Inc.*, No. 04-55665 at p. 20 (9th Cir. Oct. 2004). The main theme of these examples is that actions taken with knowledge of the scheme do not necessarily constitute primary violations, unless the actions themselves are deceptive or manipulative.

> Moreover, the Clearing Broker defendants specifically engineered trading strategies that catered exclusively to timers and late traders.
>
> The Clearing Broker defendants were motivated to engage in such conduct by the many sources of income offered by opening their execution systems to market timers and late traders, including the fees and commissions (including contingent deferred sales charges, or "CDSC's") they received for processing the market timer and late trading transactions. The Clearing Broker defendants also benefitted from their role as the executors of market timing and late trading by leveraging various quid pro quo benefits from market timers and timing brokers, including the ability to cross-sell other products and services they offered to the timers and brokers, including financing and private client services. By collecting such fees and other benefits, the Clearing Broker defendants directly benefitted from the rapid in-and-out trading by certain of the market timers, while harming long-term fund investors who bore the transaction costs and other harms, as described herein, of such excessive trading.

Consol. Am. Compl. ¶¶ 98, 99.

These general allegations are the only allegations made against one of the broker/dealer defendants, AST Trust Co. No specific facts are pled as to the role it allegedly played. Therefore, plaintiffs' claims against AST as an alleged aider and abettor are entirely insufficient and must be dismissed for failure to comply with Rule 9(b) and the PSLRA. 15 U.S.C. §§ 78u-4(b)(1)(B), (b)(2). As for Prudential, only one specific allegation is made: that it

> developed a 'shotgun' system that allowed a market timer to scatter trades across various mutual funds to enable the timers to successfully execute larger and more frequent trades by hedging against the risk that 'capacity' would be . . . taken before they placed their orders were they to have placed their order in only one or a few fund families.

Consol. Am. Compl. ¶ 98. While this allegation demonstrates that Prudential may have been an aider and abettor to a market timing scheme, it does not charge that Prudential orchestrated the scheme or committed manipulative or deceptive acts in its furtherance. Therefore, plaintiffs' claim against Prudential fails under *Central Bank*.

The allegations against the other two broker/dealer defendants are more extensive. Bank of America is alleged to have provided Canary, one of the major market timers, "with an

electronic trading system that permitted Canary to circumvent restrictions on the frequency and

timeliness of its trades." Consol. Am. Compl. ¶ 100.[14]  More specifically, plaintiffs allege that

> [b]eginning in 2001, Bank of America: (1) set Canary up with a state-of-the-art
> electronic late trading platform, allowing it to trade late as late as 8:30 ET in the
> hundreds of mutual funds that the bank offered its customers; (2) provided Canary
> with approximately $300 million of credit to finance its late-trading and market
> timing activity in the hundreds of mutual funds that Bank of America could access
> by virtue of it size and power; and (3) sold Canary the derivative short positions it
> needed to time the funds as the market dropped.

*Id.*  Bank of America's motivations for its activities are alleged to be that it "made tens of

millions of dollars [in fees] through the late trading and timing activity" and that "Canary agreed

to leave millions of dollars of 'sticky assets' with Bank of America bond funds on a long-term

basis and paid Bank of America substantial fees, often over a million dollars per month."[15]

Consol. Am. Compl. ¶ 101.

Bear Stearns' involvement in the scheme is alleged to have been systemic.  Seven

paragraphs of the consolidated amended complaint are directed to its activities.  They read as

follows:

> 102.  In addition, throughout the Class Period, Bear Stearns facilitated market
> timing throughout the mutual fund industry.  Bear Stearns actively facilitated the
> improper trading of mutual funds by knowingly permitting its affiliated broker-

---

[14]The complaint also alleges in conclusory fashion that Bank of America provided "at
least one other major market timer" with a similar electronic trading system.  However, the
follow-up allegations relate only to Canary.  See Consol. Am. Compl. ¶ 100.

[15]"Sticky Assets" are "typically long-term investments made not in the mutual fund in
which the timing activity was permitted, but in one of the fund manager's financial vehicles that
assured a steady flow of fees to the manager.  Often the sticky assets would be placed, and sit
quietly, in low-risk money-market or government bond funds; but sometimes they would end up
in a hedge fund run by the fund managers with a higher fee structure than the typical mutual
fund, generating huge fees for the investment advisors and their affiliated entities."  Consol.
Am. Compl. ¶ 114.

dealers to execute market timing and late trades over its clearing platform. Bear Stearns's improper use of its platform involved trading in several mutual fund complexes and Bear Stearns' employees expressly approved this trading. Bear Stearns also actively communicated with various market timers and mutual fund firms to further the improper trading via the firm's platform. In fact, according to Timing Witness #1, in the late 1990s through 2001, a large portion of all time brokers cleared their trades using Bear Stearns' platform.

103. Bear Stearns knowingly facilitated improper trading through a network of introducing broker-dealers, to whom Bear Stearns provided access to its clearing platform. Bear Stearns' network of broker-dealers included in-house personnel and outsider firms such as Brean Murray and Kaplan & Co., which had core businesses of market timing mutual funds on behalf of hedge fund clients.

104. Specifically, senior Bear Stearns employees approved the use of the firm's trading platform for this improper purpose. For instance, during the Class Period, representatives of Brean Murray & Co. met with Michael Zackman of Bear Stearns to specifically discuss arranging market-timing and late-trading capabilities through the firm's platform. This meeting resulted in Bear Stearns installing a computer in Brean Murray's offices that accessed its trading platform, known internally as the Bear Stearns Mutual Fund Routing System ("MFR System"). Similar to the sophisticated equipment that Bank of America set up in Canary's office, the MFR System provided Brean Murray with a direct link to Bear Stearns' clearing platform through which Brean Murray could make automated market timing trades at will.

105. Bear Stearns also provided its network of brokers with access to the MFR System so that they could engage in late trading. For instance, Bear Stearns permitted its affiliated brokers at Brean Murray to enter trades as late as 5:30 p.m. ET, but at the price set as of 4:00 p.m. ET. Furthermore, Bear Stearns permitted its brokers to employ deceptive strategies to avoid detection from regulators and internal monitors. For example, the time stamp function on the MFR system was disabled so that there was no record of when the late trades were placed.

106. Similarly, senior managers at Bear Stearns met with market timers to assure them that it permitted improper trading over its platform. For example, according to Timing Witness #1, in 2000, a representative of Canary met with a Bear Stearns introducing broker-dealer (Kaplan & Co.) who had direct access to Bear Stearns' clearing platform. The meeting occurred in Boca Raton, Florida in the vicinity of the Bear Stearns building, in which the broker-dealer also maintained its office. In addition to the introducing broker and the Canary representative, the meeting was attended by Mr. Acosta, Bear Sterns's [sic] compliance officer for the Boca Raton office. According to Timing Witness #1, Mr. Acosta "knew exactly" what Canary was looking for from Bear Stearns (i.e., the ability to market time using its

platform), and he approved Canary's use of Bear Stearns's trading platform for its improper trading activity.

107.   Additionally, Bear Stearns provided financing to certain market timers to further facilitate their improper trading.  Specifically, according to Timing Witness #1, Bear Stearns provided financing to Trout Trading Management Co., another hedge fund, for the express purpose of market timing mutual fund shares.

108.   Throughout the Class Period, Bear Stearns profited from its participation in the market timing and late trading scheme.  Primarily, Bear Stearns profited from the commissions and fees generated from timers trading over the firm's platform.  Moreover, Bear Stearns also profited from the various other arrangements it extended to timers, including financing of the improper activities.

Consol. Am. Compl. ¶¶ 102-108.

I find that the allegations against Bank of America and Bear Stearns are sufficient to require discovery concerning the respective roles they played in the late trading and market timing scheme.  Of course, mere financing or clearing of transactions, even with knowledge that they are part of a fraudulent scheme, are insufficient to subject a person to Rule 10b-5 liability under *Central Bank*.  *See, e.g., In re Blech Sec. Litig.,* 961 F. Supp. at 583.  However, Bank of America is not only charged with financing and normal clearing activities.  It also is alleged to have provided Canary with a trading platform that allowed Canary to trade as late as 8:30 ET.  Likewise, Bear Stearns is accused of allowing a network of brokers to have access to its Mutual Fund Routing System ("MFR System") for the purpose of effectuating late trades.  Bear Stearns is further alleged to have permitted the brokers "to employ deceptive strategies to avoid detection from regulators and internal monitors," including disabling the time stamp function on the MFR System.  Consol. Am. Compl. ¶ 105.  These acts are "manipulative or deceptive" on their face, and by virtue of the trades they enabled, they affected the worth of mutual fund shares.  Thus, they are the functional equivalent in the mutual fund industry of sham transactions that artificially

17

affect market prices in more conventional contexts.  *See, e.g., Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476-77 (1977).  Moreover, these alleged acts of deception, when considered with other allegations concerning the extent of Bank of America's and Bear Stearns' activities on behalf of late traders and high-volume market timers, imply that Bank of America and Bear Stearns did not merely assist in facilitating late trades and market timed transactions.  Rather, it is reasonably inferable that they participated in initiating, instigating, and orchestrating the scheme.  If discovery demonstrates this to be so, Bank of America and Bear Stearns face primary liability under *Central Bank.*

*C.  Reliance*

In *Central Bank*, the Supreme Court found support for its holding in the concept of reliance: "[w]ere we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions."  511 U.S. at 180.  This statement confirms the importance of this element of a 10b-5 claim.  However, because *Central Bank*, 511 U.S. at 191, and its progeny recognize that a person other than a defendant with whom the plaintiff directly dealt may be held liable under Rule 10b-5, it necessarily follows that a person who is a principal, and not merely an aider and abettor, in a fraudulent scheme can be held responsible for his own acts committed in connection with a scheme founded on misrepresentations or omissions.  This is in accord with the established rule, both in criminal and civil law, that a person may be held accountable for furthering a scheme of which he is a principal.[16]  Thus, as stated in *In re Lernout & Hauspie Sec.*

_____

[16]Cases holding that there is no co-conspirator liability under Rule 10b-5 post-*Central Bank*, *see, e.g., Dinsmore v. Squadron, Ellenoff, Plesent, Scheinfeld & Sorkin*, 135 F.3d 837, 842-43 (2d Cir. 1998); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1244 (N.D. Cal. 1995)**,**

*Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003), primary liability can apply to "any person who substantially participates in a manipulative or deceptive scheme . . . even if a material misstatement by another person creates the nexus between the scheme and the securities market."

Defendants argue, however, that plaintiffs' allegations are insufficient because they do not aver that plaintiffs actually relied upon the failure of the fund defendants to disclose that they permitted widespread late trading and market-timed transactions in the funds. This argument fails because the Supreme Court has held that in omissions cases "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute Citizens v. United States*, 406 U.S. at 153-54. Self-evidently, a person selecting a mutual fund in which to purchase and hold shares might have considered it important to know whether (and to what extent) favored investors were being allowed to late trade and market time in the fund in light of the fact that toleration of the practice could increase fund expenses and have a substantial effect upon future fund performance.[17]

---

are not to the contrary. Although conspiracy law incorporates the agency principle that the acts of one co-conspirator may be attributed to another, this does not mean that every co-conspirator is converted into a principal of the offense charged. To the contrary, it is black-letter law that a person may be found guilty as a conspirator even if he commits only a single, relatively trivial act in furtherance of the conspiracy. Thus, *Dinsmore* and *Gupta* merely implement the *Central Bank* holding that a participant in a scheme who is not himself a principal cannot be held liable for the acts of another of the participants.

[17]In their briefs, plaintiffs also contend that the "fraud on the market" theory gives rise to a presumption of reliance. *See generally, Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004); *Cromer Fin. Ltd v. Berger*, 205 F.R.D. 113, 130 n.21 (S.D.N.Y. 2001). The difficulty with this contention is that the fraud on the market theory is based upon the proposition that material misrepresentations or failures to disclose material facts will result in inflated prices. Here, the effect of late trading and market timing was to depress share value. Moreover, the fraud on the market theory focuses on the

Defendants further contend, however, that plaintiffs are not entitled to the *Affiliated Ute* presumption because plaintiffs also allege that the fund defendants made several affirmative misrepresentations in their prospectuses.  For example, one Janus prospectus allegedly misrepresented that

> [f]requent trading into and out of the Fund can disrupt portfolio investment strategies and increase fund expenses for all shareholders, including long-term shareholders who do not generate these costs.  The Fund is not intended for market timing or excessive trading . . . .  Transactions accepted by your financial intermediary in violation of our excessive trading policy are not deemed accepted by the Fund.

*Id.* ¶ 124.   Another Janus prospectus allegedly misrepresented that the fund would not accept trades after the close of the New York Stock Exchange's regular trading session.  *Id.* ¶ 125.

While it is true, at a certain level of generalization, that "[t]he *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b-5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*," *Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993), a more precise and accurate statement of the rule is that the *Affiliated Ute* presumption applies only where a plaintiff's claim is *primarily* based upon material omissions.  Indeed, the two cases cited in *Cox* in regard to the reach of *Affiliated Ute* make this clear.  *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984) ("This Circuit has recognized the limited reach of the *Ute* presumption, applying it only in primarily omission cases in which a duty to disclose existed."); *Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 359 (5th Cir. 1987) ("A court must, therefore, analytically characterize a 10b-5 action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive

---

point of sale whereas plaintiffs' damage theory concentrates on the dilution of share value over time.

misrepresentation case."); *see also Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("We must therefore analyze the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption should apply.") .

In the present case, the gravamen of plaintiffs' claim is not for specific misrepresentations but for the funds' failure to disclose that they were permitting favored customers to engage in late trades and market-timed transactions.  Reading the amended complaint as a whole, it is clear that plaintiffs allege they were relying upon the integrity of the fund managers and the reasonable assumption that the managers were not breaching their fiduciary duty by permitting the value of their shares to be diluted by improper transactions.  Thus, what is significant about the alleged misrepresentations made in the prospectuses is that they failed to cure—in fact, exacerbated—the underlying wrong: manipulative and deceptive conduct in facilitating, while not disclosing, widespread late trading and market timing in the funds.  Under these circumstances, I find that the *Affiliated Ute* presumption applies.

## D.  Causation

In order to state a claim under Section 10(b), "the plaintiff must show both '*loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question.'"  *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996) (quoting *Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir. 1985)).  "Transaction causation" and "reliance" are virtually synonymous, and plaintiffs have adequately pled transaction causation for the same reasons they have adequately pled reliance.

Loss causation simply "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stoneparth Group., Inc.* 343 F.3d 189, 197 (2d Cir. 2003); *see also Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).  All that a plaintiff is required to allege is "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4) (2005).  Plaintiffs have fully met this burden here.  According to their allegations, they were harmed as a result of defendants' fraudulent scheme and course of business which diminished the value of their shares by, *inter alia*, siphoning off from the funds profits to which shareholders were entitled, substantially increasing transaction expenses and fees, requiring sales of securities held by the fund in a falling market (sometimes with adverse tax consequences), and also requiring the fund to hold an excessive amount of cash to redeem shares in market timed trades.  These allegations of loss are clear and direct, and while the theory upon which they are based must ultimately be put to the test of evidentiary proof, it is at least facially plausible.[18]

*E. Scienter*

Allegations of scienter must comply with Fed. R. Civ. P. 9(b).  As stated in *Royal Ahold*, "plaintiffs must successfully plead with particularity facts specific to each individual defendant that create a strong inference the defendant acted knowingly or recklessly."  351 F. Supp. 2d at

---

[18]The trader defendants and broker/dealer defendants make an additional argument that plaintiffs' losses were not caused by them because the allegedly wrongful acts of the fund defendants constituted an intervening cause.  This argument is merely a reassertion in a different guise of the earlier contention that the trader defendants and broker/dealer defendants cannot be held accountable for their actions under a theory of scheme liability.  Of course, plaintiffs may not recover duplicative damages from different defendants.  However, for the reasons I have stated in Section I.B, I find that a defendant who is a principal in a fraudulent scheme faces primary liability under Rule 10b-5 and may be responsible for losses caused by his joint actions with other principals.

369 (citing *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338 (4th Cir. 2003)).

Here, plaintiffs have adequately pled facts sufficient to show that the fund defendants, the traders, and Bank of America and Bear Stearns (the only broker/dealers against whom I find the scheme allegations to be sufficient) acted knowingly or recklessly.  The fund defendants are alleged, *inter alia*, to have recognized the harmful effects of market timing and late trading on long-term investors—as disclosed in an internal report they commissioned and as stated in the funds' prospectuses, Consol. Am. Compl ¶¶ 124, 142-47—yet the funds "entered into or maintained agreements with at least twelve market timers . . . [that] permitted the market timers to trade far more frequently than other shareholders and, in some cases, to make frequent trades of up to tens of millions of dollars each in the mutual funds." *Id.* ¶ 131.  The trader defendants are alleged to have used specific platforms or systems to conceal their market timing, *id.* ¶¶ 98, 100, 105-06, and Bank of America and Bear Stearns are charged with deceptive acts, the very commission of which reflect guilty knowledge.   Moreover, plaintiffs allege the various financial incentives providing motivation for the activities in which the defendants engaged, e.g., the traders' profits from late trades and market timing and the fund managers' and the broker/dealers' increased fees, increased commissions, and the receipt of "sticky assets" upon which still further fees could be earned.  *Id.* ¶¶ 99, 101.  These allegations are sufficient under Rule 9(b).

## II. CLAIMS UNDER THE 1933 ACT

Plaintiffs also assert claims against the fund defendants under Sections 11 and 12(a)(2) of the 1933 Securities Act.  15 U.S.C. §§ 77k, 77l(a)(2).  Defendants raise a number of subsidiary issues in seeking dismissal of these claims, including (1) plaintiffs' failure to identify the allegedly misleading prospectuses, and (2) plaintiffs' failure to allege the materiality of the

challenged disclosures.[19]  On the second point, I am satisfied that plaintiffs have adequately pled the materiality of the disclosures they have identified.  However, on the first point I agree with defendants that if plaintiffs' Securities Act claims were otherwise viable, they would have to specify the prospectus pursuant to which each named plaintiff purchased his shares.  *See In re Royal Ahold*, 351 F. Supp. 2d at 399-401.

There is a more fundamental defect, however, in plaintiffs' claims under the Securities Act: they do not (and given the diminution in value theory of damages they have postulated, cannot) allege facts demonstrating they have suffered harm within the meaning of either Section 11 or Section 12(a)(2).

Under Section 11 there is only one measure of damages:

> [T]he difference between the amount paid for the security . . . and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security . . . and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e) (2005).  Further, any difference between the price paid and the later lower value or price—whether at sale or at the time of suit—must be attributable to the misrepresentation and not depreciation resulting from some other cause, such as a general downtrend in the market.

Because the existence of recoverable damages is an element of a Section 11 claim, a

---

[19]The fund defendants as a group raise two other subsidiary omnibus defenses: (1) the nonamenability to suit of trustees/directors and registrant issuers under Section 12(a)(2), and (2) a limitations bar as to defendants who were newly added when the second consolidated amended complaints were filed.  These defenses raise issues that would require particularized inquiries in each family of fund cases in which they apply.  I will decline to make such inquiries in light of my holding that plaintiffs have failed to allege recoverable harm under Sections 11 and 12(a)(2).

plaintiff must plead facts demonstrating that he suffered the particular type of injury contemplated by the statute. *See Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 378 (D.N.J. 1999). Although the statutory language of Section 12(a)(2) is different, the effect is the same. Section 12(a)(2) provides for two alternative remedies: (1) rescission upon plaintiffs' prompt tender of shares in exchange for the original purchase price, or (2) rescissionary damages if plaintiff has sold his shares. 15 U.S.C. § 77l(a)(2) (2005); *Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986). As is true under Section 11, "if a plaintiff sells the securities at issue for an amount greater than the plaintiff's purchase price, then the plaintiff has suffered no [recoverable] damages." *PPM Am., Inc. v. Marriott Corp.*, 853 F. Supp. 860, 876 (D. Md. 1994).[20]

---

[20]Plaintiffs contend that under Section 11 they may recover for the diminution in "value" of their shares caused by late trading and market timing between the date of their purchase and the date suit was filed even if that diminution in value is not reflected in the shares' NAV for which they could have been sold on the market. At best, this contention applies only to persons who did not sell their shares prior to suit being instituted (or have not done so since suit was instituted).

For persons who have sold, the "price" at which they sold their shares—not the "value" of those shares at the time of sale—is the touchstone of their damage. As to persons who have not sold their shares, Section 11 does refer to the "value" of their securities at the time suit was instituted. As a preliminary matter, it appears to me the word "value" as used in Section 11 is the equivalent of "price," i.e., the amount that a security could have been sold for at the time suit was brought if a sale had then been made. The word "price" implies the occurrence of a transaction and therefore it would have been awkward for Section 11 to have used "price" (instead of "value") in setting the measure of recoverable damages when a plaintiff has not engaged in an actual sales transaction before or after the institution of suit.

I am aware, however, that other courts have held that "value" and "price" as used in Section 11 are not necessarily the same. *See, e.g., McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 351 n. 80 (S.D.N.Y. 2003). These cases do not explain why persons who do not sell their shares prior to or after the institution of suit should be treated any differently from those who do: as is the consequence of construing the words "value" and "price" differently. However, assuming their holding to be sound, *McMahan & Co.* and *In re Initial Public Offering Sec. Litig.* also indicate that market price is the "primary gauge" of value. *See, e.g., McMahan*, 65 F.3d at 1049 (citing *Mills v. Elec. Auto-Lite Co.*, 552 F.2d 1239, 1247 (7th Cir. 1977)). Here, plaintiffs have proffered no sound reason why the NAV of fund shares—their market price—should not be

Here, plaintiffs have not alleged facts demonstrating that they (or the other members of the putative class) have sold their shares (or could have sold their shares at the time suit was filed) for an amount less than they paid for the shares.  The failure to make such allegations is not fatal to their 10b-5 claims because, as I have previously indicated, plaintiffs have articulated and pled a theory of damages that does not depend upon their having paid more for their shares than they received (or could have received) in selling them.  However, the only damages recoverable under Sections 11 and 12(a)(2) are based upon price differentials, and plaintiffs therefore have not stated any cognizable harm under those statutes.[21]

### III.  CLAIM UNDER SECTION 36(b)
### OF THE INVESTMENT COMPANY ACT[22]

Section 36(b) of the Investment Company Act ("ICA") provides as follows:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, . . . to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person

deemed to constitute the shares' value for purposes of Section 11 analysis.

[21]Plaintiffs assert a claim for control person liability against Janus Capital Group and Janus Capital Management under Section 15 of the 1933 Act, 15 U.S.C. § 77o.  Because one of the elements of such a claim is commission of a primary violation by the alleged controlled person, *see, e.g., In re Royal Ahold*, 351 F. Supp. 2d at 407; *In re MicroStrategy Inc. Sec. Litig.,* 115 F. Supp. 2d at 661, and because I find that no such violation was committed, plaintiffs' claim under Section 15 fails as well as their other claims under the 1933 Act.

[22]A Section 36(b) claim has also been asserted in the parallel derivative actions, and there is a dispute among the different groups of plaintiffs as to which of them has the right to pursue the claim.  That dispute will be resolved at a later stage of this litigation.  In the meantime, in order to keep down the cost of litigation, counsel for the investor class plaintiffs are assigned responsibility for taking discovery on, and otherwise pursuing, the Section 36(b) claim.

of such investment adviser, . . . for breach of fiduciary duty in respect of such
compensation or payments paid by such registered investment company . . . to
such investment adviser or person.

15 U.S.C. § 80a-35(b) (2005).  Plaintiffs assert claims against Janus Capital Group, Janus Capital

Management, and Janus Distributors LLC under this section.[23]

Section 36(b) only concerns compensation.  It "was not enacted to provide a cause of

action separate from Section 36(a) to govern the directors' independence or the investment

adviser's general performance.  For this reason, most of the cases decided under Section 36(b) are

narrowly focused on disproportionate, excessive, or unearned fees."  *Migdal v. Rowe Price-*

*Fleming Int'l*, 248 F.3d 321, 328-29 (4th Cir. 2001) (citations omitted).  Thus, plaintiffs may not

use Section 36(b) as a means generally to challenge late trading and market timing practices.  Nor

may they recover under Section 36(b) the profits paid to traders in connection with late trades or

market timed transactions.  They may, however, assert a claim under Section 36(b) for excessive

fees and expenses resulting from the defendants' scheme.  Such a claim is supported by

allegations in the complaint that (1) management fees, which were based upon the amount of

funds under management, were increased excessively by late trades and market timed transactions

that increased the funds under management, (2) the influx of funds from late trades and market

timed transactions excessively increased fees paid by funds for distribution of shares, and (3) and

the management fees paid as the result of the deposit of "sticky assets" that would "sit quietly, in

low-risk money-market or government bond funds" were entirely unearned.  Consol. Am. Compl.

---

[23]Plaintiffs also assert a Section 36(b) claim against Janus Investment Fund and Janus
Adviser Series.  For the reasons stated in note 3, *supra*, the claim against these defendants will
be dismissed.

¶¶ 109-114.

## IV.  CLAIMS UNDER SECTIONS 34(b) AND 36(a)
## OF THE INVESTMENT COMPANY ACT

Plaintiffs next assert claims against the fund defendants under Sections 34(b) and 36(a) of the ICA.  Section 36(a) authorizes the SEC to bring an action for "breach of fiduciary duty involving personal misconduct" with respect to investment companies.  15 U.S.C. § 80a-35(a) (2005).  Section 34(b) makes it unlawful for any person to make a false and misleading statement or omission in certain filings and records.  15 U.S.C. § 80a-33(b) (2005).  Unlike Section 36(b), neither Section 34(b) nor 36(a) expressly creates a private right of action.  Therefore, plaintiffs' claims under these sections may proceed only if Congress intended to create an implied private right of action and a private remedy.  *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001).  "Statutory intent on this latter point is determinative.  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."  *Id.*[24]

In *Sandoval*, the Supreme Court noted that its "method for discerning and defining causes of action" is no longer the method that it employed decades ago.  Under what the Court characterized as the "*ancien regime,*" it was "the duty of the courts to be alert to provide such remedies as are necessary to make effective the Congressional purpose" expressed by a statute.

---

[24]Plaintiffs argue that the Supreme Court's recent decision in *Jackson v. Birmingham Board of Education*, 125 S. Ct. 1497 (2005), undercuts *Sandoval* and supports their position.  I do not believe it does.  In holding that there is a private right of action for retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq., the Court emphasized that "we reach this result based on the statute's text.  In step with *Sandoval*, we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex."  125 S. Ct. at 1507.  *Jackson* does not alter the Court's emphasis on statutory text.

28

*Id.* at 287 (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)).  Under the Court's present

approach, "the interpretative inquiry begins with the text and structure of the statute, and ends

once it has become clear that Congress did not provide a cause of action."  *Sandoval,* 532 U.S. at

at 289 n.7.

The Second Circuit has applied *Sandoval* in holding that no private right of action exists

under Sections 26(f) and 27(i) of the ICA.  *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283

F.3d 429, 436 (2d Cir. 2002).[25]  Noting that "a court must 'begin [its] search of Congress's intent

with the text and structure' of the statute" and that no provision of the ICA explicitly provides for

a private right of action for violations of either Section 26(f) or 27(i), the court concluded that

"we must presume that Congress did not intend one."  *Id.* at 432 (quoting *Sandoval*, 532 U.S. at

288).  The Second Circuit found that this presumption was "strengthened" by three other features

of the statute.  First, Sections 26(f) and 27(i) "do not contain rights-creating language."

> The language of these sections only describes actions by insurance companies that
> are prohibited; it does not mention investors such as the plaintiffs.  "Statutes that
> focus on the person regulated rather than the individuals protected create 'no
> implication of an intent to confer rights on a particular class of persons.'"

*Olmsted*, 283 F.3d at 433 (quoting *Sandoval*, 532 U.S. at 289).  Second, noting that Section 42 of

the ICA explicitly provides for enforcement of all provisions of the ICA by the SEC, the court

recognized that "[t]he express provision of one method of enforcing a substantive rule suggests

that Congress intended to preclude others."  *Id.* at 433 (quoting *Sandoval*, 532 U.S. at 290).

---

[25]Plaintiffs rely upon the Second Circuit's opinion in *Strougo v. Bessini*, 282 F.3d 162 (2d
Cir. 2002) as "reaffirming its recognition of an implied right of action under 36(a)."  *Bessini* was
decided a few days before (not "contemporaneously with," as asserted by plaintiffs) *Olmsted*.  In
any event, in *Bessini,* the court merely reversed the dismissal of the plaintiff's Section 36(a)
claim without considering whether a private right of action exists under that section.

29

Third, "Congress's explicit provision of a private action to enforce . . . [Section 36(b)] suggests that omission of an explicit private right to enforce other sections was intentional." *Id.* at 433.

Several district courts, relying on *Olmsted*, have held that no private right of action exists under various sections of the ICA, including Sections 34(b) and 36(a). *E.g., In re Eaton Vance Mutual Funds Fee Litig.*, No. 04 CIV 1144JGK, 2005 WL 1813001, at **7-9 (S.D.N.Y. Aug. 1, 2005) (holding that there is no implied private right of action under Sections 34(b), 36(a), and 48(a) of the ICA); *Chamberlain v. Aberdeen Asset Mgmt. Ltd.,* No. 02-CV-5870, 2005 WL 195520, at *4 (E.D.N.Y. Jan. 21, 2005) (holding that there is no implied private right of action under Section 36(a) of the ICA);[26] *meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 621-23 (S.D.N.Y. 2003) (holding that there is no implied private right of action under Section 12(d)(1)(A) of the ICA); *White v. Heartland High Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 986-87 (E.D. Wis. 2002) (holding that there is no implied private right of action under Section 34(b) of the ICA). *See also Jacobs v. Bremner*, No. 05 C 143, 2005 WL 1719307, at **3-4 (N.D. Ill. July 20, 2005) (finding the Supreme Court's holding in *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2625-27 (2005), in addition to *Sandoval*, sufficient to extinguish courts' ability to imply a private right of action under Section 36(a)).

Although other district courts reached a contrary conclusion, *see, e.g., Young v.*

---

[26]The court's opinion in *Chamberlain* was vacated as a condition of a settlement agreement. *Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, No. 02-CV-5870, 2005 WL 1378757, at *1 (E.D.N.Y. Apr. 12, 2005). In doing so, however, the court stated that granting the motion to vacate did not "constitute a reconsideration of the merits of the case or a negation of the substance of the previously issued Order; rather the Motion is granted simply in order to permit the parties to proceed to settlement." *Id*. at *2. In any event, even if the opinion has no formal precedential value, I find its reasoning to be correct.

*Nationwide Life Ins. Co.*, 2 F. Supp. 2d 914, 925-26 (S.D. Tex. 1998); *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 796-98 (S.D.N.Y. 1997); *In re Nuveen Fund Litig.*, No. 94 C 360, 1996 WL 328006, at **5-6 (N.D. Ill. June 11, 1996), they did so under the *ancien regime* before *Sandoval* was decided.  Likewise, although there were statements in committee reports relating to the 1970 and the 1980 amendments to Section 36 reflecting support for implication of private rights of action under the section,[27] these statements are of little, if any, significance after *Sandoval.  See Exxon Mobil*, 125 S. Ct. at 2625-27*; Jacobs,* 2005 WL 1719307, at **3-4.  The text of a statute is the focus of the inquiry under the *regime actuel*, and such extraneous factors as isolated bits of legislative history, the "'expectations' that the enacting Congress had formed 'in light of the contemporary legal context,'" and interpretations given by one Congress to the enactments of another, no longer carry the day.  *Sandoval*, 532 U.S. at 287-88, 292; s*ee also Central Bank*, 511 U.S. at 185-86; *Olmsted*, 283 F.3d at 433-35.  Therefore, I join in the opinions of other courts that have considered the issue after *Sandoval* and hold that the unambiguous language of Sections 34(b) and 36(a) makes clear that no private right of action

---

[27]     *1970 Amendment*:  "Although section 36(b) provides for an equitable action for breach of fiduciary duty as does section 36(a), the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)."  S. Rep. No. 91-184, at 16 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4911.
     *1980 Amendment*:  Although its previous "rationale for implying private rights of action under the securities laws" was "well articulated," in recent years the Supreme Court has used "a strict construction of statutory language and expressed intent.  The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question [as] would be consistent with and further Congress' intent in enacting that provision. . . . In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the [ICA]."  H.R. Rep. No. 96-1341, at 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4810-11.

exists under either statute.[28]

# V.  STATE LAW CLAIMS

Invoking supplemental jurisdiction, plaintiffs have asserted state law claims for breach of

fiduciary duty/constructive fraud, aiding and abetting breach of fiduciary duty, and unjust

enrichment.  By the agreement of the parties, briefing has been deferred as to whether plaintiffs'

allegations are sufficient to state viable claims under state law.  The only question now to be

addressed is whether plaintiffs' claims should be dismissed under the preemption provision of

SLUSA.  That provision states that

> [n]o covered class action based upon the statutory or common law of any State . . .
> may be maintained in any State or Federal court by any private party alleging (A) a
> misrepresentation or omission of a material fact in connection with the purchase or
> sale of a covered security; or (B) that the defendant used or employed any
> manipulative or deceptive device or contrivance in connection with the purchase or
> sale of a covered security.

15 U.S.C. § 78bb(f)(1) (2005).

The preemption issue frequently arises when plaintiffs assert state law claims on behalf of

---

[28]Plaintiffs also assert a claim for control person liability under Section 48(a) of the ICA. There can be no liability under Section 48(a) if there has been no actionable primary violation under another section of the ICA.  *See, e.g., In re Royal Ahold*, 351 F. Supp. 2d at 407. Therefore, my rulings that there is no private right of action under either Section 34(b) or Section 36(a) are dispositive of any Section 48(a) claim alleged to have arisen in connection with violations of those sections.  As to plaintiffs' Section 48(a) claim based upon a primary violation of Section 36(b), defendants make several arguments: (1) there is no private right of action under Section 48(a) for the same reasons there is no private right of action under Sections 34(b) and 36(a); (2) under Section 36(b) suit may be brought only against an investment adviser or affiliated person or other person enumerated in the statute and under Section 36(b)(3) liability is expressly limited to the "recipient" of the compensation and payments challenged in a Section 36(b) claim; and (3) there are insufficient allegations to show that any defendant named in the Section 48(a) claim "procured" the excessive fees as the title of Section 48(a) suggests is essential.  Because permitting the Section 48(a) claim to go forward will not substantially broaden the scope of discovery, I will defer ruling upon these issues until a later stage of the litigation.

holders (as opposed to buyers and sellers).[29]   In such cases plaintiffs argue that if *Blue Chip Stamps* bars holder claims under Rule 10b-5, because they are not "in connection with" the purchase or sale of securities, it follows that the claims are not preempted by SLUSA, which uses the same language.   The courts of appeal have reached different conclusions on this question. *Compare Dabit*, 395 F.3d at 43, *and Green v. Ameritrade, Inc.,* 279 F.3d 590, 598 (8th Cir. 2002), *with Kircher*, 403 F.3d at 484.

Here, plaintiffs have not asserted state law claims limited to holders.[30]   Thus, the preemption issue now presented does not concern SLUSA's "in connection with" language. Rather, plaintiffs contend that their claims are not preempted because none of the claims require proof of fraud or misrepresentation as a necessary component.   There is authority for the general proposition upon which plaintiffs rely. *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 386 (S.D.N.Y. 2004); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 341 F. Supp. 2d 258, 266 (S.D.N.Y. 2004).   However, an equally valid proposition is that "preemption . . . [turns] on whether the SLUSA prerequisites are 'alleged' in one form or another," not on the "essential legal elements of a claim." *Rowinski v. Salomon Smith Barney, Inc.*, 398 F.3d 294, 300 (3d Cir. 2005); *see also Dabit*, 395 F.3d at 34; *Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 879-

---

[29]In these cases the preemption issue is often intertwined with the question of whether a plaintiff's action has been properly removed to federal court pursuant to SLUSA's removal provision, which contains language virtually identical to SLUSA's preemption provision. *See* 15 U.S.C. § 78bb(f)(2) (2005).

[30]During oral argument it was suggested that plaintiffs might wish to consider seeking leave to further amend their complaint to assert a variety of holder state law claims, including one for fraud.  Although such a claim would be inconsistent with the position plaintiffs are taking in regard to their Section 10(b) claim, it would provide them with protection if ultimately it were held that holders lack standing to sue under Rule 10b-5, but that their state law claims are not preempted for that very reason.

80 (8th Cir. 2002).  *Norman* and *Xpedior* are not to the contrary.  *See Norman*, 350 F. Supp. 2d at

386 (the Complaint "simply contains no allegations of fraud"); *Xpedior*, 341 F. Supp. 2d at 265-

66 ("Courts must probe the plaintiffs' pleading" to examine not just the "technical elements of a

claim" but also the "factual allegations intrinsic to the claim as alleged.").

      Plaintiffs have incorporated by reference into the state law counts of the consolidated

amended complaint all of the allegations of fraud and misrepresentation made in support of other

claims.  Thus, regardless of the elements of the state law claims, they are preempted on the face of

the complaint and will be dismissed.  The dismissal will be with leave to file a second amended

consolidated complaint without reference to any allegations of misrepresentation or fraudulent

scheme in the state law counts, provided that such a second amended complaint can responsibly

be filed.  However, substantial doubt appears to exist whether any viable state law claim for

breach of fiduciary duty/constructive fraud, aiding and abetting breach of fiduciary duty, and

unjust enrichment can be asserted under the circumstances of this case.  Such claims are

preempted under SLUSA if they are based on allegations of an "omission of a material fact" or

the use or employment of "any manipulative device or contrivance."  As I have indicated earlier

in this opinion, *see* Section I.B, the nondisclosure of the material fact of the existence of late

trading and of market timing practices lies at the heart of the alleged wrongs.  Plaintiffs should

bear these considerations in mind before filing amended state law claims on behalf of purchasers.

      A separate order is being entered herewith.


Date: <u>August 25, 2005</u>      <u>/s/                         </u>
                             J. Frederick Motz
                             United States District Judge