IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS | * | |
| INVESTMENT LITIGATION | * | MDL-1586 |
| | * | |
| | * | |
| (In re Janus Subtrack) | * | Civil No. 04-MD-15863 |
| | * | |
| | * | |
| | ***** | |

**FUND DERIVATIVE OPINION**

This opinion addresses the motions to dismiss filed in a derivative action instituted on behalf of Janus Investment Fund ("JIF"), Janus Aspen Series ("JAS"), and Janus Advisor Series ("JAD")[1] against various Janus entities, officers, and fund trustees and numerous third-party broker/dealers and traders. The nature and structure of these MDL proceedings are described in the companion opinion I am issuing today on motions to dismiss filed in the investor class action in the "Janus subtrack."

The derivative plaintiffs have asserted various state law claims and federal claims under the Investment Company Act ("ICA"), 15 U.S.C. §§ 80a-1 et seq., and the Investment Advisers Act ("IAA"), 15 U.S.C. §§ 80b-1 et seq.[2] By agreement of the parties, briefing was deferred on all issues relating to the cognizability of the state law claims pending my ruling on the demand

---

[1]JIF, JAS, and JAD are all open-end management investment companies, commonly known as mutual funds, which issue shares in various fund series.

[2]The state law claims are for breach of fiduciary duty, breach of contract, aiding and abetting breach of fiduciary duty, unjust enrichment, interference with contract, and civil conspiracy.

1

futility issue. Because none of plaintiffs' state law claims can be pursued unless demand is excused, and because I find that plaintiffs have not alleged sufficient facts to excuse demand, the state law claims will be dismissed without consideration of their underlying merit. My ruling on the demand futility issue is also dispositive of all the federal claims asserted by plaintiffs, other than the claim under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), as to which the statute expressly excuses demand.[3] However, the parties have briefed other issues concerning the viability of those claims, and in order to prevent the possibility of unnecessary delay in these proceedings, I will consider them now.

This opinion addresses five questions:[4]

(1) Have plaintiffs, as required by Fed. R. Civ. P. 23.1, alleged facts showing that the funds have "failed to enforce a right which may be properly asserted by . . . [them]"?

(2) Have plaintiffs alleged sufficient facts excusing their failure to make demand upon the fund trustees before instituting this action?

(3) Have plaintiffs stated a viable claim under Section 47(b) of the ICA, 15 U.S.C. § 80a-

---

[3]For the reasons I set forth in the companion investor class opinion, I find that plaintiffs have stated a cognizable claim under Section 36(b) for allegedly excessive fees paid to the investment adviser defendants. There remains a dispute between the derivative plaintiffs and the investor class plaintiffs as to which group is entitled to assert this claim. That dispute will be resolved at a later stage of the litigation. In the meantime, in order to keep down the cost of litigation, counsel for the investor class plaintiffs (who have asserted other claims surviving defendants' motions to dismiss) are assigned responsibility for taking discovery on, and otherwise pursuing, the Section 36(b) claim.

[4]There are two additional questions this opinion does not address. First, defendants challenge plaintiffs' standing to bring an action on behalf of the shareholders of any Janus fund in which one of them does not himself own shares. In light of my other rulings, I am not reaching that question. Second, plaintiffs assert a claim under Section 36(a) of the ICA (as well as a claim under Section 36(b)). For the reasons stated in the companion investor class opinion, there is no private right of action under that section.

46(b)?

(4) Is there a private right of action for damages under the IAA?

(5) Have plaintiffs stated a viable claim for a recission under Section 215 of the IAA, 15 U.S.C. § 80b-15(b)?

I.

Fed. R. Civ. P. 23.1 permits a shareholder to bring a derivative action to enforce a right belonging to a corporation or unincorporated association when the corporation or association has "failed to enforce a right which may properly be asserted by it." Defendants contend this provision bars plaintiffs' suit because the fund trustees have been actively cooperating with the SEC and state authorities in achieving regulatory settlements that will compensate the fund shareholders harmed by late trading and market timing activities. Plaintiffs counter by pointing out that "a regulatory proceeding does not constitute an action by an investment company" and that "[t]he Trustees did not initiate the regulatory proceedings and they are not in control of them." Derivative Pls.' Omnibus Opp'n Mem. at 36. Therefore, according to plaintiffs, "the failure of the companies themselves to bring these causes of actions is . . . sufficient, by itself, to satisfy the threshold requirement of Rule 23.1."[5] *Id*.

---

[5]Plaintiffs also contend that the fund trustees' participation in the regulatory settlement process is immaterial to the Rule 23.1 question because "the regulators have not asserted any claim to recover any damages caused to any Funds by the faithless fiduciaries." Derivative Pls.' Omnibus Opp'n Mem. at 36. Although plaintiffs may correctly draw a distinction between the compensation the regulators are obtaining for injured fund shareholders and the relief plaintiffs are seeking to recover for the mutual funds themselves, the distinction reflects an underlying difficulty in plaintiffs' case. Plaintiffs take the position that they are seeking recovery for the funds as entities, and they reject the concept of distributing the proceeds of any recovery to persons who held mutual fund shares during the period that late trading and market timing activities were occurring. Rather, plaintiffs contend that this is like any other derivative action in which any recovery becomes the asset of the corporate entity on behalf of which the action is

3

Plaintiffs are obviously correct that proceedings instituted by regulatory authorities are not the same as suits instituted by the funds. However, plaintiffs' argument ignores the more fundamental question: What is the right that is to be enforced? It is not simply the right to sue. *Cf. In re Delta & Pine Land Co. S'holders Litig.*, No. Civ. A. 17707, 2000 WL 875421, at *7 &

---

instituted. Mutual funds, however, are quite different from other corporate entities. They do not have assets of their own but merely hold in trust securities (and cash) for the benefit of the mutual fund shareholders. Therefore, any recovery made by a mutual fund in a derivative action would merely increase the proportionate value of the investment of the persons who hold shares in the fund at the time of the recovery.

That result would be, at best, paradoxical because it would compensate persons who were not harmed at all by late trading or market timing activities (current shareholders who did not own shares when these activities were occurring) while failing to compensate others who were injured (persons who owned shares when late trading and market activities occurred but later sold them). Likewise, there would be no just or logical relationship between the compensation paid and the harm suffered as to persons who are current shareholders but who owned shares for different periods of time (or in amounts different from their present holdings) while late trading and market timing activities occurred.

Plaintiffs respond by saying this is always the case when a derivative action is filed. However, in the usual circumstance, the stock of a corporate entity on whose behalf the derivative recovery is made is valued on the basis of a wide variety of factors (many of which are intangible), and the entity does not serve simply as a pass-through of net asset value to its shareholders.

Furthermore, even to the extent that a recovery made in a derivative action filed on behalf of an ordinary corporate entity may (by increasing share price) indirectly redound to the benefit of its then current stockholders (as distinct from the stockholders at the time of the occurrence of the wrongs giving rise to the recovery), the disconnection between those who were harmed and those who were benefitted is less dramatic (and, as a matter of economic theory, does not exist at all). That is because a potential recovery in a derivative action is itself an asset of the corporation. Therefore, when a person, who owned stock in a corporate entity when wrongful acts giving rise to a derivative action or potential derivative action occurred, sells that stock before the derivative action is resolved, he makes the decision to accept a market price for the stock that presumably takes into account the value of the potential recovery. In contrast, the net asset value of a mutual fund is based entirely upon the underlying securities (and cash) in which the fund is invested and not upon the value of any chose in action held by the fund itself as an independent entity. Therefore, when a mutual fund shareholder sells his shares prior to the resolution of a derivative action, the price he receives includes no component for any potential recovery in that action.

4

n.21 (Del. Ch. June 21, 2000).  Rather, it is the right to obtain full compensation for losses caused by late trading and market timing activities.  The fund trustees will have enforced this right if, at the end of the day, it is determined that the regulatory settlements resulted in the payment of full compensation.  Because the adequacy of the regulatory settlements thus bears directly upon the Rule 23.1 question, I would immediately accelerate resolution of it were I not dismissing plaintiffs' claims (other than their claim under Section 36(b) of the ICA) on other grounds.

II.

Plaintiffs did not make demand upon the fund trustees before instituting this action.  The issue of whether demand should be excused on the ground of futility is, of course, determined by state law as to the state law claims plaintiffs are asserting.  State law is also applicable to the demand futility issue in connection with claims asserted under the ICA and IAA.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

JIF is organized in Massachusetts, and JAS and JAD are organized in Delaware.  Therefore, Massachusetts and Delaware law apply to the demand futility issues here presented.  Both of these states take a very narrow view of when demand may be excused.  *See, e.g., Guttman v. Huang*, 823 A.2d 492, 500 (Del. Ch. 2003); *Harhen v. Brown*, 730 N.E.2d 859, 868 (Mass. 2000).  More than a century ago, the Massachusetts Supreme Judicial Court posited: "[i]t would be contrary to the fundamental principles of corporate organizations to hold that a single shareholder can at any time launch the corporation into litigation to obtain from another what he deems to be due it, or to prevent methods of management which he thinks unwise." *Dunphy v. Travelers' Newspaper Ass'n*, 16 N.E. 426, 431 (Mass. 1888).  Therefore, under Massachusetts

5

law a derivative plaintiff must plead specific facts demonstrating "the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." *Ross v. Bernhard*, 396 U.S. 531, 534 (1970). It is presumed that directors are "acting, not fraudulently, but with fair discretion in obedience to the law," *Bartlett v. New York, New Haven & Hartford R.R. Co.*, 109 N.E. 452, 453 (Mass. 1915), and demand will be excused only if there is a particularized showing that the majority of directors "have participated in wrongdoing, or are otherwise interested," *Harhen*, 730 N.E.2d at 865.[6]

Delaware law is to the same effect.[7] It is "[a] cardinal precept of the General Corporation Law of the State of Delaware . . . that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citation omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Because

---

[6]Since this action was instituted, Massachusetts has enacted a universal demand statute. Mass. Gen. Laws Ann. ch. 156D, § 7.42 (2004) (effective July 1, 2004). Arguably, this statute applies to any new parties and claims added in the consolidated amended complaint after July 1, 2004. *See ING Principal Prot. Funds Derivative Litig.*, No. 03-12198JLT, 2005 WL 1107072, at *5 (D. Mass. May 9, 2005) (amendment of complaint adding funds' independent trustees does not relate back to initial filing date when determining applicability of universal demand statute). I need not reach that question, however.

[7]The law of Maryland (under which a number of the fund defendants in other tracks and subtracks in these proceedings are organized) is perhaps even more restrictive than the law of Delaware and Massachusetts. In *Werbowsky v. Collomb,* 766 A.2d 123, 144 (Md. 2001), the Maryland Court of Appeals indicated that demand will seldom be excused:

> We adhere, for the time being, to the futility exception, but, consistent with what appears to be the prevailing philosophy throughout the country, regard it as a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

"[b]y its very nature the derivative action impinges upon the managerial freedom of directors," strict demand requirements are imposed. *Aronson*, 473 A.2d at 811. In situations where derivative plaintiffs are attacking an affirmative business decision made by the board, a "Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id*. at 814.[8] Further, a derivative plaintiff must establish that a majority of the board is interested or lacks independence in order to excuse demand on that ground. *Id*. at 815-17; *see also Harhen*, 730 N.E.2d at 864-65; *Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000).[9]

The Delaware Supreme Court has somewhat modified the second prong of the *Aronson* test in cases where the derivative plaintiffs are not challenging an affirmative decision made by the present board. This modified test applies in cases, such as this one, in which the board is charged with a failure of oversight.[10] Under the modified test, a court of chancery is to

---

[8] Because *Aronson* was addressing the two findings a court must make in determining whether demand is excused, it might appear at first blush that a plaintiff must meet both prongs of the test *Aronson* articulated. However, the test is actually disjunctive, because demand is excused if a plaintiff has pled facts raising a reasonable doubt *either* that a majority of the members of the board are not disinterested or independent *or* that the challenged decision was not otherwise a product of a valid exercise of business judgment. *See, e.g., Brehm,* 746 A.2d at 256.

[9] Maryland law is the same. *Werbowsky,* 766 A.2d at 144.

[10] The derivative plaintiffs assert that they are accusing fund trustees of "active misconduct." Derivative Pls.' Omnibus Opp'n Mem. at 42. However, the very alleged misconduct that they characterize as "active" is a failure of oversight: "the Trustees' approval of the Management Contracts *without a reasonable investigation*." In any event, even if the fund trustees' alleged misconduct is deemed as "active" or an "affirmative decision," the result would be the same.

7

determine (in addition to making an appropriate inquiry under the first prong of the *Aronson* test), "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Because the same fundamental principles underlie Delaware and Massachusetts demand futility law and because the *Aronson/Rales* test provides a well considered and useful means for deciding the demand futility issue in a failure of oversight context, I will employ that test in deciding whether demand upon the fund trustees was excused.

Plaintiffs make two arguments in asserting that demand upon the fund trustees is excused. First, they contend that their allegations that the fund trustees sit on the boards of multiple funds and are highly compensated provide sufficient facts to create a reasonable doubt as to whether a majority of the trustees are disinterested and independent. Delaware and Massachusetts have enacted statutes expressly declaring that any investment company trustee who is not to be considered an "interested" trustee under the ICA is deemed "to be independent and disinterested for all purposes." Del. Code Ann. tit. 12, § 3801(h) (1998); Mass. Gen. Laws Ann. ch. 182, § 2B (1998) (same). These statutes are substantively identical to the Maryland statute, Md. Code Ann., Corp. & Ass'ns § 2-405.3(b) (1998), which was enacted in response to the decision in *Strougo v. Scudder, Stevens & Clark, Inc*., 964 F. Supp. 783, 795 (S.D.N.Y. 1997), holding that service on multiple fund boards at a high salary could render a trustee "interested" and undermine his "independence" in considering a demand for suit from a derivative plaintiff. *See* Burton M. Leibert, *Fund Governance*, Practicing Law Institute,

8

Corporate Law and Practice Course Handbook Series, 1056 PLI/Corp 9, 12 & 63 (1998).  Thus, there can be no question that the statutes apply in the demand futility context.  *See In re Eaton Vance Mut. Funds Fee Litig.*, No. 04 CIV 1144JGK, 2005 WL 1813001, at **14-15 (S.D.N.Y. Aug. 1, 2005)*.*  There likewise is no question that six of seven of the *Janus* fund trustees are not "interested" within the meaning of the ICA; the consolidated amended complaint names only Thomas Bailey (Janus' founder) as "an interested Trustee."  Consol. Am. Compl. ¶ 21(b)(viii).

Plaintiffs' second argument is that demand is excused because they have pled specific facts sufficient to establish a reasonable doubt that the fund trustees face a substantial risk of liability.  I accept the predicate of this argument that the exposure of a majority of the trustees to a substantial likelihood of liability would prevent the board from "exercis[ing] its independent and disinterested business judgment in responding to a demand."  *Rales*, 634 A.2d at 934; *see also McCall v. Scott*, 239 F.3d 808, 817 (6th Cir. 2001), *amended on denial of reh'g,* 250 F.3d 997 (amending only Section II.C, 239 F.3d at 817-19); *Aronson*, 473 A.2d at 805.[11]  However, plaintiffs have not alleged sufficient facts raising a reasonable doubt that the trustees do face a substantial likelihood of liability.

Plaintiffs assert that the trustees violated the fiduciary duty they owed to the funds and

---

[11]Defendants argue that the Delaware and Massachusetts statutes rendering "disinterested" and "independent" any trustee of an investment company who is not "interested" within the meaning of the ICA preclude the excusal of demand on the ground that a majority of the trustees face a substantial likelihood of liability.  In light of the fact that these statutes had their provenance as a response to the holding in *Stro90*, 964 F. Supp. 783, I find their only conclusive mandate is that service on multiple boards at a high salary is insufficient to render a trustee interested and not independent.  Thus, even if a majority of the board is "disinterested" and "independent" within the meaning of the Delaware and Massachusetts statutes, demand will be excused if a majority of the board faces a substantial likelihood of liability; in that event the board may not be able to exercise impartial business judgment in responding to a demand.

their shareholders because they approved advisory contracts without detecting and preventing late trading and market timing activities.  Specifically, they allege that because late trading and market timing were endemic in the mutual fund industry and because of the "copious coverage" of the problem in books and articles, the trustees were on notice that the activities might be occurring in the Janus funds.  They also contend that the trustees should have put procedures and processes in place that would have provided them with relevant information about whether widespread late trades and market timed transactions were being conducted.  According to plaintiffs, such procedures and processes should have enabled the trustees to monitor the volume of "round trips" or "in and out" trades, the trading activities of the largest investors, and the "turnover ratio."

    Noticeably absent, however, are any allegations by plaintiffs that the trustees knew that widespread late trading and market timing activities were occurring within the Janus funds themselves.[12]  This case is therefore critically distinguishable from *In re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), and *McCall, supra,* relied upon by plaintiffs.  In *Abbott*, the plaintiffs alleged that the board "knew of the violations of law" by company managers on the basis of "an extensive paper trail" over a six-year period, *id*. at 809, including several FDA warning letters, *id*. at 800, 802, SEC disclosure forms that imputed knowledge to the directors, *id*. at 806, and an article in the *Wall Street Journal* "about Abbott's FDA problems," *id*. at 808.  Likewise, in *McCall*, it was alleged that the board had been given

---

[12]Plaintiffs do allege that the directors—at least those on the funds' audit committees— were aware of high turnover ratios in the Janus funds and should have inferred from this fact the occurrence of large scale market timing activities.  Assuming the allegation to be true, the most it suggests is that the directors were negligent in their duties.

10

audit information showing "unmistakable signs that improper practices were being employed throughout the corporation" and had been advised of a *qui tam* action that "clearly presented claims of . . . illegal billing practices." 239 F.3d at 820, 822. Further, several articles had appeared in the *New York Times* detailing an investigation into the company about these matters. *Id.* at 823.

It was the existence of such "red flags" evidencing wrongdoing in the corporations for which they were responsible (not generalized wrongdoing in the industry of which those corporations were a part) that subjected the directors to the substantial likelihood of liability in *Abbott* and *McCall*. *See also Miller v. U.S. Foodservice, Inc.*, 361 F. Supp. 2d 470, 479-80 (D. Md. 2005). No such red flags were waved here. *Cf. In re Citigroup Inc. S'holders Litig.*, No. 19827, 2003 WL 21384599, at *2 n.7 (Del. Ch. June 5, 2003). Perhaps with the benefit of hindsight it may be said that the fund trustees were asleep at the switch and should have been more vigilant in detecting late trading and market timing activities occurring within the Janus funds. However, at most their failure to do so constituted negligence, not the intentional conduct, *see, e.g., Guttman*, 823 A.2d at 505-07; *In re Caremark Int'l, Inc. Derivative Litig.*, 698 A.2d 959, 968 n.16 & 971 (Del. Ch. 1996), recklessness, *see, e.g., In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (applying Delaware law) or, at the least, gross negligence, *see, e.g., McCall*, 250 F.3d at 999; *Aronson*, 473 A.2d at 812, required to hold them liable for their inactions.

In *Caremark*, the court noted that a failure of oversight claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." 698 A.2d at 967. The plaintiffs' allegations here fall far short of the mark that is required to prevail

11

on such a claim, and therefore a majority of the trustees do not face the substantial likelihood of liability necessary to excuse presuit demand upon them.

III.

Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), declares to be void and "unenforceable by either party" any investment advisory agreement that "is made in, or whose performance involves," a violation of the ICA. "Section 47(b) contemplates civil suits for relief by way of rescission and for damages." *See, e.g., Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir. 1977). Courts generally look to Section 29(b), 15 U.S.C. § 78cc(b), of the Securities Exchange Act of 1934 ("Exchange Act") for guidance when interpreting Section 47(b). *See, e.g.*, *Mills v. Elec. Auto-Lite* Co., 396 U.S. 375, 387 (1970) (noting that they are counterparts).

In *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F. Supp. 485, 501-02 (S.D.N.Y. 1977), the court held that Section 29(b) "only renders void those contracts which by their terms violate the [Exchange] Act . . . for it is only such contracts which are 'made in violation of,' or 'the performance of which involves the violation of the statute.'" *See also Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981) (holding that under Section 29(b) "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts"), *aff'd*, 672 F.2d 901 (2d Cir. 1981) (table). In *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982), the Fifth Circuit purported to reject this narrow interpretation and instead interpreted Section 29(b) as "render[ing] voidable those contracts that are either illegal when made or as in fact performed." There, the court rescinded agreements selling partnership interests because they were procured by an unregistered broker in violation of the Exchange Act and could not be performed lawfully. *Id*. at 564. However, as the

12

Third Circuit noted in a later case, *Regional Properties* is consistent with the results in *Drasner* and *Zerman* because the alleged violation was inseparable from the performance of the contract. *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 200-01 (3d Cir. 2001). The distinction drawn by the Third Circuit was between such "inseparable from performance" violations (which give rise to an action under Section 29(b)) and violations involving conduct that is "collateral or tangential to the contract between the parties" (which do not give rise to a Section 29(b) claim). *Id.* at 201.

Here, the performance of the investment adviser contracts was not, as a matter of law, necessarily unlawful, as was the performance of the agreements involved in *Regional Properties*. Moreover, the late trading and market timing activities about which plaintiffs complain were entirely "collateral and tangential to" the investment advisory contracts. Therefore, in accord with all the relevant precedents, I find that plaintiffs have failed to state a claim under Section 47(b).

IV.

In *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979), the Supreme Court held that the IAA provides "a limited remedy of voiding the investment adviser contract under Section 215" and "confers no other private causes of action, legal or equitable." Despite this clear pronouncement, plaintiffs contend they have a private right of actions for damages under the IAA because in 1990 Congress passed the Securities Law Enforcement Remedies Act ("SLERA"), Pub. L. No. 101-249, which amended Section 214, 15 U.S.C. § 80b-14, to confer

jurisdiction in the district courts over "actions at law" as well as over "suits in equity."[13]

There are two fallacies in plaintiffs' contention.  First, as the House Report on SLERA explained, the "principal purpose" of SLERA was "to provide the Securities and Exchange Commission . . . with new remedial authority that will enable the agency to operate its enforcement program in a more flexible manner."  H.R. Rep. No. 101-616 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1380.  Second, by its terms Section 214 is a jurisdictional provision, and the Supreme Court has cautioned that such provisions themselves do not imply the existence of a private right of action.  *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 577 (1979) ("[P]laintiffs' rights must be found, if at all, in the substantive provisions of the 1934 Act . . . , not in the jurisdictional provision."); *see also Krinsk v. Fund Asset Mgmt.*, *Inc*., 654 F. Supp. 1227, 1232 n.3 (S.D.N.Y. 1987) (rejecting the notion that the jurisdictional section of the ICA creates a private right of action).  Therefore, I find there is no private right of action for damages under the IAA.

V.

The final question to be decided is whether plaintiffs may bring an action for rescission under Section 215 of the IAA, which voids "every contract made in violation of any provision of this subchapter and every contract . . . the performance of which involves the violation of . . . any provision of this subchapter."  15 U.S.C. § 80b-15(b) (2005).  This language is similar to that of

---

[13]Plaintiffs have cited no authority in support of their view, and since the time that SLERA was enacted courts have continued to hold that there is no private right of action for damages under the IAA.  *See, e.g., Frailoi v. Lemcke*, 328 F. Supp. 2d 250, 274 (D.R.I. 2004); *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 643 (E.D. Va. 2003); *Goldstein v. Malcolm G. Fries & Assoc., Inc.*, 72 F. Supp. 2d 620, 624-25 (E.D. Va. 1999); *Shahidi v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 2:02CV483FTM29S, 2003 WL 21488228, at *2 (M.D. Fla. Apr. 28, 2003).

Section 47(b) of the ICA which, as explained in Part III, *supra*, has been interpreted to provide a cause of action only in instances where the terms of a contract themselves violate the ICA or where the violations alleged are "inseparable from" the performance of the contract. The language of Section 215 is virtually the same as the language of Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), to which courts have turned for guidance in interpreting Section 47(b).

Defendants argue, based upon the likeness of these provisions, that Section 215 of the IAA should be interpreted as Section 47(b) of the ICA has been interpreted. However, that may be too superficial an approach. Section 215 voids any contract "made in violation of . . . any provision of this subchapter," and Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits an investment adviser from "engaging in any act, practice, or course of business which is fraudulent or deceptive." There is no comparable provision to Section 206 in the ICA of which Section 47(b) is a part. Moreover, although Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, does prohibit the use of manipulative and deceptive devices, it is, by virtue of the "in connection with the purchase and sale of . . . securit[ies]" language it contains, more limited in scope than is Section 206 of the IAA.

The Fifth Circuit's decision in *Laird v. Integrated Resources, Inc.*, 897 F.2d 826 (5th Cir. 1990), is instructive in this regard. There, it was alleged that an investment adviser had failed to disclose a conflict of interest when he entered into a contract with plaintiffs. The court held that this failure to disclose was wrongful under Section 206 of the ICA and that the contract was thus voidable under Section 215 as having been "made in violation of . . . [a] provision of this subchapter." *Id*. at 841. *Laird's* reasoning would apply equally here where the adviser defendants failed to disclose the conflicts under which they were operating as a result of late

15

trading and market timing activities.

Because *Laird* appears to be the only precedent directly on point and arguably is inconsistent with the cases interpreting Section 47(b) of the ICA I have previously cited, I would defer ruling on this issue until a later stage of the litigation if I were not dismissing plaintiffs' IAA claim on the separate ground that they failed to make a demand upon the trustees before instituting this action. I note, however, that even if the claim were not dismissed, plaintiffs' potential recovery under Section 215 would be limited to "restitution of the consideration [the fees] given under the contract, less any value conferred by the other party." *Transamerica Mortgage*, 444 U.S. at 25 n.14. They could not recover for diminution of the value of the funds allegedly caused by late trading and market timing activities. *Id*. Thus, any relief they might obtain under Section 215 would be essentially parallel to (and redundant of) their claim for excessive fees under Section 36(b) of the ICA.

A separate order is being entered herewith.


Date: <u>August 25, 2005</u>          /s/_____
                                       J. Frederick Motz
                                       United States District Judge