UNITED STATES DISTRICT COURT

DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | Civil Action No. MDL 15863 |
| | Case No. 04-md-15863 |
| IN RE ALGER, COLUMBIA, JANUS, MFS, ONE GROUP, PUTNAM, AND ALLIANZ DRESDNER | (Judge Motz) |
| [Allianz Dresdner Subtrack] | Case No. 04-md-1933 |
| Pingitore v. Allianz Dresdner Asset Management of America, L.P., *et al.* | |

## DEFENDANT STEPHEN J. TREADWAY'S ANSWER TO PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Defendant Stephen J. Treadway ("Treadway") submits this answer solely for the purpose of providing answers specific to Defendant Treadway. In submitting this answer, Treadway adopts the responses and affirmative defenses set forth in the Answer filed by the Allianz Defendants with regard to all paragraphs of the Second Amended Complaint except as specifically provided below:

[No. 56: Defendant John E. Cashwell, Jr. ("Cashwell") was at all relevant times a Senior Vice President of PEA. Cashwell, along with Taegan Goddard and defendant Kenneth Corba, negotiated, entered into on behalf of PEA, and supervised, market timing agreements.]

56. Defendant Treadway admits the first sentence of Paragraph 56, but denies knowledge or information sufficient to form a belief as to the truth or accuracy of the second sentence of Paragraph 56.

764117_2

[No. 57: Defendant Kenneth W. Corba ("Corba") was at all relevant times Managing Director, Chief Executive Officer and Chief Investment Officer of PEA. As alleged below, Corba, together with Taegan Goddard and Cashwell, negotiated, entered into on behalf of PEA, and supervised market timing agreements.]

57. Defendant Treadway admits the first sentence of Paragraph 57, but denies knowledge or information sufficient to form a belief as to the truth or accuracy of the second sentence of Paragraph 57.

[No. 81: Taegan Goddard ("Goddard") was at all relevant times Managing Director and Chief Operating Officer of PEA. It was Goddard who was first contacted by the market timers' representatives at Circle Trust Company, and Goddard who introduced Circle Trust Company to John Cashwell and others at PEA. Goddard, together with defendants John Cashwell and Kenneth Corba, negotiated, entered into on behalf of PEA, and supervised market timing agreements.]

81. Defendant Treadway admits that Goddard was at all relevant times Managing Director and Chief Operating Officer of PEA, but denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 81.

[No. 82: David Byck ("Byck") was at all relevant times a consultant who acted as an intermediary to obtain and execute market timing agreements on behalf of various clients, including Canary. Byck introduced Canary to the PIMCO Fund family.]

82. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82.

[No. 102: Indeed, an internal ADAM and PAD document reflects the minutes of a Shareholder Services department "Staff Meeting" dating from January 13, 2000, wherein Carol Rodgerson, a PIMCO Vice President who managed the Shareholder Services unit, presented to her staff on "New Business." The minutes state: "Carol reviewed market timing and explained that in the MMS prospectus it states that no more than 6 round trips in any 12 month period is permitted. She also mentioned that anyone inquiring about market timing trades should be told that PIMCO discourages it." (Emphasis added.) The foregoing illustrates PIMCO's own senior officers' interpretation of the MMS Trust prospectus as prohibiting "more than 6 round trips in any 12 month period," and acknowledgment that "market timing" should not be allowed, or perceived as a policy tolerated by PIMCO, in recognition of the fact that it harmed the average PIMCO Fund shareholder. Moreover, that the ADAM-affiliated Defendants did not view the Funds' prospectuses as ambiguous or permissive is further evidenced by that fact that, in

instances where ADAM "market timing police" wished market timers to stop a particular market timing activity, they sent an e-mail communication such as one sent on May 16, 2002 to an identified timer, stating that "PIMCO has identified certain [] accounts that violate PIMCO's prospectus and/or have been determined to be harmful to our Funds and subsequently our shareholders. These trades ... appear to be transactions in response to market fluctuations (i.e. market timing). As such, PIMCO does not allow this activity to occur in our Funds." When it suited their self-interest of increasing assets under management, however, the ADAM-affiliated Defendants not only looked the other way when market timing activity occurred in their Funds, but affirmatively entered into negotiated transactions to permit massive amounts of market timing.]

102. The internal document referenced in Paragraph 102 is a document that speaks for itself and therefore any allegations that differ from the actual writing are denied. Defendant Treadway further states that the other documents referenced in Paragraph 102 are documents that speak for themselves and therefore any allegations that differ from the actual writings are denied. Defendant Treadway denies the remaining allegations in Paragraph 102 as to him, PAD or PAFM, and denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations as to the other defendants.

[No. 116: During the Class Period, defendants unlawfully acted to enrich themselves and their hedge fund clients and other favored investors at the expense of other Fund shareholders. As detailed herein, with respect to the ADAM-affiliated Defendants, senior PIMCO Fund complex executives had knowledge of, and furthered, this activity and would not pass up the profits generated by courting multi-million dollar hedge fund clients, and other market timers and late traders, putting profits over their fiduciary duties to act in the best interests of the PIMCO Funds' long-term shareholder clients. Indeed, defendants PAFM, PEA, and PAD were recently the subject of an Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisors Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, dated September 13, 2004, File No. 3-11645 (the "SEC Consent Order"). Pursuant to the SEC Consent Order, defendants PAFM, PEA, and PAD were ordered to pay a total of $50 million, and were ordered to comply with certain internal governance reforms. The total payment of $50 million, consisted of disgorgement in the amount of $10 million and civil money penalties in the amount of $40 million: $10 million by PAFM, $10 million by PAD, and $20 million by PEA. The findings of fact by the SEC in the SEC Consent Order against defendants PAFM, PAD and PEA, all subsidiaries of defendant ADAM, conclude that senior officers at these ADAM entities knowingly arranged to permit market timing by third parties in the Funds beginning, at least, from 2001 up to and through 2003.]

116. Defendant Treadway denies the allegations in the first two sentences of Paragraph 116 as to him, PAD or PAFM, and denies knowledge or information sufficient to form a belief as to the truth and accuracy of these sentences as to the other defendants. With respect to the remaining allegations in Paragraph 116, Defendant Treadway states that the SEC Consent Order as defined in the Complaint is a document that speaks for itself and refers to the SEC Consent Order for an accurate description of its provisions.

[No. 117: In addition, defendants ADAM, PAD and PEA, among others, were the subject of a Complaint filed by the New Jersey Attorney General in the Superior Court of New Jersey, Essex County, New Jersey, at Civil Action Docket Number C-54-04, on or about February 15, 2004. The New Jersey Complaint charges ADAM, PAD, PEA and other ADAM entities with fraud in a scheme that, *inter alia*, allowed a large investor and his affiliated entities to market time many hundreds of millions of dollars in PIMCO Funds in exchange for, *inter alia*, placing $25 million of long term "sticky" assets in a PIMCO hedge fund where PIMCO's officers desired greater assets, and transferring and maintaining assets temporarily not actively deployed in "targeted" funds in the market timing scheme, in money market funds and/or short term bond funds within the PIMCO Fund family. The ADAM-affiliated defendants permitted such scheme, notwithstanding that such investor was well-known inside ADAM and mutual fund circles as a market timer.]

117. Defendant Treadway states that the New Jersey Complaint as defined in Paragraph 117 is a document that speaks for itself and therefore any allegations that differ from the actual writing are denied. Treadway further denies all other allegations in Paragraph 117 as to him, PAD and PAFM, and denies knowledge or information sufficient to form a belief as to the truth and accuracy of the remaining allegations as to the other defendants.

[No. 138: In October 2001, a representative of Circle Trust called Taegan Goddard, the Chief Operating Officer of PEA (and former employee of Circle Trust and former colleague of the caller), to discuss market timing PIMCO's PEA Funds on behalf of Brean Murray and its client, Canary. After the call, Goddard arranged a meeting between Circle Trust and PEA Senior Vice President John Cashwell.

138. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 138.

[No. 139: Shortly after the initial October 2001 contact, Cashwell met with the Circle Trust representative, who suggested a subsequent meeting with Ken Corba, the Chief Executive Officer of PEA, to introduce PEA to brokers from Brean Murray. Brean Murray wanted to explain their business to Corba and, at the same time, obtain for Canary and/or other clients the ability to market time and late trade PEA Funds. To that end, a conference call between PEA, Circle Trust, and Brean Murray was scheduled a week later to discuss more of the details of such an arrangement.]

139. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 139.

[No. 140: After Cashwell's meeting with Circle Trust, Cashwell briefed Corba and Goddard on the discussions, and informed them that he was going to contact Brean Murray for the purpose of setting up a meeting with Corba at PEA's offices. That meeting took place on November 1, 2001, when Brean Murray came to PEA to meet with Corba and Cashwell, in Corba's office. At the November 1, 2001 meeting, Brean Murray explicitly told Corba and Cashwell that they had high net worth clients that were interested in market timing PEA Funds.]

140. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 140.

[No. 141: During the November 1, 2001 meeting, Brean Murray explained that they were seeking approximately $100 million in market timing capacity in the Funds at a rate of three to four "round-trip" exchanges per month (contrary to the PIMCO Funds' above-cited prospectus language). Brean Murray specified that they only wanted capacity in Funds where their client's investment would consist of 3% or less of the total fund value. In exchange for permission to execute the round trip exchanges, Brean Murray proposed that their clients would make a "long-term investment," *i.e.,* provide so-called "sticky assets," in certain PEA or PIMCO Funds that would equal 25% of the market timing capacity, *i.e.,* approximately $25 million.]

141. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 141.

[No. 147: Corba made the decision to have Canary "park" the long-term investments, or "sticky assets," in the PEA Select Growth Fund (which he managed) in order to increase the assets in the Fund, which were relatively small at the time. Indeed, Canary's sticky assets in the PEA Select Growth Fund nearly doubled the assets in that Fund. Putting the sticky assets in the PEA Select Growth Fund helped attract other investors to the Fund by increasing the Fund's assets under management to a level sufficient to have the funds NAV published in *The New York Times* and *The Wall Street Journal.* Thus, by putting Canary's sticky assets in the PIMCO PEA Select Growth Fund, the Fund increased in size, and in turn got free publicity, which would lead

to greater investment, again increasing the Fund's size, thus increasing the fees paid to PEA and Corba.]

147. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 147.

[No. 148: Early in 2002, Corba met with the Managing Directors and Portfolio Managers at PEA to inform them that PEA was going to enter a market timing relationship with Brean Murray and their clients Trout and Canary. The terms of the agreement (the "Brean Murray Agreement") were to allow market timing for a total of $100 million in the PEA Growth, PEA Innovation, and PEA Target Funds. Canary would be allowed to make four to five "round trip" exchanges per month in those Funds. PEA was allowing the market timing in exchange for $25 million in sticky assets in the PIMCO PEA Select Growth Fund. Moreover, virtually all of Canary's trades of PIMCO Funds pursuant to the Brean Murray Agreement were late trades.]

148. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 148.

[No. 149: The Brean Murray Agreement blatantly violated the express representations made in the relevant prospectuses relating to the PIMCO PEA Growth, PEA Innovation, and PEA Target Funds as described in paragraphs 101, 125-27 above.]

149. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 149.

[No. 150: On January 30, 2002, after Canary had decided to accept the full $100 million in timing capacity, Canary arranged for $25 million in sticky assets to be deposited in the PIMCO PEA Select Growth Fund. On February 8, 2002, Brean Murray, on behalf of Canary, invested $27,301,027.00 in the PIMCO PEA Target Fund, and $26,052,341.00 in the PIMCO PEA Innovation Fund. E-mails dated February 11 and 12, 2002, among Brean Murray representatives (including Michael Grady and Ryan Goldberg) and ADAM personnel (including Corba, Treadway, Cashwell, Goddard, and others) reflect that substantial amounts of the monies placed in the Target and Innovation Funds had been initially deposited through BOA, into the PIMCO Short-Term, Low Duration, Total Return, Money Market and Real Return Funds. Exhibits attached to the New Jersey Complaint make clear that the ADAM-affiliated Defendants, and particularly Cashwell, were kept meticulously abreast of Canary's trading and Cashwell received virtually every significant e-mail regarding the Canary account. For example, a February 11, 2002 e-mail from Michael Grady of Brean Murray to Cashwell states, "John, We apologize for the delay in getting you this e-mail. *Going forward you will receive the trade confirms from us on the same day that we trade on.* On 2/8/02 we exchanged into

$27,301,027.00 of the Pimco Target Fund & $26,052,341.00 of the Pimco Innovation Fund." (Emphasis added.)]

150.   Defendant Treadway admits that in February 2002 Canary via Brean Murray and Bank of America invested in certain PIMS and MMS Funds. Defendant Treadway further states that e-mails dated February 11th and 12th, each exhibits attached to the New Jersey Complaint, are documents that speak for themselves and therefore any allegations that differ from the actual writings are denied, and otherwise denies the allegations as to himself and denies sufficient knowledge or information to form a belief as to the truth or accuracy of the remaining allegations of Paragraph 150.

[No. 151: After Canary began actively timing the Innovation Fund, the portfolio manager of the Fund, Dennis McKechnie, decided that large redemptions late in the day disrupted his trading strategies and harmed returns for Fund shareholders. For these reasons, McKechnie forbade Canary from making further trades in the Innovation Fund after late February 2002.]

151.   Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 151.

[No. 152: During 2002, Canary was conducting its market timing transactions as exchanges in and out of PIMCO bond funds. However, as certain representatives at PIMCO complained that the rapid trading in and out of those Funds was injurious to such Funds, Brean Murray arranged for the trades to be made through a cash account at defendant Bear Stearns, although trading through the PIMCO bond funds continued during the Class Period (and such trading through PIMCO bond funds continued to be offered to Canary through other intermediaries such as David Byck, *see, e.g.,* December 13, 2002 e-mail from Scott Spalding, PIMCO Vice President, to David Byck, cited *infra*).]

152.   Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 152, except admits that Brean Murray started trading through Bank of America but later switched to Bear Stearns.

[No. 153: Defendant Bear Stearns arranged for Canary's trades to clear the day after the trade was entered ("T+1 "), as opposed to three days later ("T+3"), as otherwise would have

occurred. This enabled Canary to purchase and redeem Fund shares more quickly than the industry norm. In February 2002, Brean Murray also executed three (3) roundtrips on behalf of Canary in the PEA Target Fund.]

153. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 153.

[No. 154: After Canary lost capacity in the PIMCO PEA Innovation Fund, Stern had a lunch meeting on March 5, 2002 at The Racquet Club in Manhattan with Cashwell, Corba, Goldberg and Grady. Treadway was supposed to attend but did not. At the March 5 lunch meeting, Stern stated that he was interested in obtaining additional market timing capacity in the PIMCO Funds, and also expressed an interest in investing in PEA-managed hedge funds.]

154. Defendant Treadway admits that he was invited to attend a lunch meeting on March 5, 2002 at The Racquet Club in Manhattan and that he did not attend this lunch meeting. Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 154.

[No. 155: On March 7, 2002, Cashwell sent Brean Murray the portfolio holdings information for the PIMCO PEA Target, Growth, and Select Growth Funds, which was non-public information. On the same day, Cashwell also sent Stern an e-mail containing the operating documents for the PIMCO PEA Advantage and PIMCO PEA Worldwide Value hedge funds, as well as for the Horizon Fund, another hedge fund managed by PEA.]

155. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 155.

[No. 157: On March 22, 2002, Stern met with Michael Gaffney ("Gaffney"), the portfolio manager of the Horizon Fund, as well as the PEA Opportunity Fund, and with John Cashwell. During the meeting, Gaffney pitched the Horizon Fund to Stern. Stern told Cashwell that Canary wanted to invest $2 million in the Horizon Fund. Stern also indicated he would "like to see a little give on the fund trading side," meaning that he wanted increased market timing capacity in the Funds in exchange for his investment in the Horizon Fund. On March 25, 2002, Cashwell told Corba that Canary wanted to market time the Innovation and Opportunity Funds as part of the agreement, and Corba was informed that part of the reason for the long-term investment in the Horizon Fund would be in exchange for Canary's ability to obtain further market timing capacity in the Funds, including the Opportunity Fund.]

157. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 157.

[No. 158: Following the March 22, 2002 meeting with Stern, Canary invested $2 million in the Horizon Fund on a long-term basis, and in exchange therefor received an additional $5 million in trading capacity in the Opportunity Fund.]

158. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 158.

[No. 159: On or about March 29, 2002, Cashwell sent Stern the subscription documents for the Horizon Fund. He also told Stern that PEA would draft a "side letter" allowing Stern to divest from the Horizon Fund if PEA's market timing relationship with Canary ended, and Canary obtained a waiver of the lock-up period for investments with the Horizon Fund in the event the Canary/PEA market timing relationship ended.]

159. Defendant Treadway states that to the extent the allegations in Paragraph 159 refer to documents, those documents speak for themselves and therefore any allegations that differ from the actual writings are denied, and otherwise denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 159.

[No. 160: PEA received 1 % of total assets under management and a performance fee consisting of 20% of the net profits generated by the Fund in annual fees from the Horizon Fund. Likewise, PAFM and PEA collectively received an advisory fee of 0.65% of net assets under management for the Opportunity Fund.]

160. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 160 except refers to the offering documents for the Horizon Fund for an accurate statement of the fees paid by the Horizon Fund to its advisor. Similarly, with respect to Sentence 2 of Paragraph 160, Treadway refers to the applicable public documents for the PEA Opportunity Fund, including prospectuses and statements of additional information for an accurate statement of the fees paid by those funds.

[No. 162: On April 4, 2002, PEA sent a letter (dated April 2, 2002) to Stern that read:

Dear Ed:

In the event the market timing relationship between Canary Investment Management and PIMCO Funds ceases, PIMCO Equity Partners will waive the 12-month lock-up period, without penalty, for investments made on behalf of African Grey Capital Associates LLC in the PIMCO EQUITY Advisors HORIZON FUND, L.P. However, we will require at least thirty days notice for all redemptions from the fund.

All other provisions of the PIMCO EQUITY ADVISORS HORIZON FUND, L.P. will apply.

Sincerely,

Taegan Goddard.

162. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 162. Treadway further states that the April 4, 2002 letter from Taegan Goddard to Edward Stern is a document that speaks for itself and therefore any allegations that differ from the actual writing are denied.

[No. 165: Canary timed the Growth and Target Funds from April 2002 onward. Throughout this period of time, the broker representatives e-mailed Corba and others trade notifications for the purchases and redemptions of the Funds. These notifications demonstrated the frequent trading activities in the Canary accounts.]

165. Defendant Treadway admits Canary made investments in the Growth and Target Funds, admits that Brean Murray e-mailed information about those investments and refers to those e-mails for their contents, but otherwise denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 165.

[No. 168: Pursuant to an April 1, 2002 request from Brean Murray, on April 4, 2002, Cashwell sent Brean Murray a non-public list of the portfolio holdings of the PIMCO PEA Target, PEA Growth, PEA Opportunity, and PEA Select Growth Funds. By April 26, 2002, the Canary account had executed "at least 5 round trips" that month alone in the PIMCO PEA Target Fund, despite the fact that the agreement was limited to four round trips per month, and also despite the fact that the relevant fund prospectuses indicated that no more than six round trips in any twelve month period would be permitted, as discussed in greater detail herein. Similarly, a "market timing policeman" at PAD, PAD Vice President and former Manager of Operations,

Steve Howell ("Howell"), alerted his superiors that the Canary account "was dividing the movement of shares (in or out of the fund) across a couple of days thereby increasing the number of individual transactions hitting the account." At that point, Treadway requested a more "precise and limiting" definition of what constituted "four round trips."]

168. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the first sentence of Paragraph 168. With respect to Sentence 2 of Paragraph 168, Treadway denies knowledge or information with respect to any agreement with Canary and denies the allegations with respect to the prospectus and refers to that prospectus for its terms. With respect to Sentences 3 and 4 of Paragraph 168, those allegations refer to specific documents that speak for themselves, and therefore any allegations that differ from the actual writings are denied. Treadway further admits that he sent an e-mail requesting a more "precise and limiting" definition of what constituted four round trips. Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 168.

[No. 202: At various times during its relationship with Canary, PEA disclosed to Brean Murray, which then disclosed to Canary, the exact portfolio holdings of the Funds in which Canary was investing. These Funds included the PIMCO PEA Target, PIMCO PEA Growth, PIMCO PEA Innovation, PIMCO PEA Opportunity, and PIMCO PEA Select Growth Funds. PEA provided the portfolio holdings information to Brean Murray and Canary on a regular, monthly basis, before it was publicly available.]

202. Defendant Treadway denies knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 202.

[No. 204: For example, on January 15, 2002, Cashwell sent the portfolio holdings information of the PEA Funds to Brean Murray. Brean Murray then forwarded that information to Canary.]

204. Defendant Treadway denies knowledge of information sufficient to form a belief as to the truth or accuracy of the allegations in Paragraph 204.

[No. 206: From April 2003 until January 2004, a Marketing Associate at PEA regularly (monthly) sent the complete portfolio holdings of the PIMCO PEA Opportunity Fund to Brean Murray. Thus, for example, a June 3, 2002 e-mail from Cashwell to Ryan Goldberg of Brean Murray, regarding "Brean Murray Trading," in response to Goldberg's May 30, 2002 e-mail (inquiring, "Hi John, If you could have the positions in the three fund [sic] POPAX [Opportunity] PGWAX [Growth] PTAAX [Target] emailed to us we would appreciate it."), stated, "Hi Ryan, My associate Kara Margolis will be sending you this info each month.... She'll send the May info." That same day, an e-mail from Kara Margolis, identified in her e-mail as "Kara A. Margolis, Marketing Associate, PIMCO Equity Advisors," was sent to Ryan Goldberg, regarding "Month-End Holdings," stating, "Ryan, Attached is the holdings data you requested as of 5/31/02."]

206. With respect to Sentences 2 and 3 of Paragraph 206, the June 30, 2002 e-mail from Cashwell to Ryan Goldberg and the e-mail of the same date from Kara Margolis to Mr. Goldberg are documents that speak for themselves and therefore any allegations that differ from the actual writings are denied. Defendant Treadway otherwise denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 206.

[No. 243: As alleged herein, defendants acted with scienter in that each of them knowingly or recklessly participated in a scheme to defraud Plaintiff and other purchasers and holders of the Funds and profited from their participation in said scheme, as alleged herein. Each of the defendants knowingly or recklessly permitted and/or engaged in market timing and/or late trading of shares of the Funds, as alleged herein.]

243. Defendant Treadway denies the allegations in Paragraph 243 as to him, PAD and PAFM, and denies knowledge or information sufficient to form a belief as to the truth and accuracy of the allegations in Paragraph 243 as to the other defendants.

[No. 244: The SEC Consent Order found that PAFM, PEA and PAD, and the NJ Consent Order found that ADAM, PAD and PEA, knowingly entered into and/or were aware of agreements with known market timers and late traders that explicitly permitted the wrongdoing complained of herein, and/or facilitated or implemented such agreements. For example, the SEC Consent Order found that, "without any disclosure to Fund shareholders (and contrary to representations), Respondents executed a secret arrangement with one preferred client to allow market timing in amounts exceeding $4 billion in trading volume" (*id.,* ¶1), and that PAFM, PEA and/or PAD "willfully violated" §§ 206(1)-(2) and 204A of the Investment Advisers Act (in, *inter alia*, employing schemes to defraud their clients) and §§17(d) and 34(b) of the Investment

Company Act (in, *inter alia*, making material misrepresentations or omissions in registration statements). *Id.* ¶¶ 54-57. The ADAM-affiliated Defendants had employees whose jobs were to enable, facilitate, and monitor trading by market timers and late traders, and were otherwise able to detect market timing and late trading through these Defendants' trading and order entry systems, as alleged herein.]

244. Defendant Treadway states that the SEC Consent Order and the NJ Consent Order are documents that speak for themselves and therefore any allegations purporting to quote, summarize or paraphrase the documents that differ from the actual writings are denied. Defendant Treadway denies the remaining allegations in Paragraph 244 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 244 as to the other defendants.

[No. 245: The ADAM-affiliated Defendants knew that market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiff and the other members of the Class. See, e.g., New Jersey Consent Order,¶2(i) ("The executives and officers at PEA and PAD were aware of the damaging effect that market timers had on their funds.") Moreover, the SEC Consent Order and New Jersey Consent Order found that these Defendants knew that the public documents and statements issued or disseminated in the name of the Funds were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public. Each of these ADAM-affiliated Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.]

245. Defendant Treadway states that the New Jersey Consent Order and the SEC Consent Order are documents that speak for themselves and therefore any allegations that differ from the actual writings are denied. Defendant Treadway denies the remaining allegations in Paragraph 245 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 245 as to the other defendants.

[No. 246: The ADAM-affiliated Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein. Investors attracted to the Funds by market timing and/or late trading arrangements increased the amount of assets under management, and thereby permitted these Defendants to receive increased management fees, brokerage commissions, and

other fees, which were based on the amount of assets under management and/or the size and volume of transactions in the Funds. *See, e.g.,* New Jersey Consent Order,¶2(i) ("As a result of permitting market timing, PEA, ADAM and PAD, and Canary and their intermediaries, profited substantially at the expense of the long-term PEA fund investors.")]

246. Defendant Treadway states that the New Jersey Consent Order is a document that speaks for itself and therefore any allegations that differ from the actual writing are denied. Defendant Treadway denies the remaining allegations in Paragraph 246 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations in Paragraph 246 as to the other defendants.

[No. 248: Canary knew of and participated in the fraudulent scheme alleged herein by entering into agreements to engage in, and/or by repeatedly conducting, market timing of the Funds.]

248. Defendant Treadway denies the allegations in Paragraph 248 as to him, PAD, and PAFM, and states that he is without knowledge or information sufficient to form a belief as to the truth of the allegations about Canary.

[No. 249: Canary knew that: (i) market timing was enormously harmful to long-term investors in the Funds, including Plaintiff and the other members of the Class; (ii) market timing was contrary to the language in the Funds' Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as alleged herein; and (iii) the ADAM-affiliated Defendants had mechanisms in place to prevent market timing and late trading, but knowingly or recklessly circumvented such mechanisms for the benefit of Canary and other market timers/late traders.]

249. Defendant Treadway is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 249, except denies that he, PAD, or PAFM engaged in any "knowing" or "reckless" conduct for which they are liable to Plaintiffs.

[No. 251: Each of the Broker and Clearing Defendants knew of and participated in the fraudulent scheme alleged herein by entering into and/or effectuating agreements to engage in, and/or by repeatedly conducting, market timing and/or late trading of the Funds.]

251. Defendant Treadway is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 251, except denies that he, PAD, or PAFM engaged in conduct for which they are liable to Plaintiffs.

[No. 252: Each of the Broker and Clearing Defendants knew that: (i) market timing and late trading activity was enormously harmful to long-term investors in the Funds, including Plaintiff and the other members of the Class; (ii) market timing and late trading was contrary to the language in the Funds' Prospectuses, Statements of Additional Information, Registration Statements, and amendments thereto, as alleged herein; and (iii) the ADAM-affiliated Defendants had mechanisms in place to prevent market timing and late trading, but knowingly or recklessly circumvented such mechanisms for the benefit Canary and other market timers and late traders.]

252. Defendant Treadway is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 252, except denies that he, PAD, or PAFM engaged in any "knowing" or "reckless" conduct for which they are liable to Plaintiffs.

[No. 261: Brean Murray, on behalf of Canary, entered traded orders in PIMCO Funds on Bear Stearns' "MFR" software specially installed in its offices. Bear Stearns allowed Brean Murray to enter or cancel trades until at least 5:30 p.m., after the 4:00 Eastern time deadline for receiving that day's NAV, permitting Brean Murray to circumvent the forward-pricing rule. Internal Brean Murray documents reflect that the "Treasurer of Bear Stearns has approved leverage above Reg-T for various existing clients." PIMCO Funds personnel, including Steve Howell of the market timing police at PAD, were aware, at a minimum through e-mails sent by Ryan Goldberg of Brean Murray, that Brean Murray was using Bear Stearns' system to enter its trades of PIMCO Funds.]

261. Defendant Treadway is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 261, except admits that certain personnel, including Steve Howell, were aware that Brean Murray used Bear Stearns' computer system to enter trades and further denies any implication that Treadway, PAD, or PAFM knew of or were permitting Bear Stearns's or Brean Murray's alleged circumvention of the forward pricing rule.

[No. 264: Each of the Broker and Clearing Defendants was highly motivated to participate in the wrongdoing alleged herein, pursuant to which they each received enormous

fees and commissions, including brokerage fees and commission, wrap fees, clearing fees, and other transaction fees, for their participation in the market timing and late trading schemes.]

264. Defendant Treadway is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 264, except Treadway denies that he, PAD, or PAFM were involved in any late trading or market timing schemes with the Broker or Clearing Defendants.

## CAUSES OF ACTION

## VIOLATIONS OF THE EXCHANGE ACT

## FIRST CLAIM FOR RELIEF

## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER ON BEHALF OF PURCHASERES

[*Against the ADAM-Affiliated Defendants, Cashwell, Corba, Treadway, Stern, Canary, Banc of America and Bear Stearns*]

[No. 271: Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.]

271. Defendant Treadway restates and incorporates by reference his responses to the allegations as set forth above as though fully set forth hereafter.

273–284 Defendant Treadway denies the allegations of law set forth in Paragraphs 273-284 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
### AND SEC RULE 10B-5 PROMULGATED THEREUNDER
### ON BEHALF OF HOLDERS

[*Against the ADAM-Affiliated Defendants, Cashwell, Corba, Treadway, Stern, Canary, Banc of America and Bear Stearns*]

[No. 285: Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.]

285. Defendant Treadway hereby incorporates by reference all the responses set forth above as though fully set forth hereafter.

287–298. Defendant Treadway denies the allegations of law set forth in Paragraphs 287-298 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT

[*Against ADAM, the Investment Advisors, Treadway, Corba and Stern*]

[No. 299: Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.]

299. Defendant Treadway hereby incorporates by reference all of the responses set forth above as though fully set forth hereafter.

301-307. Defendant Treadway denies the allegations of law set forth in Paragraphs 301-307 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

# FOURTH CLAIM FOR RELIEF

## VIOLATIONS OF THE INVESTMENT COMPANY ACT OF 1940

## VIOLATION OF SECTION 36(B) OF THE INVESTMENT COMPANY ACT

*[Against the Investment Advisors, Treadway, and PAD]*

[No. 308: Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.]

308. Defendant Treadway hereby incorporates by reference all of the responses set forth above as though fully set forth hereafter.

310–312. Defendant Treadway denies the allegations of law set forth in Paragraphs 310-312 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

# FIFTH CLAIM FOR RELIEF

## VIOLATION OF SECTION 48(A) OF THE INVESTMENT COMPANY ACT

*[Against ADAM, the Investment Advisors, Treadway and Corba]*

[No. 313: Lead Plaintiff hereby incorporates by reference all of the allegations set forth above as though fully set forth hereafter.]

313. Defendant Treadway hereby incorporates by reference all the responses set forth above as though fully set forth hereafter.

316–321. Defendant Treadway denies the allegations of law set forth in Paragraphs 316-321 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

# VIOLATIONS OF STATE AND COMMON LAW

## SIXTH CLAIM FOR RELIEF

## BREACH OF FIDUCIARY DUTY/CONSTRUCTIVE FRAUD

*[Against ADAM, the Investment Advisors, the Trustee Defendants, and PAD]*

323–327. Defendant Treadway denies the allegations of law set forth in Paragraphs 323-327 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

## SEVENTH CLAIM FOR RELIEF

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

*[Against ADAM, the Investment Advisors; Treadway, Corba, Cashwell, the Broker Defendants; Stern; Canary; the Market Timing Defendants; and the Clearing Defendants.]*

329–331. Defendant Treadway denies the allegations of law set forth in Paragraphs 329-331 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

*[Against All Defendants]*

333–336. Defendant Treadway denies the allegations of law set forth in Paragraphs 333-336 with respect to him, PAD, and PAFM, and denies knowledge or information sufficient to form a belief as to the allegations against the other defendants, and otherwise adopts the responses set forth in the Answer filed by the Allianz Defendants.

STEPHEN J. TREADWAY,

By his attorneys,

 /s/ Alan Levine_____

Alan Levine (AL 1073)
Stephen L. Ascher (SA 7820)
Maxine G. Sleeper (MS 9533)

Kronish Lieb Weiner & Hellman LLP
1114 Avenue of the Americas
New York, NY 10023
*Phone:* (212) 479-6000
*Fax:* (212) 479-6275

Dated: April 12, 2006.