IN THE UNITED STATES DISTRICT COURT
___FOR THE DISTRICT OF MARYLAND___

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | * * * | |
| _____ | * | |
| IN RE JANUS AND PUTNAM SUBTRACKS | * * | MDL No. 04-MD-15863 |
| _____ | * * | |
| MARINI *et al.* | * * | Civil No. JFM-04-497 |
| v. | * * | |
| JANUS INVESTMENT FUND *et al.* | * * | |
| _____ | * * | |
| STEINBERG *et al.* | * * | Civil No. JFM-04-518 |
| v. | * * | |
| JANUS CAPITAL MANAGEMENT LLC *et al.* | * * * | |
| _____ | * * | |
| SAUNDERS *et al.* | * * | Civil No. JFM-04-560 |
| v. | * * | |
| PUTNAM AMERICAN GOVERNMENT INCOME FUND *et al.* | * * * | |
| _____ | * * | |
| ZUBER *et al.* | * * | Civil No. JFM-04-564 |
| v. | * * | |
| PUTNAM INVESTMENT MANAGEMENT LLC *et al.* | * * * | |
| _____ | * | |

**OPINION**

This MDL proceeding involving market timing in the mutual fund industry has been pending for approximately four and one-half years.[1]  Two of my colleagues, Catherine C. Blake and Andre M. Davis, and I have presided over the proceedings.  We have organized the MDL by creating separate subtracks for each mutual fund family.  In each subtrack there are two separate groups of claims: claims asserted by mutual fund investors under Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5 promulgated pursuant to the Act, 17 C.F.R. § 240.10b-5, and claims brought on behalf of the mutual funds themselves under Section 36(b) of the Investment Company Act ("ICA").  15 U.S.C. § 80a-35(b).[2]

Although we have held joint hearings on issues common to all the cases, Judge Blake, Judge Davis, and I have each independently handled the cases in the separate subtracks.  In order to avoid conflict of interest problems, we have not issued joint opinions.  Instead, one of us has taken the lead in addressing common issues by authoring a single opinion on those issues.  *See, e.g.*, *In re Alger, Columbia, Janus, MFS, One Group, and Putnam Mutual Fund Litig.*, 320 F. Supp. 2d 352 (D. Md. 2004) (deferring ruling on motions to remand) ("*In re Mutual Fund Litig. I*"); *In re Mutual Funds Inv. Litig., Janus Subtrack*, 384 F. Supp. 2d 845 (D. Md. 2005) (denying in part and granting in part motions to dismiss consolidated amended complaints) ("*In re Mutual Fund Litig. II*").  In most instances Judge Blake, Judge Davis, and I have independently agreed

---

[1]Initially, plaintiffs also asserted claims for late trading against some of the defendants. All of these claims in the Janus, Putnam, and RS subtracks that I am handling have now been resolved through settlement.

[2]In the Janus and Putnam subtracks there are separate groups of plaintiffs in the Rule 10b-5 and Section 36(b) actions.  In the RS subtrack the same plaintiffs assert both sets of claims.

upon resolution of the common issues, and in those instances we have followed up by issuing

opinions applying the rulings on the common issues to the cases within our respective subtracks

On one occasion Judge Blake and I disagreed on an issue, *compare In re Mutual Funds Inv.*

*Litig.*, 403 F. Supp. 2d 434 (D. Md. 2005) (Blake, J.), *with In re Mutual Funds Inv. Litig.*, No.

MDL-15863, 2006 WL 2381056 (D. Md. Aug. 15, 2006) (Motz, J.), and in due course the Fourth

Circuit issued an opinion adopting Judge Blake's view of the matter.  *See Wangberger v. Janus*

*Capital Group, Inc. (In re Mut. Funds Inv. Litig.)*, 529 F.3d 207, 210 (4th Cir. 2008).

      Since the institution of the MDL actions, regulatory settlements have been reached with

the Attorney General of Colorado and the Attorney General of Massachusetts in connection with

improper trading in, respectively, the Janus and Putnam funds.  The Janus and RS funds have

reached regulatory settlements with the Attorney General of New York.  Additional regulatory

settlements have been reached with the Securities and Exchange Commission in all funds in

which the Commission found that improper trading had occurred, including Putnam, Janus, and

RS.  Further, many settlements have been reached in principle between various plaintiffs and

defendants in the MDL actions.  These settlements await court approval and consummation.

      Discovery at long last has been completed, and presently pending are various motions in

the Janus, Putnam, RS, and Scudder subtracks.[3]  I am handling the first three of these subtracks,

and Judge Blake is handling the Scudder subtrack.  There are no new motions pending in the

---

[3]In the Janus subtrack plaintiffs inadvertently included in their second amended consolidated complaint state law claims that, after I dismissed them from the consolidated amended complaint and after the Supreme Court's decision in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), plaintiffs had agreed were not viable.  In their opposition to defendant's summary judgment motion, plaintiffs "consent to dismissal [of those claims] with prejudice."  (Pl. California Financial Advisors' Mem. in Opp'n to Janus Defs.' Mot. for Summ. J. ["Janus Pls.' Mem."] 50 n.9.)

subtracks handled by Judge Davis.  On December 10 and 11, 2008, Judge Blake and I heard oral

argument on the pending motions in the Janus, Putnam, and Scudder subtracks.  This opinion

addresses the issues presented in the Janus and Putnam subtracks.[4]  Judge Blake will issue an

opinion of her own in the Scudder subtrack, either disagreeing with or applying the rulings I am

making on the issues common to all the cases.  Because RS plaintiffs' lead counsel was ill, oral

argument on the issues specific to the RS subtrack was not held in December and will be

scheduled for a later date.  Therefore, I am reserving ruling on the RS motions.

The pending motions include (1) motions for summary judgment filed by defendants as

to all of the claims asserted by both the investor and derivative plaintiffs; (2) motions for class

certification filed by the investor plaintiffs; (3) motions in limine filed by defendants challenging

the proposed testimony of various plaintiffs' expert witnesses on *Daubert* grounds; and (4) a

motion for default judgment against Gregory Trautman and Trautman Wasserman Co. in the

Janus subtrack.  In brief summary my rulings are as follows:

1.  I am granting defendants' summary judgment motion in the Putnam subtrack as to the

investor claims, except I am requesting further briefing as to the investor claims based upon

market-timed trades made by defined contribution and 401(k) plans;

2.  I am granting defendants' motion for summary judgment in the Janus subtrack as to

plaintiffs' investor claims based upon arranged market timing and requesting further briefing as

to the other investor claims;

---

[4] The defendants in the Janus subtrack are Janus Capital Group Inc. ("JCG"), Janus
Capital Management LLC ("JCM"), and Janus Distributors LLC.  The defendants in the Putnam
subtrack are Putnam Investment Management, LLC, Putnam Retail Management LP, Putnam
Investment Trust, Putnam, LLC, Putnam Investment Management Trust, Lawrence J. Lasser,
Gordon H. Silver, Irene M. Esteves, Robert F. Lucey, and Stephen M. Oristaglio.

3.  I am denying the summary judgment motions filed by defendants as to the Section 36(b) claims but I am substantially limiting those claims;

4.  I am granting plaintiffs' motion for default judgment in the Janus subtrack against Gregory Trautman and Trautman Wasserman Co.;

5.  I am deferring ruling upon the class certification motions; and

6.  I am deferring ruling on the in limine motions.


# I.  INVESTOR CLAIMS[5]

## A.  Summary Judgment

"A successful securities fraud plaintiff must show that: '(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages.'"  *Cozzarelli v. Inspire Pharms. Inc.*, --- F.3d ----, 2008 WL 5194311, at *3 (4th Cir. Dec. 12, 2008) (*quoting Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007)).  The summary judgment motions raise issues of standing, reliance, causation, and scienter.


*1.  Standing*

In *In re Mutual Fund Litig. I* and *In re Mutual Fund Litig. II*, I indicated that I might hold that the purchaser/seller standing rule established by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), does not apply to the claims asserted by the investor plaintiffs in these

---

[5]My prior opinions in *In re Mutual Fund Litig. I* and *In re Mutual Fund Litig. II* set forth the background facts and the nature of plaintiffs' claims.  Therefore, this opinion assumes that a reader has general knowledge about the facts and issues.

cases.  I deferred ruling upon that question, however, because it appeared from the record as it then existed that the putative class included purchasers of mutual fund shares as well as pure holders.

The summary judgment record confirms that this is in fact true and demonstrates that the named class representatives in the Janus and Putnam subtracks all purchased shares during the class period.  Defendants in those subtracks nevertheless contend that under *Blue Chip Stamps* the named class representatives lack standing because they are "shareholders . . . who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b-5" and thus fall within the third category of potential plaintiffs barred by the *Birnbaum* rule the Supreme Court adopted.  *Blue Chip Stamps*, 421 U.S. at 737.  To the extent that this category of potential plaintiffs is intended to bar suit by pure holders, it is immaterial here because, as I have indicated, plaintiffs did purchase mutual fund shares during the class period.  Plaintiffs' role here was not merely passive, as concerned the *Birnbaum* court in defining the parameters of standing.  To the contrary, they made new investments and were damaged thereby, as a result of defendants' alleged wrongdoing. Moreover, as defendants recognize, this category of potential plaintiffs applies to shareholders who are essentially asserting a derivative action for damages caused to a corporation by insider violations of Rule 10b-5, and defendants' argument is based upon the premise that the investor plaintiffs are claiming damages caused to the mutual funds themselves by market timing transactions.

This premise is incorrect.  The value of the shares of an ordinary corporation is determined by a market where purchasers and sellers of the shares place their own valuations

upon the corporation's assets; if wrongful conduct diminishes those assets, a purchaser of the corporation's stock has only been indirectly harmed and her claim is derivative in nature.  In contrast, a mutual fund owns assets for the benefit of its shareholders, and the value of a share in a mutual fund is determined at the end of every business day by a simple mathematical formula: the value of the shares in the fund's underlying portfolio, minus administrative expenses, divided by the number of outstanding shares.  The sum of the net asset value of each share of a mutual fund equals the net assets of the mutual fund.  In other words, a mutual fund owns no assets separately and apart from its shareholders, and if (as the investor plaintiffs allege) unlawful conduct has diminished the value of the fund's portfolio and/or increased its administrative expenses, each individual shareholder has suffered direct, concrete, non-derivative harm.

## 2.  Reliance

In *In re Mutual Fund Litig. II*, I held, *inter alia*, that plaintiffs could rely upon the presumption established by *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), to meet their burden of proof on the reliance issue.[6]  384 F. Supp. 2d at 864.  As I described in *In re Mutual Fund Litig. II*, plaintiffs allege that the funds "fail[ed] to disclose that they were permitting favored customers to engage in late trades and market-timed transactions."  *Id.*

---

[6]The Supreme Court has decided *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008), since I issued my opinion in *In re Mutual Fund Litig. II*.  Arguably, *Stoneridge* cast in more solid stone the purchaser/seller rule of *Blue Chip Stamps* by limiting post-PSLRA judicial extension of the Rule 10b-5 private cause of action (thereby drawing into question my dictum concerning the standing issue in *In re Mutual Fund Litig. II*), and unquestionably it affected my analysis of scheme liability relating to the claims against traders and broker/dealers.  *See infra* Part I.B.  However, *Stoneridge*'s discussion of scheme liability is irrelevant to the claims asserted against the fund defendants because they are alleged to have been principals, not aiders and abettors, in committing the 10b-5 violations.

Plaintiffs further claim that "they were relying upon the integrity of the fund managers and the reasonable assumption that the managers were not breaching their fiduciary duty by permitting the value of their shares to be diluted by improper transactions." *Id.*  Based upon these allegations, I ruled that the language in various prospectuses arguably was misleading because it "failed to cure-in fact, exacerbated-the underlying wrong: manipulative and deceptive conduct in facilitating, while not disclosing, widespread . . . market timing in the funds." *Id.*

Nothing in the summary judgment record changes my reliance analysis as to the claims against Janus and Putnam.  As set forth in Section I.A.4, *infra*, language in the Janus and Putnam prospectuses reflected that market timing trades, because they were injurious to long-term investors, were not permitted in the funds at the very time that, in the case of Janus, arranged agreements existed with market timers, and, in the case of Putnam, insiders were engaged in market timing.  Although an investment adviser may owe a statutory duty only to a mutual fund it advises, not to the fund's investors, *see, e.g.*, *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006), if a defendant is responsible for including misleading language in a prospectus, that defendant may be found to have assumed a duty to persons to whom the prospectuses were distributed to correct any material omissions or misleading statements.  *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) ("[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects.") (citation and internal quotations omitted); *cf. SEC v. Tambone*, --- F.3d ----, No. 07-1384, 2008 WL 5076554, at *19-21 (1st Cir. Dec. 3, 2008) (holding, in an SEC action, that an underwriter who does not "actually utter[]" false or misleading statements in

a mutual fund's prospectus may nonetheless be found primarily liable for "ma[king] . . . implied [false] statements to investors").

Plaintiffs present ample evidence of substantial involvement by employees of the Janus and Putnam investment advisers, including members of their legal department, in the drafting and review of fund prospectuses.  (Mari Dep. 124:25-125:6, Oct. 8, 2007, Janus Pls.' Ex. 5; Lao Dep. 62:9-12, Jan. 31, 2008, Janus Pls.' Ex. 8; Whiston Dep. 71:2-10, Feb. 7, 2008, Janus Pls.' Ex. 7; Lasser Dep. 87:20-25, Dec. 6, 2007, Putnam Pls.' Ex. 82; Silver Dep. 122:1-10, Nov. 5, 2007, Putnam Pls.' Ex. 108; Woolverton Dep. 14:8-21, 146:9-147:13, Jan. 10, 2008, Putnam Pls.' Ex. 135.)  In fact, Janus defendants admit that "it is undisputed that the Janus legal department drafted and edited certain prospectus language, which was then circulated among JCM and JCG employees for review."  (Janus Consolidated Statement of Material Facts ["CSMF"] ¶ 115.)  In my view this evidence is fully sufficient to withstand defendants' summary judgment motions.


*3.  Transaction Causation and Loss Causation*

Plaintiffs "must show both '*loss causation*-that the misrepresentations or omissions caused the economic harm-and *transaction causation*-that the violations in question caused the [plaintiff] to engage in the transaction in question.'"  *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 360 (4th Cir. 1996) (*quoting Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir. 1985)).  Because "'[t]ransaction causation' and 'reliance' are virtually synonymous," *In re Mut. Funds Inv. Litig. II*, 384 F. Supp. 2d at 864, plaintiffs meet their burden as to transaction causation for the same reasons they satisfy the reliance element.

To establish loss causation, plaintiffs must show that "the misrepresentations or omissions caused the economic harm." *Gasner*, 103 F.3d at 360 (*quoting Bennett*, 770 F.2d at 313). In other words, loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Defendants argue that plaintiffs must satisfy loss causation as formulated in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 339-40 (2005): inflated purchase price followed by a corrective disclosure that leads to a drop in share price. However, in *Dura*, the Supreme Court did not indicate that the "truth, then price drop" model is the only test of loss causation. To the contrary, the Court noted that it "need not, and d[id] not, consider other proximate cause or loss-related questions." *Id.* at 346.

In the present case a price drop after disclosure of the truth could never occur because, as described earlier in this opinion, shares of mutual funds are not priced in their own market but rather under a mathematical calculation that depends upon the market prices of the securities and cash held in a mutual fund's portfolio. This does not mean, however, that plaintiffs did not suffer economic loss from defendants' alleged improper conduct. According to their evidence, their losses stemmed from dilution of the value of their shares, increased administrative costs incurred by the funds, and what they describe as "flight damages." (*See* Janus Pls.' Mem. 46.) These losses are defined and concrete, and, if plaintiffs' evidence is credited (as it must be for summary judgment purposes), "'the very facts about which the defendant[s] lied [] caused [plaintiffs'] injuries.'" *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (*quoting Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)); *cf. In*

*re Omnicom Group, Inc. Sec. Litig.* 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008) (*citing Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005)) (loss causation can be established by showing that "the materialization of the risks that were concealed by the alleged misrepresentations or omissions proximately caused plaintiffs' loss"). Indeed, although defendants challenge the amount of the alleged losses calculated by plaintiffs' experts, they do not deny (as is generally recognized in the mutual fund industry and as defendants' regulatory settlements attest) that market timing does cause loss to long-term mutual fund investors.

### 4. Scienter

"In a securities fraud action, 'the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud.'" *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)). "Proof of scienter need not be direct, but may be inferred from circumstantial evidence." *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994).

"A plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli*, 2008 WL 5194311, at *3 (*quoting Ottmann*, 353 F.3d at 343-44)). This "'severe recklessness' is, in essence, 'a slightly lesser species of intentional misconduct.'" *Ottmann*, 353 F.3d at 344 (*quoting Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). A showing of mere negligence cannot establish the necessary mental state. *Cozzarelli*, 2008 WL 5194311, at *3. To establish scienter as to a corporation, an

agent of the corporation must act with the appropriate state of mind, "since corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184.

When the cases encompassed within this MDL were initially instituted, plaintiffs' theory was that they could prove defendants had acted intentionally by entering into express arranged market timing agreements with certain traders. As the litigation progressed, plaintiffs' claims expanded to include damages caused by traders with whom the mutual fund defendants had tacit market timing agreements or, at the least, by traders to whose market timing trades the mutual fund defendants wilfully or recklessly turned a blind eye. Although the latter claims may not have been expressly asserted in the amended complaints and second amended complaints, their existence was known because much discovery was directed toward them. Thus, I consider them to be properly before me on the summary judgment record.

However, plaintiffs have decided to pursue yet an additional theory that first surfaced in their written oppositions to defendants' summary judgment motions and became even clearer during the course of oral argument. Plaintiffs now assert that even if the mutual fund defendants did not expressly or tacitly enter into market timing agreements or did not intentionally or recklessly bury their heads in the sand about market timing transactions, defendants are nevertheless liable because they knew, but did not disclose, that despite the efforts they were making to control market-timed transactions, such trades were occurring and causing harm to long-term shareholders in the funds. Before, plaintiffs were asserting that the mutual fund defendants had acted in bad faith in order to increase their own fees by arranging market timing

trades or intentionally or recklessly ignoring their existence.[7]  Now, plaintiffs are asserting that,

even assuming the mutual fund defendants acted in good faith in attempting to control market

timing, defendants are liable under Rule 10b-5 because they knowingly failed to disclose a

material fact: the existence of uncontrollable market timing.

Arguably, this theory is sound in principle.  However, plaintiffs' claims based upon it

come too late.  Although abstractly the new claims may seem to constitute only a subtle shift,

they substantially change the focus of the litigation that has been pending several years.[8]  To

permit plaintiffs to amend their amended and second amended complaints would unfairly

prejudice defendants.

---

[7]The Janus plaintiffs' Second Amended Consolidated Complaint ("Janus SACC") asserts
that the Janus defendants permitted, and in many cases actively encouraged, market timing
activity.  (Janus SACC ¶ 2.)  Plaintiffs claim that "defendants permitted and encouraged this
conduct for the purpose of increasing the amount of assets under management, thereby
increasing the fees payable to the investment advisors . . . ."  (*Id.* ¶ 3.)

The Putnam plaintiffs' Second Consolidated Amended Complaint ("Putnam SCAC")
similarly alleges that defendants' knowing allowance of market timing harmed the fund
investors.  (Putnam SCAC ¶¶ 8-9.)  The SCAC states that the magnitude of market timing in
Putnam funds "could not have occurred absent Putnam's agreements with [market timers] and its
consistent failure to enforce its guidelines when favored brokers and customers were identified
as market timers."  (*Id.* ¶ 67.)  Plaintiffs assert that the Putnam defendants were "highly
motivated to allow and facilitate" market timing because "[l]arge investors attracted to the
Putnam Funds by market timing arrangements increased the amount of assets under management
and permitted Putnam Management, among other things, to receive increased management fees."
(*Id.* ¶ 123.)

[8]For example, plaintiffs never developed during discovery or submitted with their written
oppositions to the summary judgment motions any expert testimony or other evidence
concerning what they contend the prospectuses should have stated to cure the omission upon
which they now rely.  It was only toward the end of oral argument that plaintiffs' counsel
proffered a prospectus now used by Scudder funds to show what they believe prospectuses years
ago during the class period should have said.  Of course, the new language has been written with
the 20/20 hindsight that the regulatory investigations into market timing and these MDL
proceedings provide.

Accordingly, I will analyze the scienter element not through the prism of the pure nondisclosure theory plaintiffs now seek to espouse but rather on the theory on which the litigation has proceeded: that language in the prospectuses for which the mutual fund defendants were responsible misled prospective purchasers of mutual fund shares to conclude that defendants recognized that market timing injured long-term investors and were attempting to stop it when, in fact, they had entered into express arranged timing agreements with some traders and intentionally or recklessly ignored the fact that other traders were market timing.

    *a. Janus*

During the class period, prospectuses in Janus funds either expressly stated or strongly implied that market timing was not permitted in the funds.  For example, the intermediary prospectuses provided, under the "Purchases" section:

> The Fund does not permit excessive trading or market timing.  Excessive purchases of Fund shares disrupt portfolio management and drive Fund expenses higher.  The Fund reserves the right to reject any specific purchase order.  Purchase orders may be refused if, in Janus Capital's opinion, they are of a size that would disrupt the management of the Fund.

(Janus Adviser Series Funds, Worldwide Fund, Intermediary Prospectus, Dec. 31, 2000, Janus Defs.' Ex. 86, at 2.)

Similar language was used in the "Exchanges" section.  Under the section "Excessive Trading," the intermediary prospectus stated:

> Excessive trading of Fund shares in response to short-term fluctuations in the market – also known as "market timing"– may make it very difficult to manage the Fund's investments.  The Fund does not permit excessive trading or market timing.  When market timing occurs, the Fund may have to sell portfolio securities to have the cash necessary to redeem the market timer's shares.  This can happen at a time when it is not advantageous to sell any securities, which may harm the Fund's performance.  When large dollar amounts are involved, market timing can also make it difficult to use long-term investment strategies because the portfolio manager cannot predict

14

> how much cash the Fund will have to invest.  When in Janus Capital's opinion such activity would have a disruptive effect on portfolio management, the Fund reserves the right to refuse purchase orders and exchanges from or into the Fund by any person, group or commonly controlled account.  The Fund may notify a market timer of rejection of a purchase or exchange order after the day the order is placed.  If the Fund allows a market timer to trade Fund shares, it may in the future require the market timer to enter into a written agreement to follow certain procedures and limitations.

(*Id.* at 2-3.)  This language later read, in relevant part:  "Frequent trades into or out of the Fund can disrupt portfolio investment strategies and increase Fund expenses for all Fund shareholders, including long-term shareholders who do not generate these costs.  The Fund is not intended for market timing or excessive trading."  (Janus Adviser Series Funds, Worldwide Fund, Intermediary Prospectus, Sept. 30, 2002, Janus Defs.' Ex. 86, at 14.)

The retail prospectuses contained an express limit on the number of exchanges.  Each retail prospectus during the class period stated, under "Exchange Policies":

> You may make four exchanges out of the Fund during a calendar year (exclusive of Systematic Exchanges).  Exchanges in excess of this limit may be subject to an exchange fee or may result in termination of the exchange privilege.  The Fund reserves the right to reject any exchange request and to modify or terminate the exchange privilege at any time.  For example, the Fund may reject exchanges from accounts engaged in or known to engage in excessive trading (including market timing transactions).

(*E.g.*, Janus Investment Funds, Worldwide Fund, Retail Prospectus, Feb. 17, 1999, Janus Defs.' Ex. 86, at 40.)  In 2000, the following language was added:  "The exchange privilege is not intended as a vehicle for short-term or excessive trading.  The Fund does not permit excessive trading or market timing.  Excessive purchases, redemptions, or exchanges of Fund shares disrupt portfolio management and drive Fund expenses higher."  (Janus Investment Funds, Worldwide Fund, Retail Prospectus, Jan. 31, 2000, Janus Defs.' Ex. 86, at 43-44.)  In 2001, an "Excessive Trading" section, almost identical to the Excessive Trading section in the

intermediary prospectuses, was added. (Janus Investment Funds, Worldwide Fund, Retail

Prospectus, Feb. 16, 2001, Janus Defs.' Ex. 86, at 44-45.)

              i.       *Arranged Market Timing*

     Defendants in the Janus subtrack admit that between November 2001 and September

2003, Janus entered into or maintained arranged market timing agreements with twelve entities.

(Janus CSMF ¶ 23.) These agreements clearly violated the language in the Janus prospectuses.

Defendants contend, however, that plaintiffs have been fully compensated for any harm caused

by trades made pursuant to these agreements by Janus's regulatory settlement with the SEC. I

agree.

     Under the SEC Order, Janus will pay $50 million in disgorgement to investors in the

Janus Funds. (Janus CSMF ¶ 37.) The SEC-approved Independent Distribution Consultant

("IDC"), Professor Christopher M. James, found that nine of the twelve approved timers traded

more than four times per year. (Janus Defs.' Ex. 39, at 3.) The IDC's Modified Plan of

Distribution calculates the total damages from those nine arranged timers to be approximately

$21 million, including dilution, incremental portfolio trading costs, administrative costs, and

foregone appreciation. (*Id.* at 5.) Plaintiffs do not dispute that the IDC's $21 million calculation

compensates "shareholders damaged by the market timing activity of the 12 timers disclosed to

the SEC," responding only that the figure does not address harm from non-arranged timing.[9]

(Janus CSMF ¶ 50, *see also id.* ¶ 100.) Because plaintiffs fail to offer credible proof (or, indeed,

---

     [9]In 2006, plaintiffs' expert Marc Vellrath calculated damages from seven of the twelve
arranged timers to be about $20 million. (Janus Defs.' Ex. 66 ¶ 9.) Vellrath did not update these
calculations in his subsequent reports to include the other five arranged timers, nor does he
challenge Professor James's findings.

any argument at all) that they suffered greater damages from arranged timers than the $50

million they are to receive under the regulatory settlements, defendants are entitled to summary

judgment as to the arranged timers.

ii.     *Non-Arranged Market Timing*

An additional question exists, however: whether the Janus defendants had tacit

agreements with other traders permitting market timing transactions or intentionally or recklessly

ignored market timing transactions.  As to this question, the record is clear that defendants

during the class period progressively took steps to detect and deter non-arranged market timing,

including imposing redemption fees in several funds, generating a "Market Timer Watch List" to

share with other mutual fund families, contacting financial intermediaries to provide data or

investigate suspicious flows evidencing market timing, creating an excessive exchange report

listing all transactions over $50,000, establishing a four-exchange limitation on retail accounts

and restricting accounts that hit the limit, monitoring purchases and sales (as well as exchanges),

requiring financial intermediaries to enter into written agreements obligating the intermediary to

submit trades in accordance with the terms set forth in the Janus prospectuses, and using

software applications for "Matrix Level 3" accounts to identify and track potential market timers.

(*See* Janus CSMF ¶¶ 23, 125-26; Decl. of John Mari, Janus Defs.' Ex. 23.)  Further, defendants

assert that their ability to monitor and stop market timing in huge omnibus accounts held by

firms like Fidelity, Charles Schwab, and TD Waterhouse was limited because these accounts

were not "transparent," i.e., they did not reflect the identity of the underlying investor,[10] and

_____

[10]The date on which defendants gained access to on-line portals, which provided a certain
level of transparency into these large omnibus accounts, is disputed.  (*See* Janus CSMF ¶ 131.)

Janus could not insist that the omnibus account holders identify the underlying investors. (*See* Janus CSMF ¶¶ 76, 78, 131, 133, 136.)  Defendants also point to the warnings and restrictions placed on many accounts, and to several occasions where Janus rejected entire omnibus trades that appeared to include market-timed transactions.  (*See* Decl. of John Mari, Janus Defs.' Ex. 23, App. A; Janus CSMF ¶ 127.)

On the other hand, plaintiffs allege that the Janus defendants delayed in taking these steps despite the fact that their efficacy was known.  Moreover, defendants warned or restricted trading in only between nine and eleven of the eighteen retail accounts in which most of the dilution damages occurred (Janus CSMF ¶¶ 74a, 130), rejected or requested that the intermediary warn only twelve of the twenty-one NSCC matrix level 3 accounts (*id.* ¶ 74c), warned or restricted trading in only six of the thirteen other NSCC accounts in which defendants identified market timing (*id.* ¶ 74e), and warned the investor or restricted trading in only between twenty-one and twenty-seven of the fifty-seven manually traded omnibus accounts in which market timing seemed to be occurring (*id.* ¶ 74b).  During the course of oral argument, plaintiffs' counsel also suggested that a red flag was waved in the face of defendants whenever traders with whom Janus had arranged market timing agreements engaged in substantial transactions because these transactions reflected that an opportunity for profiting from market-timed trades existed on the day of the trades.  According to plaintiffs, defendants should have checked to see if other trades were being made on the same day by other accounts in which market timing was suspected and, if they did not do so, it was the result of willful blindness.[11]

---

[11]Plaintiffs also argue that defendants' scienter is demonstrated by their failure to adopt a "zero tolerance" policy toward market timing as proposed by a Janus employee and by their failure to adopt a policy of rejecting in their entirety omnibus account transactions, whenever

On the basis of this record, I am not ready to decide whether plaintiffs can meet their burden of proving scienter as to the non-arranged market timing transactions.[12]  Therefore, after conferring with counsel, I will set a schedule for the submission of additional briefs on the scienter issue.  I recognize that the parties may have already said everything that can and needs to be said on the issue, and that additional briefs would provide no further guidance.  If that be so, counsel can so advise me when we confer.  However, because so many issues have necessarily been raised in connection with the numerous pending motions, it may be that further briefing focused on the conflicting evidence relating to defendants' alleged failure to stop or restrict suspected market-timed trades would be useful.  At the least, I believe I should give counsel the opportunity to submit additional briefs if they believe the briefs might enlighten me.

---

there was reason to believe that market-timed trades were included within the transactions.  I find these arguments unpersuasive.  Both of the policies proposed by plaintiffs carried with them substantial risks to the financial health of the Janus funds, and it would be unrealistic and unfair to ascribe intentional or reckless wrongdoing to Janus executives in failing to take measures they reasonably could have concluded would adversely affect all investors in the funds.

[12]It may be that eventually I will conclude plaintiffs have met their burden as to suspected market-timed transactions that defendants intentionally or recklessly chose to ignore, but not as to suspected market-timed transactions that defendants actively sought to curtail.  If I were to draw this distinction, the amount of damages recoverable by plaintiffs presumably would be affected.

*b. Putnam*[13]

Throughout the class period, the Putnam prospectuses provided, under the section "How do I exchange fund shares?":

> The exchange privilege is not intended as a vehicle for short-term trading. Excessive exchange activity may interfere with portfolio management and have an adverse effect on all shareholders. In order to limit excessive exchange activity and otherwise to promote the best interests of the fund, the fund reserves the right to revise or terminate the exchange privilege, limit the amount or number of exchanges or reject any exchange. The fund into which you would like to exchange may also reject your exchange. These actions may apply to all shareholders or only to those shareholders whose exchanges Putnam Management determines are likely to have a negative effect on the fund or other Putnam funds. Consult Putnam Investor services before requesting an exchange.

(*See, e.g.*, Putnam New Opportunities Fund Prospectus, Oct. 1999, Putnam Pls.' Ex. 161, at 13-14.)  With respect to pricing, the prospectuses provided, "If events materially affecting the values of the fund's foreign investments occur between the close of foreign markets and the close of regular trading on the New York Stock Exchange, these investments will be valued at

---

[13]In the Putnam subtrack, plaintiffs bring claims for "control person" liability against five individual defendants. These defendants move for summary judgment on those claims, arguing, *inter alia*, that they were not "control persons" within the meaning of Section 20(a). Of course, in order to prevail on a Section 20(a) claim, plaintiffs must first prove that a primary violation of Rule 10b-5 has occurred. *In re Mutual Fund Litig. II*, 384 F. Supp. 2d at 855 n.8. Because I am holding that the non-individual Putnam defendants are entitled to summary judgment on all claims other than those arising from market timing trades by defined contribution and 401(k) plans, it follows that the individual defendants are entitled to summary judgment on those claims as well. On the other hand, I recognize that if I ultimately deny the summary judgment motion (upon which I am presently deferring ruling) filed by the non-individual defendants as to the claims based upon market timing trades made by defined contribution and 401(k) plans, I will have to rule upon the viability of the Section 20(a) claims asserted as to those claims as well. To provide assistance to the parties in evaluating their positions in light of the rulings made in this opinion, I note that the arguments made by the individual defendants as to all Section 20(a) claims presently appear persuasive. However, I will defer ruling on the Section 20(a) claims based upon market timing trades made by defined contribution and 401(k) plans so that, if another round of briefs is filed, the parties can focus upon the question of whether each of the individual defendants had the requisite power of control over the trades in question.

their fair value." (*See, e.g.*, Putnam New Opportunities Fund Prospectus, Oct. 1999, Putnam

Pls.' Ex. 161, at 9.)  After Putnam began implementing redemption fees in certain of its

international funds, the following language was added to prospectuses for those funds:

> How do I sell fund shares? . . .  The fund will impose a redemption fee of 1.00% of
> the total redemption amount (calculated at market value) if you sell or exchange
> your shares after holding them for less than 90 days.  The redemption fee is paid
> directly to the fund, and is designed to offset brokerage commissions, market
> impact, and other costs associated with short-term trading.  For purposes of
> determining whether the redemption fee applies, the shares that were held the
> longest will be redeemed first.  The redemption fee may not apply in certain
> circumstances, such as redemptions on certain omnibus accounts, including 401(k)
> plans, and in the event of shareholder death or disability. . . .

(Putnam Asia Pacific Growth Fund Prospectus, Jan. 2002, Putnam Pls.' Ex. 164, at 14.)  Similar

language was added under the "How do I exchange fund shares?" section.  (*Id.* at 16 ("In order

to limit excessive exchange activity and otherwise to promote the best interests of the fund, the

fund imposes a redemption fee of 1.00% of the total exchange amount (calculated at market

value) on exchanges of shares held less than 90 days. . . .").)  It is this prospectus language which

could have misled prospective investors to conclude that defendants were attempting to stop

market timing, when in fact, plaintiffs allege, defendants were entering into arranged agreements

permitting market timing as well as intentionally or recklessly allowing market timing to occur.

### i.    *Arranged Market Timing*

Plaintiffs contend that Putnam had agreements with certain investors allowing these

favored investors to engage in market timing.  No reasonable jury could conclude, however, that

Putnam entered into a single arranged market timing agreement.  To the contrary, the evidence

shows that Putnam repeatedly rejected offers from potential market timers, and plaintiffs present

no evidence that Putnam ever accepted such an offer.  To support their claim of arranged market

timing, plaintiffs point to Expedited Exchange Participants ("EXPP") agreements entered into by Putnam.  (*See* Pls. Ohio Tuition Trust Authority and Joseph Shanis' Combined Mem. in Opp'n to the Mots. for Summ. J. of the Putnam Defs. ["Putnam Pls.' Mem."] 6-7.)  But the plain language of the EXPP agreements required compliance with the prospectus exchange requirements and did not allow trades beyond the number permitted by the prospectus.  (*See* Putnam Defs.' Statement of Undisputed Facts ["SUF"] ¶¶ 47-48.)  The EXPP agreements were operational in nature, used to facilitate periodic asset reallocation among sectors, not market timing in the rapid trading sense.  (*See id.* ¶¶ 49-50.)  Indeed, plaintiffs do not identify any problematic trading by any EXPP firm.  Defendants are therefore entitled to judgment as a matter of law as to plaintiffs' arranged timing claim.

ii.   *Employee and Defined Contribution and 401(k) Plan Market Timing*

Plaintiffs point to various pieces of evidence they allege demonstrate recklessness by defendants as to employee market timing:  Putnam did not warn the timing employees and portfolio managers to stop their timing or take any disciplinary action against them during the class period, did not take adequate steps to detect, monitor, and deter employee trading,[14] and did not adequately supervise its investment management professionals.  (*See* Putnam Pls.' Statement of Facts ["SOF"] ¶¶ 138-68.)  Plaintiffs claim that at least six Putnam employees who worked as investment management professionals engaged in excessive short-term trading of Putnam mutual funds in their personal accounts.  (*Id.* ¶ 144.)  Four of these individuals timed in funds over which they had investment decision-making responsibility.  (*Id.*)

---

[14]Putnam's human resources department, not the Market Timing Department, was responsible for employee trading compliance.  (Putnam Pls.' SOF ¶ 159.)

Defendants have not contested, in their papers or at oral argument, the merits of a Rule

10b-5 action based on the employee market timing.  Instead, they argue that Putnam has made

full restitution in its regulatory settlements for trading by employees.  I agree.

Professor Peter Tufano, the SEC-approved Independent Assessment Consultant ("IAC")

appointed pursuant to Putnam's regulatory settlements, calculated "all potential market timing

trades by employees" of Putnam from January 1, 1997 through December 31, 2003[15] to be $4.3

million in dilution, administrative costs, and portfolio transaction costs.  (Putnam Defs.' SUF ¶

30.)  Plaintiffs' proposed expert Marc Vellrath does not disagree with the IAC's calculations,

and Vellrath did not perform his own analysis.  (*See id.* ¶ 33.)  While the total offset amount

available to Putnam is unclear from the current record, as discussed below, even Vellrath agrees

that Putnam will pay approximately $47.9 million in disgorgement pursuant to the SEC

settlement and $5 million in disgorgement under the Massachusetts Attorney General settlement.

(*See* Putnam Defs.' Ex. 77 ¶ 22.)  This more than offsets the $4.3 million in damages caused by

employee timing.  As plaintiffs have been fully compensated, summary judgment is granted in

favor of the Putnam defendants as to the employee trades.

* * * * *

Plaintiffs assert that Putnam's policy as to market timing it detected in defined

contribution and 401(k) plans ("DC/401(k) plans") was essentially one of inaction.  (*See* Putnam

Pls.' SOF ¶ 73.)  A report by a committee of the Putnam Board of Trustees concluded "that

Putnam Investments could have and should have been more vigorous in monitoring and deterring

---

[15]The range used by the IAC begins over two years prior to commencement of the Class
Period, so the IAC's figures may be too high to the extent they capture timing occurring prior to
the class period.

excessive short-term trading in the 401(k) plans Putnam Fiduciary Trust Company ("PFTC") administered." (Putnam Pls.' Ex. 73, at 2.) The committee found that even when Putnam possessed participant level transaction data about trading in the DC/401(k) plans, Putnam did not utilize it to detect market timing. (*Id.* at 4.) And when timing was detected, the Market Timing Department's role was simply one of "advice." (Putnam Pls.' Ex. 42, p. 11.) Plaintiffs claim that if a plan sponsor denied Putnam's request that a plan participant's trading be restricted, Putnam's only course of action was to continue to raise the issue with the plan sponsor – an ineffective response. (*See* Putnam Pls.' Mem. 6; Putnam Pls.' SOF ¶¶ 76-77.)

There has been some suggestion that ERISA and state law affected the courses of action available to mutual funds in stopping market timing in defined contribution and 401(k) plans. However, defendants do not specifically contest the merits of plaintiffs' 10b-5 claim as to DC/401(k) plans. (*See* Mem. of Law in Supp. Putnam Defs.' Mot. for Summ. J. on All Remaining Claims ["Putnam Defs.' Mem."] 28-30; Putnam Defs.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J. on All Remaining Claims 16-17.) Therefore, it appears that as to the merits of this claim, summary judgment should be denied.

That said, defendants claim, as they do with employee market timing, that they have made full restitution under the regulatory settlements to shareholders for market timing in DC/401(k) accounts. The IAC concluded that all potential market timing trades by participants in the DC/401(k) plans caused $55.6 million in dilution, administrative costs, and portfolio transaction costs. (Putnam Defs.' SUF ¶ 31.) Again, Vellrath does not disagree with the IAC's calculations, and he did not perform his own analysis. (*See id.* ¶ 33.)

24

Given the current record, questions concerning the amount of restitution paid by defendants pursuant to the regulatory agreements need to be clarified.  According to Vellrath, Putnam has paid $52.9 million in disgorgement.  (Putnam Defs.' Ex. 77 ¶ 22.)  This would not be enough to offset the total damages.  Defendants, however, represent -- without citation -- that payments of over $150 million have been made to Putnam shareholders and mutual funds.  (*See* Putnam. Defs.' Mem. 30; Putnam Defs.' SUF ¶ 29.)  This $150 million figure includes at least $45 million of the SEC penalty, which cannot be used as offset, so at most, defendants may be entitled to an offset of about $105 million.  (*See* Putnam Defs.' Mem. 30 n.21.)  This amount would constitute full restitution for both the timing by employees and in the DC/401(k) accounts.  While the 2005 report from the IAC provides some information as to the amount paid under the regulatory agreements, I cannot determine from this record which restitution figure is correct.  Therefore, after conferring with counsel, I will set a briefing schedule on the issue of offset.[16]

iii.      *Non-Arranged Market Timing*

Plaintiffs further assert that defendants knowingly or recklessly allowed market timers to time Putnam funds even after they were aware of the rampant timing and its impact on long-term shareholders.  I do not agree.  A reasonable jury, viewing all facts in a light most favorable to the plaintiffs, could not find from the evidence in this case that the Putnam defendants intentionally or recklessly ignored non-arranged market timing.

There is no dispute that Putnam knew rampant market timing was occurring in its funds and that this market timing could be, and was, harmful.  However, there is no evidence that

---

[16]When I confer with counsel, I will also ask whether they believe that submission of additional briefing as to the merits of the 10b-5 claim as to the defined contribution/401(k) plans would be helpful.

Putnam was reckless in taking action or failing to take action against market timers it identified, or that Putnam tacitly agreed to allow the non-arranged market timing.

When Putnam's Market Timing Department ("MTD") suspected market timing,[17] the MTD employees would coordinate with Putnam Retail Management and use judgment and experience to determine the best approach towards the broker or shareholder.  (*See* Putnam Defs.' SUF ¶ 66.)  This discretion was allowed by the prospectuses.  (*See, e.g.*, Putnam New Opportunities Fund Prospectus, October 1999, Putnam Pls.' Ex. 161, at 14 (stating that the Fund reserves the right to reject exchanges and terminate the exchange privilege of either all shareholders or "only . . . those shareholders whose exchanges Putnam Management determines are likely to have a negative effect on the fund or other Putnam funds").)  If the excessive activity continued after a warning, a telephone call was made to advise the representative or shareholder that Putnam had decided to terminate further trading privileges.  In some instances, Putnam would warn a broker more than once, especially if the prior warning had been some time ago, if the broker had a history of representing clients who were not rapid traders, or if Putnam wanted to save the relationship with the broker.  (*See* Putnam Defs.' SUF  ¶¶ 67-68.)  While

---

[17]To detect market timing, the MTD would conduct a detailed review of trading in funds that had an inflow and outflow equal to or greater than 1% of the fund's assets in any rolling 10 day period.  (*See* Putnam Defs.' SUF ¶¶ 55-56.)  The MTD also reviewed daily reports listing exchanges over $100,000, accounts with four round trips over certain thresholds, and purchases and redemptions of $250,000 or more in each fund.  (*See id.* ¶¶ 57-58.)  Putnam's market timing detection and deterrence tools became more sophisticated over time, to better identify possible market timing.  (*See id.* ¶ 59.)  Despite these efforts, traders and account representatives devised means to avoid detection, such as using multiple ID numbers, blank IDs, accounts which did not identify the brokers, or split trades.  (*See id.* ¶¶ 70-71.)  To further deter market timing, Putnam began implementing redemption fees in March 2001, and by October 2002 had extended the fees to all Putnam global and international funds.  (*See id.* ¶¶ 74-76.)  Putnam also expanded its use of fair value pricing later in the class period.  (*See id.* ¶ 82.)

plaintiffs fault the MTD's flexible approach to handling detected market timers, even plaintiffs'

proposed expert Kathleen Leugers agrees that it appears the MTD employees "were acting in

good faith," and that the people at Putnam were "well-intentioned," although they "could and

should have done more." (Leugers Dep. 74:3-9; 170:4-7, June 24, 2008, Putnam Defs.' Ex.

106.)[18]

      The Putnam defendants provide extensive documentation of their efforts to stop detected

market timers. Geoffrey Bobroff's review of the case documents indicates that there were at

least 682 warnings to brokers about rapid trading. (*See* Report of Geoffrey H. Bobroff, Putnam

Defs.' Ex. 96, at 15.) A 107-page "All Calls Report" lists hundreds of warnings and

terminations. (Putnam Defs.' Ex. 109.) A Market Timing Call Tracking database shows at least

456 offenders engaging in rapid trading during the Class Period; Putnam terminated at least 232

of these offenders' trading privileges. (*See* Bobroff Report, Putnam Defs.' Ex. 96, at 15.)

Putnam also terminated entire accounts. (*See, e.g.*, Putnam Defs.' Ex. 24.) And the Putnam

Board of Trustees concluded that in 2001, three prominent market timers, Canary Capital,

Security Trust Company, and Security Brokerage, declined or ceased investing in Putnam funds

due to Putnam's efforts. (*See* Putnam Pls.' Ex. 73, at 9.)

      Given defendants' extensive and comprehensive efforts to stop market timing once it was

detected, their actions towards detected market timing cannot constitute recklessness as a matter

---

[18]Defendants have filed a motion in limine challenging Leugers' qualifications as an
expert. I will rule upon that motion if and when it is necessary for me to do so. However, even
if Leugers is not qualified as an expert, the very fact that a person proffered as an expert by
plaintiffs opines that the Putnam defendants "act[ed] in good faith" and agrees they were "well-
intentioned" dramatically undercuts plaintiffs' claims. (Leugers Dep. 74:3-9; 170:4-7, Putnam
Defs.' Ex. 106.)

of law.  Every indication in the record points to Putnam's good faith in stopping detected market timing.  Therefore, plaintiffs present no genuine issue of material fact concerning defendants' alleged intentional or reckless misconduct.

### B.  Motion for Default Judgment Against Gregory Trautman and Trautman Wasserman Co.

In the Janus subtrack plaintiff has moved for default judgment against Gregory Trautman and Trautman Wasserman Co. ("the Trautman defendants").

The Trautman defendants failed to produce any witness at a Rule 30(b)(6) deposition. (Mem. of Points and Authorities in Supp. of Pl. CFAs' Mot. for Terminating Sanctions Rendering Judgment by Default 2-3.)  Although Trautman Wasserman Co. is allegedly defunct (*see id.* at 9), that fact alone may not have justified the failure of the Trautman defendants to produce a Rule 30(b)(6) witness.  *See Calzaturrficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co.*, 201 F.R.D. 33, 38 (D. Mass. 2001).  In any event, the Trautman defendants' failure to respond to the subsequent attempted communications from plaintiffs' counsel and their failure even to file an opposition to plaintiffs' motion for default constitute a "pattern of indifference and disrespect to the authority of the court" that the Fourth Circuit has held warrants imposition of the severe sanction of dismissal or default judgment.  *See Mutual Fed. Sav. & Loan Ass'n v. Richards & Assoc., Inc.,* 872 F.22 88, 93 (4th Cir. 1989).

Despite the Trautman defendants' misconduct in this litigation, I would not enter a default judgment against them if, as a matter of law, they could not be held liable to plaintiffs.  However, that is not the case.  The only possible legal defense the Trautman defendants might assert is that plaintiffs' claims against them are founded upon a theory of scheme liability and that this theory

28

was rejected by the Supreme Court in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008).  Such a defense would lack merit.  If, as has been assumed both by the parties and by me thus far in this litigation, a single unlawful scheme allegedly is involved, *Stoneridge* provides no solace to defendants like the Trautman defendants because trader defendants, unlike the defendants in *Stoneridge*, are principals in a scheme existing in the securities market that causes damage to persons in the securities market.  *See Stoneridge*, 128 S. Ct. at 774 (alleged scheme "took place in the marketplace for goods and services," a realm governed primarily by state law, "not in the investment sphere").  Alternatively, plaintiffs' claims might be conceptualized as being based upon two overlapping, complementary schemes with the same victims but different groups of defendants pursuing different goals.  The principals of the first scheme were the mutual fund defendants, and their purpose was to obtain increased management fees by virtue of an increase in assets under management as a result of permitted but undisclosed market-timed transactions.  The principals of the second scheme were traders, and their purpose was to obtain profits through market-timed transactions.[19]  In either event, *Stoneridge* does not provide a viable defense to a trader.

---

[19]The "overlapping, complementary" schemes conception of the misconduct alleged by plaintiffs might affect the legal analysis of the claims against traders and broker/dealers who assisted them in two respects.  First, because by definition long-term mutual fund shareholders did not know of the allegedly unlawful market timing, this might be an atypical case in which reliance is not a requisite element of plaintiffs' proof.  *Cf. Stoneridge*, 128 S. Ct. at 768 (listing reliance as an element in "a typical 10(b) action"); *In re Parmalat Securities Litig.*, 376 F. Supp. 2d 472, 491-92 (S.D.N.Y. 2005) (not including reliance as an element of a claim asserted under Rule 10b-5(a) or Rule 10b-5(c)).  Second, because traders allegedly profited from transactions in the securities market, the "in connection with" requirement of Section 10b-5 might be met by those transactions (as well as the purchases of mutual fund shares made by plaintiffs).

In sum, finding that the Trautman defendants acted in bad faith, that their noncompliance with the discovery practice prejudiced plaintiffs, that defendants in other cases must be deterred from similar misconduct, and that a less severe sanction would not be effective, *see Mutual Fed. Sav. & Loan Ass'n*, 872 F.2d at 92, and further finding that there is a legal basis for holding them liable, I will enter a default judgment against them on the issue of liability.

### C.  Miscellaneous Observations

The rulings I have made render moot some of the remaining issues raised by the parties or make deferral of resolution of those issues appropriate.  However, two miscellaneous observations may be helpful in shaping the remainder of the litigation.

First, although a shareholder in a mutual fund may well have standing to assert claims on behalf of shareholders of other mutual funds in the same fund family, *see Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (finding Rule 23 typicality satisfied where named plaintiffs invested in two of three partnerships); *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 123 (S.D.N.Y. 1997) (finding class representatives' claims sufficiently typical when they invested in only twenty of seventy partnerships); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98CIV.4318, 2000 WL 1357509, at *5 (S.D.N.Y. Sept. 20, 2000) (mem.) (certifying a class of investors in two mutual funds even though the named plaintiffs invested in only one of the funds), considerations of litigation manageability must be taken into account in defining the scope of any class certification.

Second, while I am deferring ruling upon the various motions in limine, I note that at the least, if any investor plaintiffs' claims ultimately survive defendants' summary judgment

motions in the Janus and Putnam subtracks, the opinions expressed by one of their proposed

experts, Marc Vellrath, will have to be substantially modified to limit his estimate of damages

only to what he concludes are actual market-timed trades in omnibus accounts.


## II.  SECTION 36(b) CLAIMS

Section 36(b) claims are asserted against the investment adviser defendants in the Janus

and Putnam subtracks in separate actions filed by shareholders suing on behalf of the mutual

funds that paid fees to the investment advisers.  In *In re Mutual Funds Litig. II*, I denied motions

to dismiss the Section 36(b) claim asserted against Janus defendants.  384 F. Supp. 2d at 868.  I

echo that ruling here, denying the motions for summary judgment as to the Section 36(b) claims.

Two different approaches have evolved in deciding the viability of Section 36(b) claims.

The first approach requires determining whether an investment adviser has received

"disproportionate, excessive, or unearned fees."  *See Migdal v. Rowe-Price Fleming, Int'l*, 248

F.3d 321, 328-29 (4th Cir. 2001); *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928

(2d Cir. 1982).  The second approach requires determining whether the fee was freely and

honestly negotiated on the basis of adequate information disclosed by the adviser.  *See Jones v.*

*Harris Assocs. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008); *Green v. Fund Asset Management, L.P.*,

286 F.3d 682, 686 (3d Cir. 2002); *Galfand v. Chestnutt*, 545 F.2d 807, 811-12 (2d Cir. 1976).

Although the Seventh Circuit rejected the *Gartenberg/Migdal* "excessive fees" approach

in adopting the "free and honest negotiation" approach in *Jones*, I find that here the two

approaches lead to the same place.  As I held in *In re Mutual Funds Litig. II*, Section 36(b) "only

concerns compensation" and therefore "plaintiffs may not use Section 36(b) as a means generally

to challenge . . . market timing practices."  384 F. Supp. 2d at 867-68.  To the extent that a portion of the fees paid to the investment adviser defendants was "disproportionate, excessive, or unearned," however, because it was based upon the existence of market timing agreements or of insider market-timed trades not disclosed when the fees were negotiated, plaintiffs (derivatively, on behalf of the funds that paid the fees) may recover that portion of the fees.[20]  Of course, as expressly provided in Section 36(b), any such recovery may only be for any portion of the fees paid beginning a year prior to the filing of the complaint. 15 U.S.C. § 80(a)-35(b)(3).


A separate order effecting the rulings made in this opinion is being entered herewith.[21]


Date:   December 30, 2008                    /s/_____
                                             J. Frederick Motz
                                             United States District Judge

---

[20]Under the *Jones v. Harris* approach, the mechanism for plaintiffs' recovery of fees may be the rescission of the adviser agreements, accompanied by a *quantum meruit* award to the advisers for the fees they earned on non-market-timed transactions.  As to the *quantum meruit* issue, plaintiffs have not presented any evidence that the fees charged by the advisers were unreasonable when evaluated by industry standards.  Thus, if the adviser contracts were rescinded, it is likely that plaintiffs could recover only the difference between the total fees paid to the advisers and the amount attributable to intended or recklessly permitted market-timed transactions.

[21] Because I am entering this opinion during the holiday season, I am extending the time for the filing of any motions to reconsider until January 21, 2009.  Of course, I hope the parties understand I have paid close consideration to all the arguments they have made and, by extending this deadline, I am not inviting any motions to reconsider nor expecting that any will be filed.