IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| IN RE MUTUAL FUNDS INVESTMENT LITIGATION | Case No.: 04-MD-15863, 04-CV-518 |
| *Steinberg et al. v. Janus Capital Management LLC et al.* | |

MEMORANDUM

Fund Derivative Plaintiffs ("Plaintiffs") have sued Janus Capital Management ("JCM") and Janus Distributors LLC ("JD") under Section 36(b) of the Investment Company Act ("ICA"), 15 U.S.C. § 80a-35(b). Defendants have filed a Motion for Summary Judgment. For the reasons explained below, this motion will be granted.

I.

"Janus Defendants" are JCM and JD. (Fund Derivative Pl.'s Mem. of Law in Opp. to Janus Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 1 n.1.) JCM is an "investment adviser to the Janus family of mutual funds" ("Janus Funds"), and JD is "an affiliate of JCM which serves as the [Janus] Funds' distributor."[1] (*Id.*)

Plaintiffs are shareholders bringing claims derivatively on behalf of the Janus Funds under Section 36(b). *See In re Mut. Funds Inv. Litig.* ("*In re Mut. Funds II*"), 590 F. Supp. 2d

---

[1] Prior opinions of this Court set forth the background of this multi-district litigation. I assume the parties' familiarity with these opinions and will not engage in a detailed recitation of the facts.

1

741, 759–60 (D. Md. 2008). Plaintiffs allege that Janus Defendants violated Section 36(b) by breaching their fiduciary duty to the Janus Funds regarding receipt of compensation. (*See* Pl.'s Mem. at 4.) Plaintiffs argue that Janus Defendants breached this duty by allowing various entities to market time the Janus Funds, thereby increasing the advisory fees Janus Defendants received. (*See id.*)

In 2004, JCM settled claims ("the Settlement")—stemming from accusations it permitted twelve discretionary frequent traders[2] to market time seven of the Janus Funds[3]—brought by the Securities and Exchange Commission ("SEC") under Section 206 of the Investment Advisers Act ("IAA"), Section 17 of the ICA, and Section 34 of the ICA. (*Id.* at 1–2.) The SEC did not assert claims on behalf of the seven affected Janus Funds or under Section 36(b). (*Id.* at 1.)

Under the Settlement, JCM agreed to pay $100 million, $50 million in disgorgement and $50 million in civil penalties. (*See* Supp. Decl. of John Mari in Supp. of Mot. for Summ. J. ("Mari Decl.") ¶ 3; Mem. for the Janus Def. in Supp. of their Mot. for Summ. J. ("Def.'s Mem."), Ex. A at 11.) This money was to be placed in a "Fair Fund," pursuant to Section 308(a) of the Sarbanes Oxley Act of 2002, 15 U.S.C. § 7246, and distributed to investors in the seven affected Janus Funds pursuant to an SEC-approved "Distribution Plan." (*See* Mari Decl. ¶ 3; Def.'s Mem., Ex. A at 11.) More specifically, the Settlement stated:

> The Distribution Plan shall provide for investors to receive, from the monies available for distribution in order of priority, (i) their proportionate share of losses suffered by the fund due to market timing, and (ii) a proportionate share of advisory fees paid by funds that suffered such losses during the period of such market timing. (Def.'s Mem., Ex. A at 9–10.)

---

[2] "Twelve entered into discretionary frequent trading arrangements with JCM . . . . [But] [o]nly nine of these twelve traded more than four times per year, and the IDC examined all purchases and sales by these nine entities." (Def.'s Mem., Ex. B at 3.) The nine entities are: Canadian Imperial, Ikebana, Roundhill, Rydex, Shorewood, Signalert, Thornberry, Trautman, and Tripod. (*Id.*, Ex. B at 3.)

[3] The seven Janus Funds are: Adviser International Growth, Adviser Worldwide, Enterprise, High Yield, Mercury, Overseas, and Worldwide. (Pl.'s Mem. at 6 n.10.)

Although all $100 million was to be distributed, the Settlement only permitted JCM to claim an offset for monies paid under the disgorgement portion of the Fair Fund, not monies paid under the civil penalty portion. (*Id.*, Ex. A at 11.) The Settlement explained:

> To preserve the deterrence effect of the civil penalties, JCM agrees that it shall not, after offset or reduction in any Related Investor Action for the amount of disgorgement paid by it, further benefit by offset or reduction of any part of the civil penalties paid by it. . . . For the purposes of this paragraph, a 'Related Investor Action' means a private damages action brought against JCM by or on behalf of one or more investors based on substantially the same facts as those set forth in the order. (*Id.*, Ex. A at 11.)

Janus Defendants hired an Independent Distribution Consultant ("IDC") to create the Distribution Plan—subsequently approved by the SEC—which called for distribution of the Fair Fund in five "waves," the last of which was sent on June 10, 2009. (Mari Decl. ¶ 4.) By June of 2009, "at least $61 million had been already distributed to investors." (Pl.'s Mem. at 9 (citing Def.'s Mem., Exs. C & D).)

The Distribution Plan also provided that any money not distributed to individual investors would be deposited in an "Undistributed Funds Account" and credited to the seven affected Janus Funds themselves. (Mari Decl. ¶ 5; Def.'s Mem., Ex. B at 6.) After the last wave of money was sent to investors, the Undistributed Funds Account held $19,257,589, which was credited to the seven affected Janus Funds on June 22, 2009.[4] (Mari Decl. ¶ 6; Pl.'s Mem., Ex. E.)

---

[4] Each of the seven funds received the following amount: (1) JAD Worldwide: $5,969,497; (2) JIF Mercury: $7,067,267; (3) JAD International Growth: $3,549,796; (4) JIF Enterprise: $1,328,703; (5) JIF Overseas: $465,648; (6) JIF Worldwide: $494,064; (7) JIF High Yield: $382,614. (Def.'s Mem., Ex. E.)

In 2008, I granted summary judgment on some of the investor claims against Janus Defendants because I found that the distribution of the Fair Fund had fully compensated investors for any losses they may have suffered. In doing so, I granted Janus Defendants a $21 million offset for civil liability from the money they paid into the Fair Fund. This is the only offset from the Settlement from which Janus Defendants have benefited.[5]

## II.

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.

---

[5] Plaintiffs argue that Janus Defendants have already utilized $47 million in offsets from the Fair Fund for *investors'* claims and therefore Janus Defendants are only entitled to an additional $3 million in offsets from the $50 million disgorgement. In their July 2008 Motion for Summary Judgment, Janus Defendants argued:

> [A]ssum[ing], *arguendo*, that 'flight damages' are recoverable . . . . the maximum losses attributable to the twelve entities with which JCM personnel entered into discretionary frequent trading arrangements [is $47,215,720] . . . . $47.2 million is less than the $50.0 million that the affected investors *already* stand to recover through the distribution of the regulatory settlement. (Mot. of the Janus Def. for Summ. J., Dkt. No. 2954 (July 2, 2008) 28–29 (emphasis in original).)

However, Janus Defendants only actually benefited from approximately $21 million in offsets from distributions to investors. As I explained:

> The IDC's [Distribution Plan] calculates the total damages from those nine arranged timers to be approximately $21 million, including dilution, incremental portfolio trading costs, administrative costs, and foregone application. Plaintiffs do not dispute that the IDC's $21 million calculation compensates 'shareholders damaged by the market timing activity of the 12 timers disclosed to the SEC,' responding only that the figure does not address harm from non-arranged timing. Because plaintiffs fail to offer credible proof (or, indeed, any argument at all) that they suffered greater damage from arranged timers than the $50 million they are to receive under the regulatory settlements, defendants are entitled to summary judgment as to the arranged timers. *In re Mut. Funds II*, 590 F. Supp. 2d at 751–52 (internal citations omitted).

I also noted, "[i]n 2006, plaintiffs' expert Marc Vellrath calculated damages from seven of the twelve arranged timers to be about $20 million. Vellrath did not update these calculations in his subsequent reports to include the other five arranged timers, nor does he challenge [the IDC's] findings." *Id.* at 751 n.9. I later held in a separate opinion "that plaintiffs do not present sufficient evidence of defendants' scienter to survive summary judgment [regarding non-arranged market timing]." *In re Mut. Funds Inv. Litig.* ("*In re Mut. Funds III*"), 626 F. Supp. 2d 530, 531 (D. Md. 2009).
In light of my prior analyses, I reject Plaintiffs' argument that Janus Defendants are limited to $3 million in offsets for these Section 36(b) claims.

56(c). The materiality of facts is determined by the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

III.

Janus Defendants' liability to the seven affected Janus Funds under Section 36(b) may be offset by the amount Janus Defendants paid in *disgorgement* to those seven funds pursuant to the Settlement. (*See* Def.'s Mem., Ex. A at 11 (emphasis added) (allowing JCM to use the disgorgement portion of the Fair Fund to offset its damages in any "private damages action brought against JCM by or on behalf of one or more investors based on substantially the same facts as those set forth in the order[]").)[6] Janus Defendants' liability may *not*, however, be offset by money paid in *civil penalties* pursuant to the Settlement because permitting such an offset would defeat the deterrence value of the civil penalty. (*See id.*, Ex. A at 11 (emphasis added).). Since the Fair Fund has distributed roughly $19 million to the seven affected Janus Funds, Janus Defendants are entitled to a $19 million offset *if* the $19 million came from the disgorgement portion, not the civil penalty portion, of the Fair Fund.

I find that the $19 million should be considered to have come from the disgorgement, and Janus Defendants are accordingly entitled to a $19 million offset in their liability to the seven Janus Funds for these Section 36(b) claims.[7]

---

[6] *Cf. In re Mut. Funds II*, 590 F. Supp. 2d at 751–52 (holding that Janus Defendants' liability to investors' claims of securities fraud is offset by disgorgement to investors pursuant to the Settlement because "plaintiffs have been fully compensated for any harm caused by trades made pursuant to these agreements by Janus's regulatory settlement with the SEC[]"); *In re Mut. Funds III*, 626 F. Supp. 2d at 531.

[7] To be more precise, Janus Defendants are entitled to an offset in their liability to *each* of the seven Janus Funds individually for the amount of money the Fair Fund distributed to *each* of those seven funds individually. The exact amount of distribution each fund received is detailed in *supra* note 4.

Plaintiffs argue that because the Settlement gave investors priority over the Janus Funds in accessing money from the Fair Fund, and the investors received $61 million prior to the $19 million being distributed to the seven affected Janus Funds, the $50 million disgorgement was fully exhausted by the time the $19 million was distributed. (*See* Pl.'s Mem. at 9–11.) This argument assumes that the entire disgorgement was distributed before any of the civil penalty was distributed. However, neither the Settlement nor the Distribution Plan mandates full distribution of disgorgement before distribution of the civil penalty, and Plaintiffs do not point to any case law suggesting such a rule. I reject Plaintiffs' argument because it would force an arbitrary decision about the origin of fungible monies and would not further the sensible goals behind allowing Janus Defendants to claim an offset for the disgorgement it paid into the Fair Fund.

In fact, the goals behind the Settlement's offset rules support holding that the $19 million payment came from the disgorgement. To ensure that the $50 million civil penalty serves as a $50 million deterrent, the Settlement bans JCM from claiming an offset for any of the civil penalty; that is, it requires JCM to suffer a $50 million loss (the civil penalty) *in addition* to any other civil liability it may have. (*See* Def.'s Mem., Ex. A at 11 (emphasis added).) The Settlement allows JCM to claim up to $50 million in offsets from the disgorgement paid into the Fair Fund because even if the full $50 million disgorgement is offset, JCM still pays that full $50 million civil penalty on top of any civil liability. Consequently, regardless of what money was distributed when, if Janus Defendants are restricted to $50 million in offsets, they will still be required to pay $50 million *in addition* to any civil liability and the Settlement's civil penalty will still result in a full $50 million deterrent.

Accordingly, since Janus Defendants have thus far only offset around $21 million in liability from monies they paid into the Fair Fund, they may claim up to roughly $29 million more in offsets without undermining the deterrence goals of the Settlement. Because the $19 million paid to the seven affected Janus Funds falls well under $29 million, Janus Defendants can properly claim an offset for it. In sum, because granting Janus Defendants a $19 million offset does not threaten the $50 million deterrent of the civil penalty, and avoids any potential windfall for the Janus Funds, Janus Defendants are entitled to such an offset.[8]

IV.

Under Section 36(b), investment advisers, such as Janus Defendants, "have a fiduciary duty with respect to the receipt of compensation" to registered investment companies. *See* § 80a-35(b); *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326 (4th Cir. 2001). More specifically, they have "a fiduciary duty with respect to determining and receiving their advisory fees." *Green v. Fund Asset Mgmt.*, 286 F.3d 682, 685 (3d Cir. 2002) (citing § 80a-35(b)). A shareholder of an investment company may bring a private action, either as an investor or on behalf of the investment company, against an adviser for breach of this duty. *See* § 80a-35(b);

---

[8] Plaintiffs argue that the doctrine of judicial estoppel precludes Janus Defendants from seeking an offset greater than roughly $3 million because, as described *supra* note 5, Janus Defendants previously argued that they were entitled to a roughly $47 million offset for investor claims. The requirements for applying judicial estoppel are: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation"; (2) "[t]he position at issue must be one of fact as opposed to one of law"; (3) "the prior inconsistent position must have been accepted by the court"; (4) "the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage." *See Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (internal citations and quotations omitted).
  Judicial estoppel does not apply here. Putting aside whether Janus Defendants' current position is in fact "inconsistent" with their previous position, this Court never granted Janus Defendants a $47 million offset on the investor claims. *See supra* note 5. Further, the issue of the amount of offset that Janus Defendants are entitled to may be one of law, not fact. Finally, there is no indication Janus Defendants "intentionally misled the court to gain unfair advantage." Regardless, even a roughly $3 million offset would far exceed the amount of damages the Janus Funds are entitled to under Section 36(b). *See infra* Sections IV, V.

*Migdal*, 248 F.3d at 326.  The plaintiff-shareholder bears the burden of proving the breach. *See* § 80a-35(b)(1); *Migdal*, 248 F.3d at 326.

The Fourth Circuit has held that this fiduciary duty is breached when the adviser "charge[s] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Migdal*, 248 F.3d at 326 (internal citations and quotations omitted). That is, a breach occurs when the fees charged are excessive or disproportionate to the services rendered. *Id.* at 328–29. Other circuits, however, have held that the test is "whether the fee was freely and honestly negotiated on the basis of adequate information disclosed by the adviser." *See In re Mut. Funds II*, 590 F. Supp. 2d at 760 (citing *Jones v. Harris Assoc. L.P.*, 527 F.3d 627, 633 (7th Cir. 2008); *Green*, 286 F.3d at 686; *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811–12 (2d Cir. 1976)).[9]

I need not resolve which of these standards is most appropriate because in my view what is critical here is that Section 36(b)'s fiduciary duty also requires a scienter.[10] Depending on which standard is employed, to breach the fiduciary duty regarding compensation an investment adviser must *intentionally or recklessly* accept unearned/excessive compensation or *intentionally or recklessly* fail to negotiate compensation honestly. Including a scienter requirement is consistent with a widely recognized goal of Section 36(b): preventing advisers from obtaining excessive fees by exploiting the fact that a typical mutual fund is captive to its adviser because it is organized by its adviser, managed by its adviser, and unable to easily move from one adviser to another. *See Green*, 286 F.3d at 685 (quoting S. REP. NO. 91-184 (1969) (discussing goals of

---

[9] The Supreme Court granted certiorari in *Jones* to resolve this circuit split, and oral arguments were held in November. *See Jones*, 527 F.3d, *cert. granted*, 129 S. Ct. 1579 (Mar. 9, 2009).

[10] I wrote in *In re Mut. Funds II*: "it is likely that plaintiffs could recover only the difference between the total fees paid to the advisers and the amount attributable to intended or recklessly permitted market-timed transactions." 590 F. Supp. 2d at 760 n.20. This was a misstatement. The sentence should have read: "It is likely that plaintiffs could recover only the fees paid to the advisers attributable to intended or recklessly permitted market-timed transactions."

Section 36(b)); *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928–29 (2d Cir. 1982) (same). *But see Jones*, 527 F.3d at 631–34 (Section 36(b)'s legislative history is "like many legislative histories . . . containing expressions that seem to support every possible position").

Furthermore, allowing recovery in the absence of intentional or reckless adviser misconduct would be to concentrate on the compensation itself, not on the adviser's actions. This focusing on the compensation itself, and ignoring the adviser's conduct, would allow Section 36(b) to be used to *de facto* challenge the reasonableness of the fees, which is inconsistent with the text and intent of the Section 36(b).[11] *See Jones*, 527 F.3d at 632 ("Section 36(b) does not say that fees must be 'reasonable' in relation to a judicially created standard."); *Gartenberg*, 694 F.2d at 928 (describing how the original version of Section 36(b) imposed a "reasonableness" test which, after complaints from the mutual fund industry, was changed to the fiduciary duty language). *But cf. Gartenberg*, 694 F.2d at 928 ("[T]he substitution of the term 'fiduciary duty' for 'reasonable,' while possibly intended to modify the standard somewhat, was a more semantical than substantive compromise, shifting the focus slightly from the fund directors to the conduct of the investment adviser-manager.").[12]

---

[11] Similarly, the Seventh Circuit has suggested that the excessive/disproportionate test compels judges to *de facto* analyze the reasonableness of adviser fees. *Jones*, 527 F.3d at 632–33 (in rejecting the excessive/disproportionate test, noting: "The trustee (and in the end investors, who vote with their feet and dollars), rather than a judge or jury determine how much advisory services are worth. Section 36(b) does not say that fees must be 'reasonable' in relation to a judicially created standard. It says instead that the adviser has a fiduciary duty.").

[12] I was unable to find a Section 36(b) case in which this scienter issue arose. I suspect this is because proof of a breach is usually powerful evidence of the adviser's state of mind. For instance, in most cases employing the excessive/disproportionate test, if a plaintiff can establish that the compensation was excessive, that plaintiff will have little trouble proving that the sophisticated investment adviser knew that the fee was excessive. Likewise, employing the honest negotiation test, if an adviser was dishonest or not forthcoming in negotiating compensation, almost by definition the adviser's conduct is intentional.

9

V.

As for a remedy, plaintiffs filing a Section 36(b) action may only recover "actual damages resulting from the breach . . . [not to] exceed the amount of compensation or payments received from such investment company." *See* § 80a-35(b)(3). Further, plaintiffs may only recover fees paid beginning a year prior to the filing of the complaint. *See id.*

Accordingly, Janus Defendants may be liable for the "actual damages" caused by their alleged breach. Such damages amount to the portion of the fees the Janus Funds paid as a result of either, depending on which standard for breach is employed, Janus Defendants' intentional or reckless charging of excessive/disproportionate fees or failure to honestly negotiate for those fees. *Cf. In re Mut. Funds II*, 590 F. Supp. 2d at 760 (quoting *In re Mut. Funds. Inv. Litig.* ("*In re Mut. Funds I*"), 384 F. Supp. 2d 845, 868 (D. Md. 2005)) ("Section 36(b) only concerns compensation and therefore plaintiffs may not use Section 36(b) as a means generally to challenge market timing."); *Kalish v. Franklin Advisers, Inc.*, 928 F.2d 590, 592 (2d Cir. 1991) (emphasis added) (holding that plaintiff in Section 36(b) action was not entitled to a jury trial because plaintiff was only seeking return of the *portion of the fee* that was excessive, which is "restitutionary relief" that is "equitable in nature," despite "damages" language of the statute). In this particular case, both standards "lead to the same place": Janus Defendants are only liable for the "portion of the fees paid to the [Janus Defendants that] was disproportionate, excessive, or unearned . . . because it was based upon the existence of market timing agreements or of insider market-timed trades not disclosed when the fees were negotiated . . . ." *In re Mut. Funds II*, 590 F. Supp. 2d at 760 (internal citations and quotations omitted).

a. Flight Damages

As I have strongly suggested if not previously held, Plaintiffs may not recover "flight damages" under Section 36(b). Any flight damages suffered by the Janus Funds did not result from Janus Defendants' breach of their fiduciary duty with respect to determining and receiving compensation. That is, flight damages were *not* "disproportionate, excessive, or unearned" compensation "based upon the existence of market timing agreements or of insider market-timed trades not disclosed when the fees were negotiated."

b. Janus Defendants' Fees

The remaining issue is the amount of fees paid to Janus Defendants that Plaintiffs could potentially recover under Section 36(b). In other words, what portion of the fees resulted from Janus Defendants' breach of their fiduciary duty regarding compensation?

There is no genuine dispute of fact that Janus Defendants only possessed the requisite scienter for receipt of the fees attributable to the market timing they intentionally or recklessly permitted. Those are the only fees which can be said to have resulted from Janus Defendants intentionally or recklessly accepting excessive/disproportionate compensation or failing to negotiate honestly and openly. As a result, those are the only fees which resulted from a Section 36(b) breach. Since the only market timing intentionally or recklessly permitted by Janus Defendants was that of the twelve discretionary frequent traders in the seven Janus Funds subject to the SEC Settlement,[13] Plaintiffs may only recover fees attributable to those twelve traders'

---

[13] *See In re Mut. Funds II.*, 590 F. Supp. 2d at 751–52 (holding that investors were fully compensated for losses from all "arranged" market timing—agreements with the twelve market timing entities—by the Settlement (and therefore all the "arranged" market timing occurred in the seven Janus Funds subject to the Settlement)); *In re Mut. Funds II*, 626 F. Supp. 2d at 531, 537 (granting summary judgment on 10b-5 claims regarding all "non-arranged" market timing—that is, the market timing in all funds except the seven Janus Funds subject to the Settlement—because none of the "non-arranged" market timing was permitted "intentionally or recklessly" by Janus

11

activities in those seven funds.[14] That is, Plaintiffs may only recover the fees that were based on the investments of those twelve traders in those seven funds, which total $819,541.[15]

Because the roughly $19 million offset to which Janus Defendants are entitled exceeds the $819,541 which Plaintiffs could potentially recover under Section 36(b),[16] the Janus Funds have been fully compensated, Plaintiffs will be unable to recover any additional damages from Janus Defendants under Section 36(b), and summary judgment is therefore appropriate.

---

Defendants); (Def.'s Mem., Ex. A at 2 (the Settlement concerned the market timing of twelve discretionary traders in the Janus Funds); Def.'s Mem., Ex. B at 3 (the Distribution Plan pursuant to the Settlement concerned the market timing of twelve discretionary traders in the seven Janus Funds).).

[14] Plaintiffs argue that I have already concluded that the proper remedy for this claim is rescission of the advisory fee contracts minus *quantum meruit* for Janus Defendants' services. (Pl.'s Mem. at 14.) Plaintiffs further argue that because "[t]here is no such thing as partial rescission[,]" they are entitled to recoup all the fees paid to Janus Defendants in 2003 ($610 million) minus *quantum meruit*, which Janus Defendants bear the burden of proving. (*Id.* at 14–15.) Plaintiffs bolster this theory by asserting that Congress incorporated fiduciary law principles into Section 36(b), and these principles require that "the amount of rescissory damages awarded under Section 36(b) . . . be equivalent to the *profits* [Janus Defendants] obtained while breaching [their] fiduciary duty . . . ." (*Id.* at 15 (emphasis in original).) Additionally, Janus Defendants may only keep fees necessary to reimburse them for "expenses actually incurred in serving [the Janus Funds] . . . ." (*Id.*)

     I do not accept Plaintiffs' theory of recovery under Section 36(b). To begin with, I did not previously hold that the proper mechanism for recovery in this case was rescission minus *quantum meruit*. I merely suggested that it *may* be the appropriate remedy under some circumstances. Plaintiffs fail to cite any case law holding that rescission minus *quantum meruit* is the required method of awarding damages under Section 36(b). Although in many Section 36(b) cases the damages may in fact equal what would be awarded via rescission minus *quantum meruit*, Section 36(b) does not require all the formalities and burden-shifting that the Plaintiffs assert accompany the rescission mechanism for recovery. This is particularly true where, as in this case, requiring such formalities would create substantial, unnecessary inefficiencies—that is, forcing Janus Defendants to disprove their liability for every dollar of the $610 million it received in fees, despite the fact that $610 million is nowhere near the actual damages caused by Janus Defendants' breach. Nor does Section 36(b) require all the formalities of fiduciary law: Section 36(b)'s fiduciary duty "is significantly more circumscribed than common law fiduciary duty doctrines . . . ." *Green*, 286 F.3d at 685. This "is demonstrated by § 36(b)'s limitations on recovery: . . . a shareholder may only sue the recipient of the fees; recovery is limited to *actual* damages resulting from the breach . . . . Further, the plaintiff has the burden of proving a breach of fiduciary duty in contrast with the common law rule that requires a fiduciary to justify its conduct." *Id.* (internal citations omitted) (emphasis in original). Rather, as explained above, a plaintiff is simply entitled to whatever the plaintiff can prove are its actual damages resulting from the breach.

[15] I am unclear how Janus Defendants came up with this figure—and the figures in *infra* note 16—as the amount attributable to the activities of the twelve traders in the seven Janus Funds. As far as I can tell, the only evidence in the record of this figure is a one page document—which Janus Defendants allege was compiled by Cornerstone Research—merely listing the amount of fees attributable to the activities of the twelve discretionary frequent traders in the seven funds. (*See* Def.'s Mem., Ex. F; *see also* Mari. Decl. ¶ 7.) Nonetheless, because Plaintiffs' capable lawyers do not contest this $819,541 figure, I assume that it is accurate.

[16] To be more precise, the distribution to *each* of the seven funds must have exceeded the portion of the fees paid by *each* of the seven funds to Janus Defendants that was attributable to intentionally or recklessly permitted market timing. *See supra* note 7. In fact, each of the seven funds did receive a distribution far exceeding the amount of fees each paid as a result of this intentionally or recklessly permitted market timing. *See supra* note 4. (Def.'s Mem., Ex. F (fees paid to Janus Defendants attributable to recklessly or intentionally permitted market timing broken down by each fund: (1) Adviser Worldwide: $277,526; (2) Mercury: $186,887; (3) Adviser International Growth: $168,107; (4) Enterprise: $28,749; (5) Overseas: $6,457; (6) Worldwide: $26,887; (7) High Yield: $124,928.)

12

DATE: January 20, 2010                                             _____/s/_____
                                                                    J. Frederick Motz
                                                                    United States District Judge