IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE:  MUTUAL FUNDS INVESTMENT § | MDL 1586 |
| LITIGATION § | |
| ——————————————————— § | Case No. 04-md-15863 |
| § | (Judge Motz) |
| IN RE: ALGER, COLUMBIA, JANUS, § | |
| MFS, ONE GROUP, PUTNAM AND § | **KIMBERLY J. CLIFTON'S** |
| ALLIANZ DRESDNER § | **AMENDED OBJECTION TO** |
| § | **SETTLEMENT, OBJECTION TO** |
| § | **ATTORNEYS' FEES REQUEST** |
| § | **NOTICE OF INTENTION TO** |
| § | **APPEAR AND REQUEST TO** |
| § | **SPEAK AT THE HEARING** |

ENTERED
RECEIVED

JAN 18 2011

TO THE HONORABLE DISTRICT JUDGE:

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY_____ DEPUTY

COMES NOW **Kimberly J. Clifton** ("Objector") and files this Amended Objections to the Proposed Settlement, Objection to Attorneys' Fees, Notice of Intent to Appear and Request to Speak at the Hearing, and would show the Court as follows:

1. **Objector is a Class Member**

Objector declares under penalty of perjury under the laws of the United States of America and Texas that the following statements are true and correct:

(a) Objector is a member of the class.

(b) During the period between October 1, 2001 and December 31, 2001, Objector owned:

452.960 shares of SB Money funds Cash Port CL A
 50.000 shares of NASDAQ 100 Trust Ser 1
 66.000 shares of Symbol: QQQ
591.346 shares of PIMCO Innovation Fund Class B

(See Exhibit "1" attached to Original Objection.)

(c)     The parties sent to Objector a notice of the class settlement, with a claim form. the notice was received by Objector after September 21, 2010.  (See Exhibit "2" attached to Original Objection.)

(d)     Objector objects to the Settlement in *In Re:  Allianz Mutual Funds Settlement.*

## 2.     Notice of Intention to Appear and Request to Speak at the Hearing

Objector intends to appear at the hearing, if any.[1]  Objector requests that she be allowed to appear in person or through counsel at the final approval hearing to talk about these objections, and to otherwise participate in the final approval hearing.

## 3.     Objection to Notice

Objector received the postcard notice only after the date to opt out or object had passed. The notice received is defective because it fails to advise  Objector of the Court's Order of October 18, 2010 allowing an additional period to either opt out or object to the settlement.  Only be going to the settlement website was Objector able to determine that she could still object.  It is likely that many people who received a notice late will take no further action.  For class members who received notice after September 21, 2010, a completely new notice should have been issued to actually inform the class members of the actual, pertinent dates.  The notice fails to meet minimum due process standards and is fundamentally defective.

## 4.     Objections to the Settlement

### A.     Adequacy of Class Compensation

The "formula" for compensation devised by counsel is confusing to Objector.  However, if Objector's calculations are correct, only those class members owning a substantial number of shares are compensated.  The next subclass members receive nothing.  Such compensation is grossly unfair, and, in fact, it should be the reverse.  That is, all class members should receive a

---

[1] Court Order of October 18, 2010, document 3504-1, concerning the necessity for a further Fairness Hearing.

minimum payment of ten dollars.   Objector herein owns substantially less than the number of shares necessary to receive any compensation.

Class counsel and defendants know how many class members will receive a payment and how many will not.   That would be important for the Court and the Objector to know when determining the formula for reimbursement.

The proposed settlement is grossly unfair to the subclass owning less than the minimum number of shares to receive compensation.   In return for nothing, the defendants receive a full release from any and all claims held by these class members.   Yet, on information and belief, these class members are the ones suffering the greatest loss.

Although it is true that class settlements have been approved with small portions of the class receiving nothing, it is also true, as in *Mirfasihi v. Fleet Mortgage*, 356 F.3d 781 (7th Cir. 2004), that where a substantial minority or even the majority, receives no benefit, the settlement has been disapproved.   In *Fleet Mortgage*, "The district judgment has approved a handsome fee for the class lawyers . . .despite the meagerness of the relief agreed to in settlement. . . . Would it be too cynical to speculate that where may be going on here is that class counsel wanted a settlement that would give them a generous fee and that Fleet wanted a settlement that would extinguish 1.4 million claims against it."

A similar situation recently faced the Honorable Sam Sparks in the *Dell Inc., Securities Litigation*, Cause No 06-cv-726-SS in the Western District of Texas, Austin Division, where the settlement also contained a ten dollar minimum payout for claims.   As in this case most shareholders received nothing.   The settlement was approved without the ten dollar minimum and all class members who filed a claim received something.   A copy is attached as Exhibit "1".   Objector urges the Court to adopt the reasoning of Judge Sparks.

**B.      Objection to Class Representative**

Guiding principles in selecting class representatives are:

(1)      The class must have a "conscientious representative Plaintiff."      *Rand v.*
*Monsanto*, 926 F.2d 596, 599 (7th Cir. 1991); and

(2)      . . .class representative must . . ."fairly and adequately protect the interest of the
class." Rule 23(a)(4).

A conflict of interest must not exist between the named Plaintiffs and the class. *Meridith*
*v. Mid-Atlantic*, 129 F.R.D. 130, 133.

In this case, where a fairness hearing has already been held, the lead Plaintiffs may have
suffered the same type of damage, but the number of shares is substantially different.   More
importantly, the proposed settlement shows clearly the imprint of partiality and self-dealing on
the part of the class representatives as they are the primary beneficiaries.   The Court must
consider disparate relief granted to different subclasses of investors or if any of the class
representatives were members of the subclass disadvantaged by the settlement.

If in advancing their own interests the named plaintiffs had also advanced the interests of
the class, their burden would have been met.  Unfortunately, they did not.

It has long been the law that "An absent class member will not be bound to a judgment
wherein he was not adequately represented." *Hornsberry v. Lee*, 311 U.S. 32 (40).  Here, the
interests of the largest shareholder is advanced at the expense of the smaller investors.  The
settlement should not be approved.

**C.      Objections to the Proposed Attorneys Fees**

**(1)      Legal Standards**

Attorney fees in class actions require particular scrutiny. MANUAL FOR COMPLEX LITIGATION 4th § 13.24, pp. 180 - 182. It is especially "problematic when settlement negotiations involving attorney fees are conducted simultaneously with negotiations on the merits."

Although the practice of negotiating lump sum settlements is not prohibited, it "should be reviewed for fairness of the allocation between damages and attorney fees." (*Id.*) Since, "[i]n complex litigation. . .there is often no traditional client with the authority to negotiate the rate at which attorneys are to be paid." MANUAL FOR COMPLEX LITIGATION 4th § 14. Therefore, the Court should carefully scrutinize any attorney fee request . Additionally, FED. R. CIV. P. 23 requires that class action attorney fees must be "reasonable."

"In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel. *See, e.g., Strong [v. Bellsouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998)] 137 F. 3d at 849 ("To fully discharge its duty to review and approve class action settlement agreements, a district court must assess the reasonableness of the attorneys' fees."); MANUAL FOR COMPLEX LITIGATION 4th § 14.11. ("The court must distribute the [fee award] among the various plaintiffs' attorneys, which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel."). The court's duty to review attorneys' fees is no less compelling in common fund cases, like this case, where a separate fund to pay attorneys' fees is created as part of the class action settlement. *See e.g., Strong*, 137 F.3d at 849.

The district court's close scrutiny of fee awards serves to "protect the nonparty members of the class from unjust or unfair settlements affecting their rights as well as to minimize conflicts that may arise between the attorney and the class, between the named plaintiffs and the

absentees, and between various subclasses." *Id.* (internal quotations and citations omitted.) The court's review also "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *Id.* (citing *In re GM Trucks,* 55 F.3d at 820 (emphasizing that the "court's oversight function" serves to deflect the "potential public misunderstandings that may cultivate in regard to the interests of class counsel") (internal quotations an citations omitted); *Foster v. Boise-Cascade, Inc.,* 420 F. Supp. 674, 680 (S.D. Tex. 1976), aff'd 577 F.2d 335 (5th Cir. 1978) (explaining that the court has the "obligation in any Rule 23 class action to protect [the class action device] from misuse" because the "most commonly feared abuse is the possibility that Rule 23 encourages strike suits promoted by attorneys who simply are seeking fat fees")(internal quotations and citations omitted.)).

To fulfill its duty, "the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties." *Strong,* 137 F.3d at 850. Although exacting judicial review of fee applications may be burdensome, it is "necessary to discharge the [court's] obligation to award fees that are reasonable and consistent with governing law." MANUAL FOR COMPLEX LITIGATION § 14.231 (4th ed. 2004.)

Although 25% of a common fund seems to be a typical benchmark, such benchmarks are subject to considerable fluctuation and should be applied, if at all, with the caveat that "[t]he benchmark percentage should be adjusted, replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *See Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990).

When the settlement fund *vis-a-vis* the pool of potential class members is (1) small and (2) where actual common benefit is difficult to determine and, for some of the class members, non-existent, the "normal" percentage fee should be reduced.

Factors to be considered by the Court in setting attorney fees are:

- the size of the fund and the number of persons who actually receive monetary benefits;

- any understandings reached with counsel at the time of appointment concerning the amount or rate for calculating fees; any budget set for the litigation; or other terms proposed by counsel or ordered by the court;

- any agreements or understandings, including side agreements, between attorneys and their clients or other counsel involved in the litigation;

- any substantial objections to the settlement terms or fees requested by counsel for the class by class members (it is, however, a court's duty to scrutinize applications for fees, independently of any objection) -- in the appropriate case, a court has authority to award fees to an objector that assists the court in scrutinizing the settlement, the fee requests, or

- the skill and efficiency of the attorneys;

- the complexity and duration of the litigation;

- the risks of nonrecovery and nonpayment.

WHEREFORE, Objector prays that the Court deny the proposed settlement, deny certification of the settlement class, deny the requested fees to Class Counsel and grant Objector such other and further relief as to which Objector may be entitled.

Thomas L. Cox, Jr.
S. B. 04964400
4934 Tremont
Dallas, Texas  75214
(469) 531-3313
FAX:  (214) 855-7878
tcox009@yahoo.com

Certificate of Service

I hereby certify that a copy of the above and foregoing document has been maile on the 12th day of January, 2011 as follows:

Clerk, U.S. District Court
District of Maryland
101 W. Lombard Street
Baltimore, MD  21201

Robert M. Kornreich
Wolf Popper LLP
845 Third Avenue
New York, NY  10022

_____
Thomas L. Cox, Jr.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

*In re*

                                           **Case No. A-06-CA-726-SS**

**DELL INC., SECURITIES LITIGATION**

_____ FILED    _____ ENTERED
_____ LOGGED  _____ RECEIVED

<u>**O R D E R**</u>

JAN 1 8 2011

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____

BE IT REMEMBERED on May 21, 2010, the Court held a hearing in the above-styled cause,

and the parties appeared through counsel. Before the Court were Union Asset Management Holding

AG ("Lead Plaintiff")'s Unopposed Motion for Settlement [#224] and memorandum in support

thereof [#225]; Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval

of the Settlement Plan of Allocation [#242], Lead Plaintiff's response in support [#264]; Lead

Plaintiff's Motion for Attorneys' Fees [#243], Lead Plaintiff's response in support [#264]; Joann F.

Brook's Motion to Intervene [#251]; the Motion to Appear Pro Hac Vice by Mark E. Wilson [#252];

and objections to the foregoing filed by Jeannine T. Morris, Edward H. Sonn, Andrew J. Applegate,

Amelia P. Klingler, William R. Klingler, Geneva E. Wright, Oscar P. Fitzgerald, Neil R. Scheier,

Travis Cox, George Sibley, Brian F. Murphy Rev Trust, The Raymond M. Murphy Rev Trust,

Althans M. Katherine, Jerry Sachs, Kathy Kowalchuk, Joann F. Brooks, Osman Pekin, P. William

Bercik, Steven G. Schuleman, St. Stephen, Inc., and Smokestack Lightning Limited.  Having

considered the foregoing motions, responses, replies, and objections, the case file as a whole, the

-1-



relevant law, and the representations of counsel at the hearing, the Court enters the following opinion
and order.

## Background

This is a securities fraud class action brought on behalf of all investors who purchased
common stock in Dell, Inc. ("Dell") between May 16, 2002 and September 8, 2006 (the "Class
Period"). Plaintiffs allege violations under Sections 10(b) and 20(a) of the Securities Exchange Act
of 1934, as amended by the PSLRA, 15 U.SC. §§ 78u-4, and Rule 10b-5 promulgated thereunder.
This Court consolidated various similar actions on February 28, 2007, and chose Union Asset
Management Holding AG ("Lead Plaintiff") as the lead plaintiff of the consolidated action on April
9, 2007. Plaintiffs filed their Consolidated Amended Complaint [#164] on January 11, 2008 against
Dell; Michael Dell, Dell's founder and Chairman; Kevin Rollins, Dell's former President and Chief
Executive Officer; James Schneider, Dell's former Chief Financial Officer; and
PricewaterhouseCoopers ("PwC"), Dell's outside auditor.

In general, Plaintiffs allege the Defendants fraudulently and materially inflated reported
revenues during the Class Period by $463 million, and engaged in erroneous accounting by
accelerating and overstating revenue, mismanaging various accruals and reserves, and manipulating
warranty liabilities. Pls.' Am. Compl. at ¶¶ 96, 101, 103-42. Secondly, Plaintiffs allege Defendants
disseminated false and misleading information to the public attributing Dell's success to its unique
business model and other things, but never to accounting fraud. Because of the fraud—which
Plaintiffs allege was "unwound" beginning in 2005 with the announcement of disappointing earnings
statements—Dell's share price dropped 45.3% between August 11, 2005 and September 8, 2006.
Plaintiffs allege this drop represented "the unwinding of Dell's fraudulent scheme" and represented

a total loss to shareholders of $45.7 billion. *Id.* at ¶ 767. Finally, Plaintiffs allege the Individual

Defendants took advantage of the inflated stock prices during the Class Period to cash in some of

their stock and stock option grants, and earn tremendous bonuses. *See, e.g. id.* at ¶ 666. Plaintiffs

also allege PwC, Dell's longtime auditor, consistently approved the now-restated financial

statements as prepared in accordance with GAAP and their audits as prepared in accordance with

GAAS, although they were not. *Id.* at ¶¶ 19, 267. These opinions from PwC, Plaintiffs allege, were

materially false and misleading as well. *Id.* at ¶ 243.

On October 7, 2008, this Court issued an order granting Defendants' and PwC's motions to

dismiss Plaintiffs' Amended Complaint, finding Plaintiffs had failed to adequately plead a strong

inference of scienter as to Defendants or PwC, and had failed to adequately plead loss causation.

Following the dismissal, Lead Plaintiff filed a notice of appeal with the Fifth Circuit Court of

Appeals on November 3, 2008.

On November 29, 2009, Lead Plaintiff and the Dell Defendants entered into a stipulation of

settlement, and on December 22, 2009, this Court entered an order preliminarily certifying the

Settlement Class, approving the Stipulation and Notice, and setting a final approval hearing. That

hearing took place on May 21, 2010.

## Analysis

I.   **Lead Plaintiff's Unopposed Motion for Settlement [#224] and memorandum in support [#225], and Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [#242]**

   A.   **Certification of the Settlement Class**

The proposed settlement class in the present case consists of "all persons who purchased or

otherwise acquired the common stock of Dell Inc., directly or beneficially, between May 16, 2002

-3-

and September 8, 2006, inclusive, and who were damaged thereby." Rice Decl. at ¶ 7.  The

Settlement Class excludes "[p]ersons who timely and validly request exclusion from the Settlement

Class pursuant to the Notice; Defendants; [PwC]; the officers and directors of Dell Inc. and [PwC]

during the Settlement Class Period; members of their immediate families and legal representatives,

heirs, successors, or assigns, and any entity in which Defendants or [PwC] have or had a controlling

interest during the Settlement Class Period." *Id.* at ¶ 8.

The certification requirements of Federal Rule of Civil Procedure 23 generally apply with

full force even when certification is solely for settlement purposes. *See Amchem Prods. Inc. v.*

*Windsor*, 521 U.S. 591 (1997); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) (citing

*Garza v. Sporting Goods Properties, Inc.*, 1996 WL 56247 at *3 (W.D. Tex. 1996)).  Of course, in

the settlement context the district court need not consider "whether the case, if tried, would present

intractable management problems, for the proposal is that there be no trial"; however, the court's

consideration of the other factors in Rule 23 is of "vital importance," and demands "undiluted, even

heightened" attention in the settlement context, as the court will lack a later opportunity to make

adjustments to the class. *Amchen Prods, Inc.*, 521 U.S. at 620.  The familiar Rule 23 requirements

are numerosity, commonality, typicality, and adequacy of representation.

**Numerosity.**  The numerosity requirement is met when "joinder of all members is

impracticable." FED. R. CIV. P. 23(a)(1).  In this case, it would of course be highly difficult to join

all the members of the proposed settlement class, which includes all persons who purchased or

otherwise acquired the common stock of Dell within a span of almost four and a half years.  For this

reason, the Fifth Circuit has held the numerosity requirement is "generally assumed to have been met

in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*,

-4-

*Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981). No objector disputes whether the numerosity requirement is met in the present case, and the Court finds the requirement is plainly satisfied.

**Commonality.** The commonality requirement mandates there be at least one factual or legal issue which is common to all or substantially all of the class members. FED. R. CIV. P. 23(a)(2), *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). The threshold of commonality is not high; it is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members. *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993). In this case, the settlement class members' claims all arise out of the same set of operative facts and are based on common legal theories: that Defendants' misrepresentations violated federal securities law, Dell's public statements were false and misleading, Defendants knew their statements were false when they made them, the price of Dell's common stock was artificially inflated during the Class Period as a result of the fraud, and certain Dell stockholders sustained damages as a result. Thus, factual or legal issues common to all the settlement class members are without doubt present in this case.

It should be noted, because at least one objector raises the point, the proposed settlement class consists of "all persons who purchased or otherwise acquired the common stock of Dell Inc., directly or beneficially, between May 16, 2002 and September 8, 2006, inclusive, *and who were damaged thereby*." Rice Decl. at ¶ 7 (emphasis added). One objector argues the last clause of this definition is too imprecise, and will essentially require a mini-trial to determine whether each potential class member was damaged. However, the fact some claims may require some individualized analysis is not fatal to commonality. *James v. City of Dallas*, 254 F.3d, 551, 570 (5th Cir. 2001). In this case, whether each potential class member was damaged is likely to be an

-5-

objective question which can be decided definitively based on evidence of his or her Dell stock

holdings during the Class Period. The Fifth Circuit has approved at least one securities class action

settlement with a class definition almost identical to that in this case. *See Feder v. Elec. Data Sys.*

*Corp.*, 429 F.3d 125, 129 (5th Cir. 2005) (approving a class definition which included "[a]ll persons

and entities who purchased or otherwise acquired the securities of [the Company][during the Class

Period], and who were damaged thereby.").

Furthermore, at least one district court has considered an almost identical argument (made,

in fact, by the same objector who advances the argument in the present case) and rejected it. *See In*

*re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d 467, 492-94 (S.D.N.Y. 2009) ("*IPO*"). In

*IPO*, the objector argued the inclusion of the phrase "who were damaged" in the class definition was

not adequately precise or objective, would require a mini-trial to determine whether a potential class

member qualified for the class, and would require the court to address the issue of liability. *Id.* at

492-93. The district court found this argument "ha[d] no merit," as the phrase simply identified

those who would have had standing to bring suit. *Id.* at 493. The district court also reasoned that

because an investor is damaged solely by losing money, a "quick look at trading cards would show

whether [a potential class member] had lost money on its investments" and been damaged. *Id.*

Finally, the court found the settlement plan of allocation—not the district court—would determine

the amount of damages to which a class member was ultimately entitled. *Id.*

This Court agrees with the commonsense reasoning set forth in *IPO*, and finds it persuasive

the Fifth Circuit has specifically affirmed a class definition with the phrase "and who were damaged

thereby." *Feder*, 429 F.3d at 129. Based on the foregoing, the Court finds the commonality

requirement is met in the present case.

**Typicality.**  Like commonality, the test for typicality is not demanding—it "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  Typicality is satisfied when the named plaintiffs' claims for relief arise from the same common nucleus of operative facts as the claims of absent class members. *Id.*  In this case, all the Class Members' claims arise from the same underlying facts, and rest on the same legal arguments (basically, that Defendants' conduct violated federal securities laws); thus, Lead Plaintiff's claims are effectively indistinguishable from the rest of the Class Members' claims, and the Court finds typicality is met with respect to the proposed Settlement Class.

**Adequacy of Representation.**  To meet the requirement for adequacy of representation, plaintiffs must show (1) the zeal and competence of the representative party's counsel and (2) the willingness and ability of the representative party to take an active role in and control the litigation and to protect the interests of absentees. *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002). The relatively protracted period of litigation in this case makes the adequacy determination simple; the proposed class representatives have actively participated in litigation and settlement negotiations and have demonstrated the ability to ably represent the class's interests.  Class counsel is experienced, and there has been no assertion of incompetency by any potential member of the settlement class in this case.  This requirement is satisfied.

**Superiority and Predominance.**  Finally, in addition to satisfying the Rule 23(a) requirements, Plaintiffs must satisfy at least one sub-section of Federal Rule of Civil Procedure 23(b) in order to certify a class. *Regents of Univ. of Cali. v. Credit Suisse First Boston (USA)*, 482 F.3d 372, 295 (5th Cir. 2007).  Plaintiffs assert their claims satisfy Rule 23(b)(3) in that "the questions

-7-

of law or fact common to class members predominate over any questions affecting only individual members, and...a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

The predominance inquiry requires the questions of law or fact common to the members of the class "predominate over any questions affecting only individual members." *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir.2005). The superiority analysis is "fact-specific and will vary depending on the circumstances of any given case"; it requires simply that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3); *Robertson v. Monsanto Co.*, 287 Fed. App'x. 354, 361 (5th Cir. 2008). Both the superiority and predominance requirements are met in this case. As for superiority, a class action is undoubtedly the best available method of litigating the case. Litigating each shareholder's claim against Defendants individually would be a massive waste of judicial resources, as the vast majority of the issues of law and fact in this case—the fraudulent misrepresentations or omissions in question, the scienter of the Defendants, the loss causation, etc.—are common to all the class members. Most of the class members would have absolutely no incentive to litigate their claims outside the purview of a class action, as their losses are relatively small and the hurdles to bringing a suit in the context of the PSLRA are relatively high. As for predominance, the parties have not identified a single issue affecting only an individual member of the class (save damages); all the liability issues in this case are common questions of law or fact. Thus, a class action is undoubtedly superior to other available methods for fairly and efficiently adjudicating this controversy, and the Court finds the proposed Settlement Class meets all the requirements of Rule 23.

-8-

Therefore, certification of the proposed settlement class is appropriate in this case, and Lead Plaintiff's motion for certification of the settlement class is hereby GRANTED.

## B.    Final Approval of the Settlement Agreement

### (1)    Terms of the Agreement

The Settlement Agreement entered into between Lead Plaintiff and the Dell Defendants provides for a payment of $40 million in cash into a Net Settlement Fund by the Dell Defendants. Def.'s Mot. Approval, Ex. A ("Rice Decl."). All settlement class members have until May 11, 2010 to file a valid proof of claim substantiating their purchase of Dell common stock during the Class Period and their resulting damages. *Id.* at ¶ 47. Lead Plaintiff estimates about 3.34 billion shares of Dell stock were damaged during the Class Period, and thus the estimated recovery per damaged share—before deduction of attorneys' fees and expenses—is about one cent per share. *Id.* at ¶ 48. This estimated recovery, of course, assumes 100% of the class members with recoverable damages will actually make a claim. *Id.*

The Settlement Agreement further states class members who make a valid claim will receive a distribution from the Net Settlement Fund, subject to a $10.00 *de minimis* requirement. *Id.* at ¶ 49. If the Net Settlement Fund has sufficient funds, each claimant will receive an amount equal to the total of their net loss; however, in the more likely scenario that the Net Settlement Fund is not sufficient, each claimant will receive his or her *pro rata* share of the Fund. *Id.* The initial distribution will be made after all the claims are processed; if there are any funds remaining in the Net Settlement Fund six months after the initial distribution, there will be a second distribution, and additional distributions will continue in six-month intervals until Lead Plaintiff determines the distributions are "no longer cost-effective." *Id.* at ¶¶ 49-50.

-9-

### (2)    *Notice Issued*

A district court has discretion to approve a class-action settlement under Rule 23(e) provided,

among other things, the parties establish that all interested parties have been given reasonable notice

of the settlement and its terms. FED. R. CIV. P. 23(e)(1)(B). In this case, it is undisputed Lead

Plaintiff provided two forms of notice of the proposed Settlement Agreement to potential class

members: (1) a full 8-page notice to all identifiable class members sent to their last known address;

and (2) a summary notice published in *The Investors Daily* and *The New York Times*. As of April

2010, Lead Plaintiff had mailed 1.7 million notice packets to potential settlement class members.

Lead Plaintiff also posted the notice packets online at www.dellsecuritieslitigation.com, and posted

a phone number for potential class members to call if they had questions concerning the settlement.

The notice itself adequately describes both the key facts of the suit, the monetary distribution

of the settlement, and the procedure for objecting to the settlement. In fact, not a single objector has

raised a complaint about the form or content of the notice itself, and the Court—after a thorough

review of the notice—likewise finds no cause for objection. The notice satisfies the requirements

of Rule 23, and the Court therefore finds the potential class members have been given reasonable

notice of the Settlement Agreement and its terms. *See, e.g. Schwartz v. TXU Corp.*, 2005 U.S. Dist.

LEXIS 27077 (N.D. Tex. Nov. 8, 2005) (citing *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426,

429–30 (5th Cir. 1977)).

### (3)    *Fair, Adequate, and Reasonable Settlement*

A district court has discretion to approve a class-action settlement under Rule 23(e) if the

settlement is fair, adequate, and reasonable. *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004)

(citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)). The district court's "exercise of

-10-

discretion is to be tested by inquiries that ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Ayers*, 385 F.3d at 368 (quoting *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983)). In assessing whether the settlement is reasonable, the Fifth Circuit has set forth six key points, or "*Reed* factors," which should be considered. These factors are:

> (1) the existence of fraud or collusion behind the settlement;
>
> (2) the probability of plaintiffs' success on the merits;
>
> (3) the range of possible recovery;
>
> (4) the complexity, expense and likely duration of the litigation;
>
> (5) the stage of the proceedings and the amount of discovery completed; and
>
> (6) the opinions of class counsel, class representatives, and absent class members.

*Reed*, 703 F.2d at 172 (citing *Parker*, 667 F.2d at 1209). The Court will consider the *Reed* factors in turn.

First, there has been no suggestion the settlement was collusive; the case has been extensively and vigorously litigated up to this point. As for the second factor (Plaintiffs' likelihood of success on the merits), it is low. As set forth in Lead Plaintiff's motion for final approval, the Fifth Circuit's historic rate of reversal for Rule 12(b)(6) dismissals of securities class action suits is not high; in 2005, one district court found "about 90% of this Circuit's reported PSLRA decisions involving the adequacy of pleadings in securities fraud cases have upheld their dismissal." *Schwartz v. TXU Corp.*, 2005 WL 3148350 at *32 (N.D. Tex. 2005). Plaintiffs' case—which was dismissed by this Court and was on appeal in the Fifth Circuit awaiting a ruling when the parties agreed to settle the

-11-

case—was no doubt in dire straits, with Lead Plaintiff facing a significant risk the class members would recover nothing at all.

As for the third *Reed* factor, the range of possible recovery in this case is wide: if the Court's dismissal were upheld on appeal, Plaintiffs would recover nothing. On the other end of the spectrum, Lead Plaintiff's counsel at the final approval hearing represented their damages "could have run into the billions" had everything gone in favor of Plaintiffs, although he represented $120 million would be a more realistic forecast of Plaintiffs' possible damages. Similarly, Plaintiffs' Amended Complaint alleged the drop in Dell's stock caused by Defendants represented a total loss to shareholders of $45.7 billion. Am. Compl. at ¶ 767. Of course, this forecast was significantly dimmed by the fact Plaintiffs' Amended Complaint was dismissed in the district court. Thus, based solely on the procedural posture of this case, $40 million appears to be well within the reasonable range of recovery.[1]

Turning to the fourth factor, the legal issues involved in this case are complex; securities litigation on the whole is "notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983). Thus, the complexity, expense, and likely duration of the suit weighs in favor of approval of the settlement. Securities claims are difficult to prove, and without agreeing to a settlement, Plaintiffs no doubt face unpredictable and significant delays and expense in prosecuting this case. As counsel recognized at the hearing, and as is discussed *infra*, even if Plaintiffs managed to prevail on appeal, they would face tall hurdles in establishing the elements of their claims in the district court and convincing the jury of liability and the amount of damages.

---

[1] Plaintiff's expert witness, Professor Lynn Baker, testified the $40 million settlement is "an extraordinary result" given the posture of this case.

Next, Lead Plaintiff claims the fourth *Reed* factor—the "stage of the proceedings and the amount of discovery completed"—weighs most strongly in favor of approval of this settlement, as Defendants have already won a dismissal of the lawsuit in the district court (a ruling for which the probability of reversal is low, as discussed above), and thus there is a significant chance Plaintiffs will recover nothing at all if the case continues. In considering this *Reed* factor, the Court must evaluate whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369.

The Court disagrees with Lead Plaintiff's argument this factor weighs most strongly in favor of settlement. Lead Counsel admitted at the hearing no formal discovery has yet been conducted in this case, not even a single deposition. Lead Counsel claims Plaintiffs are not entitled to discovery under the PSLRA given the fact their claims have been dismissed, and because they are under a statutory stay of discovery during the pendency of the appeal. But notwithstanding the reasons for the lack of discovery—which the Court assumes are valid—there is no mistaking the fact this settlement was essentially made in the dark, with very little information about the possibility of proving Plaintiffs' claims at trial. Thus, Lead Counsel is unable to value this case except by comparing it to settlements in other securities class actions—a metric which must satisfy, as it is the only one available, but one which fails completely to take into account the individual claims of this case and their likelihood of being proven. The Court can readily ascertain that the settlement in this case is a relatively good one for a securities class action in the procedural posture of this case; however, the Court finds itself groping in the dark to determine whether it is a very good settlement based on the merits of the claims at issue in this particular case. It is entirely unclear which, if any,

-13-

of Plaintiffs' allegations were likely capable of being proven at trial and what the real value of the claims—from $45.7 billion to zero—is.

It is somewhat troubling to approve a settlement for claims which remain so shrouded in mystery. However, Lead Counsel's point that it was barred from discovery by the PSLRA and a statutory stay is well taken, and Lead Counsel further represents it has investigated Plaintiffs' claims as diligently as possible outside the context of traditional discovery by, for instance, hiring private investigators and experts on GAAP, loss causation, and damages. Thus, the Court finds the parties were informed about the merits of their respective positions, and the settlement can be approved as reasonable even without formal discovery having been conducted.[2]  The Court relies on the representations of counsel for both sides that they have "achieved the desired quantum of information necessary to achieve a settlement," *see, e.g. Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977), and finds the fourth *Reed* factor weighs in favor of approval, if only slightly.

Finally, Lead Plaintiff and Lead Counsel strongly agree a class settlement is in the interest of all concerned, as it will achieve finality and avoid appellate litigation. Out of 1.7 million class notices sent to potential settlement class members, only 21 have so far filed objections in this Court—about 0.001% of the total potential class members. This is a minuscule number of complaints, especially considering the fact the Court has had no objections indicating the notice packets were mailed late, the response time was inadequate, or the procedures for filing objections were not well-explained. Thus, it appears the potential class members have been given every chance

---

[2]The Fifth Circuit has held a lack of formal discovery "does not compel the conclusion that insufficient discovery was conducted; instead, "[t]he scope of the discovery to be conducted in each case rests with the sound discretion of the trial judge." *Cotton v. Hinton*, 559 F.2d 1326, 1332-33 (5th Cir. 1977). In fact, the *Cotton* court noted discovery often wastes the time of the court, the parties, and the attorneys, adds unnecessarily to the financial burden of investigation, and is used to harass the opposing party, such that informal discovery is "desired." *Id.* at 1332.

to object, but the large majority have simply chosen not to. Furthermore, Lead Plaintiff represents as of March 29, 2010, only 68 potential class members had requested exclusion from the Settlement Class.

The Court notes there was one objection voiced by almost every objector who appeared at the hearing: an objection to the *de minimis* provision of the Settlement Agreement, which limits recovery of damages to those class members whose potential recovery amount is ten dollars or more. Lead Counsel argues the *de minimis* requirement is necessary and justified because the likely cost of processing these smaller claims outweighs the actual recovery to the Settlement Class Members. Rice Decl. at ¶ 60. Many courts have recognized *de minimus* thresholds for payable claims are beneficial to the class as a whole, since they save the settlement fund from being depleted by the administrative costs associated with claims unlikely to exceed those costs. *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048 at *9 (E.D.N.Y. 2007) (citing *In re Global Crossing Secs. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004)). In *Global Crossing*, the district court approved a ten dollar *de minimis* threshold and noted "[c]lass counsel are entitled to use their discretion to conclude that, at some point, the need to avoid excessive expense to the class as a whole outweighs the minimal loss to the claimants who are not receiving their *de minimis* amounts of relief." 225 F.R.D. at 463. On this rationale, courts have frequently approved such thresholds, often at ten dollars. *In re Gilat Sat. Networks*, 2007 WL 1191048 at *9.

In the present case, the ten dollar *de minimis* provision was the portion of the Plan of Allocation which inspired the most vociferous objections, mostly on the part of individual shareholders who felt the institutional shareholders in the class were benefitting at their expense. *See, e.g.* Docket Nos. 235, 238, 240, 255, 256. Lead Counsel admitted at the hearing it is impossible

-15-

to know (before the claims are received and processed) how many shareholders will get nothing because of the *de minimis* provision; in fact, it may be a majority of the class members.[3]  In response to the objections regarding the *de minimis* provision, Lead Counsel suggested at the hearing that the Court might remove the *de minimis* provision and put in place a different provision to keep the administration costs manageable, such as a provision limiting each claimant to one check, negotiable only within some set period of time.  Such a provision would allow all class members to recover at least some portion of their damages, but would conserve the Settlement Fund by not requiring the administrators to re-issue and re-mail checks long after they have been sent.

Thus, in the interests of allowing each shareholder to recover at least some portion of their damages and of addressing the concerns of those who appeared at the hearing, and because Lead Counsel expressed equal satisfaction with this solution, the Court finds the *de minimis* provision of the Settlement Plan of Allocation should be eliminated, and replaced with a provision limiting each claimant to one check negotiable within 60 days.  This solution is reasonable to preserve the Settlement Fund from excessive and unnecessary expenses, which is in the overall interest of the class as a whole.[4]

The rest of the objections the Court received can be generally summarized as follows: (1) the requested attorneys' fees are too high, *see* Docket Nos. 233, 235, 236, 237, 238, 240, 245, 246, 247,

---

[3]By the Court's calculations, a class member would have had to own approximately 1,200 shares to survive the *de minimis* provision and recover $10.01.

[4]It should also be noted the new provision eliminates a conflict of interest from the settlement which troubled the Court at the hearing.  Class counsel, as fiduciaries of the interests of the class, argued for the inclusion of the *de minimis* provision; however, the *de minimis* provision would have undoubtedly wiped out the recovery of a portion of the class members, and class counsel admitted to having *no idea* how many of its clients the provision would affect.  If the provision affected the majority of the class, class counsel would have found themselves in the awkward ethical position of having advocated what was to the detriment of the majority of the class, their clients.  The new provision adopted by the Court eliminates this ethical conflict.

248, 250, 256, 2611; (2) the settlement amount is too low, and is disproportionally low compared with the attorneys' fees, *see* Docket Nos. 236, 237, 246, 247, 253, 255; (3) the settlement impermissibly favors a small group of class members (the institutional investors) over the vast majority of the class, for which the probable recovery is not worth the trouble to submit a claim, *see* Docket No. 255; (4) there was no securities fraud on the part of Defendants, and therefore the complaint was properly dismissed in the first place, *see* Docket No. 254; (4) the settlement punishes current shareholders of Dell in order to benefit the settlement class, *see* Docket Nos. 250, 254; (5) securities class action suits in general are unfair extortion, and this settlement will only encourage them, *see* Docket Nos. 233, 234, 254, 255; and (7) the Plan of Allocation makes no distinction between institutional and individual investors, although the losses could not have been as damaging to institutional investors because they presumably affected a smaller percentage of their total holdings, *see* Docket No. 253.

As for the objections concerning attorneys' fees, they are addressed in the second half of this order. Otherwise, the objections have little impact on the Court's determination. For instance, any objection the $40 million recovery is too low does not take into account the procedural posture of the case and the steep and perilous path Plaintiffs would have had to climb (even in the event of a reversal) to get any recovery. The class members might very well have received nothing had this litigation continued. The other objections—that institutional investors will benefit more than individual investors because of their larger holdings, that securities class actions are extortion and should be eliminated, that there was no securities fraud on the part of Defendants in the first place, or that current shareholders are being punished to the benefit of the class members—are either meritless or are outside the purview of this Court's review. For instance, it is true those with larger

-17-

holdings (such as institutional investors) sustained greater monetary damages and will recover proportionately under the Plan of Allocation, but this fact cannot (and should not) change the Plan of Allocation. It is absolutely necessary to any just allocation that those who have lost the most also stand to gain the most. Likewise, whether securities class actions are fundamentally wrong is another objection which the Court has no power to address; it is an objection which must be raised with Congress, not the Court. And whether there was in fact any securities fraud on the part of the Dell Defendants or whether Dell's current shareholders are unfairly losing money into the pockets of the class members are questions for which Dell is responsible, not the Court. Dell and its counsel must certainly have considered these issues carefully before Defendants agreed to and recommended this settlement for the Court's approval. This Court's role in approving this settlement is primarily to safeguard the interests of the absent class members, not the interests of the Defendants or even of Dell's current shareholders, as the Defendants (including Dell) were represented by competent counsel at the settlement negotiations. *See, e.g. In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) ("The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."). The lawyers for Dell are fiduciaries for the company—and, by extension, the existing shareholders of the company. They acted in their capacity as fiduciaries in recommending this settlement and, because they are officers of the Court, the Court shall rely on their representations.

Therefore, based on all the foregoing, the Court accepts the recommendation of counsel for all parties and finds the Plan of Allocation is fair, reasonable, and adequate, and is not the product of collusion between the parties. The allocation formula "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel," *In re Am. Bank*

-18-

*Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001), and the Plan of Allocation in this case is reasonable, rational, and recommended by competent counsel. The Plan calculates each class member's total recognized losses and allocates recovery based on the class member's purchases and sales relative to the alleged corrective disclosures, which is consistent with the allegations in the Amended Complaint. Each class member will receive his or her *pro rata* share of the total funds based on the calculation of his or her recognized losses. This approach is a reasonable one, and is consistent with the Plaintiffs' allegations throughout this case.

In sum, the Court finds the Settlement Plan of Allocation is fair, reasonable, and adequate, and should be approved. Lead Plaintiff's Unopposed Motion for Settlement [#224] and Lead Plaintiff's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [#242] are therefore GRANTED, subject to the change outlined above with respect to the *de minimis* provision of the Plan.

Before turning to attorneys' fees, the Court takes a moment to note that although the Settlement Plan is indeed reasonable and fair—and is actually probably ***more*** than fair to the class members, who stood in very real danger of receiving absolutely nothing—it is also a good example of how deficient our present securities class action laws are. This Court joins in the chorus for further equitable reform of our present securities law. Congress has recognized the class-action vehicle for litigation involving nationally-traded securities has been sorely abused, and has injured the entire United States economy. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (citing H.R. Conf. Rep. No. 104-369, p. 31 (1995)). "[M]anipulation by class action lawyers of the clients whom they purportedly represent" has long been rampant, and these abuses result in extortionate settlements with no substantial benefit to anyone but the lawyers. *Id.* The

damaged shareholders in this lawsuit stand to gain, based on the lawyers' best approximations, about one cent per damaged share. The lawyers, however, seek (under their agreement with their carefully-selected client) 25% of the total recovery plus expenses: roughly $10.5 million dollars. It is clear from these numbers who exactly had an incentive to bring this case, and who is the ultimate victor. It is neither the Plaintiffs nor the Defendants, but the lawyers.

**II.     Lead Plaintiff's Motion for Attorneys' Fees and Expenses [#243]**

As indicated above, Lead Plaintiff (joined by Lead Counsel and the other attorneys in this case) requests the Court approve attorneys' fees in the amount of 25% of the Settlement Fund, or $10 million plus interest, and expenses in the amount of $450,000. *See* Pl.'s Mot. Atty.'s Fees [#243] at 1. Lead Plaintiff represents this amount is consistent with the terms of its retainer agreement with Lead Counsel (the "Retainer Agreement"). *Id.* at 2.

**A.     Attorneys' Fees**

Pursuant to Federal Rule of Civil Procedure 23(e), the Court must independently analyze the reasonableness of the attorneys' fees proposed in the settlement agreement. *See Strong v. BellSouth Telecomm., Inc.,* 137 F.3d 844, 849-50 (5th Cir. 1998). The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). Thus, in common fund cases the attorneys' fees are taken out of the total recovery, lessening the ultimate award for the individual class members. *In re Enron Corp. Sec., Derivs. & ERISA Litig.,* 586 F. Supp. 2d 732, 745 n. 10 (S.D. Tex. 2008). Because of this arrangement—in which the plaintiffs' loss is the attorneys' gain—the Court must

carefully scrutinize the fee award in common fund cases such as this one, as the interests of the attorneys directly conflict with those of the class. *Id.* at 745.

### (1)    *Method of Calculating Fees*

In common fund cases, courts typically utilize one of two methods of calculating attorneys' fees: (1) the percentage method, under which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, under which the court awards fees by multiplying the number of reasonable hours expended by a reasonable hourly rate and applying a lodestar multiplier. *In re OCA, Inc. Secs. & Deriv. Litig.*, 2009 WL 512081 at *17 (E.D. La. 2009) (citing *In re Enron*, 586 F. Supp. 2d at 745-46). The Fifth Circuit has not expressly adopted the percentage method over the lodestar method for common fund lawsuits; "[t]he law of the Fifth Circuit as to which of the two methods should be employed...is at best unclear." *In re Combustion, Inc.*, 968 F. Supp. 1116, 1134 (W.D. La. 1997). But, as other courts have noted, "[t]he vast majority of Courts of Appeals have approved or mandated the use of the percentage method" in common fund cases, and the method has been specifically approved by the Supreme Court. *In re OCA*, 2009 WL 512081 at *17. In fact, the Manual for Complex Litigation identifies the Fifth Circuit as the *only* circuit that has yet to explicitly adopt the percentage method in common fund cases. *Klein v. O'Neal, Inc.*, 2010 WL 1435161 at *34 (N.D. Tex. April 9, 2010) (citing *Manual for Complex Litigation (Fourth)* § 14.121 (2010)). Numerous district courts in this circuit have used the percentage method in common fund cases,[5] generally concluding "though the Fifth Circuit has not explicitly accepted the percentage method,

---

[5]*See. e.g., In re Enron*, 586 F. Supp. 2d at 751; *In re OCA*, 2009 WL 512081 at *19-20 (collecting cases); *Klein v. O'Neal, Inc.*, 2010 WL 1435161 at *34 (N.D. Tex. April 9, 2010) (collecting cases). It should be noted these courts and other circuit courts often perform a cross-check on the percentage method, as discussed *infra*. *See, e.g. Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000); *In re OCA*, 2009 WL 512081 at *23.

it does appear to be amenable to its use, so long as the *Johnson* framework is utilized to ensure that

the fee awarded is reasonable." *See, e.g,. Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843

(E.D. La. 2007) (citations omitted).

The rationale behind this widespread (and increasing) use of the percentage method to

calculate attorneys' fees in securities class action cases is because the method is considered

"particularly appropriate" to the PSLRA. *In re OCA*, 2009 WL 512081 at *19. The PSLRA

explicitly contemplates the use of the percentage method to calculate attorneys' fees in securities

actions (although it does not prohibit the lodestar method), stating "[t]otal attorneys' fees and

expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable

***percentage*** of the amount of any damages and prejudgment interest actually paid to the class." 15

U.S.C.A. § 78u-4(a)(6) (emphasis added). Furthermore, a group of "prominent judges and

practitioners" studied the issue and identified a number of flaws in the lodestar method which make

it less appropriate for these types of cases, including: (1) increasing the workload of the judicial

system; (2) lack of objectivity; (3) a sense of mathematical precision unwarranted in terms of the

realities of the practice of law; (4) ease of manipulation by judges who prefer to calculate the fees

in terms of percentages of the settlement fund; (5) encouraging duplicative and unjustified work; (6)

discouraging early settlement; (7) not providing judges with enough flexibility to award or deter

lawyers so that desirable objectives, such as early settlement, will be fostered; (8) providing

relatively less monetary reward to the public interest bar; and (9) confusion and unpredictability in

administration. *Di Giacomo v. Plains All Am. Pipeline*, 2001 WL 34633373 at *6 (S.D. Tex. 2001)

(citing *Task Force Report*, 108 F.R.D. 237, 246-49 (1986)). The benefits of the percentage fee

-22-

method include "readily ascertainable fee amounts that align the interests of class counsel with those of the class members." *Id.*

Therefore, based on all the foregoing, and because it was the method chosen by Lead Plaintiff and Lead Counsel in their Retainer Agreement (discussed *infra*), the Court finds the percentage method is appropriate for this case, as long as the Court utilizes the familiar *Johnson* framework to ensure the fee awarded is reasonable.[6]

### (2)      *Percentage of the Fund Method*

Since the passage of the PSLRA, many courts have held a fee request submitted pursuant to a retainer agreement entered into by a properly-selected lead plaintiff and a properly-selected lead counsel is "entitled to deference, given the lead plaintiff's role in selecting counsel under the PSLRA." *See In re Enron*, 586 F. Supp. 2d at 749; *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001). For instance, in *In re Worldcom, Inc.*, the district court recognized "when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005).

---

[6]The *Johnson* factors are (1) required time and labor; (2) issues' novelty and complexity; (3) the skill required to properly litigate them; (4) whether the attorney had to refuse other work to litigate the case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or case circumstances imposed any time constraints; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) whether the case was "undesirable;" (11) the type of attorney-client relationship and whether it was long-standing; and (12) awards made in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

In the present case, Lead Counsel requests 25% of the Settlement Fund in attorneys' fees (a total of $10 million), and claims this fee amount was negotiated at arms length with the Lead Plaintiff and is thus entitled to a strong presumption of reasonableness. The Retainer Agreement between Lead Plaintiff and Lead Counsel in fact provides for a fee in the range of 18% to 25% of the total recovery, with the precise percentage to be set by Lead Plaintiff and Lead Counsel based on the amount of "discovery and work done to date." *See* Pl.'s Mot. Final Approval, Ex. II (copy of the Nov. 7, 2006 Retainer Agreement). Lead Plaintiff has filed an affidavit stating Lead Counsel's fee request of 25% is "fair and reasonable," in light of the fact Lead Counsel has "vigorously prosecuted this litigation[.]" *See id.*, Ex. XII.

Lead Counsel argues a fee of 25% is not excessive. Courts have indeed recognized "[a]ttorney fees awarded under the percentage method are often between 25% and 30% of the fund." *See, e.g., Klein*, 2010 WL 1435161 at *35; *In re OCA*, 2009 WL 512081 at *19 (citing 4 NEWBERG ON CLASS ACTIONS § 14.6 (4th ed.) (finding, in the context of securities suits, "common fee awards generally fall within the 20 to 33 percent range."). The Manual for Complex Litigation states a fee of 25% of a common fund "represents a typical benchmark," MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2010), and the Ninth Circuit has adopted a benchmark of 25% in all common fund cases. *See Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003). However, "[i]n order to prevent windfalls to attorneys, the percentage of attorneys' fees awarded typically decreases as the settlement award increases in size." *Id.* And although benchmarks may be helpful indicators of the reasonableness of the percentage used in a class action, many courts have recognized, because of the wide variety of percentages that have been approved, "a district court may not rely on a formulaic

-24-

application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES Litig.*, 243 F.3d 722, 736 (3d Cir. 2001).

In the present case, the Court agrees the Retainer Agreement, setting a fee range of 18% to 25%, was entered into by a properly-selected, sophisticated Lead Plaintiff and properly-selected Lead Counsel, and the terms of the Agreement are therefore entitled to a presumption of reasonableness. The requested fee appears to be within the range of reasonable fees in this and other circuits, although fee percentages do tend to decrease in inverse proportion to the total amount of a class recovery. *See, e.g. In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 444 (S.D. Tex. 1999) (citing cases). The Court also notes although the objections from the Settlement Class are relatively few, the majority of those who did object voiced vociferous complaints about the amount of attorneys' fees, especially in comparison to the potential recovery of the class members themselves.

In light of these considerations, the Court will take a hybrid approach, and proceed to examine the requested 25% fee in light of the *Johnson* factors to determine whether a deviation from the requested percentage is appropriate and to test the overall reasonableness of the fee. *Schwartz v. TXU Corp.*, 2005 WL 3148350 at *28 (N.D. Tex. 2005) (finding "[s]ome district courts within the Fifth Circuit have applied a hybrid approach in analyzing the fairness and reasonableness of requested fees. These courts have used the percentage method to set an initial percentage fee, and then reviewed that fee based on the '*Johnson* factors.'"). As other courts have done, this Court will analyze each relevant *Johnson* factor separately and will then consider what deviation from the benchmark percentage, if any, is warranted based on all the factors considered together. *See, e.g., Harrah's*, 1998 WL 832574.

### (3)    The Johnson Factors

The *Johnson* factors are intended to ensure "a reasonable fee." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974). The twelve factors are (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717-19. While the *Johnson* factors must be addressed, "rarely are all the *Johnson* factors applicable; this is particularly so in a common fund situation." *Di Giacomo*, 2001 WL 34633373 at *9 (citing *Uselton v. Comm'l. Lovelace Motor Freight, Inc.*, 9 F.3d 849, 854 (10th Cir. 1993)).

**(1) Time and Labor Required.** At the time of filing the request for attorneys' fees, class counsel claimed to have spent 8,386.36 documented hours prosecuting this case on behalf of the class. See Pl.'s Mot. Final Approval, Ex. VII. Professor Lynn Baker, Lead Plaintiff's expert witness on fee arrangements in complex litigation, testified at the final settlement approval hearing that the requested percentage fee is consistent with the "lodestar cross-check" she conducted. A "lodestar" is generally calculated by multiplying the number of hours reasonably expended on the litigation by an appropriate hourly rate in the community for such work. *Shipes v. Trinity Industries*, 987 F.2d 311, 319-20 (5th Cir. 1993). Ms. Baker stated she reviewed time records submitted by the attorneys, and using those time records and the attorneys' reported rates she calculated a total lodestar fee of

-26-

$3,564,203.00. She also testified it is appropriate to apply a risk multiplier of approximately 2.5 in this case because of the substantial risk involved in taking the case on a contingent fee basis.[7] Thus the total lodestar fee, as calculated by Ms. Baker, is $8,910,507.50.

Based on the foregoing, the Courts finds the first *Johnson* factor, for time and labor required, weighs in favor of a reduced percentage fee. The lodestar fee testified to by Ms. Baker is an extremely generous one for multiple reasons. First, it assumes the legitimacy of every hour reported by Lead Counsel, although generally the party seeking attorneys' fees bears the burden of presenting adequately documented time records to prove the number of hours for which compensation is requested is reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). The court should exclude from the lodestar fee calculation any hours it finds were not "reasonably expended"—in other words, "all time that is excessive, duplicative, or inadequately documented." *Id.* at 434. As the Supreme Court has explained, "[c]ases may be overstaffed, and the skill and experience of lawyers vary widely"; thus, the application should show the attorneys have exercised "billing judgment," or a good faith effort to document their time and write off any excessive, duplicative, or inadequately documented hours. *Id.*

Ms. Baker testified she spent a total of thirty minutes reviewing the time records of the attorneys in this case. This Court, which has conducted many lodestar analyses, knows there is no way to adequately examine billing records—particularly in a case with as many lawyers as this one—in such a short amount of time. The assumption which must be drawn is that Ms. Baker simply assumed there was not a single hour in the billing records which was excessive, duplicative,

---

[7]In using the lodestar method, courts typically apply "multipliers" ranging from one to four. *Di Giacomo*, 2001 WL 34633373 at *11 (collecting cases). In contingency fee cases, a multiplier reflects the possibility of no recovery. *Id.*

-27-

or inadequately documented, as she did not reduce class counsel's documented hours by a single hour.[8] Furthermore, Ms. Baker assumed the propriety of a blended rate of $425, which included attorneys who charged hourly rates as high as $900 per hour. Ms. Baker did not testify whether she believed this is an appropriate hourly rate in the community for such work, but the Court finds it very difficult to believe it is. In a 2006 report, the State Bar found the average hourly rate for lawyers with over 25 years of experience to be just $258 per hour. *See* STATE BAR OF TEXAS, *Hourly Rates in 2005 Report* (Sept. 21, 2006). A substantial number of the hours claimed by Plaintiffs are billed at over three times that rate. In short, the lodestar fee calculated by Ms. Baker is the most lavish lodestar which could possibly be accepted by any district court conducting a lodestar analysis in this case. Nonetheless, Ms. Baker's lodestar fee is still over $1 million less than Lead Counsel's requested percentage fee. Thus, the Court finds the time and labor required to prosecute this case justify a decrease in the benchmark, to a percentage at the low end of the range agreed upon in the Retainer Agreement.

(2) **Novelty and difficulty of the issues.** Securities actions are generally large and complex cases involving difficult financial and accounting issues. *In re OCA*, 2009 WL 512081 at *21. "Moreover, Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in [the Fifth C]ircuit." *Id.* (citing *In re Enron*, 586 F. Supp. 2d at 788). For example, unlike many other circuits, the Fifth Circuit has rejected the group pleading doctrine. *See, e.g. Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-65 (5th Cir. 2004) (holding the group pleading doctrine "cannot withstand the PSLRA's specific

---

[8]Neither did the Court attempt to determine from the voluminous billing records submitted in this case which hours were reasonably expended and which were not, primarily because the undersigned does not have weeks or months to devote himself solely to the question of attorneys' fees in this single case.

requirement that the untrue statement or omissions be set forth with particularity as to each defendant" and "conflicts with the scienter requirement"). Furthermore, with respect to the loss causation element, the Fifth Circuit has decided the plaintiff bears the burden at the class certification stage of demonstrating by a preponderance of all admissible evidence the stock price actually moved because of the defendants' alleged misrepresentation or corrective disclosure. *See, e.g., Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269, 264-66 (5th Cir. 2007) (citing *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663, 665-66 (5th Cir. 2004) ("to trigger the presumption [of reliance] plaintiffs must demonstrate that ... the cause of the decline in price is due to the revelation of the truth and not the release of unrelated negative information[.]"). This requirement would undoubtedly have posed a substantial hurdle in this particular case.

Thus, it is clear this case carried significant risk and difficulty. However, the difficulty of pleading and proving a claim under the PSLRA is something Lead Counsel was well aware of when taking this case. None of the legal issues outlined above are particularly novel. Although Lead Counsel trumpets the difficulty of proving this case at trial, it wisely does not argue the case would have required any groundbreaking legal analysis. Therefore, because the legal issues are somewhat difficult but not novel, and because Lead Counsel was wholly aware of the challenging aspects of this case at the time it fought to be Lead Counsel and negotiated its fees in the Retainer Agreement, the Court finds this factor is neutral and warrants neither an increase nor a decrease in the benchmark.

**(3) Skill required to perform the legal service adequately.** As noted by the Court in *Di Giacomo*, this factor is evidenced where "counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative

-29-

investigation to provide the information necessary to analyze the case and reach a resolution." 2001

2001 WL 34633373 at *12. "The trial judge's expertise gained from past experience as a lawyer and

his observation from the bench of lawyers at work become highly important in this consideration."

*Johnson,* 488 F.2d at 718.

Because Plaintiffs were not successful in overcoming the motions to dismiss, nor were they

successful on appeal (as it was never concluded), the only demonstrable success Lead Counsel has

had is in settling this case. This Court found the Amended Complaint drafted by Lead Counsel did

not meet the requirements of the PSLRA or Rule 9(b) for either of the major elements of its claims.

Because of this Court's dismissal of the Amended Complaint, this case was in a far more precarious

position at the time it was settled than it would have been in if the Plaintiffs had prevailed at the

motion to dismiss stage. Thus, although the settlement may well be a reasonable one considering

the current procedural posture of the case, the Court cannot ignore the fact Plaintiffs would have had

much more leverage in the settlement had Lead Counsel drafted a complaint sufficient to survive the

motions to dismiss. Because of the dismissal, no formal discovery was ever conducted in this case,

and therefore Lead Counsel did not engage in that costly and time-consuming process (although it

did engage in various types of informal discovery).

In short, the Court finds the legal services rendered in this case required considerably less

skill and time than the average securities class action. Although Lead Counsel was successful in

obtaining a speedy and fair settlement after its case was dismissed, it did not adequately plead its

claims in the first place.[9] Furthermore, although Lead Counsel did investigate its claims through

---

[9]For instance, in *Schwarz* the district court considered this prong of the *Johnson* framework and
remarked "[b]ut for [counsel]'s diligent and tenacious efforts, all of the Class's claims could have been dismissed with
prejudice at the pleading stage." 2005 WL 3148350 at *30. In this case, the claims *were* dismissed with prejudice at

-30-

informal discovery and negotiate a fair settlement, it never engaged in any type of formal discovery, which would have allowed it to investigate those claims more aggressively, and could not produce any evidence for the Court to evaluate, in any meaningful manner, the reasonableness of the settlement. Thus, the Court finds this factor also merits a decrease in the percentage fee.

(4) **Preclusion of other employment by the attorney.** Lead Counsel alleges in its motion for attorneys' fees it "has been precluded from accepting other matters as a result of the substantial time and resources devoted to" this case. Pl.'s Mot. Atty.'s Fees at 13. However there is no evidence, such as an affidavit, cited to support this claim. There is no doubt the attorneys did pass up other work in order to prosecute this case, but the Court cannot assume that legal work would have been more lucrative than this case without any evidence so indicating. This factor is neutral.

(5) **The customary fee for similar work; awards in similar cases.** The Court discussed, *supra*, the typical fees in securities cases involving comparable awards. Because the benchmark percentage is about average for cases of this kind, the Court finds this factor does not warrant an adjustment. *See In re OCA*, 2009 WL 512081 at *21.

(6) **Whether the fee is fixed or contingent.** Consideration of this factor is designed to "demonstrat[e] the attorney's fee expectations when he accepted the case." *Johnson*, 488 F.2d at 718. In the present case, Lead Counsel prosecuted this case on a contingency basis and advanced costs. There was a real risk of no recovery, and significant uncertainty as to the recovery amount, if any. This risk should rightly be considered in the award of attorneys' fees, and for this reason the Court adjusted the lodestar fee by a multiplier of 2.5 in its discussion of the first factor, *supra*. The Court also notes, however, this case was brought against a corporation with deep pockets and every

---

the pleading stage, and therefore Lead Counsel deserves less accolades for its diligence and tenacity.

-31-

incentive to quickly settle. The market price for accepting this risk, as evidenced by the Retainer Agreement, was 18 to 25% of the total recovery. Lead Counsel made a high-risk investment which will have paid off very handsomely if it is awarded a fee in this agreed-upon range. The Court finds no adjustment of the benchmark is required on the basis of this factor.

(7) **Time limitations; nature and length of attorney-client relationship.** Lead Counsel recognizes these factors are inapplicable to this case, and are therefore neutral.

(8) **Amount involved and the results obtained.** The United States Supreme Court and the Fifth Circuit have held "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *In re Enron*, 586 F. Supp. 2d at 796 (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992); *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)). Lead Counsel argues it obtained a "particularly good result" in this case by settling early in the proceedings, prior to obtaining discovery. As discussed at length, *supra*, the settlement obtained appears to be a reasonable and rational one, considering the procedural posture of this case and the likelihood of no recovery had it continued. However, it is impossible to know whether the settlement is a "particularly good" or "laudable" recovery for the class, as Lead Counsel claims, because no discovery was ever conducted in this case, and no evidence was ever presented in the record for the Court to make any intelligent determination on the subject. Although Lead Plaintiff touts statistics about average settlement amounts in other securities class actions and the Fifth Circuit's low rate of reversal for dismissals under the PSLRA, these are simply general statistics, which do not take into account the individual aspects of this particular case. The statistics are admittedly the only metric available to measure the reasonableness of the settlement, as no discovery was done, and the statistics do indicate the settlement is reasonable (and better for the class than the

-32-

likely alternative); however, the statistics do not prove the settlement is in any way extraordinary. The Court is simply without means to evaluate whether the amount of the settlement was the best possible result, or even near it. One thing is sure: had Lead Counsel succeeded at either the trial or the appellate level, Plaintiffs would have had substantially more leverage in settling their claims.

Therefore, although the Court may safely assume the settlement is reasonable and rational, it will not assume the settlement is exceptional. Aside from the settlement, the results achieved by Lead Counsel in the litigation were undeniably poor. Because counsel obtained no notable results in trial or on appeal, but did achieve what appears to be a reasonable settlement based on the dire procedural posture of the case, the Court finds this prong justifies a slight decrease in the benchmark percentage.

### (9) Experience, reputation, and ability of the attorneys.

The Court does not question the legal ability, experience, reputation, or resources of Lead Counsel. Counsel performed diligently and skillfully with respect to the settlement negotiations, and managed to achieve a relatively speedy settlement, and one which was a welcome alternative to awaiting a decision on appeal and, in the best case scenario, attempting to convince a jury of its claims. As the Court recognized in a previous order appointing Lead Counsel, the firm "appears to have extensive experience in securities class action litigation."

**(10) Undesirability of the case.** Class action cases often carry with them elevated risks, a requirement of lengthy investigation through informal discovery, and a possibility of no recovery, all of which speak to the undesirability of such a case. *Di Giacomo*, 2001 WL 34633373 at *12. However, as the court recognized in *Di Giacomo*, the quality and number of attorneys who file suit (and fight for their client to be the lead plaintiff) in a case such as this is also an indication such cases

are usually highly desirable. In this case, the Court well remembers the number and prominence of

the attorneys who battled for the privilege of having their client assume the role of lead plaintiff.

Lead Counsel won this battle, and thus its claims about the supposed undesirability of this case ring

somewhat hollow. Nonetheless, because there is risk inherent in a contingent fee case of any kind,

the Court finds this factor is neutral, and supports a fee percentage within the agreed-upon range.

### (4) *Conclusion*

Having analyzed the fee award under the *Johnson* factors, the Court finds they collectively

warrant a downward adjustment of the fee award to 18% of the total recovery. The fee is within the

range of agreed-upon fees in Lead Counsel's Retainer Agreement with its own carefully-selected

client, and is therefore presumptively reasonable. This fee will compensate counsel liberally, but

will also protect the interests of the members of the settlement class to the greatest possible degree.

Having carefully scrutinized the fee award in light of the applicable law and the Court's experience

with this litigation as a whole, the Court hereby awards attorneys' fees in the amount $7,200,000.00

(SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS AND NO CENTS), or 18% of the

Net Settlement Fund.[10]

### B. Expenses

Lead counsel also requests $450,000 for reasonable expenses incurred in the prosecution of

the litigation. Lead Counsel has submitted copies of documentation for well over $450,000 in

reasonable expenses during the course of the litigation. The documentation, it should be noted, is

a colossal tower of receipts for expenses such as printing, copying, experts, online research, "other

---

[10]Let it be known this is a payment at the rate of $858.64 *per hour*. No lawyer in the country would turn down
compensation at this rate.

professionals," travel, postage, process service, office supplies, telephone, and fax charges. The

Court has no specific information or evidence which would allow it to possibly determine which of

these expenses were actually reasonable and necessary to this litigation. However, because the total

of the expenses far exceeds $450,000, and because the documentation is supported by the affidavits

of counsel, who are officers of the Court, the Court will accept the figure of $450,000 as a reasonable

amount. The Court hereby awards Lead Counsel and Liaison Counsel reasonable costs and expenses

in the amount of $450,000 (FOUR HUNDRED AND FIFTY THOUSAND DOLLARS AND NO

CENTS), which expenses shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with

interest, from the date such Settlement Fund was funded to the date of payment, at the same net rate

the Settlement Fund earns.

## III.     Dr. Schuleman's Motions and Objections

Dr. Steven Schuleman appeared at the final settlement approval hearing as an objector, and

his counsel addressed the Court multiple times at the hearing. Since the Settlement Hearing, Dr.

Schuleman has filed four motions: a Motion to Permit the Filing of Claim [#276], a Motion for

Continuation of Fairness Hearing [#277], a Motion to Amend Class Notice [#278], and a Motion to

Appoint Additional Class Counsel [#276].  However, none of these motions or objections were

timely filed. The notice sent to the potential class members in this case clearly indicates on the first

page that all objections must be filed with the Court by April 10, 2010. Because the date of the final

approval hearing was continued, the Court actually accepted objections all the way up until the date

of the hearing, on May 21, 2010. At the hearing, the Court the considered the objections of those

who appeared (including Dr. Schuleman, who was represented by counsel), and directed all parties

who wished to comment further on any issues to do so on or before June 4, 2010, the final deadline.

-35-

Dr. Schuleman did not file any of his motions or comments until June 7, 2010. Because this litigation simply has to end at some point, and because Dr. Schuleman has had more than ample time to inform the Court of his position on the settlement at issue (and has in fact done so repeatedly, both in writing and orally), Dr. Schuleman's motions and objections are DISMISSED as time-barred.

### Conclusion

In accordance with the foregoing,

IT IS ORDERED that Union Asset Management Holding AG's Unopposed Motion for Settlement [#224] is GRANTED.

IT IS FURTHER ORDERED that Union Asset Management Holding AG's Motion for Certification of the Settlement Class and Final Approval of the Settlement Plan of Allocation [#242] is GRANTED in part, subject to the *de minimis* provision being stricken from the Plan of Allocation and replaced by a provision limiting each claimant to one check, negotiable within 60 days.

IT IS FURTHER ORDERED that Union Asset Management Holding AG's Motion for Attorneys' Fees [#243] is GRANTED IN PART, in accordance with the foregoing order.

IT IS FURTHER ORDERED that Plaintiffs' Lead Counsel and Liaison Counsel are hereby awarded 18% (EIGHTEEN PERCENT) of the Settlement Fund, or $7,200,000.00 (SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS AND NO CENTS), in fees, plus interest, which sum the Court finds to be fair and reasonable. The award of attorneys' fees shall be allocated by Lead Counsel and Liaison Counsel among all of Plaintiffs' counsel who prosecuted this litigation in a manner consistent with their respective contributions.

IT IS FURTHER ORDERED that Plaintiffs' Lead Counsel and Liaison Counsel are hereby awarded reasonable costs and expenses in the amount of $450,000 (FOUR HUNDRED AND FIFTY THOUSAND DOLLARS AND NO CENTS), which expenses shall be paid to Plaintiffs' Lead Counsel from the Settlement Fund with interest, from the date such Settlement Fund was funded to the date of payment, at the same net rate the Settlement Fund earns.

IT IS FURTHER ORDERED that Joann F. Brook's Motion to Intervene [#251] is DENIED.

IT IS FURTHER ORDERED that the Motion to Appear Pro Hac Vice by Mark E. Wilson [#252] is DISMISSED as moot.

IT IS FINALLY ORDERED that the Motion to Permit the Filing of Claim [#276], Motion for Continuation of Fairness Hearing [#277], Motion to Amend Class Notice [#278], and Motion to Appoint Additional Class Counsel [#279] filed by Steven Schuleman are DISMISSED as time-barred.

SIGNED this the 10th day of June 2010.

SAM SPARKS
UNITED STATES DISTRICT JUDGE